```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TENNESSEE
 2                  AT KNOXVILLE, TENNESSEE
   _____
 3                                  )
   UNITED STATES OF AMERICA,        )
 4                                  )
             Government,            )
 5                                  )
   vs.                              ) Case No. 3:20-cr-21
 6                                  )
   ANMING HU,                       )
 7                                  )
             Defendant.             )
 8 _____ )
```

**TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE THOMAS A. VARLAN**

**June 9, 2021**
**VOLUME III of VII**

<u>**APPEARANCES:**</u>

       <u>**ON BEHALF OF THE GOVERNMENT**</u>:

       CASEY ARROWOOD, ESQ.
       U.S. DEPARTMENT OF JUSTICE
       OFFICE OF U.S. ATTORNEY
       800 Market Street
       Suite 211
       Knoxville, TN 37902

       MATTHEW J. MC KENZIE, ESQ.
       U.S. DEPARTMENT OF JUSTICE
       NATIONAL SECURITY DIVISION
       950 Pennsylvania Avenue, NW
       Washington, DC 20530

<u>**REPORTED BY:**</u>

Teresa S. Grandchamp, RMR, CRR
P.O. Box 1362
Knoxville, Tennessee 37901
(865) 244-0454

1    **APPEARANCES:** (Continued)

2                ON BEHALF OF THE DEFENDANT:

3           A. PHILLIP LOMONACO, ESQ.
            LAW OFFICES OF A. PHILLIP LOMONACO
4           800 South Gay Street, Suite 1950
            Knoxville, TN 37929
5
                        * * * * * * * *
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**INDEX**

**WITNESSES FOR THE GOVERNMENT:**                               PAGE

**JEAN MERCER**

Direct Examination                                                7
By Mr. Mc Kenzie

Cross-Examination                                                38
By Mr. Lomonaco

Redirect Examination                                            106
By Mr. Mc Kenzie

Recross-Examination                                             111
By Mr. Lomonaco

**GREG TOLLIVER**

Direct Examination                                              117
By Mr. Mc Kenzie

Cross-Examination                                              126
By Mr. Lomonaco

**KATHY COOPER**

Direct Examination                                             147
By Mr. Arrowood

Cross-Examination                                             169
By Mr. Lomonaco

**KELCEY COLE**

Direct Examination                                             178
By Mr. Arrowood

Cross-Examination                                             193
By Mr. Lomonaco

**CAROL MALKEMUS**

Direct Examination                                             197
By Mr. Mc Kenzie

Cross-Examination                                             203
By Mr. Lomonaco

1   **MONICA COLE**

2   Direct Examination                                        207
    By Mr. Mc Kenzie
3
    Cross-Examination                                         247
4   By Mr. Lomonaco

5   **PASQUALE RINALDI**

6   Direct Examination                                        253
    By Mr. Arrowood
7


8                          **EXHIBITS**

9   **FOR THE GOVERNMENT:**

10
    **EXHIBIT** (DESCRIPTION)                    **ID:**    **IN EVID:**
11
    **Exhibit No. 8-N**(Email Attachment)         26           26
12  **Exhibit No. 9-F**(NASA Grant and            30           30
    Cooperative Agreement)
13  **Exhibit No. 3-Y**(Email)                    36           36
    **Exhibit No. 3-Z**(Email Attachment)         37           37
14  **Exhibit No. 9-E**(Email)                   123          124
    **Exhibit No. 9-A**(Email)                   155          155
15  **Exhibit No. 9-B (previously                            158
    received)**
16  **Exhibit No. 9-G**(Email)                   159          160
    **Exhibit No. 9-H**(Email Attachment)        160          167
17  **Exhibit No. 8-T**(Invoice)                 200          200
    **Exhibit No. 8-O**(Invoice)                 211
18  **Exhibit No. 8-P**(Invoice)                 214          215
    **Exhibit No. 8-Q**(Invoice)                 217          218
19  **Exhibit No. 8-R**(Invoice)                 219          219
    **Exhibit No. 8-S**(Invoice)                 221          221
20  **Exhibit No. 8-U**(Invoice)                 223          223
    **Exhibit No. 8-V**(Invoice)                 225          225
21  **Exhibit No. 8-W**(Invoice)                 227          227
    **Exhibit No. 8-X**(Invoice)                 229          242
22  **Exhibit No. 8-Y**(Invoice)                 231          232
    **Exhibit No. 8-Z**(Invoice)                 233          234
23  **Exhibit No. 9-I**(Invoice)                 235          236
    **Exhibit No. 9-J**(Invoice)                 239          240
24  **Exhibit No. 9-K**(Invoice)                 242          243
    **Exhibit No. 9-L**(Invoice)                 244          245
25  **Exhibit No. 10-F**(Process Report)         257          258
    **Exhibit No. 10-N**(Photograph)             260          261

```
Exhibit No. 10-G(Screen Shot)          261
Exhibit No. 7-K(Chinese Document)      264
```

**FOR THE DEFENDANT:**

| | | |
|---|---|---|
| **Exhibit No. 23**(Publication) | 61 | 62 |
| **Exhibit No. 23-A**(Revised Invention Disclosures) | 69 | 70 |
| **Exhibit No. 24**(Memorandum) | 89 | |
| **Exhibit No. 83**(Proposal & Budget Development) | 97 | 98 |
| **Exhibit No. 132**(March 2019 NASA Training Materials) | 100 | 100 |
| **Exhibit No. 31**(Email) | 127 | 127 |
| **Exhibit No. 32**(Email) | 129 | 129 |

* * * * * * * *

 1          THE COURTROOM DEPUTY:  All rise.

 2          This honorable court is again in session.

 3          THE COURT:  All right.  Good morning, everyone.

 4   Looks like we're ready to proceed with the next witness;

 5   so we'll bring our jury in.

 6          (Whereupon the following report of

 7           proceedings was had within the presence

 8           and hearing of the jury:)

 9          THE COURT:  All right.  Thank you.  Everyone

09:03AM 10   please be seated.

11          And it looks like the government is ready with

12   its next witness; so the courtroom deputy will

13   administer the oath.

14          THE COURTROOM DEPUTY:  Yes, sir.

15          (The witness was thereupon duly sworn.)

16          THE COURTROOM DEPUTY:  Have a seat.

17          Please state and spell your name for the

18   record.

19          THE WITNESS:  Sure.  Jean Mercer, J-e-a-n.

09:03AM 20   Last name, M-e-r-c-e-r.

21          THE COURTROOM DEPUTY:  Thank you, ma'am.

22          MR. MC KENZIE:  All right.  Your Honor, may I

23   inquire?

24          THE COURT:  Yes.

25

1          **JEAN MERCER**,

2     having been first duly sworn, was examined and testified

3     as follows:

4                        DIRECT EXAMINATION

5     BY MR. MC KENZIE:

6     Q.        Good morning, Ms. Mercer.

7     A.        Good morning.

8     Q.        By whom are you employed?

9     A.        I'm employed by the University of Tennessee,

09:03AM  10    Knoxville campus.

11    Q.        How long have you worked for the University of

12    Tennessee?

13    A.        A little over five-and-a-half years now.

14    Q.        What is your current position at the University

15    of Tennessee?

16    A.        Associate vice-chancellor for research

17    administration.

18    Q.        Will you please explain to the jury some of

19    your duties and responsibilities as associate

09:04AM  20    vice-chancellor.

21    A.        Sure.  So part of my responsibilities are to

22    review proposals that we're submitting to an external

23    funding agency.  So I have a group of individuals within

24    our office that can help to provide guidance to faculty

25    on questions that they have as they're preparing their

1   proposal.  We look to see that the proposal information

2   that they have put together is in compliance with the

3   university policy, as well as with the sponsor

4   requirements.  And then once the sponsor has received

5   the proposal and decides that they want to fund it, we

6   also review the awards and the terms and conditions that

7   that particular sponsor has and make sure that the

8   faculty member is aware of what those requirements are

9   before we accept that award.

09:04AM  10   Q.      Prior to being the associate vice-chancellor,

11   did you hold a different position?

12   A.      I did.  Prior to that, I was the assistant

13   vice-chancellor for research.

14   Q.      And please explain to the jury the time frame

15   in which you were the assistant vice-chancellor for

16   research.

17   A.      So I was the assistant vice-chancellor for

18   research from January 1st of 2015 -- or, actually, let

19   me back that up -- 2016 to March 1st of this year.

09:05AM  20   Q.      Were your duties and responsibilities as

21   assistant vice-chancellor similar to the duties and

22   responsibilities you have now?

23   A.      Yes.

24   Q.      What, if any, experience did you have working

25   with sponsored programs prior to becoming assistant

vice-chancellor for research?

A.        So previously I worked at Indiana University for almost 20 years.  I started out in the research administration field helping to put proposals together, working in a department, and then as I got more experience, I moved into the dean's office that they had, and then I moved into the central office and oversaw their sponsored programs.

Q.        During that 20 years at the -- at Indiana University, did you work on grant applications?

A.        Correct.  Yes, I did.

Q.        What, if any, training did you receive on how to properly submit proposals and grant applications when you were at the University of Indiana?

A.        So, starting out in the field, a lot of it is learning as you go.  So you look to other colleagues that maybe have more experience to help guide you on specific nuances of that particular institution.

So in the case of Indiana University, it was looking at individuals who were familiar with the policies of the university, getting some guidance from them.  It was looking at sponsor requirements.

So every sponsor has guidelines for their proposals and what they expect to see and what their requirements are.  They also will have kind of terms and

 1  conditions of what do you need to follow when you're

 2  conducting a project for that particular sponsor.  And

 3  so it was reading all of those.  It was being part of

 4  professional organizations.  So there are a few of them

 5  that have been around for several years.  One is the

 6  National Council of University Research Administrators.

 7  Another one is the Society For Research Administrators

 8  International, and for both of those organizations, they

 9  have regional meetings, as well as annual meetings and

09:07AM 10  webinars, and they talk about, you know, trends that are

11  happening, changes that are happening with particular

12  sponsors or with federal regulations and making sure

13  that everybody is kind of up-to-date on what's

14  occurring, and we talk about best practices that other

15  universities may put into place to make sure that we all

16  understand kind of what the expectations are.

17  Q.       You mentioned those seminars and webinars.

18  With what frequency do you attend those?

19  A.       So when I started out, I attended every

09:08AM 20  opportunity I could possibly get.  So the NCURA

21  sessions, the National Council of University Research

22  Administrators, I would attend at least twice a year,

23  and then I would look at any informational pieces that

24  they might send out via an email for other

25  organizations.

1    Another one is the Council of Governmental

2  Regulations.  I would attend those meetings, and those

3  were three times a year.

4    There is also another meeting that's called the

5  Federal Demonstration Partnership, and that was also

6  attended three teams a year, and I continue to do that

7  today.

8  Q.    Through your training and also experience in

9  the field, have you become familiar with the term

09:08AM 10  "conflict of interest" as it relates to applying for

11  sponsored programs?

12  A.    Yes, Your Honor.

13  Q.    Will you please explain to the jury what a

14  conflict of interest is.

15  A.    Sure.  So, a conflict of interest, when we look

16  at that, we are looking to see, is there something that

17  the investigator, which is typically the faculty member,

18  who is overseeing that research may be involved with or

19  have an outside activity that could impact their --

09:09AM 20  either ability to do the research or could be perceived

21  to be a conflict with the type of research that they're

22  doing.  So we look to see, you know, is there anything

23  there that could influence the results of the research,

24  how they report the research, anything about how they

25  may conduct it.  And so we want to make sure that if

there is a conflict that we identify it upfront so we
can help them to mitigate what that issue may be and
make sure that they're able to conduct the project as
they need to without having a conflict.

Q.        What, if any, requirements are there for
researchers to disclose their conflict of interest on
grant applications or applications for other sponsored
programs?

A.        So every agency asks that investigators
disclose their employment history on their grant
applications.  They ask that they disclose funding that
they may receive for that particular area of research or
for other research projects they have done as a
university.

          At the University of Tennessee and at Indiana
University, we would ask investigators to disclose any
outside activities that they had so that we could just
make sure there wasn't a conflict that we couldn't
handle or manage for them.  So we wanted to be upfront
to the sponsors about what may be out there and make
sure that we could mitigate it.

Q.        Why is it important to disclose these
conflicts?

A.        So, it's important because from a funding
agency perspective, they obviously don't want to fund

research or projects that may be funded in another way
or may be impacted by relationships or other things that
an investigator has because they want to make sure that
the resources that they're contributing to the project
go toward the specific goals of that research.

Q.      What, if any, role does conflict of interest
play in the University of Tennessee's determination as
to whether or not to submit a proposal for a grant or
contract?

A.      So, for the University of Tennessee, what we
look at is:  Did an investigator identify conflicts?  If
they did, who are we submitting the proposal to?  Are
there -- so, for instance, if they identified that they
had an entity that they had a relationship with, is that
entity part of this particular proposal?  So are we
planning to give money to that entity?  Are there other
individuals who are part of that entity who are involved
in the research?  We want to know all of that upfront so
that we can make sure that we're disclosing to the
sponsor if that is the case, but, also so we can help
them to find a plan to mitigate what those impacts might
be.  And some of those things you can mitigate.
Sometimes you can't mitigate it, but we want to make
sure we know what they are.

Q.      Through your training and experience, have you

1   become familiar with the term "conflict of commitment"?

2   A.          Yes, I have.

3   Q.          Will you please explain to the jury what a

4   conflict of commitment is.

5   A.          Sure.  So, a conflict of commitment is when you

6   have time that is being essentially paid from another

7   organization that conflicts with time that you are also

8   contributing to another project or to another

9   organization.  So the concept behind it is:  You don't

10  want two entities paying or supporting efforts for the

11  same type of work that you're doing.

12  Q.          During your time as assistant vice-chancellor

13  for research, did you help in the grant application

14  process, either by supervising or approving

15  applications?

16  A.          Yes, I did.

17  Q.          What was your individual role in those

18  applications?

19  A.          So it depended on each application.  Typically

20  I was supervising other individuals that were reviewing

21  the proposals.  I would be the individual they would

22  come to if they had questions about particular things

23  that were in the proposal, and then if there were

24  assurances that needed to be signed off on by

25  that -- for that particular sponsor, I would review

09:12AM (line 10)
09:13AM (line 20)

1  those assurances and make sure that we could agree to

2  whatever that requirement was.

3  Q.      Could you please give the jury an overview of

4  how an application for sponsored funding goes from

5  proposal, contract, to then being put into action?

6  A.      Sure.  So, typically an investigator will have

7  an idea for some type of research or project that they

8  want to do.  They will look to see if there are funding

9  agencies out there that are interested in that type of

09:14AM 10 work or that would support that type of area of

11 research, and they will go out, look at that particular

12 agency's website or guidelines, whatever it is that they

13 may have, and prepare an application.

14      Majority of the sponsors have some type of set

15 guidelines and application package, as far as the format

16 that they want to see things in and what they want

17 included in that format.  And so the investigators have

18 that information.

19      Typically at the University of Tennessee, there

09:14AM 20 are also individuals in the department and in the

21 college, as well as my office, that can help them if

22 they have got questions about, you know, "What pieces do

23 I include?  I've got questions about what this

24 particular thing is asking me about."  And so we try and

25 be a resource there to help them as they have got

1    questions.

2           And then once that proposal is developed, it's

3    routed to -- from the investigator, they sign off on it

4    electronically.  It is routed to their department head

5    or their department head's designee that they have

6    chosen to look at that particular proposal.  And what

7    they're looking at is to see, does the goals of that

8    project correspond to the type of work that that

9    department, you know, wants supported.  They look to see

10   is there a commitment for funding that the particular

11   investigator needs from the department or from the

12   college, and if so, do they agree they can provide that

13   funding if it's needed.

14          And then from there, once they have signed off

15   on it, it goes to the dean's office, and the dean or

16   their designee reviews -- they're looking to see, you

17   know, what type of research is it, what type of

18   commitments are in there.  You know, are there questions

19   that they may have from a college perspective.

20          And then once they have reviewed everything,

21   they send it on and approve it and it would come into my

22   office.  And when it comes into my office, we're looking

23   for, you know, are the pieces of the application there

24   together; do they have all the pieces that are required.

25          So typically it's going to be a statement of

1   work, a budget, a budget justification, depending upon

2   the agency.  They're going to ask for their biosketch,

3   which is kind of like a mini CV or a mini resume.  And

4   then they're going to ask for specific documents that

5   that agency wants to have, that they want information

6   on, and it can vary from agency to agency as to what

7   those might be.

8           Once that proposal is --

9   Q.      I'm going to interrupt you right there for a

09:16AM 10  moment and we'll pick up with the narrative.

11          Who provides the biosketch and other

12  information about the investigator to your office?

13  A.      Typically that information is provided by the

14  faculty member, whoever's biosketch that is.  So if it's

15  the principal investigator, the lead faculty member on

16  the project, their biosketch, they're providing it.  If

17  it is one of their colleagues, their colleagues should

18  provide to them their biosketch, and then they would

19  include it as part of the proposal.

09:17AM 20  Q.      In 2016, what, if any, independent research or

21  verification did your office do once it received that

22  information from the investigator?

23  A.      For the biosketch?

24  Q.      For the biosketch.

25  A.      We didn't do any additional verification.

1  Q.      Why not?

2  A.      We believed that whatever the investigator had

3  put on their biosketch was accurate.

4  Q.      During your time as assistant vice-chancellor

5  for research, did you work on grant applications with

6  NASA?

7  A.      Yes.

8  Q.      Were you aware of any particular restrictions

9  that NASA placed on their grants or contracts?

09:18AM  10  A.      Yes, I was.

11  Q.      What were these restrictions?

12  A.      So the big restriction that NASA had was what

13  they called the Chinese Assurance, and what it -- what

14  it required is that NASA did not want to provide support

15  to projects where we were going to coordinate or fund

16  Chinese-controlled entities.  So it could be the Chinese

17  government; it could be an organization that was

18  controlled by the Chinese government.  And in that time,

19  they considered universities of higher education as

09:18AM  20  controlled by the Chinese government.

21  Q.      How did you become aware of these restrictions?

22  A.      So, I became aware of those restrictions when I

23  was at Indiana University because that restriction came

24  in to place around 2011, 2012.

25  Q.      How did NASA communicate these restrictions on

1  their proposals -- or excuse me -- solicitations?

2  A.        So typically what NASA did is:  In their

3  guidelines, when an individual was going to propose to

4  them, they had information in the guidelines about that

5  restriction.  Also, through some of the professional

6  organizations, they had communicated that this was a

7  change that NASA was making so that everybody was aware

8  of what that change was.

9  Q.        And what -- in general, what steps, if any, did

10  the University of Tennessee at Knoxville take to ensure

11  compliance with these NASA restrictions?

12  A.        So, during which time period?

13  Q.        Start with 2016.

14  A.        Okay.  So in 2016, the University of Tennessee,

15  when that certification came through as part of a

16  proposal, they -- they looked to see, you know, did the

17  investigator submit the proposal.  They assumed if they

18  didn't have anything listed in their biosketches and we

19  weren't aware of anything, then we didn't do anything

20  more.

21  Q.        Why didn't you do anything more?

22  A.        Because at that time we believed that if the

23  investigator didn't identify a conflict -- or I

24  shouldn't say a conflict -- didn't identify in their

25  biosketch that they had some type of relationship and

1   there wasn't anything listed in the proposal that would

2   tell us there was a Chinese-controlled entity as part of

3   the proposal, we wouldn't do anything more.  We believed

4   the information that we had.

5   Q.      You indicated that there was -- did there come

6   a time that the University of Tennessee's policy

7   changed?

8   A.      Yes.

9   Q.      Approximately when did that change?

09:20AM  10  A.      It probably changed about a year after I got

11  into the position.  We knew, one, that a lot of the

12  federal agencies were moving towards more robust

13  disclosures of information in their proposals.  We also

14  looked at, as a university, where could we improve our

15  processes and make sure that we had appropriate

16  information.

17          So, at that point, we shifted, and previously

18  David Smelser and my office had been signing a lot of

19  the Chinese Assurances, and at that time, I was able to

09:21AM  20  get access to the outside interest disclosures around

21  2017, and I asked David that anytime we had a proposal

22  that had any type of assurance that we were making,

23  whether it was NASA, Department of Defense, UT-Batelle,

24  that he send that information to me and I would be the

25  one to make the assurance because I could pull up the

outside interest disclosures and I could see if there

was anything in that outside interest disclosure.

Q.       Directing your attention to in or about 2017.

Did there come a time that you learned that the

University of Tennessee's conflict of interest policy

was changed?

A.       Yes.

Q.       How did you become aware of that change?

A.       So, as part of a collective look at our

policies overall in the research area, we looked at some

of the things that needed to be monitored and changed

because they hadn't changed the policies in several

years.

        And so I was part of a working group that

looked at, like, the outside interest disclosure form,

what types of questions should we really be asking.  As

part of that, we looked at the conflict of interest

policy and realized that there were discrepancies in

information.  And so we wanted to make sure that the

policy was in alignment with the changes that we were

making to the outside interest disclosure form.

        MR. MC KENZIE:  Your Honor, I'd like to show

the witness what's already in evidence as Exhibit 2-J.

I'd like to draw the witness's attention to the first

paragraph.

1    BY MR. MC KENZIE:

2    Q.        Will you just read the -- the second and third

3    sentences for the jury.

4    A.        Sure.   Under Objective?

5    Q.        Yes.

6    A.        Okay.   "If the university is to carry out its

7    mission in the areas of instruction, research, and

8    public service with unquestioned credibility, the

9    highest standards of objectivity and integrity must be

09:23AM 10   maintained.   The purpose of this policy is to promote

11   those high standards."

12         MR. MC KENZIE:   Could we please scroll down to

13   page 7.

14   BY MR. MC KENZIE:

15   Q.        Earlier you mentioned conflict of interest

16   forms.   Could you just explain to the jury what you were

17   referring to when you said "conflict of interest forms"?

18   A.        Sure.   So, there is an outside interest

19   disclosure form that every individual that's a

09:24AM 20   researcher, along with our staff and faculty, are

21   required to fill out on an annual basis, and it commonly

22   is referred to as a conflict of interest disclosure.

23   The formal title is entitled Outside Interest Disclosure

24   Form, and that document basically asks questions about,

25   you know, what outside interests do they have, whether

1    it's positions, consulting, if they own stock that's not

2    publicly held in an organization, did they have a

3    business that they have started up.  Just kind of some

4    basic information so that we can get an idea of is there

5    potentially a conflict there that we need to be aware of

6    and make sure that we're managing.

7    Q.        I'd like to direct your attention to paragraph

8    e., which is displayed on the screen.

9              Could you please read the first sentence of

10   this paragraph.

11   A.        Sure.  "Covered individuals involved in

12   research (i.e., investigators as defined in Section 1

13   above) must have disclosed outside interests that may be

14   affected by the research before proposals are submitted

15   to funding agencies."

16   Q.        You mentioned that beginning in 2017, you would

17   begin to -- you began reviewing these outside interest

18   disclosure forms.

19             Will you please describe to the jury what, if

20   any, reliance you placed on those disclosure forms.

21   A.        So, when I looked at the outside interest

22   disclosure forms, I relied on what information was put

23   in those forms.  The investigator was the one to fill

24   those out with all of their interests and their

25   positions or appointments and any businesses that they

1    may have owned, and so, you know, I figured they're in

2    the best position to know what activities they are

3    involved in.  I would rely upon that.

4    Q.        After checking the forms -- I'd like to get

5    back to the overview to the jury of what happens.

6              After you -- assume for this narrative that you

7    discovered no conflicts of interest.  Describe to the

8    jury what happens next after you've confirmed that all

9    the paperwork for the proposal is in line.  What happens

09:26AM  10  next?

11   A.        So, once we've confirmed everything is

12   together, we would submit it to the sponsor.  So, every

13   sponsor has a different way in which you submit

14   applications, and we would follow whatever directions

15   there were in their guidelines to submit it.  And then

16   at that point, usually there would be a period of

17   time -- and it's typically months -- before you would

18   hear back from a sponsor to let us know if they chose to

19   fund that particular project.

09:27AM  20            If they decided to fund it, they would send an

21   award to us.  We would look at the award, the terms and

22   conditions in the award, you know, let the faculty know

23   the award has been received, you know, here is a copy of

24   it, and then we would review it.  If we had questions or

25   we need a clarification, we would talk with the faculty

member to make sure we understood and got questions
answered, and then we would sign it if it was something
that required a signature.

If it was not a document that required a
signature, we would go ahead and send that up to our
sponsored projects accounting office and they would set
an account up for it.

Once we signed the other documents and they
were considered fully executed, we would also send that
up to our sponsored accounting office.

Q.      Who reviewed the terms and conditions of the
contract?

A.      So, typically it was one of our contract
coordinators, and then when they would send it to me to
sign the contract, I would go back over and review the
terms and conditions and ask them questions if there was
something that was not clear or I wanted to make sure we
had talked to a faculty member about a particular thing.

Q.      How, if at all, were the principal
investigators made aware of the terms and conditions of
the contract?

A.      So, when we first received the contract, we
would send a copy to the investigator.  We would ask
them to respond back confirming that they had looked at
it, that they agreed with the information that was in

1  there, and that if they had any questions, to please

2  reach out, and we would give them a contact person's

3  name of the individual who was reviewing the contract.

4  Q.       And who would ultimately sign the contracts?

5  A.       I would ultimately sign the contracts.

6  Q.       I'd like to direct your attention now to

7  October of 2016.  Did there come a time that you worked

8  on a grant application to NASA where Anming Hu was the

9  principal investigator?

09:29AM 10  A.       Yes.

11           (Government's Exhibit 8-N was marked for

12            identification.)

13           MR. MC KENZIE:  Your Honor, I'd like to show

14  the witness Exhibit 8-N, as in Nancy.

15           Your Honor, if this is not in evidence already,

16  I'd move to admit it.

17           THE COURT:  So admitted.

18           (Government's Exhibit 8-N was received into

19            evidence.)

09:29AM 20  BY MR. MC KENZIE:

21  Q.       Please explain to the jury what this is, what

22  this document is.

23  A.       So, this document is a subcontract agreement

24  that we received from Jet Propulsion Laboratory, which

25  is part of the California Institute of Technology.

1  Q.      Who is the subcontractor in this contract?

2  A.      So, the subcontractor is the University of

3  Tennessee, Knoxville.

4  Q.      And in the upper right-hand corner, could you

5  please read that subcontract number?

6  A.      Sure.  It's Subcontract No. 1560728.

7          MR. MC KENZIE:  Could we please scroll --

8  perfect.

9  BY MR. MC KENZIE:

09:30AM  10  Q.      Who is the -- if University of Tennessee is the

11  subcontracting agency, who is the other agency in this

12  contract?

13  A.      The other agency is JPL, Jet Propulsion

14  Laboratory.

15          MR. MC KENZIE:  Will you scroll down.

16  BY MR. MC KENZIE:

17  Q.      Who signed this subcontract on behalf of the

18  University of Tennessee?

19  A.      I did.

09:31AM  20  Q.      What is the total amount of the subcontract

21  that would be paid to the University of Tennessee?

22  A.      60,000.

23  Q.      You've mentioned that the contracting agency

24  was -- is JPL.  Who was ultimately funding this

25  contract?

A.        So, ultimately, it's NASA funding that is going

to the Jet Propulsion Laboratory.

          MR. MC KENZIE:  Can we please scroll up to the

top of the page.

BY MR. MC KENZIE:

Q.        What, if any, NASA restrictions apply to this

subcontract?

A.        So, the same NASA restrictions, as far as the

Chinese Assurance, would apply to this contract as well.

Q.        How do you know that?

A.        Because since NASA is the prime agency that is

providing the funding, their terms and conditions flow

to JPL and to us.

Q.        Before signing this contract, what, if any,

review did you conduct?

A.        So, I looked at the agreement to see what were

the requirements that they put in here, and then, you

know, once I reviewed that -- I don't recall at the time

if I had specific questions or not, but if I did, I

would have asked Tara, who was the person handling the

contract, and then I would have signed it.

Q.        At the time you signed this contract, did you

believe that the University of Tennessee was in full

compliance with the terms and conditions of the

contract?

1  A.        Yes, I did.

2  Q.        At the time you signed this, did you have any

3  reason to believe that Anming Hu worked for a university

4  in China?

5  A.        No, I did not.

6  Q.        If you had known that Anming Hu worked at a

7  university in China, would you have signed this

8  contract?

9  A.        No, I would have had a conversation before we

09:33AM  10  did anything.

11  Q.        Conversation with who?

12  A.        I would have had a conversation with the

13  vice-chancellor for research, with the department head,

14  and with the provost.

15  Q.        After you signed the contract, what did you do

16  with it?

17  A.        So, after we signed the contract, we had all of

18  the documentation that we needed.  We sent it to our

19  sponsored projects accounting office to go ahead and get

09:34AM  20  an account set up so that the project could be started.

21  Q.        Once the account was set up, were you

22  personally involved anymore in the project?

23  A.        No.

24  Q.        I'd like to direct your attention now to

25  November of 2018.  Did there come a time that you worked

1   on a -- on another contract related to NASA with Anming

2   Hu as the principal investigator?

3   A.      Yes.

4           (Government's Exhibit 9-F was marked for

5            identification.)

6           MR. MC KENZIE:  I'd like to show the witness

7   Exhibit 9-F.

8           Your Honor, if this is not in evidence already,

9   I'd move to admit it.

09:34AM 10          THE COURT:  So admitted.

11          (Government's Exhibit 9-F was received into

12           evidence.)

13  BY MR. MC KENZIE:

14  Q.      Please explain to the jury what this document

15  is.

16  A.      So, this document is a cooperative agreement, a

17  contract, with NASA, the Marshall Space Flight Center,

18  and the University of Tennessee.

19  Q.      Will you please read the award -- federal award

09:35AM 20  identification number for the jury.

21  A.      Sure.  80MSFC19M0003.

22  Q.      Who is the funding agency in this agreement?

23  A.      The funding agency is NASA; in particular, the

24  Marshall Space Flight Center.

25  Q.      Who is the recipient of the funding?

1   A.     The recipient is the University of Tennessee.

2   Q.     Who is the principal investigator in this

3   agreement?

4   A.     Dr. Anming Hu.

5   Q.     And for what amount -- or what amount is

6   the -- is NASA going to provide?

7           MR. MC KENZIE:  We might need to scroll down a

8   little bit.  There it is (indicating).

9   BY THE WITNESS:

09:36AM 10   A.     $50,000.

11           MR. MC KENZIE:  And then could we scroll down a

12   little bit more.

13   BY MR. MC KENZIE:

14   Q.     And directing your attention to the right side

15   of the screen.  Who signed this contract on behalf of

16   University of Tennessee?

17   A.     I did.

18           MR. MC KENZIE:  I'd like to scroll down to

19   Terms and Conditions.

09:36AM 20           Keep going down, please.  Thank you.

21   BY MR. MC KENZIE:

22   Q.     Before signing this contract, did you review

23   the terms and conditions of the contract?

24   A.     Yes, I did.

25   Q.     Did you review all of the terms and conditions?

1    A.        Yes.

2    Q.        Could you please read the heading under 1800 at

3    the top of the screen?

4    A.        Restrictions On Funding Activities With China.

5    Q.        Will you please -- please read paragraph (a) to

6    the jury.

7    A.        Sure.   "NASA is restricted from using

8    appropriated funds to enter into or fund any grant or

9    cooperative agreement of any kind to participate,

09:37AM  10   collaborate, or coordinate bilaterally with China or any

11   Chinese-owned company, at the prime recipient level or

12   at any subrecipient level, whether the bilateral

13   involvement is funded or performed under a no-exchange

14   of funds arrangement."

15   Q.        What, if any, steps did you take to ensure that

16   the University of Tennessee at Knoxville complied with

17   these restrictions in this case?

18   A.        So, in this case, I looked at the outside

19   interest disclosure form that we had on file for Dr. Hu

09:38AM  20   to see if he had identified any relationships that he

21   may have had.   I also looked to see what was in the

22   proposal, as far as entities that we may have been

23   partnering with, and that was kind of the basic review

24   that I did.

25             MR. MC KENZIE:   Your Honor, I'd like to show

1  the witness what is already in evidence as Government's

2  2-F.

3  BY MR. MC KENZIE:

4  Q.      Could I ask you to read the date in the top

5  right-hand corner.

6  A.      Date Created?

7  Q.      Yes.

8  A.      9/15/2016.

9  Q.      Could you please read the Full Name.

09:39AM 10  A.      Anming Hu.

11          MR. MC KENZIE:  Can we please scroll down.

12  BY MR. MC KENZIE:

13  Q.      Will you please read the -- read question 1,

14  along with the answer.

15  A.      "Do you hold an office, directorship, or

16  employment in an outside organization?  No."

17          MR. MC KENZIE:  Your Honor, I'd like to show

18  the witness what is in evidence as 2-G, as in George.

19  BY MR. MC KENZIE:

09:39AM 20  Q.      Will you please read the date in the top right

21  corner.

22  A.      10/30/2017.

23  Q.      Will you please read the Full Name.

24  A.      Anming Hu.

25          MR. MC KENZIE:  Scroll down.

1  BY MR. MC KENZIE:

2  Q.        Will you read question 1, along with the

3  answer.

4  A.        "Are you an officer, director, board member,

5  trustee, or employee of any organization or business

6  entity (for profit or non-profit) other than the

7  university?"  And the answer was, "No."

8          MR. MC KENZIE:  Let me show the witness what is

9  marked as 2-H and is in evidence.

09:40AM  10  BY MR. MC KENZIE:

11  Q.        Will you please read the first question along

12  with the answer.

13  A.        "Are you an officer, director, board member,

14  trustee, owner, or employee of any organization or

15  business entity (for profit or non-profit) other than

16  the university?  No."

17  Q.        After reviewing these forms, what did you do

18  with regards to the contract?

19  A.        I signed the contract.

09:41AM  20  Q.        In this particular case in 2018, had you been

21  aware -- had you been made aware that the federal

22  government was investigating Anming Hu?

23  A.        I honestly don't remember at what point I

24  became aware of that.

25  Q.        Before signing this contract, did there come a

1    time that you sent any kind of question to a federal

2    agent asking whether it was okay to sign the contract?

3    A.        Yes, I did.

4    Q.        Do you recall who -- who that person was that

5    you sent the email to?

6    A.        So I sent an email to our Office of General

7    Counsel.

8    Q.        Okay.  Do you recall what the response was?

9    A.        That I was fine to sign the contract.

09:42AM 10   Q.        Do you recall any additional guidance you were

11   given?

12   A.        No, I do not.

13   Q.        After receiving that, did you proceed with

14   processing this contract the way that you ordinarily

15   would?

16   A.        Yes.

17   Q.        After you signed the contract, what happened to

18   the contract?  How was it -- how was it then -- who did

19   you pass it on to?

09:42AM 20   A.        So, after I had signed the contract, I would

21   give it back to the award coordinator to finish up kind

22   of the administrative paperwork and send it to the

23   sponsored projects accounting office.

24   Q.        I would like to now direct your attention to

25   2019.

1    MR. MC KENZIE:  And I'd like to show the

2  witness Exhibit 3-Z, as in zebra -- excuse me -- 3-Y.  I

3  went out of order there.  3-Y.

4    (Government's Exhibit 3-Y was marked for

5     identification.)

6    MR. MC KENZIE:  Your Honor, at this time, I'd

7  like to move 3-Y into evidence.

8    THE COURT:  So admitted.

9    (Government's Exhibit 3-Y was received into

10    evidence.)

11    MR. MC KENZIE:  I would like to scroll down,

12  please.  And then go up a bit.

13  BY MR. MC KENZIE:

14  Q.    I want to start with:  What is this?

15  A.    So this is an email from Tiffany Bell in our

16  office who was reviewing a proposal and had asked the

17  principal investigator and Dr. Hu -- who was a

18  co-investigator on this -- a question about the NASA

19  Chinese Assurance.

20    MR. MC KENZIE:  Will you please scroll up.

21    Can we just bold this middle section or blow it

22  up so we can see it better.

23  BY MR. MC KENZIE:

24  Q.    Who sent this email?

25  A.    So, this email was from Anming Hu.

09:43AM  (line 10)
09:44AM  (line 20)

1  Q.        What was the subject?

2  A.        Subject was NASA Assurance Form.

3  Q.        Would you please read the response.

4  A.        "Hi, Tiffany.  I have read through this letter

5  and confirm that I will fully obey the policy.  Anming

6  Hu."

7            MR. MC KENZIE:  Will you scroll up to the top?

8  BY MR. MC KENZIE:

9  Q.        And who did -- who was the ultimate recipient

10 of this email chain?

11 A.        So, I received it after Tiffany had received

12 the response.

13 Q.        Why was this email sent to you?

14 A.        Because I had asked Tiffany to give me

15 confirmation that she had asked them and that we had

16 that information on file.

17            (Government's Exhibit 3-Z was marked for

18             identification.)

19            MR. MC KENZIE:  I'd like to show the witness

20 Exhibit 3-Z, which is an attachment to this exhibit.

21            Your Honor, I ask that 3-Z be admitted into

22 evidence.

23            THE COURT:  So admitted.

24            (Government's Exhibit 3-Z was received into

25             evidence.)

BY MR. MC KENZIE:

Q.        What is this document?

A.        So, this is the assurance document for the NASA
proposal.

Q.        In either 2016 or 2018, when you signed
contracts with Anming Hu as the principal investigator,
if you had known at that time -- at those times that
Anming Hu was employed at a Chinese university, would
you have signed those contracts?

A.        No, I would not.

Q.        Thank you.

          MR. MC KENZIE:  No further questions, Your
Honor.

          THE COURT:  Thank you.

          Cross-examination.

                    CROSS-EXAMINATION

BY MR. LOMONACO:

Q.        Hello, Ms. Mercer.

          You talked sort of quick and I was trying to
write it all down.  How are you today?

A.        I'm good.  How are you doing?

Q.        Thank you.  I'm doing okay.

          Ms. Mercer, how long did you work at the
University of Tennessee?

A.        So, I've been at the University of Tennessee

1   for about five-and-a-half years now.

2   Q.       So what year did you start there?

3   A.       2016.

4   Q.       Okay.  And when you first started telling the

5   jury what you do and how you do your job and so on, I

6   got the impression that you were talking about what

7   you're doing now, how you conduct your business now,

8   about the daily procedures and so on.  Some of those

9   procedures were a little bit different back at the time

09:47AM 10  that Professor Hu was applying for these NASA grants;

11  correct?

12  A.       I'm not sure which procedures you're referring

13  to.  When I was talking in general about the process of

14  what we do, that has been the same.

15  Q.       Well, for instance, I'm talking about the

16  procedure of checking the Outside Interests Disclosure

17  Form before the grant is signed.

18           You had meetings with the FBI and you confided

19  in them that you had never checked those forms before

09:48AM 20  the FBI got involved in this case; right?

21  A.       We had not checked them in 2016, correct.

22  Q.       Right.  And you made that statement to the FBI?

23  A.       Correct.

24  Q.       When was the first time you understood that the

25  FBI was investigating Anming Hu?

1   A.     I honestly don't know at what point I became

2   aware of that.

3   Q.     Are you aware of the fraud awareness meeting in

4   2018 that the FBI held at your university?

5   A.     They had several.

6   Q.     Yeah. There were three -- what I call

7   PowerPoint presentations in 2019. But in 2018, they

8   came and they -- they went and held a fraud awareness

9   meeting, they called it. You were present?

09:48AM   10   A.     Yes.

11   Q.     And is this the first time you understood that

12   there may be an employee that is committing fraud?

13   A.     No. Actually, at that meeting, there was

14   nothing discussed about specific individuals at all.

15   Q.     Okay. What was discussed?

16   A.     Generally, the Chinese Initiative, what the DOJ

17   had put forth as far as this was an area of concern.

18   They talked about being aware and mindful, disclosing

19   relationships. When they did the presentations, we did

09:49AM   20   them with the chancellor and their cabinet.

21   Q.     That was the next year; right?

22   A.     I thought it was 2018.

23   Q.     Okay. So they didn't name any names in the

24   first meeting?

25   A.     No.

1    Q.       But they were making you aware of Chinese

2    professors; correct?

3    A.       No, they were not calling out any -- any

4    particular individuals at all.

5    Q.       I didn't say any individual, but you said they

6    told you about the Chinese Initiative.

7    A.       The China Initiative.

8    Q.       Yes.  And that was directed at professors that

9    may be committing economic espionage for China?

09:50AM  10   A.       Correct.

11   Q.       Would it be your understanding that the

12   majority, if not all, would be Chinese?

13            MR. MC KENZIE:  Objection, Your Honor.

14            THE COURT:  Basis for objection?

15            MR. MC KENZIE:  For her understanding of an

16   ethnicity of the people who are committing the crime.

17            MR. LOMONACO:  Your Honor, I asked her if it

18   was her understanding that they were talking about

19   people at the university that were basically Chinese.

09:50AM  20            THE COURT:  I'll overrule the objection for

21   now, but you can ask that question.  I'm not sure you

22   need to ask much more on that, but --

23            MR. LOMONACO:  Okay.

24   BY MR. LOMONACO:

25   Q.       Can you answer that question?  Were they

1  interested in the people that were working at the

2  university that were Chinese?

3  A.        No.  How they explained it is:  That they were

4  looking at anybody who would have connections, not

5  necessarily any particular ethnic group.

6  Q.        Okay.  So telling you about the China

7  Initiative was for what purpose?

8  A.        Making us aware that that was something that

9  was on the horizon and occurring.

09:51AM 10  Q.        So they made you aware that they were involved

11  in the China Initiative?  Yes?

12  A.        Yes.

13  Q.        Okay.  Thank you.

14           Let me -- let me direct your attention to

15  Government's Exhibit 2-J.

16           Before we get into that, the way I understand

17  your testimony is that Professor Hu didn't fill out the

18  conflict of interest form indicating he had employment

19  and that had you known, you would have done what?  What

09:52AM 20  would you have done?

21  A.        So, had there been something on the outside

22  interest disclosure form and we had been aware of it, I

23  would have talked with our vice-chancellor for research,

24  with his department head, and with the provost.

25  Q.        Okay.  So all it is is a question.  Yes or no;

1  right?

2  A.        Yes.

3  Q.        So if he said, "yes, I had employment," you

4  would go all the way up to the provost before you even

5  talked to Professor Hu?

6  A.        Yes, I would.

7  Q.        Why?

8  A.        Because it would have been a situation that we

9  wanted to find out how did they want to handle it.

09:53AM 10  Q.        Handle what?

11  A.        Well, he would be restricted from applying for

12  a NASA proposal.

13  Q.        Just because he said "yes" to a question of,

14  "Do you have outside employment?"

15  A.        If he had identified that that outside

16  employment was with a Chinese university, yes.

17  Q.        Okay.  The question was a yes or no question;

18  right?

19        What else did you look at besides -- or what

09:53AM 20  else were you supposed to look at besides the outside

21  interest disclosure?

22  A.        The proposal itself.

23  Q.        Proposal itself.

24        What about the technical disclosure form; do

25  you know what that is?

1   A.        No.   If you could clarify what you're referring

2   to.

3   Q.        Well, a professor is supposed to fill out a

4   disclosure of certain things and other forms, too,

5   right?

6   A.        The outside interest disclosure form?

7   Q.        No, other forms.   Are you aware of any other

8   forms where the professor would list his associations,

9   his collaborations, affiliations?

10  A.        In the NASA proposal?

11  Q.        No, in his work at UT.

12  A.        I am not aware of other forms that he may have

13  been required to complete, no.

14  Q.        Okay.   So -- so the outside interest conflict

15  of interest form is what you would look at and nothing

16  else?

17  A.        And the proposal.

18  Q.        And the proposal.   Okay.

19            Well, let's look at the conflict of interest

20  form then.

21            MR. LOMONACO:   If we could go down to about

22  page 7.

23  BY MR. LOMONACO:

24  Q.        I believe you read some paragraphs there.

25  Let's find the heading on that.

1

2          MR. LOMONACO:  I'm sorry.  Before we do that,

3   let's go right to the top of the document.

4          Page down a little bit.

5          I'm looking at the wrong document.  I need to

6   look at the -- let's do the outside interest disclosure

7   form that they showed.

8   BY MR. LOMONACO:

9   Q.        I'm sorry.  I'm showing you the wrong document.

09:55AM  10   We'll get back to this one in a minute.

11          MR. PARSONS:  Which number do you want?

12          MR. LOMONACO:  2-F; is that it?  Yes.

13   BY MR. LOMONACO:

14   Q.        Okay.  So you -- this is what Professor Hu was

15   supposed to sign; right?

16   A.        Correct.

17   Q.        This is what you would look at; right?

18   A.        Correct.

19   Q.        And this was a revised one; right?  From the

09:56AM  20   2016/'17 one?

21   A.        A revised one?  What do you mean?

22   Q.        Different wording in the questions.

23   A.        Between '16 and '17?

24   Q.        Between his first NASA grant and his second

25   NASA grant.

1  A.       Yes.

2            MR. LOMONACO:  Okay.  So let's page down about

3  two inches here.  Okay.  Right there (indicating).

4  That's fine.

5  BY MR. LOMONACO:

6  Q.       So, Instructions.  Do you see where it says

7  Instructions?

8  A.       Yes.

9  Q.       "This form is for The University of Tennessee

09:56AM  10  faculty and staff to disclose outside interests..."  So

11  the instructions tell him to disclose outside interests;

12  correct?

13  A.       Correct.

14  Q.       "...as required by the university's conflict of

15  interest policy."  Correct?

16  A.       Correct.

17  Q.       "...(Policy FL0125)."  Did I --

18  A.       FI0125.

19  Q.       FI.

09:57AM  20            MR. LOMONACO:  Now, let's go to that one.

21  BY MR. LOMONACO:

22  Q.       So, according to the document he's supposed to

23  fill out, he's supposed to follow the policies of the

24  conflict of interest form; correct?

25  A.       The conflict of interest, yes.

1    Q.        Yes.

2              MR. LOMONACO:  Okay.  Let's -- let's go to the

3    section.

4    BY MR. LOMONACO:

5    Q.        Are you aware that the conflict of interest has

6    a -- parameters and explains what is or should be

7    considered a conflict of interest; right?

8    A.        They do have information in there, yes.

9    Q.        So you kept on talking about his employment or

09:57AM  10   his job in China, or, what -- let me see -- his work in

11   China.  Let me see the words that were used.  But you're

12   not really sure what it was; right?

13   A.        I'm not -- can you clarify what your question

14   is?

15   Q.        You're not sure what his work in China was?

16   A.        Correct.  I do not have any details about what

17   his work was.

18   Q.        Do you know who he worked for?

19   A.        I do know the university that he worked for.

09:58AM  20   Q.        Okay.  What's the name of the university?

21   A.        Beijing Jiaotong.

22   Q.        BJUT?

23   A.        Yes.

24   Q.        Do you know how long he worked there?

25   A.        I do not.

1  Q.      Do you know how much money he got paid for

2  working there?

3  A.      I have no idea.

4  Q.      Now, according to the conflict of interest

5  form, it's not a conflict of interest unless it reaches

6  a certain level of conflict; right?

7  A.      Or -- is there a particular section that you're

8  referring to?

9  Q.      I'm sorry.  I didn't hear.

09:58AM 10  A.      I'm sorry.  Is there a particular section that

11  you're referring to in the conflict of interest form?

12  Q.      I'll get to that, but my question is:  Before

13  it becomes a conflict of interest, it has to meet

14  certain parameters or requirements; right?

15  A.      From a research standpoint, no.

16  Q.      "From a research standpoint."  What does that

17  mean?

18  A.      So, when we were looking at research, whether

19  you're paid or not, you could have an outside conflict

09:59AM 20  of interest.

21  Q.      Where does it say that?

22  A.      It doesn't say in this particular policy.

23  Q.      Well, no, the conflict of interest form says we

24  have to follow this policy, doesn't it?

25  A.      Correct.

1    Q.        It says we're supposed to get our information

2    from this policy if we have any questions about what a

3    conflict of interest is; right?

4    A.        Correct.

5    Q.        Okay.  So if it doesn't say it in this policy,

6    where is it -- you know, how is somebody supposed to

7    know they're supposed to go someplace else?

8    A.        So there is other information in the sponsored

9    programs policies.

09:59AM  10  Q.        Sponsored programs policy.  Other information.

11   What do you mean "sponsored program policy"?

12   A.        So, there are specific policies for sponsored

13   programs which is research projects that identify how it

14   ties in with conflict of interest.

15   Q.        Which policies are those?

16   A.        So I don't know the policy numbers right off

17   the top of my head, but I know they're some of the

18   documents that you had requested.

19   Q.        So you don't know what policies you're talking

10:00AM  20  about?

21   A.        I don't have the specific numbers off the top

22   of my head, no.

23   Q.        Okay.  Now, how is somebody supposed to know,

24   based on the specific clear language of the conflict of

25   interest form to go to this policy that they're supposed

1  to go to some other policy?

2  A.        So they would go to this policy, but they

3  should also be aware of the other policies if they are

4  conducting research.

5  Q.        Okay.  Who tells them that?

6  A.        So, that's part of what they should be

7  following as being a university faculty member or staff

8  who is conducting research.

9  Q.        So they're supposed to be following policies,

10:00AM  10  but who tells them to look at this policy or there is

11  that policy or look at this policy?  Who tells them

12  that?

13  A.        So some of that is their business managers,

14  their department heads, and then my office as well if

15  they have specific questions or there are specific

16  things we need to point out to them.

17  Q.        Well, let's just dig down and narrow down to

18  the conflict of interest form and answering the

19  question, "Do you have employment outside of the

10:01AM  20  university?"  Correct?

21  A.        Okay.

22  Q.        Because that's what everybody is saying he lied

23  on; right?

24  A.        Correct.

25  Q.        Okay.  How do you get a definition for

1  employment outside the university if you don't follow

2  the policy and you don't follow the actual instructions

3  on the manual to determine what that employment is?

4  A.        So, the question in the outside interest

5  disclosure form is very clear.  "It asks, Do you have

6  any outside employment," depending upon what year the

7  question was.  It doesn't say anything about a

8  limitation on how much money or anything else.

9  Q.        Okay.  Well, let's go back to that previous

10  document again.  Instructions.  Do you see that?

11  A.        Uh-huh.

12  Q.        This form is for University of Tennessee

13  faculty and staff; right?

14  A.        Correct.

15  Q.        To disclose outside interests as required by

16  the university's conflict of interest policy.  "As

17  required by the policy."  It doesn't say there are other

18  procedures and policies out there.  It says, you answer

19  these questions as required by the policy.

20  A.        Correct.

21            MR. LOMONACO:  Okay.  Let's go back to the

22  policy again.

23            Sorry.  Can you go back to that page again?

24  BY MR. LOMONACO:

25  Q.        Have you reviewed this policy during this time

 1    frame that Professor Hu was filling out his conflict of

 2    interest form?

 3    A.        During the years that he filled it out, I am

 4    sure that I looked at it.

 5    Q.        I'm sorry?  I'm sorry?  Can you repeat that?

 6    A.        Yes.  During the time period, the years that he

 7    filled out an outside interest disclosure form, I am

 8    sure that I probably had looked at the policy.

 9    Q.        Okay.  So then you should be aware of how a

10    conflict of interest is defined.

11    A.        Yes, I would look at the policy for specific

12    information.

13    Q.        Okay.  So let's go to e.  (As read) "Covered

14    individuals involved in research..."  That's Professor

15    Hu; right?

16    A.        Correct.

17    Q.        "...must have disclosed outside interests that

18    may be affected by the research before proposals are

19    submitted to funding agencies."  Correct?

20    A.        Correct.

21    Q.        "Such covered individuals must keep their

22    disclosures updated for the duration of the project.

23    Examples of such interests include, but are not limited

24    to, receiving payments for services exceeding

25    $10,000..."

1    Now, would you consider that payment for

2    services payment for employment?

3    A.    It could be.

4    Q.    Okay.  "...having equity interest exceeding

5    five percent or $10,000, and holding intellectual

6    property rights."  Right?

7    And, actually, the conflict of interest forms

8    talks about, "Are you a member of a" -- "Are you a

9    director or officer or have stock," and that kind of

10:04AM   10   thing; correct?

11   A.    Correct.

12   Q.    So it's pretty much tracking what this says;

13   correct?

14   A.    Correct.

15   Q.    So if Professor Hu did not have a job that

16   exceeded $10,000 a year, he wouldn't have a conflict of

17   interest, would he?

18   A.    I would disagree because it's not limited to.

19   Q.    Yeah.

10:05AM   20   Did you talk to Mr. Zomchick lately?

21   A.    No, I have not.

22   Q.    Okay.  "Not limited to."  Okay.  What does that

23   mean?  That there are other things that he's supposed to

24   know about that are not in the policy he's supposed to

25   follow?

1    A.        These are examples of things.

2    Q.        Uh-huh.

3    A.        If they have specific questions when the annual

4    conflict of interest disclosure process notification

5    goes out, they're given contact information so that they

6    can reach out and ask if they have got specific

7    situations that they need guidance on.

8    Q.        Is he asked if he had employment?

9    A.        If he had that specific question, then, yes, he

10   could have reached out.

11   Q.        That's a specific question, isn't it?

12   A.        Yes.

13   Q.        How do you say that, "not limited to"?  I mean,

14   it may be something besides employment.  But the

15   employment question is pretty clear.  You're saying he

16   answered a question and he lied because he had

17   employment and he didn't -- he didn't put it down.

18             MR. MC KENZIE:  Objection, Your Honor.

19   BY MR. LOMONACO:

20   Q.        Is that right?

21             MR. LOMONACO:  Excuse me.

22             MR. MC KENZIE:  She didn't testify that he

23   lied.  She testified that the answer is no.  He's

24   bringing in facts beyond what this witness testified to

25   that she has.

1      MR. LOMONACO:  I agree, Your Honor.  I agree.

2      THE COURT:  Okay.  He'll rephrase.  Thank you.

3  BY MR. LOMONACO:

4  Q.      Did you talk to Professor Hu other than these

5  two grants?

6  A.      I have not talked to Professor Hu.

7  Q.      You've never talked to him?

8  A.      Not that I recall.

9  Q.      Okay.  So you processed his paperwork and never

10  discussed with him anything?

11  A.      No, because I had staff who were working with

12  him and his business person on their proposals.

13  Q.      I'm sorry; can you say that again?

14  A.      Sure.  I had staff who were working with him

15  and his business person on the proposals.

16  Q.      Okay.  So your staff worked with him, and you

17  just basically looked everything over at the end and

18  signed it?

19  A.      Correct.

20  Q.      I think you've already testified that you're

21  not sure at all what kind of employment Mr. Hu or

22  Professor Hu had outside of UT.

23  A.      Correct.

24  Q.      Did the FBI give you information about that?

25  A.      Yes, they did.

Q.        So you attended, I think, in 2018 the fraud

awareness meeting with Department of Energy Agent

Slatton and the FBI Agent Sadiku.

A.        Yes.

Q.        And this was in August of 2018; do you

remember?

A.        I don't recall what month.

Q.        You don't recall?

A.        I don't recall a specific month.

Q.        We asked you to bring any material that you

might have had in your possession that was generated or

you took notes at that meeting.

A.        Correct, you did ask.

Q.        Did you do that?

A.        I didn't have anything.

Q.        Okay.  So you didn't take any notes?

A.        No.

Q.        Keep any notes?

A.        No.

Q.        Okay.  And after this awareness meeting, you

started looking at some of the documents that pertained

to Professor Hu; correct?

A.        I did not immediately after this meeting, no.

Q.        You didn't -- you didn't look at his

publications?

1  A.      Not that I recall.

2  Q.      All right.  So you don't recall showing them to

3  the FBI and saying that you had concerns about his

4  affiliations with China?

5  A.      I don't recall that, no.

6  Q.      Okay.  Let me see if I can get you a better

7  date so it might help.  September of 2018.

8  A.      Not that I recall.

9  Q.      How about any other kind of documents that may

10 have applied to Professor Hu, sharing it with the FBI?

11 A.      They had asked for specific documents, but I

12 don't remember what month or year they had asked for

13 them.

14 Q.      Do you recall the documents they asked for?

15 A.      I think they asked for a copy of his outside

16 interest disclosure and a copy of a couple of the grant

17 applications he had submitted.

18 Q.      How about his invention agreements?

19 A.      Yes, they -- I believe they did ask for a copy

20 of that.

21 Q.      Okay.  And you were -- you complied, as best

22 you could; right?

23 A.      Correct.

24 Q.      You told the FBI that you -- that Professor Hu

25 had a contract with NASA, as a matter of fact?

1  A.      If he did at that time, yes, I would have told

2  that.

3  Q.      Okay.  And you also told the FBI that NASA

4  wanted to see or was interested in people that might

5  have a direct connection with China to refuse funding,

6  and you explained that there is two types of entities

7  that may have a connection that they would refuse

8  research and funding.  Where did you get that

9  information?

10:11AM  10  A.      I believe what you're referring to is the China

11  Assurance for the NASA proposals that I was telling them

12  about.

13  Q.      Okay.  So you're getting your knowledge of what

14  NASA requires or turns down from the NASA --

15  A.      From the Chinese Assurance document that

16  states --

17  Q.      The doc- --

18        MR. MC KENZIE:  Your Honor, objection as to

19  relevance as to her describing the Chinese Assurance

10:11AM  20  policy to the FBI.

21        THE COURT:  Well, let's keep going.  I'll

22  overrule that objection for now.

23  BY MR. LOMONACO:

24  Q.      And you told the FBI that the two types of

25  entities that NASA is interested in is entities that are

1   directly owned by the Chinese government?

2   A.          Correct.

3   Q.          Or an entity that's directly employed by the

4   Chinese government?

5   A.          That's controlled by the Chinese government,

6   yes.

7   Q.          Well, okay.  My notes say "employed by the

8   Chinese government," but you say controlled by the

9   Chinese government.  Okay.

10:12AM  10        Well, let's talk about that.  Do you know if

11  Beijing University is controlled by the Chinese

12  government?

13  A.          Yes, the -- according --

14        MR. MC KENZIE:  Objection, Your Honor, as to

15  relevance and whether or not this witness is even the

16  appropriate person to testify about it.  She hasn't said

17  anything about Beijing University other than someone

18  told her the name.

19        MR. LOMONACO:  She has already identified

10:12AM  20  Beijing University, Your Honor, and I'd like to ask and

21  try to find out what her understandings were of --

22        THE COURT:  I'll overrule the objection.  We'll

23  sort out -- it may be a -- we'll determine the relevance

24  and the jury can view the evidence as it sees fit.

25        Go ahead.

BY MR. LOMONACO:

Q.        So entities that are directly employed by the Chinese government, do you know if Beijing University is a provincial university, a government university, or a municipal university?

A.        I do not know the specifics.  But under the NASA Assurance, the FAQ that they had around this, they were considering universities of higher education under control of the Chinese government.

10:13AM  Q.        Okay.  Which documents are those?

A.        They were frequently asked questions that they had on the NASA site.

Q.        Okay.  So you're saying that anything that is controlled by the Chinese government would be some of the --

          Okay.  So I'm not going to try to -- try to get something you don't know, but I do want to ask you:  Do you know if the Beijing University is controlled by the Chinese government --

10:14AM  A.        I honest- --

Q.        -- or are you just guessing?

A.        Based upon the definition that NASA had provided, that's what I'm going to rely on.

Q.        Because it's a university?

A.        Because it's an institution of higher ed.

Q.      So you had this meeting, and did you provide
this information to the FBI?  And would it be fair to
say that if their memo says September 28th, 2018, could
you say it probably is around that time?

A.      If that's what their notes say or their memo
says, it probably was.  I just don't recall the specific
month.

Q.      And that is -- is that the same time that you
told them that you were concerned about some of the
publications you had seen for Professor Hu?

A.      I don't recall if that was at that time or not.

Q.      All right.  Did you review the publications
about Professor Hu during that time frame, the end of
2018, 2019?

A.      Most likely, yes.

Q.      The FBI asked you to do that or collect them or
something like that, or were you doing that on your own?

A.      I don't recall the FBI asking us to do that.

        (Defendant's Exhibit 23 was marked for
         identification.)

        MR. LOMONACO:  Okay.  Let's turn to one of
those publications, if we could, Exhibit 23, and see if
we've marked this for identification already.  If not,
I'd like to ask that we mark Exhibit 23 as the next
exhibit.

1       THE COURT:  Absent any objection, so admitted.

2             (Defendant's Exhibit 23 was received into

3              evidence.)

4       MR. ARROWOOD:  May we have a moment, Your

5   Honor?

6             (A discussion was had off the record amongst

7              counsel for the government.)

8       MR. MC KENZIE:  Your Honor, I ask that this not

9   be shown to the jury yet until --

10:16AM  10       THE COURT:  It's not.

11       MR. MC KENZIE:  I ask that he lay a proper

12  foundation before we admit it.

13       MR. LOMONACO:  I'm sorry; I didn't hear that

14  first part.

15       THE COURT:  He asked that you lay a proper

16  foundation for this document before they determine

17  whether they have an objection.

18       MR. LOMONACO:  I thought we had an agreement.

19  Is this not one of the ones that you had in your

10:17AM  20  disclosure -- or discovery?

21       MR. MC KENZIE:  Your Honor, can we just discuss

22  this at sidebar real quick?

23       THE COURT:  Okay.  Excuse us.

24             (Whereupon a sidebar was had outside the

25              hearing of the jury as follows:)

1       MR. MC KENZIE:  Your Honor, this appears to be

2  a Department of Energy document that's like a summary

3  report of an interview that took place with the witness.

4  That's not a business record from the University of

5  Tennessee that we've been stipulating to.  It contains

6  hearsay.

7       If he wants to cross-examine her on the content

8  of that or use it to impeach, obviously, but using that

9  extrinsic evidence of that hearsay statement to somebody

10:18AM  10  would be, one, hearsay; two, I think we need to lay a

11  foundation of relevance.  And then impeaching with

12  extrinsic evidence, obviously I would object on that

13  ground as well.

14       MR. LOMONACO:  Well, Your Honor, I thought we

15  had an agreement that -- to the -- first of all, the

16  authenticity to anything that was provided in discovery.

17  This was provided in discovery.

18       MR. MC KENZIE:  To be clear, I don't say that

19  the document's not authentic.  I just don't think it's

10:18AM  20  admissible.  I don't think he altered it or changed it

21  in any way.  I'm not accusing him of that.

22       THE COURT:  Well, why don't we just do this:

23  Looking at the document that you've sworn to, why don't

24  you -- we won't admit it in light of the objection but

25  we'll allow you to use it, just like you used the FBI

1  interview notes to cross-examine the witness.

2          MR. LOMONACO:  Use what notes, Your Honor?

3          THE COURT:  We'll allow you use it to ask

4  questions of the witness, just like you did with, I

5  think, the FBI interview notes.  But it will not be

6  admitted into evidence.

7          MR. MC KENZIE:  It won't be shown to the jury

8  as well.

9          THE COURT:  It won't be shown to the jury just

10:19AM 10  like the last document.  I mean, I think there are

11  objections that have been raised.  I'm not getting into

12  the stipulation and things like that.  Apparently the

13  government is saying there wasn't a stipulation as to

14  this document is what I'm hearing.  So in light of that,

15  I think there are valid objections they have raised.

16          MR. LOMONACO:  I can show you the emails that

17  they stipulated to authenticity.

18          THE COURT:  Well, I'm not going to --

19          MR. ARROWOOD:  Your Honor, we absolutely

10:19AM 20  stipulated to authenticity.  We're not challenging it on

21  that basis.

22          THE COURT:  I'm basing in on hearsay and other

23  objections.

24          MR. LOMONACO:  Can you give me a minute to get

25  ready for that questioning?

1          THE COURT:  Sure.

2          MR. LOMONACO:  Thank you, Your Honor.

3          (Whereupon the following was had in open court

4           within the hearing of the jury:)

5   BY MR. LOMONACO:

6   Q.       Okay.  Ms. Mercer, in February of 2019, Special

7   Agent Slatton met with you from DOE; do you remember

8   her?

9   A.       Yes, I do.

10:20AM 10  Q.       And she met and asked you to discuss with her

11  the review of the documents that she had pertaining to

12  Dr. Anming Hu --

13  A.       Correct.

14  Q.       -- correct?

15          You provided UTK's invention disclosure forms;

16  correct?

17  A.       Correct.

18  Q.       And those were Professor Hu's invention

19  disclosure forms; is that correct?

10:21AM 20  A.       Yes.

21  Q.       And the -- excuse me.  Let me get to the right

22  page on my computer.

23          There was some 99 pages, or copies of eight UT

24  invention disclosures that Professor Hu had published;

25  correct?

1    A.        That he had filed?  Correct.

2    Q.        Yes.  And publications that he filed?

3    A.        Yes.

4    Q.        He filed those with UT?

5    A.        Yes.

6    Q.        Okay.  When you're working at UT, do you review

7    these contributions by the professor?

8    A.        Their outside -- or their IP disclosures, no, I

9    do not.

10:22AM 10   Q.        Okay.  So if there are disclosures in here that

11   show his affiliations with BJUT, you would not have

12   known about that; right?

13   A.        Correct.

14   Q.        Okay.

15             MR. LOMONACO:  Excuse me a minute.

16   BY MR. LOMONACO:

17   Q.        Do you know the policy -- would somebody else

18   have reviewed these?

19   A.        From the university or from the tech transfer

10:22AM 20   office?

21   Q.        From anywhere.

22   A.        So, from the university, typically it's the

23   department chair that would have seen the invention

24   disclosures.  And then in my office Teresa Sears would

25   have seen the invention disclosure looking to see did

1  they identify a funding source for the invention.  And

2  that would have been it.  And then it would have gone to

3  the technology transfer group.

4  Q.      All right.  Thank you.

5          MR. LOMONACO:  May I have one moment, Your

6  Honor?

7          Your Honor, I think we're in agreement that if

8  we had a few minutes, we could probably discuss how

9  exactly we're going to move forward on this.  Is it

10:23AM  10  possible that I ask for the break instead of the

11  government asking?

12          THE COURT:  Very well.  We'll go ahead and take

13  a morning break --

14          MR. LOMONACO:  Thank you, Your Honor.

15          THE COURT:  -- and counsel can discuss a few

16  matters.

17          MR. LOMONACO:  Thank you.

18          THE COURTROOM DEPUTY:  All rise.

19          (Jurors excused from the courtroom.)

10:24AM  20          THE COURTROOM DEPUTY:  This honorable court

21  stands in recess until 10:40.

22          (A brief recess was taken.)

23          THE COURTROOM DEPUTY:  This honorable court is

24  again in session.

25          THE COURT:  Everyone is ready to proceed, so

1    we'll bring our jury in.

2              (Whereupon the following report of

3               proceedings was had within the presence

4               and hearing of the jury:)

5              THE COURT:  All right.  Thank you, everyone.

6    Please be seated.

7              Go ahead, Mr. Lomonaco.

8              MR. LOMONACO:  Thank you, Your Honor.

9    BY MR. LOMONACO:

10:46AM  10    Q.       Ms. Mercer, just before -- before I get into

11    this, I just wanted to ask you another question about

12    the process of you starting to look at the conflict of

13    interest outside disclosure form.  I think you at one

14    point when you were meeting with the FBI or the DOE or

15    both, you indicated, "Well, up until now, I hadn't been

16    looking at the conflict of interest form."  And how did

17    that topic come up?  Did they -- did they say, "Well,

18    what about his outside interests or outside

19    disclosures?"  Or how did you get onto the subject of,

10:47AM  20    "I hadn't looked at those before"?

21    A.       I think they asked me if I had looked at them,

22    like, as part of our normal process.

23    Q.       Uh-huh.

24    A.       And at that time, we had not.

25    Q.       Okay.  So did they have them with them when

1  they asked you that question, or did they ask you to

2  produce the outside interest disclosures?  Do you

3  recall?

4  A.       I don't recall.

5  Q.       Okay.  But you do recall that they had interest

6  in those types of documents?

7  A.       Correct.

8  Q.       That type of document; correct?

9  A.       Correct.

10:48AM  10  Q.       Now, you did provide to Ms. Slatton from the

11  DOE invention disclosures?

12  A.       Yes.

13  Q.       And where did you find those?

14  A.       So, I reached out to the UTRF, which is the UT

15  research foundation that holds our intellectual property

16  rights for the university, and asked them if they could

17  pull a copy of those.

18       MR. LOMONACO:  Okay.  Your Honor, I've -- we've

19  taken off the little memo from the agent off the top of

10:48AM  20  these disclosures; so now all we have is the

21  disclosures.  I'd like to move those into evidence as

22  Exhibit 23-A.

23            (Defendant's Exhibit 23-A was marked for

24             identification.)

25       MR. MC KENZIE:  No objection from the

1  government, Your Honor.

2          THE COURT:  Thank you.

3          23-A is admitted.

4          (Defendant's Exhibit 23-A was received into

5           evidence.)

6          MR. LOMONACO:  Thank you, Your Honor.

7  BY MR. LOMONACO:

8  Q.      Do you see that where it says Research

9  Foundation?

10:49AM  10  A.      Yes, I do.

11  Q.      Okay.  I'm not going to go through all of

12  these.  There is a lot.  There is about 100 pages or

13  more.  But let me just go through -- this first one

14  says, "Ownership Assignment, UT Research Foundation."

15  What does that mean?

16  A.      So as a university, we can't hold intellectual

17  property rights, and so we assign those to the UT

18  Research Foundation, and that way they can work with

19  companies to commercialize or whatever it is that they

10:49AM  20  need to do with the patents.

21  Q.      So this is a separate company or foundation

22  that is able to take advantage of these -- maybe the

23  value of these, if there is any value in it; is that

24  right?

25  A.      It's a separate organization from the

1    university, yes.

2    Q.        So Anming Hu's contributions here as inventions

3    and so on could be valuable; correct?

4    A.        Correct.

5    Q.        And valuable for the University of Tennessee

6    because if he's doing this work at UT, he's doing it as

7    an agent or employee of UT; right?

8    A.        Correct, but he also receives profits from it

9    as well.

10:50AM  10    Q.        Yeah, you have some sort of agreement that they

11   get a portion or whatever?

12   A.        Yes.

13   Q.        Okay.  And the next one, Anming Hu is the

14   primary contact.  That just shows that he's one of the

15   ones involved in these; right?

16   A.        Correct.

17   Q.        Okay.  Let's go down here.  Here is one, Energy

18   and Environmental Science.  So would it be fair to say

19   that Anming Hu -- and here is his -- can you see my

10:50AM  20    cursor moving around?

21   A.        Yes, I can.

22   Q.        Okay.  There is a number -- a couple of numbers

23   next to his name, and those are, like, footnotes; right?

24   A.        Correct.

25   Q.        And these are all people that are involved in

1  the research, for lack of a better word?

2  A.        They're all authors for the publication.

3  Q.        Yes.  So we've got -- and I'm trying to see.

4  This is not very clear.  Can you make out the -- is that

5  2 and F; is that what that is?

6  A.        I honestly can't tell.

7  Q.        Okay.  Let's -- do you see it?  A and F?  Okay.

8  Thank you.

9          So then we go down to this section right here

10:51AM  10  (indicating), and it says who these people are; right?

11  Or where these people come from or are involved; right?

12  A.        It says their affiliation, yes.

13  Q.        Okay.  First one is A, Department of

14  Mechanical, Aerospace, and Biomedical Engineering,

15  University of Tennessee.  That's Professor Hu, and

16  that's in the A section.

17          Let me go down to the -- this one here

18  (indicating); okay?  This is the -- F, Institute of

19  Laser Engineering, Beijing University of Technology.

10:52AM  20  Okay?  So this was somebody at Beijing University

21  collaborating on this invention; is that what it looks

22  like?

23  A.        I don't know because I don't know if this

24  particular publication is tied to the invention or not.

25  Q.        Okay.  Well, let's go to the next one.  Energy

1   and Environmental Science.  We have Professor Hu again.

2   It has the technical stuff about the invention.  So

3   you're not sure of what the relationship is; is that

4   what you're saying?

5   A.      Correct.

6   Q.      All right.  Is it your responsibility to know,

7   or is it somebody else at UT to know?

8   A.      It is not my responsibility to know the

9   technical nature, no.

10:53AM 10   Q.      Okay.  So here are acknowledgments.  "We

11  appreciate the research initiative funding provided by

12  the University of Tennessee as a new hire package to

13  Anming Hu.  Part of the work includes..."  And then it

14  goes through a number of people listed here.  "The work

15  is also in part supported by..."  And it goes on.  And

16  it says, "...program, the Beijing Overseas High-Level

17  Talent Project, Beijing National Science Foundation, and

18  National Research Foundation from Korea."  So all these

19  people are involved, and it looks like in this

10:53AM 20  publication?

21  A.      Correct.

22  Q.      That's what the publication says; correct?

23  A.      Correct.

24  Q.      And when you found these -- how did you find

25  these?

1  A.      The publications?

2  Q.      Yes.

3  A.      So you can look up on the web.  There is

4  actually resources on the web to find publications.

5  Q.      Well, you don't just type publications.  What

6  do you type on the web?

7  A.      You can type in the name.

8  Q.      Okay.  And that's what you did?

9  A.      I honestly think I probably used Web of

10:54AM  10  Science.

11  Q.      Can you say that again, please.

12  A.      Web of Science, I believe is what I used.

13  Q.      Science?

14  A.      Science.

15  Q.      That would get you a lot more publications than

16  just Professor Hu's; right?

17  A.      Right, but it's a search engine that sorts

18  through all different publications.

19  Q.      And you used his name, too?

10:54AM  20  A.      Correct.

21  Q.      Okay.  So do you know what this 100 percent

22  employment of duty is on 9/9 of 2016?

23  A.      So the 100 percent duty of employment relates

24  to a question on their intellectual property disclosure

25  that asked them to say whether or not the work was

1   conducted during their duty of employment.

2   Q.      Oh, okay.

3           If their work is done during the summer, does

4   it make a difference?

5   A.      No.

6   Q.      All right.  Are you -- do you know Professor Hu

7   is a nine-month employee at UT?

8   A.      Yes, I do know that.

9   Q.      Okay.  So here is a Laser Direct Writing and

10:55AM 10  Photonic Manufacturing -- and I won't read the whole

11  thing, but down here (indicating), Institute of Laser

12  Engineering, Beijing University, University of

13  Tennessee.  It shows his affiliation and collaboration

14  with the University of Beijing, doesn't it?

15  A.      Yes.

16  Q.      So I won't go any further.  There is many of

17  these here.  Beijing Natural Science Foundation of

18  China.

19          And, to be honest, if you know, this type of

10:56AM 20  collaboration is really encouraged by the universities;

21  correct?

22  A.      Correct.

23  Q.      So he's not doing anything wrong here?

24  A.      As far as collaborating with other individuals?

25  No.

1  Q.        Okay.  And this brings notoriety to him and to

2  the university, and maybe money, just in the form of if

3  somebody wants to use the patent, they have to pay for

4  it; right?

5  A.        For the patents, yes.  But all publications

6  don't necessarily relate to a patent.

7  Q.        I understand.

8            I mean, this is called an invention disclosure.

9  It may not be a patent.  But it's possibly an invention

10  anyway; right?

11  A.        Correct.

12  Q.        And this is put out for the whole world to see.

13  A.        When they do their publications?

14  Q.        Yes.

15  A.        Yes.

16  Q.        We have another person here by the name of D.

17  Bridges.  Do you see that?  Do you know who he is?

18  A.        I do not know who he is.

19  Q.        I would tell you that's Denzel Bridges.  He

20  worked with Professor Hu as a graduate student.

21            MR. MC KENZIE:  Objection, Your Honor.

22  BY MR. LOMONACO:

23  Q.        Would that --

24            MR. MC KENZIE:  He's testifying.

25            MR. LOMONACO:  I'm just laying a foundation.

1    He's going to be one of the witnesses, Your Honor.

2           THE COURT:  Just ask the question --

3           MR. LOMONACO:  Okay.

4           THE COURT:  -- and see if she can answer.

5           MR. LOMONACO:  Sorry.

6           THE COURT:  Actually, she said she didn't know

7    who he was; so we probably just need to move on.

8    BY MR. LOMONACO:

9    Q.      As you can see, these are some pretty technical

10:58AM  10   things here; correct?

11   A.      Yes.  I have no idea what they mean.

12   Q.      Now, when they refer to a person being a new

13   hire -- do you see here? (indicating) -- what does that

14   mean?

15   A.      So this part talks about the new hire package.

16   So when a faculty member is hired at the university,

17   typically they will receive a package of support for

18   them when they come to the university, and usually that

19   is some form of money to help get their research program

10:58AM  20   off the ground, fund post-doc graduate students, that

21   type of thing.

22   Q.      So when they first start out, they get a little

23   bit of money to start hiring some students and getting

24   some lab equipment and doing -- starting work; is

25   that --

1    A.        Correct.

2    Q.        And this is in 2016, I believe.  So that would

3    be -- let me go back.

4              Is that referring to -- provided by the

5    University of Tennessee as a new hire package.  Do you

6    know who they're referring to as the new hire?

7    A.        I do not in this one.

8              MR. LOMONACO:  Okay.  Do one more.

9    BY MR. LOMONACO:

10:59AM  10   Q.        Can you tell the jury who these people are that

11   are listed across the top?

12   A.        They're individuals that contributed to this

13   publication.

14   Q.        So they all contributed to it, in other words?

15   A.        I would assume so, yes.

16   Q.        All right.  So No. 1 and No. 12.

17             MR. PARSONS:  It's up at the top.

18             MR. LOMONACO:  It's up at the top?

19             MR. PARSONS:  Yes, it's just below the names.

11:00AM  20   BY MR. LOMONACO:

21   Q.        And No. 1 is the department of the University

22   of Tennessee.  Let's see here.  No. 6 is Professor Hu,

23   also, Institute of Beijing University.

24             So he actually has both schools listed under

25   his name there; correct?

1   A.       Correct.

2   Q.       Okay.  Let me move on then.

3         So in these publications and inventions, he was

4   not trying to hide any affiliations with BJUT, was he?

5         MR. MC KENZIE:  Objection as to speculating on

6   the defendant's intent.

7         MR. LOMONACO:  It is what it is, Your Honor.

8         THE COURT:  All right.  Let's go on.

9         MR. LOMONACO:  Sorry.  I keep getting these

11:01AM 10   objections.

11   BY MR. LOMONACO:

12   Q.       Now, in November of 2018, do you recall sending

13   Professor Hu's awards and proposals to Special Agent

14   Slatton?

15   A.       I don't recall the exact month or date, but I

16   do recall her asking for those, yes.

17   Q.       All right.  And around that time you began to

18   sign NASA letters of commitment and assurance for Anming

19   Hu's proposals?

11:02AM 20   A.       Correct.

21   Q.       Do you know why you started doing it around

22   that time?

23   A.       Part of it was a change in our processes.  So

24   we looked at -- up to that point, I was sitting on our

25   research conflict of interest committee, and so if

1  something had been disclosed in an outside in- -- or

2  outside conflict of interest form and it rose to the

3  committee level, we'd find out about it, and we realized

4  with some of the changes that were happening within the

5  federal agencies that we needed to improve our processes

6  because we didn't know about anything.

7  Q.        I apologize.  You need to do what?  I didn't

8  hear you.

9  A.        Improve our processes.

11:03AM  10  Q.        Oh, okay.  And through this time frame, there

11  were a couple of different processes improved; correct?

12  A.        Correct.

13  Q.        You started reviewing the outside interest

14  disclosures.  The training on the NASA restriction was

15  beefed up, for lack of a better word?

16  A.        Correct.

17  Q.        And, actually, the NASA -- or the outside

18  interest disclosures were reworded a little bit.

19  A.        Correct.

11:03AM  20  Q.        Now, when you started producing these awards

21  and proposals, you did that at the request of the

22  federal agents; right?

23  A.        Correct.

24  Q.        And when they came on -- when they started

25  collecting these proposals, they had already told you

1 they were investigating Anming Hu, obviously?

2 A.       I believe so, yes.

3 Q.       And did they tell you that they believed that

4 he had filled out the conflict of interest disclosure

5 improperly?

6 A.       I don't recall if they exactly stated that or

7 if we came to that conclusion based upon looking at the

8 information that they had shared.

9 Q.       All right.  So what information would they

11:04AM 10 share that helped you reach that conclusion?

11 A.       They shared with us the website information of

12 his appointment, as far as that he was named as being

13 part of another organization.

14 Q.       Okay.  Yes.  Thank you.  You have reminded me

15 what I was trying to ask you.

16        So the agents came to you and said, "Look, he's

17 got some sort of employment here" --

18 A.       Correct.

19 Q.       -- "with Beijing University" --

11:04AM 20 A.       Correct.

21 Q.       -- or something.

22        And so that's when you first started thinking

23 that the outside interest disclosure form may have some

24 relevance to this?

25 A.       That's when we obviously looked at the outside

1    interest disclosure form to see if he had disclosed

2    that.

3    Q.        Now, did the FBI ask you to look at that form?

4    A.        I don't recall them asking us to look at that

5    form.  I think we did that on our own.

6    Q.        Okay.  So when the FBI comes to you and says he

7    has employment, did they tell you -- were they specific

8    about the employment?

9    A.        Just showed us the website, but I don't recall

11:05AM  10    any additional information.

11    Q.        The website from BJUT?

12    A.        Yes.

13    Q.        Do you have or did you at any time have

14    specific detail about the employment to know how much

15    money he was making at that employment?

16    A.        No, I did not.

17    Q.        Okay.  Did you tell the FBI that our conflict

18    of interest policies have parameters on whether it's a

19    conflict of interest based on how much money the person

11:06AM  20    makes and how much time they put into the outside

21    interest?

22    A.        No.  I shared our policy with them, but I

23    didn't explicitly call anything out.

24    Q.        That policy is the one we looked at before;

25    correct?

1   A.      I believe so.  Or it was an earlier version.

2   I'm not sure which.

3   Q.      And isn't it true that even during the time

4   that -- if you know -- the time that a UT professor is

5   off -- in other words, summer vacation -- that he can do

6   whatever he wants and make as much money as he wants, or

7   is that still restricted to the parameters of the

8   policy?

9   A.      I do not know specifically.

11:07AM 10  Q.      Okay.  Who would know that more than you?

11  A.      Most likely the provost.

12  Q.      Provost?  And what's his name?

13  A.      Dr. John Zomchick.

14  Q.      Zomchick?

15  A.      Uh-huh.

16  Q.      So, in November of 2018, you began signing

17  these letters of commitment and assurances for Anming

18  Hu, and you were briefed by the FBI about these

19  documents that were being produced, and they producing

11:07AM 20  information to you and you producing information to them

21  that Anming Hu was possibly committing fraud in the NASA

22  restriction; is that a fair statement?

23  A.      It is fair to say that we were -- that they

24  shared their information with us, and I had shared what

25  information that they had asked for, but we

1    didn't -- there was no implied that they're committing

2    fraud or anything else.

3    Q.        All right.  So do you hold that -- I mean, is

4    that statement true today, or did sometime later there

5    become obvious in your mind, as far as the FBI was

6    concerned, he was committing fraud?

7    A.        I don't --

8              MR. MC KENZIE:  Objection to relevance, Your

9    Honor.

11:08AM  10          MR. LOMONACO:  It has to do on how she found

11    out that he was being accused of committing fraud, Your

12    Honor.

13            THE COURT:  I'll sustain that objection.  I

14    think you've gone into the issue sufficiently.  But that

15    particular question is objectionable, so I'll sustain

16    that objection.

17            MR. LOMONACO:  Okay.

18    BY MR. LOMONACO:

19    Q.        Now, your answer was that you were not at this

11:09AM  20    time in November 2018 fully aware of the possible fraud;

21    is that what you're saying?

22    A.        Correct.

23    Q.        Okay.  Do you recall in November 9th of 2018,

24    you -- I think you testified earlier that you talked to

25    somebody about the fact that you didn't feel comfortable

1   signing the NASA contract; correct?

2   A.        Correct.

3   Q.        And you didn't feel comfortable signing the

4   NASA contract because you thought it would cause

5   Professor Hu to step further down the line of committing

6   fraud; right?

7   A.        I don't recall if I exactly stated that.  But I

8   didn't feel comfortable having some information but not

9   having all the information.

11:10AM 10  Q.        Well, you were supposed to sign the contract

11  because all of the groundwork had been done; right?

12  A.        Correct.

13  Q.        And you contacted -- who did you express your

14  concern to?

15  A.        The Office of General Counsel.

16  Q.        Your lawyers?

17  A.        Uh-huh.

18  Q.        Okay.  And the lawyers, as far as you know,

19  contacted NASA?

11:10AM 20  A.        I believe so.

21  Q.        And what did you tell the lawyers your concern

22  was?

23            MR. MC KENZIE:  Objection, Your Honor,

24  privileged.

25            MR. LOMONACO:  They went into this on their

 1   direct.

 2           THE COURT:  What about that?

 3           MR. MC KENZIE:  I didn't ask details of a

 4   privileged conversation, Your Honor.

 5           THE COURT:  Is there a basis -- let's just go

 6   on.

 7   BY MR. LOMONACO:

 8   Q.      Okay.  So you expressed concern that you may be

 9   causing a problem with Professor Hu's employment by

11:11AM 10   signing this?

11   A.      I expressed a concern because I was concerned

12   for the university and for the faculty member.

13   Q.      Okay.  And the word came down from NASA, "Go

14   ahead and sign it anyway as you normally do"?

15   A.      Correct.

16   Q.      So that made you feel relieved; right?

17   A.      Yes.

18   Q.      In fact, I think you put three exclamation

19   points behind your word "thank you."  Is that right?

11:11AM 20   A.      (No audible response.)

21   Q.      And then it proceeded, and that's one of the

22   contracts that is included in this indictment; do you

23   know that?

24   A.      No, I did not.

25   Q.      Okay.  This was a CAN agreement; correct?

1    C-A-N?

2    A.        Yes.

3    Q.        Did you also feel uncomfortable because you had

4    not, up until that time, reviewed the conflict of

5    interest form, or had you reviewed it by then?

6    A.        In 2018, I'm sure I probably reviewed it before

7    then.

8    Q.        You were sort of in contact with the FBI during

9    this whole process; right?

11:12AM 10   A.        They would ask for information, but that was

11   about it.

12   Q.        Did you feel that somebody should tell

13   Professor Hu that there may be a problem?

14             MR. MC KENZIE:  Objection, Your Honor.  The

15   feelings about whether he should have been told or not

16   are irrelevant.

17             MR. LOMONACO:  Right.  I'll reask the question.

18             THE COURT:  Thank you.

19   BY MR. LOMONACO:

11:12AM 20   Q.        Did you attempt to tell Professor Hu that

21   you -- that he should not be in this contract?

22   A.        No, I did not.

23   Q.        Did anybody else attempt to tell Professor Hu

24   that you know of?

25   A.        I have no idea.

Q.        And isn't it a fact that since nobody told him

about this alleged violation of the NASA restriction, he

can -- he started working on the project; right?

A.        To my knowledge.

Q.        Now, in July, August, and September of 2019,

the FBI had meetings with people at the University of

Tennessee, the FBI and the DOE, U.S. attorneys; do you

recall that?

A.        Yes.

Q.        And did you attend all three meetings,

July 18th, August 30th, and September 17th of 2019?

A.        I do not know if I did or not.  I don't recall

the specific dates.

Q.        Do you recall that you went to more than one of

these meetings?

A.        Most likely, yes.

Q.        And at the meetings, they had presented to you

certain facts about Professor Hu?

A.        I honestly don't know what they presented, but

it's very possible.  That's what they have got in their

notes.

Q.        Well, didn't they have little handouts?

A.        I honestly don't recall.

Q.        All right.

1          (Defendant's Exhibit 24 was marked for

2            identification.)

3          MR. LOMONACO:  Let's go to Exhibit 24, second

4     page.

5     BY MR. LOMONACO:

6     Q.     Let me show you what is marked right now for

7     identification Defendant's Exhibit 24.  Do you see that?

8     July 18th, 2019?

9     A.     Yes, I do.

11:15AM 10  Q.     University of Tennessee, Knoxville, Email

11     review.

12          MR. LOMONACO:  Let's go to the next page.

13     BY MR. LOMONACO:

14     Q.     Do you see where it says (as read) "UTK email

15     review No. 1"?

16     A.     Yes.

17          MR. LOMONACO:  Let's go to the next page.

18     BY MR. LOMONACO:

19     Q.     (As read) "Background Anming Hu."  Does this

11:15AM 20  refresh your memory?

21          MR. MC KENZIE:  Your Honor, is this being shown

22     to the jury?  It's just marked for identification at

23     this point.

24          THE COURT:  It's identification; so we won't

25     show it to the jury right now.

1          MR. LOMONACO:  Your Honor, I ask that it be

2     shown to the jury.  I will not show them the memo on the

3     front of this.

4          MR. MC KENZIE:  Your Honor, I object.

5          THE COURT:  All right.  I'm not familiar with

6     this document.

7          MR. MC KENZIE:  If he can lay a foundation, but

8     at this point, I'm objecting.

9          THE COURT:  The basic objection is lack of

11:16AM 10     foundation?

11          MR. MC KENZIE:  Hearsay, et cetera, yes.

12          MR. LOMONACO:  We're not offering this for the

13     truth of any of what they said.

14          THE COURT:  What are you offering?

15          MR. LOMONACO:  We're offering this to, first of

16     all, see if she can identify the fact that she went to

17     this seminar with these PowerPoint pages, and then offer

18     the purpose of that.

19          MR. MC KENZIE:  Your Honor, this would be

11:16AM 20     potentially extrinsic evidence to, you know, attack the

21     credibility of this witness, but it would be hearsay.

22     It's just not admissible.

23          He's continuing to ask about whether or not she

24     received this, you know, and spoke with the FBI, which

25     is, you know, permissible, obviously, but bringing in

1  this hearsay evidence and then submitting it to the

2  jury, it's irrelevant and it's hearsay, Your Honor.  So

3  at this time I object and I'll renew that objection.

4        THE COURT:  I'll sustain the objection for now.

5  If you want to try to lay a foundation or otherwise ask

6  questions, we'll take it question by question.

7        MR. LOMONACO:  All right.

8  BY MR. LOMONACO:

9  Q.      Just so I can get as much information about the

10 foundation as I can, Ms. Mercer, do you recall

11 going -- you recall going to these presentations; right?

12 A.      I recall meeting with them, yes.

13 Q.      Yes.  And who was there?

14 A.      I honestly do not remember.

15 Q.      Well, do you know any of the investigators in

16 this case, like DOE or Slatton?

17 A.      I know Laura, but I don't recall if she was at

18 these meetings or not.

19 Q.      How about Special Agent Sadiku?  He's right

20 over here (indicating).  Was he at the meeting?

21 A.      I honestly don't remember who was present.

22 Q.      You don't remember.  Okay.  But you do remember

23 the meeting?

24 A.      Yes.

25 Q.      And the meeting was to give you information

1    about Anming Hu; correct?

2    A.        Correct.

3    Q.        And let me ask you:  You were supplied certain

4    facts by the government witness -- the government

5    agents?

6    A.        Yes.

7    Q.        And did you rely on those facts as being

8    truthful and honest?

9    A.        Yes.

11:18AM  10  Q.        Did you check any of those facts yourself?

11   A.        I personally did not.

12   Q.        According to the information I have, there were

13   exhibits to back up these PowerPoint pages.  Did you

14   look at any of the exhibits?

15   A.        Most likely at that time I probably did.

16   Q.        Okay.  If the information you were

17   reviewing -- well, I won't even go into that right now.

18   Excuse me.

19        Do you recall whether -- I think you agreed

11:19AM  20  there was more than one meeting; correct?

21   A.        You had indicated there were three meetings.  I

22   honestly don't recall how many meetings there were.

23   Q.        Well, do you recall more than one?

24   A.        Possibly.  I honestly don't remember.

25   Q.        Do you recall telling Special Agent Gibson that

 1    had you known about Anming Hu's affiliation with China,

 2    you would not have awarded him the grant?

 3    A.      I don't recall that specific thing, but that

 4    makes sense that I would have said that.

 5    Q.      Do you know -- I already asked you that, too.

 6    I'll have to get over to the other side of these

 7    documents.  Hold on a minute.

 8            Are you familiar with the training that was

 9    offered at UT discussing the NASA restriction?

11:21AM 10    A.      I'm familiar with the training that my staff

11    provided, yes.

12    Q.      Your staff?

13    A.      Yes.

14    Q.      Who is on your staff that would have done that?

15    A.      I can't recall the individuals, but it most

16    likely would have been our proposal coordinators and

17    David Smelser, our assistant director for proposals.

18    Q.      All right.  What about -- what about Tolliver?

19    A.      Greg Tolliver is one of our contract officers.

11:21AM 20    Q.      Okay.  So are you -- are you aware that in

21    2016 --

22            MR. LOMONACO:  Let's do Exhibit 14.

23            MR. PARSONS:  I think that's already been -- I

24    think that's already been admitted.

25

BY MR. LOMONACO:

Q.      Let me show you what's previously been admitted as Defense Exhibit 14.

        MR. LOMONACO:  May we publish that to the witness?

BY MR. LOMONACO:

Q.      Do you see that?

A.      I don't see it yet.

Q.      Do you see that?

A.      Yes, I do.

Q.      Okay.  Let's go to page 36 on that.  Do you recognize this as a training manual or document?

A.      Yeah, part of their PowerPoint presentation, yes.

Q.      Okay.  Let's look at this.  I believe this is the first page that really talks about special proposal requirements for NASA submissions.

        And the first bullet point says (as read) "UT always includes an amended NASA China Assurance document as the final page of the application."  Do you see that?

A.      Yes, I do.

        MR. LOMONACO:  Is this being published to the jury?  Thank you.

BY MR. LOMONACO:

Q.      No. 2, "The language indicates that we do not

 1    view our faculty, staff, and students to be entities of

 2    China."

 3              MR. LOMONACO:  Let's just go bullet by bullet

 4    slowly.

 5    BY MR. LOMONACO:

 6    Q.       Next section doesn't talk about the NASA

 7    restriction; right?

 8    A.       Right.

 9    Q.       And the next one doesn't talk about the NASA

11:23AM 10  restriction.

11              MR. LOMONACO:  Stop a minute.  Let's take a

12    look.

13    BY MR. LOMONACO:

14    Q.       Nothing here about NASA restriction in China or

15    a Chinese corporation; right?

16    A.       Correct.

17              MR. LOMONACO:  Okay.  Keep going.

18              Okay.  Nothing there.  Keep going.

19              Special proposal requirements for NASA

11:23AM 20  submissions.  Okay.  Hold on a minute.

21    BY MR. LOMONACO:

22    Q.       Nothing there about the NASA restriction;

23    correct?

24    A.       Correct.

25              MR. LOMONACO:  Keep going.

1  BY MR. LOMONACO:

2  Q.        Now we're to another type of agency; correct?

3  DOE?

4  A.        Correct.

5  Q.        And would it be fair to say -- and we can go

6  through all 33 pages, or 36 pages, but would it be fair

7  to say that that's all it says about the NASA

8  restriction?

9  A.        Yes.

11:24AM  10  Q.        Now, what was the purpose of this document that

11  your staff put together?

12  A.        It most likely was for a workshop that we were

13  doing with our research community; so with our business

14  managers, with faculty, with anybody who was interested

15  in learning more about agencies.

16  Q.        Okay.  So outside of this first statement on

17  page 1 of four pages, UT always includes an amended NASA

18  China Assurance document.  Is the document attached to

19  this proposal or this training at all?

11:25AM  20  A.        I honestly have no idea.

21  Q.        The only language here says that we -- I guess

22  UT does not view our faculty, staff, and students to be

23  entities of China.  That would include Professor Hu;

24  correct?

25  A.        Correct.

1  Q.      Okay.   So now this one has really been changed

2  a lot, has it not, this PowerPoint presentation, or this

3  training manual, or whatever it is?

4  A.      The PowerPoint presentation or the trainings

5  would change year by year.

6         (Defendant's Exhibit 83 was marked for

7          identification.)

8         MR. LOMONACO:  Let's go to Exhibit 83.

9  BY MR. LOMONACO:

11:26AM 10 Q.      Now, do you see this one here, Kiley Compton

11 and Marie Penn?

12 A.      Yes.

13 Q.      Is this another one of those training --

14 A.      I would assume so, yes.

15         MR. LOMONACO:  Can we go to the last page real

16 quick.

17         MR. PARSONS:  The last page?

18         MR. LOMONACO:  Yeah.

19 BY MR. LOMONACO:

11:26AM 20 Q.      So this is a 63-page document; right?

21         MR. LOMONACO:  Scroll up just a little bit.

22         THE COURT:  I don't believe this document is in

23 evidence yet.

24         MR. LOMONACO:  No, it's not, Your Honor.  I

25 would ask that it be moved into evidence as Exhibit --

1    THE COURT:  83?

2    MR. LOMONACO:  -- 83.

3    THE COURT:  So admitted.

4    (Defendant's Exhibit 83 was received into

5     evidence.)

6    MR. LOMONACO:  Thank you.  Can we publish this

7 now?

8    THE COURT:  It is.

9    MR. LOMONACO:  Okay.  Thank you.

11:26AM  10    Is this the first page?

11    MR. PARSONS:  It's the last page.

12    MR. LOMONACO:  Last page.

13    So let's find the section that talks about

14 NASA.  This is 2018.  Back up.

15 BY MR. LOMONACO:

16 Q.    So this says the same thing as the last one

17 said about the China Assurance document, final page.  In

18 other words, you're supposed to attach a page that says

19 Assurance, China Assurance; right?

11:27AM  20 A.    It's the specific document that NASA has.

21 Q.    And, again, it says it does not -- "We do not

22 view our faculty, staff, or students to be entities of

23 China."

24    MR. LOMONACO:  Scroll down and see if there is

25 anything else.

1  BY MR. LOMONACO:

2  Q.        And, again, there is not a lot about the NASA

3  restriction other than what the previous one said?

4  A.        Correct.

5          MR. LOMONACO:  May I have one moment, please?

6  BY MR. LOMONACO:

7  Q.        Now I'm going to show you the 2019.

8          And this 2018 proposal, when was this document

9  put together?  It says 2018 on it, but was it around

10  that time, in March of 2018, or --

11  A.        I honestly don't know when they started putting

12  it together.

13  Q.        Okay.  But that's right about the same time

14  when you were finding out about the NASA restriction as

15  the government was explaining to you; correct?

16  A.        It may have been.  But we started a series of

17  Know Your Sponsor for all of our agencies.

18  Q.        Know Your Sponsor?

19  A.        Yeah, we called it Know Your Sponsor so that

20  individuals who were working on proposals would get more

21  information about specific nuances of funding agencies

22  they were submitting to.

23  Q.        Okay.

24  A.        So we did one for UT-Batelle and for some of

25  the other sponsors as well.

1    THE COURT:  Do you want this one admitted,

2  Mr. Lomonaco?

3    MR. LOMONACO:  Yes, Your Honor, I would ask

4  that Exhibit 132 be admitted.

5    THE COURT:  132, without objection, so

6  admitted.

7    (Defendant's Exhibit 132 was marked and

8     received into evidence.)

9    MR. LOMONACO:  May we publish that, please?

11:29AM 10    THE COURT:  It is.

11    MR. LOMONACO:  Thank you.

12  BY MR. LOMONACO:

13  Q.    So let's take a look at this 2019 training

14  material.

15    So it starts right off on page 2 with NASA.

16    MR. LOMONACO:  Keep going.  Keep going.

17  BY MR. LOMONACO:

18  Q.    Okay.  We've got affiliations here.  "A PI

19  cannot submit a proposal to NASA without having a

11:30AM 20  confirmed affiliation."  That means being a member of UT

21  or something like that?

22  A.    No, what it actually meant is:  There is a

23  specific portal that NASA used, and in order for an

24  investigator to create their proposal and submit it,

25  they had to be affiliated to create their account and

 1    tie it to the university.

 2              MR. LOMONACO:  Okay.  Keep going.  Keep going.

 3              Oh, back up.  NASA Guidelines Are Extensive.

 4              All right.  Keep going.

 5    BY MR. LOMONACO:

 6    Q.        Still talking about NASA; right?

 7    A.        Yes.

 8    Q.        Oh, here is the Chinese Assurance.

 9              Now, "NASA will not fund any cooperative

11:31AM 10   efforts with Chinese companies or those affiliated

11    (researchers, students)."

12    A.        Yes, that's what it says.

13    Q.        Okay?  This is in 2019; right?

14    A.        Yes.

15    Q.        Do you know how many NASA grants were obtained

16    by Professor Hu before this came out?

17    A.        I don't know specifically, no.

18    Q.        Do you know of about at least two of them?

19    A.        There is at least two, yes.

11:31AM 20   Q.        "Researchers and students who are Chinese

21    citizens may usually work on NASA-funded projects,

22    provided they are not currently affiliated with a

23    Chinese company or university."

24              MR. LOMONACO:  Keep going.

25

BY MR. LOMONACO:

Q.      Here is the NASA Assurance letter; right?

A.      Correct.

Q.      So this PowerPoint presentation wasn't available to Professor Hu before he got involved in these two NASA projects that are the subject of the indictment in this case?

A.      Correct.

Q.      Did anybody explain this to him after this training manual came out?

A.      I honestly do not know.

        MR. LOMONACO:  Okay.  Keep going.

        Okay.  Thank you.

        Can we go to Exhibit 32?

        MR. PARSONS:  3-Z.

        MR. LOMONACO:  3-Z.  I'm sorry.

BY MR. LOMONACO:

Q.      Well, let's look a little bit closer at the China funding restrictions.  This is the assurance letter that is supposed to be attached to every NASA proposal?

A.      Correct.

Q.      Okay.  It says that NASA is restricted from using funds -- and I'm looking at paragraph No. 1 -- to enter in or find or fund any grant or cooperative

1    agreement of any kind to participate, collaborate, or

2    coordinate bilaterally with China or any Chinese-owned

3    company.

4            So the restriction seems to say, does it not,

5    that NASA is restricted from collaborating, and then it

6    says bilaterally.

7            So do you know what the definition of

8    "collaboration bilaterally" means?

9    A.      Well, it says "coordinate bilaterally".

11:34AM  10   Q.      Coordinate bilaterally, collaborate,

11   participate, all bilaterally, or any of the above.

12   Would you read it that way?

13   A.      I would actually read it participate,

14   collaborate, or coordinate bilaterally.

15   Q.      Right.  So what does "bilaterally" mean to you?

16   A.      Both directions.

17   Q.      So NASA is doing something with China and China

18   is doing something with NASA on the grant or with the

19   grant money?

11:35AM  20   A.      The individuals that are involved, yeah, are

21   doing something.

22   Q.      Still, the definition of China or Chinese-owned

23   company means the People's Republic of China, any

24   company owned by the People's Republic of China, or any

25   company incorporated under the laws of the People's

    1    Republic of China.

    2            MR. LOMONACO:  Keep going a little bit further.

    3    Keep going.  Keep going.  Okay.

    4    BY MR. LOMONACO:

    5    Q.      Still, you have the language in there that it

    6    does not apply to the participation of students,

    7    faculty, and staff from non-Chinese entities engaged in

    8    fundamental research.

    9            Now, professors are shown this assurance letter

11:36AM 10   and say, "Can you assure this?"  Correct?

   11    A.      Correct.

   12    Q.      Are they shown anything else?

   13    A.      They are given an email that kind of -- it has

   14    information in there explaining what it is and told if

   15    they have questions to let us know.

   16    Q.      Explaining what "what" is?

   17    A.      What the Chinese Assurance document is.

   18    Q.      You mean it goes into detail explaining more?

   19    A.      Yes, there is some verbiage in there that it

11:36AM 20   does.

   21    Q.      What does it say?

   22    A.      I can't recall off the top of my head, but it

   23    talks about what the restriction means.

   24    Q.      Is this a procedure that has been in place

   25    since the new training?

1  A.        It is a procedure that was in place prior to

2  the new training, yes.

3  Q.        Do you have a document like that we can look

4  at?

5  A.        I do not have it with me, but it is one of the

6  documents that we provided to you.  It was kind of

7  standard blurbs is what we called it.

8  Q.        It was an email?

9  A.        It was an overall Word document that had

11:37AM 10  different sections in it and there was one that referred

11  to the China Assurance.

12  Q.        In an email?

13  A.        The -- oops, sorry -- the files that Lela

14  provided to you.

15  Q.        Yes, but are you saying the document was an

16  email?

17  A.        Yes, the information was in an email.

18  Q.        Email from Lela?

19  A.        No, Lela sent you the entire verbiage that we

11:37AM 20  had, but how Dr. Hu would have received it is via an

21  email from the person who was looking at his particular

22  proposal.

23  Q.        Okay.  And what proposal was that?

24  A.        I don't know which specific ones.

25  Q.        So you don't know when he got it?

1  A.       I do not.

2  Q.       He could have got it at the end of 2019, for

3  all you know?

4  A.       Yeah, I have no idea.

5  Q.       Okay.

6           MR. LOMONACO:  All right.  Thank you.

7           THE COURT:  Redirect?

8           MR. MC KENZIE:  Yes, Your Honor, briefly.

9           Your Honor, I ask that the witness be shown the

11:38AM  10  Exhibit 2-F that is in evidence.

11                    REDIRECT EXAMINATION

12  BY MR. MC KENZIE:

13  Q.       During cross-examination, you were asked about

14  how someone would indicate yes -- if someone indicated

15  yes on a form what you would do.

16           Looking at 2-F, which is in evidence, if

17  someone had answered the question, (as read) "Do you

18  hold an office, directorship, or employment at an

19  outside investigation (sic)," with yes, where, if

11:39AM  20  anywhere on this form, would they have provided the

21  additional information of who that company or

22  organization was?

23  A.       So if they marked yes, then they would have

24  filled out the name of the organization, position or

25  positions held, business of the organization, and any

 1  amount of compensation.

 2          MR. MC KENZIE:  Can we scroll down to page 4,

 3  please.

 4  BY MR. MC KENZIE:

 5  Q.      And will you please read question 13 for the

 6  jury.

 7  A.      "Describe any actual or potential conflicts

 8  between the outside interests or activities disclosed on

 9  this form and your duties and responsibilities to the

11:40AM 10 university and sponsoring organizations.  Also, please

11  provide any other information about outside interests

12  that you wish to disclose.  If there are none, please

13  select no."

14  Q.      Thank you.

15          MR. MC KENZIE:  I ask that the witness now be

16  shown Exhibit 2-G, as in George, which is in evidence.

17  BY MR. MC KENZIE:

18  Q.      Directing your attention to question 1, if the

19  answer to this question is yes, where would the -- where

11:40AM 20 would the individual provide additional information

21  about an outside employer?

22  A.      They would have provided it on this form.  We

23  would have asked for the name of the organization or the

24  business, the position held, and then the business of

25  the organization or the business entity, and then the

1  listed amount of compensation.

2  Q.          And now directing your attention to page 4.

3  Will you please read question 14 to the jury.

4  A.          "Describe any actual or potential conflicts

5  between the outside interests or activities disclosed on

6  this form and your duties and responsibilities to the

7  university or organizations that sponsor research or

8  service performed by the university.  Also, provide any

9  other information about outside interests that the

11:41AM  10  university should know."

11  Q.          Do you know why the form says "actual or

12  potential conflicts"?

13  A.          Yes.

14  Q.          Why is that?  Explain to the jury why

15  actual -- why it says "actual or potential".

16  A.          So you could have an actual conflict or you

17  could have a potential conflict that you're not quite

18  sure if it's a conflict or not, and so you could, you

19  know, list on here, this could be a potential conflict,

11:42AM  20  and then we could review it.

21  Q.          I believe during cross-examination you

22  mentioned that you participated on a conflict review

23  board or review panel; is that correct?

24  A.          Yeah, the research conflict of interest panel.

25  Q.          Will you please describe to the jury what

1    that -- the purpose of that panel.

2    A.        Sure.  So, the research conflict of interest

3    group would have -- would receive any outside interest

4    disclosures where an investigator indicated there was

5    something to disclose and they also had research that

6    was -- that was involved within our office.  And so we

7    would look to see what did they identify; was there

8    actually a conflict with the research that they had

9    funded, and, if so, we'd put together like a mitigation

11:42AM  10   plan, or we'd talk to them about steps we needed to put

11   into place to make sure that they could move forward

12   with their research.

13   Q.        I'd like to direct your attention now to 2-H

14   which is in evidence.  And direct your attention to page

15   No. 2.  And ask you --

16            MR. MC KENZIE:   Page 2.

17   BY MR. MC KENZIE:

18   Q.        And ask you to read question 15.

19   A.        Okay.  "Describe any actual or potential

11:43AM  20   conflicts between the outside interests or activities

21   disclosed on this form and your duties and

22   responsibilities to the university and sponsoring

23   organizations.  Also, please provide any other

24   information about outside interests that you wish to

25   disclose."

1      MR. MC KENZIE:  I ask that the witness now be

2  shown Exhibit 2-J, which is in evidence.

3  BY MR. MC KENZIE:

4  Q.      And I direct your attention to page 7,

5  paragraph e.

6          During cross-examination, you were being asked

7  about paragraph e., and you started to discuss potential

8  conflicts of interest in research that were not

9  necessarily tied to dollar amounts.

11:44AM  10      Will you please explain to the jury what you

11  were trying to say.

12  A.      Sure.  So what I was referring to is that if an

13  investigator has an outside activity or an outside

14  interest that is not financial, then they could have a

15  potential conflict because they may benefit in some

16  other way other than monetary.

17          MR. MC KENZIE:  And could we please show the

18  Exhibit 3-Z, as in zebra.  And please scroll down to the

19  bottom.

11:45AM  20  BY MR. MC KENZIE:

21  Q.      Directing your attention to this bold language,

22  are you familiar with the policy decision behind UT's

23  inclusion of this language on their assurance forms?

24  A.      No, it was put on the assurance form prior to

25  my arrival at the university.

Q.      I'd like to direct your attention to the third

line starting with the word "does," and ending with the

word "entities".  Could you please read that line --

A.      Sure.

Q.      -- to the jury?

A.      "...does not apply to the participation of

students, faculty, and staff from non-Chinese

entities..."

Q.      At the time that you signed the contracts that

11:46AM were submitted to JPL and NASA, did you believe that

Anming Hu was faculty or staff from a Chinese entity?

A.      No, I did not.

Q.      Did you have any reason to believe that he

worked at Beijing University of Technology?

A.      No.

Q.      If you had, would you have signed the

contracts?

A.      No.

         MR. MC KENZIE:  Your Honor, I have no further

11:46AM questions.

         THE COURT:  Thank you.  Any recross?

         MR. LOMONACO:  Yes, Your Honor.

                    RECROSS-EXAMINATION

BY MR. LOMONACO:

Q.      Let's go to that same section that you just

1    talked about on this assurance letter; okay?

2              MR. LOMONACO:  Go down to the -- okay.  That's

3    it.

4    BY MR. LOMONACO:

5    Q.         "...does not apply to the participation of

6    students, faculty, and staff from non-Chinese

7    entities..."

8              Now, at the time that Professor Hu would have

9    seen this letter, who would he have been working for?

11:47AM 10  A.         I do not know.

11   Q.         You don't know?

12   A.         I mean, he's obviously --

13   Q.         Did the Beijing University show him this

14   letter?

15   A.         Did Beijing University show him this letter?

16   Q.         Yes.

17   A.         I have no idea.

18   Q.         Who showed him this letter?

19   A.         That would have been the University of

11:47AM 20  Tennessee.

21   Q.         Who was he working for when he was shown this

22   letter?

23   A.         He was working for the University of Tennessee

24   when he was shown this letter.

25   Q.         That's right.  He's not a Chinese entity, is

 1  he?

 2  A.        He is not a Chinese entity, no.

 3  Q.        And he's not faculty of a Chinese entity when

 4  he's looking at this letter, he's at UT?

 5           MR. MC KENZIE:  Objection, Your Honor.

 6           MR. LOMONACO:  Your Honor, it's

 7  cross-examination.

 8           THE COURT:  Hold on.  Let me hear the

 9  objection.

11:48AM 10        MR. LOMONACO:  I'm sorry, Your Honor.

11           THE COURT:  What's the objection?

12           MR. MC KENZIE:  Well, first off, it would

13  be -- it calls for an alternate conclusion here; right?

14  About whether he was a faculty at another -- at another

15  university at the -- at the time of -- at the time he

16  reviewed this.  That's really a question for the jury.

17           THE COURT:  Well, I understand the objection,

18  but I'll allow the question.  The witness can answer to

19  the extent she can.

11:48AM 20  BY THE WITNESS:

21  A.        Would you mind restating the question?

22  BY MR. LOMONACO:

23  Q.        Professor Hu would be given this letter as a UT

24  employee in response to a grant that was written by -- a

25  grant proposal written by him and proposed and sent to

1  NASA by UT; correct?

2  A.        Correct.

3  Q.        UT is the proposer on this assurance letter;

4  correct?

5  A.        Correct.

6  Q.        There is nothing here that would indicate to

7  Professor Hu that he should look otherwise to determine

8  that he would be a non-Chinese entity, is there?

9  A.        No.

11:49AM 10  Q.        And when you say there is conflicts of interest

11  other than monetary, and I'm sure there are, but what

12  conflicts of interest would Professor Hu have that would

13  impact on the NASA grant that you're aware of?

14  A.        I don't know what all of his conflicts of

15  interest are because he didn't disclose them.

16  Q.        Do you know any of them?

17  A.        No, I do not.

18  Q.        The FBI showed you page after page of documents

19  that he wrote, associations he had, affiliations he had,

11:50AM 20  joint papers he had, publications he had, conferences he

21  went to, people he talked to, all of -- showed you page

22  after page of those types of activities of Professor Hu;

23  correct?

24  A.        Correct.

25  Q.        Are any of those that you can say is a conflict

1  with him working on this NASA grant?

2  A.        If any of the research that he was doing at

3  Beijing --

4  Q.        No, I didn't say "if".  I said:  Can you point

5  to any one of them that shows a conflict of interest?

6  A.        Yes.

7  Q.        Which one?

8  A.        His employment at Beijing.

9  Q.        So just having employment is a conflict of

11:50AM  10  interest?

11  A.        The fact that he had a lab there was a conflict

12  of --

13  Q.        What does that have to do with a NASA grant?

14  A.        Because the work that he was doing there

15  appeared to be similar to the work he was doing here.

16  Q.        Is that against the law?

17  A.        It is if --

18  Q.        Let me ask you this --

19            MR. MC KENZIE:  Objection, Your Honor.

11:51AM  20            THE COURT:  I think he's withdrawn that

21  question.

22  BY MR. LOMONACO:

23  Q.        Let me ask you this:  The work he did at the

24  lab, do you know what it was?

25  A.        I do not.

1    Q.        Well, then, you say it's a conflict of interest

2    without even knowing what it was?  Do you know if he

3    shared any of that information with NASA?

4    A.        I do not know.

5    Q.        You're saying it's a conflict of interest

6    without even knowing that he shared any of it?

7    A.        It is a perceived conflict of interest, yes.

8    Q.        Perceived?

9    A.        Yes.

11:51AM  10  Q.        By the federal government?

11   A.        Yes.

12            MR. MC KENZIE:  Objection, Your Honor.

13   BY MR. LOMONACO:

14   Q.        And that's why you believe it's a conflict of

15   interest?

16            THE COURT:  Hold on.  Hold on.  I'll sustain

17   that -- I'll ask the jury to disregard that particular

18   question as it relates to the federal government.  It's

19   outside the purview of this witness's knowledge.  So

11:51AM  20  I'll sustain that objection.  And disregard that

21   particular question and answer.

22            Go ahead.

23   BY MR. LOMONACO:

24   Q.        Perceived by the agents that came to talk to

25   you about Anming Hu; correct?

1        MR. MC KENZIE:  Objection, Your Honor.

2        THE COURT:  Sustained.  Go ahead.

3        MR. LOMONACO:  Okay.  That's all I have.

4        THE COURT:  All right.  Thank you.  This

5   witness may be excused.

6        THE WITNESS:  Thank you.

7        THE COURT:  Government may call its next

8   witness.

9        MR. MC KENZIE:  Your Honor, the government

11:52AM 10   calls Greg Tolliver.

11        (The witness was thereupon duly sworn.)

12        THE COURTROOM DEPUTY:  Please have a seat.

13   Thank you.  Scoot in as close as you can.

14        Will you state and spell your name for the

15   record.

16        THE WITNESS:  Greg Tolliver, G-r-e-g,

17   T-o-l-l-i-v- -- as in Victor -- -e-r.

18        THE COURTROOM DEPUTY:  Thank you, sir.

19                    **GREG TOLLIVER**,

20   having been first duly sworn, was examined and testified

21   as follows:

22                    DIRECT EXAMINATION

23   BY MR. MC KENZIE:

24   Q.     Good morning, Mr. Tolliver.  By whom are you

25   employed?

1  A.       University of Tennessee in Knoxville.

2  Q.       What is your current position at the University

3  of Tennessee?

4  A.       I'm a senior contract analyst and

5  administrator.

6  Q.       How long have you been a senior contract

7  specialist?

8  A.       Just a little over five years.

9  Q.       Will you please explain to the jury some of

11:53AM  10  your duties and responsibilities as a senior contract

11  specialist.

12  A.       Certainly.  My main function is after a

13  contract or a grant is awarded to the university, I'm to

14  review that contract for compliance with Tennessee law,

15  federal law, and then administer it throughout its life.

16           As we get funding, we get additional funding,

17  if there are changes that need to be made -- for

18  instance, an extension which we've had a lot of because

19  of COVID -- we'll actually contact the sponsor, request

11:54AM  20  that we have that extension.  We'll get a modification

21  to the contractor grant and then we'll administer it

22  from that point.

23  Q.       Do you work with or do you specialize in any

24  particular sponsor or agency?

25  A.       That has changed over time as staff comes and

1  goes.  So I have had a number of different

2  responsibilities over the five years.

3  Q.      Are you familiar with NASA contracts?

4  A.      Yes.

5  Q.      What, if any, restrictions are you aware of

6  which relate to grants and funding from NASA?

7  A.      I'm not sure of the exact year, but NASA has a

8  requirement -- we call it the China Assurance

9  letter -- that is required for all NASA proposals.  It's

11:55AM 10  required at the proposal time, and then upon award, it

11  is actually in the contract itself.

12  Q.      How do you know that these -- these terms are

13  actually in the award themselves?

14  A.      By reading the award.

15  Q.      After you -- you read the award and the

16  contract, who ultimately signs the contracts on behalf

17  of the University of Tennessee at Knoxville?

18  A.      Jean Mercer.

19  Q.      And what is Jean Mercer's relationship to you?

11:56AM 20  A.      She is my director.  She is my second-level

21  supervisor, if you will.

22  Q.      In addition to reviewing the terms of the

23  contract yourself, what, if any, communication do you

24  have with the principal investigator who is part of the

25  proposal?

1  A.        Yes.   When we receive an award, it comes into a

2  central point in our office.   That award is then

3  assigned to an administrator that's responsible for that

4  sponsor.

5         In this case, at the time, I was responsible

6  for NASA.   That would have been assigned to me.   The

7  principal investigator is sent an email, basically,

8  "Congratulations, you've received this contract or

9  grant.   Please review it."   We send them a copy of it at

11:57AM  10  that point in time.   "Please review it and respond that

11  you have read it, you understand it, and can comply with

12  the terms of that agreement."   It lists me, in this

13  case, as the responsible administrator.   If there are

14  any questions, they can call me, but we ask them to

15  respond via email that -- as I said, that they have

16  read, understand and can comply.

17         And then after the contract is reviewed,

18  awarded, signed by Jean -- sometimes, some federal

19  contracts are unilateral.   They don't require our

11:57AM  20  signature, just by performing on the contract, it means

21  that we have accepted the terms of that agreement.

22         But once Jean signs it, I can enter it into our

23  system.   At that point, it's entered.   We then send a

24  copy again to the business manager and the PI, say,

25  "Here it is, the fully-executed version," if it, you

1    know, is one that requires both signatures, and, you

2    know, "This is a copy for your records."  So they get an

3    additional copy that's signed.

4          If, by some chance -- we don't negotiate

5    federal contracts very much.  They're pretty

6    straightforward and they don't like to negotiate, but if

7    there are changes to the contract, we do point those out

8    to the PI that, "Hey, you know, since you got the

9    original copy, here are the changes that have been

10   negotiated."  And so they're informed that if anything's

11   different, they know about it going forward and can

12   comply with it.

13   Q.      I'd like to direct your attention now to in or

14   about November of 2018.

15          MR. MC KENZIE:  And I'd like to show the

16   witness Exhibit 9-F, which is already in evidence.

17   BY MR. MC KENZIE:

18   Q.      Looking at this document, do you recognize what

19   this document is?

20   A.      Yes, it's a fairly standard NASA agreement;

21   cover page, anyway.

22          MR. MC KENZIE:  April, could we blow up the

23   federal award identification number nice and big.

24   BY MR. MC KENZIE:

25   Q.      Could you please read that number off to

11:58AM (line 10)
11:59AM (line 20)

1    the -- off to the jury.

2    A.          80MSFC19M0003.

3    Q.          Thank you.

4              MR. MC KENZIE:  Could we scroll down.  Scroll

5    down.  Stop right there (indicating).

6    BY MR. MC KENZIE:

7    Q.          And directing your attention to the right side

8    of the screen, who signed this contract?

9    A.          Jean Mercer.

12:00PM  10              MR. MC KENZIE:  Can we scroll back up to the

11    first page.

12    BY MR. MC KENZIE:

13    Q.          Who is the recipient of the grant or

14    cooperative agreement in this contract?

15    A.          The university itself.  All of our agreements

16    are with the university.  Individual PIs do not get the

17    awards directly.  It's all run through the university.

18    Q.          Who is the awarding organization in this

19    contract?

12:00PM  20    A.          NASA.

21    Q.          Who is the principal investigator in this

22    contract?

23    A.          Dr. Anming Hu.

24    Q.          I'm going to direct your attention to page 6 of

25    the contract.

1  A.        Okay.

2  Q.        Did the NASA restrictions on funding activities

3  with China apply in this contract?

4  A.        Yes, they did.

5  Q.        Did there come a time that you reviewed this

6  contract prior to giving it to Jean Mercer?

7  A.        Yes, I went through it and -- just looking for

8  anything that's unusual, anything that we need to be

9  aware of that's out of the ordinary.

12:01PM  10  Q.        After this exhibit was signed, did there come a

11  time that you received it signed from Jean Mercer?

12  A.        Yes.

13  Q.        What did you do with it at that point?

14  A.        At that point, I will take it and I would enter

15  it into our internal system, which we have all of our

16  grants, contracts, fellowships, etcetera, loaded into.

17  It would be assigned an internal number, and at that

18  point, I would notify the PI and the business manager

19  for that PI that it has been entered; it's been sent to

12:02PM  20  accounting to set up an account to be charged against,

21  and then I would -- in that email, I would also attach

22  another copy of the agreement.

23           (Government's Exhibit 9-E was marked for

24            identification.)

25           MR. MC KENZIE:  I ask that the witness be shown

1    Exhibit 9-E, as in Edward.

2    BY MR. MC KENZIE:

3    Q.        Do you recognize this?

4    A.        Yes.  It looks like an email that I sent.

5    Q.        Who is the recipient of the email?

6    A.        Kelcey Cole, who is the NASA contracting

7    officer, and Dr. Hu was copied on that email.  As we

8    sent -- as we sent this back to NASA and said, you know,

9    here is the UT signed agreement.

12:03PM  10    Q.        Did you author this email?

11    A.        Yes.

12            MR. MC KENZIE:  Your Honor, I ask that

13    Exhibit 9-E be admitted into evidence.

14            THE COURT:  So admitted.

15            (Government's Exhibit 9-E was received into

16             evidence.)

17    BY MR. MC KENZIE:

18    Q.        Is there an attachment on this email?

19    A.        There appears to be, yes.

12:03PM  20    Q.        Could you just please read the -- oops, sorry.

21            MR. MC KENZIE:  Can we get that blown up again?

22    BY MR. MC KENZIE:

23    Q.        Starting here (indicating) and ending here

24    (indicating), can you just read that number off to the

25    jury.

1  A.        Sure.   It's 80MSFC19M0003.

2  Q.        All right.   Thank you.

3            MR. MC KENZIE:   We can get this back to regular

4  view.

5  BY MR. MC KENZIE:

6  Q.        Why did you send this email on November 12th,

7  2018?

8  A.        To notify both NASA and Dr. Hu that we have

9  signed the agreement and it has a November 8th start

12:04PM 10 date.

11 Q.        Where were you physically located when you sent

12 this email?   In what state of the United States were you

13 located in when you sent this email?

14 A.        In Tennessee.

15 Q.        At the time you sent this email, did you have

16 any reason to believe that Anming Hu worked for anyone

17 other than the University of Tennessee?

18 A.        I did not.

19 Q.        Did you have any reason to believe that he

12:04PM 20 worked at a university in China?

21 A.        I did not.

22 Q.        If you did believe that he worked at a

23 university in China, would you have sent that email?

24 A.        No, I would have notified -- in this case,

25 Ms. Mercer, that, you know, we had -- we had a potential

```
 1   issue that we needed to look at.
 2           MR. MC KENZIE:  Thank you, Your Honor.  No
 3   further questions.
 4           THE COURT:  Thank you.  Cross-examination.
 5                   CROSS-EXAMINATION
 6   BY MR. LOMONACO:
 7   Q.      Good morning, Mr. Tolliver.
 8   A.      Good morning.
 9   Q.      Mr. Tolliver, at one point, you were -- let me
10   find the right spot.
11           You told Anming Hu to not sign the agreement;
12   is that correct?  Or that the agreement was being in
13   review -- Anming had asked how the -- how the --
14   A.      Asked for a status.
15   Q.      Status.  And you told him it was being reviewed
16   and he needed to wait or -- before it was signed;
17   correct?
18   A.      More than likely.  I don't recall that specific
19   conversation or email.
20   Q.      Okay.  Were you -- were you aware that -- that
21   there was an investigation going on against Professor Hu
22   at this time?
23   A.      I was not.
24   Q.      All right.  When did you first find out there
25   was an investigation going on?
```

12:05PM (line 10)

12:06PM (line 20)

1  A.        I don't recall the exact date.  Ms. Mercer

2  asked me for a copy of any email that I had sent Dr. Hu

3  regarding the NASA contract.  And she did not tell me

4  there was an investigation; she just asked for the

5  email.

6  Q.        All right.  And this was the CAN contract?

7  A.        I'm sure.

8  Q.        The CAN, C-A-N, proposal?

9  A.        I'm -- I'm not familiar with what you're asking

10 exactly.

11            (Defendant's Exhibit 31 was marked for

12             identification.)

13 BY MR. LOMONACO:

14 Q.        Okay.  Let me show you what's marked

15 Exhibit 31.

16            MR. LOMONACO:  Can we introduce this, Your

17 Honor, please?

18            THE COURT:  Any objection?

19            MR. MC KENZIE:  No.

20            THE COURT:  So admitted.

21            (Defendant's Exhibit 31 was received into

22             evidence.)

23 BY MR. LOMONACO:

24 Q.        Do you see that email?

25 A.        Yes, sir.

1  Q.      Do you see a cooperative agreement, UTK-CAN?

2  A.      Yes, sir.

3  Q.      Okay.  Does that refresh your memory about CAN?

4  A.      Yes.  I mean, that would have been what was in

5  the original email from Dr. Hu.  Obviously I'm -- I'm

6  responding to his email at that point.

7          I don't know if his email is further on down or

8  if this is --

9  Q.      Well --

12:08PM  10  A.      Okay.  So October 29th.  Okay.

11  Q.      This is dated October 29th, 2018, that

12  particular one?

13  A.      Right.  And why I responded that he should not

14  sign that is because it's not unusual that a researcher

15  will take it upon themselves to sign an agreement, and

16  they are not authorized by the university to sign or

17  obligate the university in any way.

18  Q.      Well, had Professor Hu ever signed one on his

19  own before?

12:08PM  20  A.      I have no idea.

21  Q.      Okay.

22  A.      But since he had asked me where he should sign,

23  I was obligated to say he should not.

24          MR. LOMONACO:  All right.  Hold on one minute,

25  please.

1    BY MR. LOMONACO:

2    Q.       This is an email from you?

3    A.       Okay.

4            (Defendant's Exhibit 32 was marked for

5             identification.)

6            MR. LOMONACO:  Exhibit 32.

7    BY MR. LOMONACO:

8    Q.       Can you see that?

9            MR. LOMONACO:  Is it published?

12:09PM  10  BY THE WITNESS:

11   A.       Yes, sir.

12           THE COURT:  Is it already admitted?  If not --

13           MR. LOMONACO:  If not, I'd like to admit it,

14   Your Honor.

15           THE COURT:  Without objection, so admitted.

16           (Defendant's Exhibit 32 was received into

17            evidence.)

18           MR. LOMONACO:  And if we could go to the email

19   from Professor Hu discussing this.

12:09PM  20  BY MR. LOMONACO:

21   Q.       He sent you an email saying, "Could you please

22   update the current status of the CAN project."  Do you

23   see that?

24   A.       Correct.

25   Q.       And then your reply was above that.

1  A.        Right.

2  Q.        And, (as read) "It's under review by the

3  assistant vice-chancellor for research.  NASA has

4  included new clauses that require review and approval."

5  Do you see that?

6  A.        Yes, sir.

7  Q.        What were those new clauses?

8  A.        I don't remember what specifically they were.

9  Q.        Could it have to do with the fact that Anming

12:10PM  10  Hu was being accused of fraudulently inducing NASA into

11  a grant?

12          MR. MC KENZIE:  Objection, calls for

13  speculation.

14  BY MR. LOMONACO:

15  Q.        If you know.

16          THE COURT:  He already testified he did not

17  know; so let's go on.  I thought his answer was he did

18  not know.  Did you say you did not know?

19          THE WITNESS:  That's correct.

12:10PM  20          THE COURT:  All right.  So I'll sustain the

21  objection from that standpoint.  The witness already

22  answered the question.

23  BY MR. LOMONACO:

24  Q.        And you don't know why it was being held for

25  review?

1  A.        No, I don't.  It's not unusual for Ms. Mercer

2  to review.

3  Q.        Is that where you got the information, from

4  Ms. Mercer?

5  A.        I would assume so.  I do not -- I do not know

6  for sure, but that would likely be where it came from.

7  Q.        And you can't point to any new clauses that

8  were in the contract; right?

9  A.        I can't tell you from 2018 which clauses I was

12:11PM  10  referring to.

11  Q.        Had you gone to a fraud awareness meeting in

12  2018 where the FBI was present?

13  A.        I can't remember if it was 2018, but, yes, I

14  have attended that with both the FBI and the DOE

15  inspector general.

16  Q.        And did you go to more than one --

17  A.        Yes, I did.

18  Q.        -- meeting?

19           Did you go to a meeting in 2019, in July, and

12:11PM  20  one in August, and one in September where the FBI was

21  there?

22  A.        I can't remember if I went to all of them.

23  Q.        You're aware of them?

24  A.        I'm aware of them, certainly, yes.

25  Q.        But how did you become aware of them?

A.      It was announced in our group that these were

occurring and it was suggested that perhaps we should

attend to become familiar with any new requirements that

might be coming out, and it was open to university

personnel, including business managers and PIs.

Q.      Were you also encouraged to attend to become

aware of Professor Hu?

A.      No, not -- not -- I was not instructed to

attend for any particular person.

Q.      When you attended, did you learn that the FBI

and the DOE were making accusations about Professor Hu

violating the NASA restriction?

A.      I was not.  They did not discuss individuals.

They discussed general policy, foreign travel; for

example, taking laptops overseas and bringing them back,

those kind of requirements.  But they did not point out

any person.

Q.      Okay.  Did you -- do you recall going to more

than one meeting with the DOE and FBI present?

A.      Yes.

Q.      But you don't recall whether it was in 2018 or

2019?

A.      I don't.

Q.      Was the U.S. attorney here today, was he

present?

1    A.        I don't believe so.

2    Q.        Agent Sadiku sitting over here (indicating),

3    was he present?

4    A.        I can't tell you.  I can't remember.

5    Q.        You can't remember?

6    A.        I can't remember all the individuals.

7    Q.        And it's just general information they were

8    giving you?

9    A.        As best I recall, yes.

12:14PM  10   Q.        Was the general information about the NASA

11   restriction?

12   A.        No.  I mean, it was just foreign travel;

13   foreign influence, if you will.  Just to be aware of.

14   It was an awareness meeting more so than an

15   instructional meeting.

16   Q.        Foreign -- foreign travel by whom?

17   A.        By faculty or staff.

18   Q.        Any particular faculty?

19   A.        No.

12:14PM  20   Q.        What would be the problem of foreign travel by

21   faculty?

22   A.        There are some countries that are on a

23   restricted list.  If you take laptops overseas, they can

24   be compromised.  They can have sensitive data, export

25   controlled data, for example, that is not to be

 1  distributed to a foreign national or a foreign

 2  government.  And there are, if you will, clean computers

 3  that are available for the faculty to check out to take

 4  with them and then to return when they come back to the

 5  United States.

 6  Q.      Did you take any precautionary steps or do

 7  anything based on those pieces of information you were

 8  given?

 9  A.      No.  I'm -- I did no foreign travel, and, you

10  know, I don't know who is traveling and who is not.

11  So --

12  Q.      So you didn't -- or UT didn't make it generally

13  known to people that weren't at the meeting?

14  A.      I can't tell you whether they did or not.

15          MR. MC KENZIE:  Objection, Your Honor, both as

16  to relevance, and we're way outside the scope of direct.

17  It's very narrow.

18          THE COURT:  Well, he answered that he doesn't

19  know, basically; so let's go on.

20          Anything else on cross?

21          MR. LOMONACO:  Your Honor, the conflict of

22  interest policy we've gone over, but I'd like to ask

23  Mr. Tolliver if he was involved in putting together a

24  new training manual for 2018 or 2019 as it had to do

25  with different sponsors.

1    BY THE WITNESS:

2    A.        Yes, we had -- we had a program called Know

3    Your Sponsor that our office tried to make available to

4    talk about individual sponsors, their peculiarities, if

5    you will, and we talked about both governmental and

6    industrial or commercial entities as well.  So it was

7    just kind of a get to know your sponsor, as the title

8    said.

9    Q.        But you put together a training manual?

12:17PM  10  A.        I wouldn't call it a manual.  It's a -- it was

11   a PowerPoint presentation.

12   Q.        PowerPoint presentation?

13   A.        That I was -- I was coauthor of.

14   Q.        And what year was that?

15   A.        I don't remember exactly.  I've done so many

16   presentations that --

17   Q.        Was it 2019 or 2018; do you recall?

18   A.        It could have been.  I mean, I don't -- I don't

19   remember the exact date.

12:17PM  20  Q.        But when you took the responsibility of putting

21   that together, did you do that in previous years or was

22   that a new endeavor for you?

23   A.        I've done presentations for many, many years

24   and in previous jobs as well.

25   Q.        Would it be fair to say that the presentations

1  you put together in 2019 regarding the NASA restriction
2  were a lot more detailed than the previous ones?
3  A.        No.  Some are detailed; some are not.
4           MR. MC KENZIE:  Objection, Your Honor.  It
5  assumes facts not in evidence that he's given multiple
6  presentations about NASA.
7           MR. LOMONACO:  Your Honor, there are facts in
8  evidence.  I've shown both of these.
9           THE COURT:  Go ahead.  Let's finish up.  Go
12:18PM 10  ahead and ask the remaining questions.
11  BY THE WITNESS:
12  A.        Do you have it available for me to look at?  I
13  could tell you more about it if I could see it.
14  BY MR. LOMONACO:
15  Q.        I'm asking you.  You said that you did more
16  than one training manual.  Did you do more than one
17  training manual --
18  A.        Not more than one NASA.
19  Q.        Excuse me, sir.  Did you do more than one
12:18PM 20  training manual on NASA?
21  A.        Not that I'm aware.  I may have made an update
22  to one for a later, but there's -- it's not a manual.
23  It's a PowerPoint presentation.
24           MR. LOMONACO:  That's all.
25           THE COURT:  Thank you.  Any redirect?

1          MR. MC KENZIE:  No, Your Honor.

2          THE COURT:  All right.  This witness may be

3    excused.

4          Just hold on.  We'll go ahead and take our jury

5    lunch break at this time.  So the jury is excused until

6    1:35.

7          (Jurors excused from the courtroom.)

8          THE COURT:  Okay.

9          THE COURTROOM DEPUTY:  This honorable court

10   stands in recess until 1:35.

11         MR. LOMONACO:  Your Honor, I'm going to need to

12   address the Court before the jury comes back in.

13         THE COURT:  Well, let's do it now.  Sit back

14   down.

15         The witness may be excused.

16         MR. LOMONACO:  Okay.  Your Honor, if you

17   recall, we had some discussions at the pretrial hearing

18   about some evidence that I wanted to produce and put on

19   the record for the jury, and that was the evidence of

20   these PowerPoint presentations that I've tried to go

21   into on several occasions with a few witnesses here

22   today.  One being in July, one August, and one in

23   September of 2019.

24         My questioning has been -- has been curtailed,

25   I believe, today when I tried to go into that, and

I'm -- I'm trying to show that the agents presented
certain evidence to several of these witnesses we've
already seen and that that information was not accurate,
and that they were influenced by these presentations by
the government, the agents.

If Your Honor is -- I would ask that you allow
me to do that, and if -- if I can't go into it, I need
to proffer this information. I would rather just do it
and show the jury what transpired, show the facts of
what happened and what was said to these witnesses and
show the jury, or at least argue to the jury, the
effects of what these PowerPoint presentations had on
the witnesses.

THE COURT: Well, I'll hear from the
government, but let me start by saying that the
particular issue that was before the Court earlier today
was introduction of the document itself. And there was
a -- as I understand it -- hearsay and other objections
to it. So that was the specific issue before the Court.

I don't know that the Court has curtailed you
to ask -- as to asking witnesses whether they were
influenced by these presentations or the effect that the
presentation had upon them.

MR. LOMONACO: Yes, sir. May I --

THE COURT: So -- so --

1          MR. LOMONACO:  May I address that, Your Honor,

2     please?

3          THE COURT:  Okay.  Go ahead.

4          MR. LOMONACO:  They made an objection to

5     hearsay, and the Court never really said, well, what is

6     a hearsay statement to make a complete ruling on whether

7     it was hearsay or not.

8          I indicated that we're not offering it for the

9     truth of the matter asserted.  In fact, we're offering

10    it for the exact opposite, or at least we're offering it

11    to show what effect it had on these attendees to the

12    meetings.

13         We're not offering hearsay information.  This

14    was written down by the agents and -- and proffered to

15    these witnesses, and I believe that -- and as I said at

16    the pretrial hearing, their testimony here today was

17    influenced by those fraud meetings and PowerPoint

18    presentations.

19         THE COURT:  Did you ask the witness that

20    question, that particular question?

21         MR. LOMONACO:  Well --

22         THE COURT:  Were the actions that were taken

23    influenced by what happened at these meetings?  I don't

24    recall that particular question.

25         MR. LOMONACO:  Yes, sir, I understand.

1          THE COURT:  And I -- so I guess what

2     you're -- what are you asking the Court now?  Are you

3     asking to introduce the documents or asking to be able

4     to ask questions as to influence and effect going

5     forward, or what?

6          MR. LOMONACO:  Well, Your Honor, these

7     witnesses have come to a consensus based on these

8     PowerPoints, and if I just ask them, were you

9     influenced, obviously they're going to say no.  If I

12:24PM 10     show the influence that was put on them, then it's up to

11     the jury to decide whether they were influenced or not.

12          So I want to be able to show the evidence that

13     reasonably could influence them and make a jury draw a

14     factual determination of whether that was evidence that

15     influenced them.

16          We do have several instances of statements that

17     were made to these witnesses that are false and we're

18     prepared to show that, and that's what I want to show.

19     And after I show that to these witnesses -- because

12:24PM 20     these witnesses don't know the statements were false.

21     Two of the witnesses testified that the exhibits to the

22     PowerPoint presentations were reviewed, and the

23     information I have, according to the memos from the

24     agents was the exhibits were left at the office, and

25     it's the exhibits that show the difference between what

 1    was told to the attendees and what the exhibits really

 2    show.

 3              So I'd like to go into that with -- and it may

 4    take some time, and I don't want to go into all of them,

 5    but I think the jury has a right to know whether the FBI

 6    influenced these witnesses and influenced their

 7    testimony based on what they were told by the FBI.

 8              That's a powerful thing for the FBI to go in

 9    three different times with several agents and address

12:25PM 10    what they said in these PowerPoint presentations.  We

11    have the pages.  It's clear what they told them.  And we

12    now have obtained the -- the exhibits that were left

13    behind, and it's clear that there are several instances

14    they were different, especially the first PowerPoint

15    presentation in July of 2019.  After the third one,

16    there wasn't so much misleading information, but there

17    was much in the first one.

18              THE COURT:  All right.  Well, let me hear from

19    the government.

12:26PM 20              MR. ARROWOOD:  Thank you, Your Honor.

21              THE COURT:  Response.

22              MR. ARROWOOD:  Briefly just to address the

23    issue that appears to be before the Court.

24              It's the government's understanding what he's

25    trying to do is to impeach the witnesses by suggesting

that their statements are somehow untruthful, and as we
said in the pretrial conference, he's, of course,
welcome to do that. He's welcome to question the
witnesses. And, from our perspective, he's even allowed
to show witnesses who said they were at the meeting,
show the witnesses the PowerPoints, and he can ask about
those PowerPoints.

But he can't use extrinsic evidence and that is
otherwise not before the jury. Again, it can be used
for impeachment purposes. But that's sort of limited
to -- I guess, the limited scope of what we think he can
be using those documents for.

Of course, if the Court were to admit them as
substantive evidence, the government would, of course,
seek to rehabilitate these witnesses by using that
document or those documents, which would be lengthy and
dive into a variety of issues that aren't substantively
part of the indictment or part of any sort of issue
before the jury.

But, of course, we would do that if they're
admitted into evidence. We think, of course, however,
he's limited in scope to impeaching the witness. He can
show it to the witness. He can ask questions about it,
but, otherwise, it's not substantive evidence that goes
before the jury, Your Honor.

1          MR. LOMONACO:  Just briefly, Your Honor.  I

2    didn't want to go into these PowerPoint presentations

3    with these witnesses other than to ask them if they were

4    there.

5          The details would be better off going into with

6    the agents that gave the presentation.  But my concern

7    was that when I started to go near this topic, I got a

8    lot of objections, and the Court sort of sustained some

9    of those, which led me to believe that if I don't raise

12:28PM 10   this issue now, it's going to get worse trying to get

11   into it with, let's say, Agent Sadiku or Agent Slatton,

12   the ones that were giving the PowerPoint presentation.

13         THE COURT:  So what you're doing now, just so

14   I'm -- I'm not trying to put words in your mouth, but

15   you're, I guess, asking the Court to respectfully

16   consider whether these documents can be -- whether

17   upcoming witnesses who were at these meetings,

18   particularly law enforcement, can be asked about the

19   substance of these documents and what -- what was said

12:28PM 20   at the meetings that pertains to these documents.

21   That's the first thing you want to do.  And the second

22   thing you want to do would be to actually introduce the

23   documents into evidence.

24         MR. LOMONACO:  Yes, Your Honor.  And not what

25   was said about the documents, what was said on the

1   documents themselves.  They're like PowerPoint pages.

2           THE COURT:  So, I understand that.  What was

3   presented at the meeting via the PowerPoints.

4           MR. LOMONACO:  Yes.  And I believe it's

5   relevant, Your Honor, and I believe it's something the

6   jury should consider because you've heard the witnesses

7   testify.  Now, I'm not at all saying they all got

8   together and said the same thing, but the theme is that

9   that outside disclosure of non-disclosing employment was

10  something that triggered the fraud, and -- and the

11  outcome of these PowerPoint presentations, it's already

12  been -- it's already been testified to by at least two

13  witnesses, and maybe three.  They said that had they

14  known of Professor Hu's employment, they would not have

15  allowed the NASA grant.  And that, I believe, was the

16  outcome of the PowerPoint presentations over three

17  different months.

18          And you really -- if you look at it and analyze

19  what was going on, it's hard to understand anything but

20  why they were doing it.

21          THE COURT:  Which witnesses do you want to ask

22  with respect to these documents?

23          MR. LOMONACO:  Well, I have Special Agent Laura

24  Slatton subpoenaed.  Laura Slatton.  S-l-a-t-t-o-n, I

25  think.  And Agent Sadiku has been -- I've been advised

12:29PM   (line 10)
12:30PM   (line 20)

1    that Special Agent Sadiku has -- is going to testify.  I

2    have served a subpoena on him, also.  So those are the

3    two main agents that were at those meetings.

4              THE COURT:  Are any of them anticipated to

5    testify this afternoon for the government?

6              MR. ARROWOOD:  No, Your Honor.  I think it

7    would likely be Friday before we got to Special Agent

8    Sadiku.

9              THE COURT:  Okay.  All right.  Well, then let

12:30PM 10   me take this under advisement and --

11             MR. LOMONACO:  Yes, sir, thank you.

12             THE COURT:  And --

13             MR. LOMONACO:  Thank you very much.

14             THE COURT:  -- can you identify which documents

15   specifically you're referring to, the document numbers?

16             MR. LOMONACO:  Yes, we have them as potential

17   exhibits.

18             MR. PARSONS:  24, 25, and 13.

19             THE COURT:  Do we have copies of those, Julie?

12:31PM 20            All right.  I'll review the documents and

21   review this discussion and may not issue -- in light of

22   who you want to use the documents with, I may not issue

23   a ruling, you know, when we come back from lunch, but I

24   will before Agent Sadiku particularly testifies.  Is

25   that satisfactory?

1    MR. LOMONACO:  That's fine, Your Honor.  And

2    just to remind the Court that we would need time to put

3    this on as proof if we don't do it in front of the jury

4    to proffer it.

5         THE COURT:  I understand.

6         MR. LOMONACO:  Thank you, Your Honor.

7         THE COURT:  Anything further, Mr. Arrowood?

8         MR. ARROWOOD:  Your Honor, just so that the

9    Court understands, so if the Court decides to allow

10   those PowerPoints into substantive evidence, those

11   PowerPoints identify a number of exhibits that go with

12   each of those PowerPoints.  So for us, in order to

13   rehabilitate the witness, we also would then at that

14   point want to ask the Court to consider admitting into

15   evidence all of the exhibits that support the

16   PowerPoints, Your Honor, so we can go through those with

17   the agent.

18        THE COURT:  I understand.

19        Thank you, everyone.  We'll see you all in a

20   little more than an hour.

21        THE COURTROOM DEPUTY:  This honorable court

22   stands in recess.

23        (A luncheon recess was taken at 12:32 p.m.)

24

25

12:31PM (at line 10)

12:32PM (at line 20)

1                    **AFTERNOON SESSION**

2                              (P.M.)

3          THE COURTROOM DEPUTY:  All rise.

4          THE COURT:  Thank you.  Government is ready

5    with its next witness; so we'll bring our jury in.

6              (Whereupon the following report of

7               proceedings was had within the presence

8               and hearing of the jury:)

9          THE COURT:  All right.  Thank you.

01:38PM  10          Everyone may be seated, and we'll swear in the

11    next witness.

12              (The witness was thereupon duly sworn.)

13          THE COURTROOM DEPUTY:  Have a seat, please, and

14    scoot in.

15          Please state and spell your name for the

16    record.

17          THE WITNESS:  Kathy Cooper, K-a-t-h-y,

18    C-o-o-p-e-r.

19          THE COURTROOM DEPUTY:  Thank you, ma'am.

20                        **KATHY COOPER**,

21    having been first duly sworn, was examined and testified

22    as follows:

23                        DIRECT EXAMINATION

24    BY MR. ARROWOOD:

25    Q.      Good afternoon, Ms. Cooper.

1    A.        Hi.

2    Q.        Welcome to Knoxville.

3              Would you please tell the jury what you do for

4    a living.

5    A.        I'm a contracting officer working for NASA

6    Marshall Space Flight Center.

7    Q.        Where is Marshall Space Flight Center located?

8    A.        Huntsville, Alabama.

9    Q.        How long have you been at the Marshall Space

01:39PM 10   Flight Center?

11   A.        Since around May 2007.

12   Q.        Can you just describe for the jury your

13   professional background while at Marshall Space Flight

14   Center.

15   A.        I've been working in the procurement field,

16   contracting field, ever since I started there supporting

17   space shuttle, supporting the space laboratories,

18   planetary sciences.

19              Last few years worked in groups supporting our

01:39PM 20   engineering labs and communications offices.  And I

21   recently moved over into a new role now that I'm

22   starting to understand their terminologies.

23   Q.        And what is the name of your current position?

24   A.        I am the branch chief for what we call PS33

25   supporting our institutional services.

1   Q.        And when did you take that job?

2   A.        May 24th, this year.  Only a couple weeks ago.

3   Q.        And so before you got this promotion, what was

4   your role at Marshall Space Flight Center?

5   A.        Branch chief for PS22, which was where we

6   supported our engineering labs and our office's

7   strategic analysis and communications.

8   Q.        And how long were you in that role?

9   A.        Since December 2015.

01:40PM  10   Q.        So most of the things we talk about today will

11   be directed towards that period of time where you had

12   that position, PS22?

13   A.        22, uh-huh.

14   Q.        All right.  What, if any, types of training did

15   you receive in agreements and grants for NASA?

16   A.        We've been doing procurement agreements

17   since -- oh, over 25 years.  So through that time, you

18   have different levels of certification that are

19   required.  So I'm level three certified, which is the

01:41PM  20   higher level, which is needed in order to be a branch

21   chief and to sign contracts and have a warrant.  There

22   is also policy and guidance on cooperative agreements.

23   But I wouldn't say specific training directly related to

24   grants or cooperative agreements.  It's procurement as a

25   whole.

1  Q.        Okay.   Would you please describe for the jury

2  again, what is a level three certification specifically?

3  A.        A level three certification is saying that I've

4  been through all the required, mandated training for

5  NASA Marshall Space Flight Center.   It's just the

6  highest mandated level of training that we would have to

7  have.

8  Q.        And when were you serving as a branch PS22,

9  were you supervising people in that office?

01:42PM  10  A.        Yes, sir.

11  Q.        How many people did you supervise?

12  Approximately.

13  A.        Approximately, I'd say maybe ten government

14  civil servants and we had some contractor support on the

15  team, also.

16  Q.        Would you please describe for the jury,

17  generally speaking, what are some of the duties of that

18  position that you had, again, branch chief for PS22?

19  A.        Assigning workloads to each of the individuals,

01:42PM  20  signing the actual contracts and agreements, doing

21  responses for headquarters.   We worked grants,

22  cooperative agreements, contracts, fixed price, cost

23  plus.   Just lots of -- anything where it obligated the

24  government's money, pretty much.

25  Q.        And given your position, were you able to sign

1     cooperative agreements --

2     A.       Yes, sir.

3     Q.       -- on behalf of NASA?

4     A.       Yes, sir.

5     Q.       Were there others in your office that also had

6     the ability to sign cooperative agreements and grants?

7     A.       Yes.

8     Q.       As a result of your employment with Marshall

9     Space Flight Center, and specifically your work as

01:43PM 10     branch chief with PS22, did you become familiar with the

11     terms and conditions that are associated with

12     cooperative agreements and grants from NASA?

13     A.       Yes, I would -- I would think I did.

14     Q.       Okay.  If you would for the jury please just

15     describe the process of obtaining a cooperative

16     agreement and in just general terms.

17     A.       They're all different.  For the ones that we

18     worked, we had what we called a cooperative agreement

19     notice.  This notice was posted out to industry in the

01:43PM 20     world to read and review.

21            Based on that notice, it said if you had an

22     ability or something that you guys were developing and

23     working that was beneficial for your industry and NASA

24     in these types of areas, submit a white paper.

25            That white paper would come in, and it would

1  say something like, hey, we want to build this widget.

2  We will spend at least -- and it was required for ours,

3  not all -- at least 50 percent cost or what we called in

4  kind.  We would either put money in or we would allow

5  our people to work it.  So roughly --

6  Q.      In your role -- I'm sorry.  In your role as

7  branch chief for PS22, did you review these white papers

8  as they would come in?

9  A.      Yes.  There was a board that would review them.

01:44PM 10  I was included in that.  We would look through the

11  papers to make sure they had met the requirements that

12  we were looking for.

13  Q.      What were some of the requirements that you

14  were looking for?

15  A.      Were they signed by an individual authorized

16  from the university or the company; did they put in

17  their 50 percent at a minimum share from the university

18  or company and show the government's participation

19  within that; were they within the overall dollar limit

01:45PM 20  that we were going for and how long were they valid.

21  Q.      Okay.  And so I imagine you've received several

22  different white papers.  Is there a selection process

23  that winnows that down to a select few?

24  A.      Yes.

25  Q.      Would you please describe to the jurors what

1    happens next.

2    A.        Sure.   Right now we have some in and there were

3    62 papers.   So there is a lot.   But the papers would

4    come in.   They actually would be reviewed by the team.

5    We would go through them with our subject matter experts

6    who would know about that area.   We would rack and stack

7    them to say, these are the papers based on the area,

8    based on the topic, based on what they would know that

9    they would meet NASA's need.   Let's say ten out of the

01:46PM  10    62 are the top ones that should be reviewed and

11    considered.

12            They would be presented to a board led by the

13    technical lead at NASA that would say, okay, based on

14    the pool of money we have, what you guys have presented

15    in front of me, I recommend these eight papers, all

16    these papers, or even more or less, whatever, submit

17    full proposals.

18    Q.        Okay.   So then is the decision communicated to

19    those who authored these white papers that are selected?

01:46PM  20    A.        Yes, at that time, usually me or my team would

21    send letters to everybody who submitted a white paper to

22    either say, "Thank you so much, you've been selected to

23    submit a proposal," or, "Thank you so much.   We don't

24    have enough funds at this time.   We'll consider you next

25    time.   If you want to resubmit, that's fine, too."   So

1    we would send those letters out to everybody.

2    Q.        Okay.  And so for white papers that were

3    selected, what's the next process for those folks?

4    A.        So once they receive the letter from me or my

5    office that says, hey, please submit a full proposal

6    within a certain amount of time, they would submit a

7    proposal that would be then reevaluated to make sure it

8    didn't drastically change from the white paper; meaning

9    the scope was still the same.  It still had all the

01:47PM  10   values that met the 50 percent share, that type of

11   stuff.

12         We would go again to the board led by our

13   technical lead at NASA to say, "Okay.  We've gotten all

14   these proposals in.  They meet our needs.  Can we award

15   them?"  They would say yes.

16         Again, I would send a letter, this time saying,

17   "Thank you so much.  You have been selected for award of

18   a cooperative agreement."  And then at that point we'd

19   work to get something in writing officially between the

01:47PM  20   two parties.

21   Q.        Okay.  So what is that something else in

22   writing that you get after a proposal has been awarded?

23   A.        A cooperative agreement.

24   Q.        Is that -- well, would you please just tell the

25   jury generally, what is a cooperative agreement?

1  A.      It's a -- it's a contract of sorts that just

2  says between both parties, here is what we both agree to

3  do.

4  Q.      Do both parties typically sign that?

5  A.      Yes.

6  Q.      Okay.  Thank you.

7          (Government's Exhibit 9-A was marked for

8           identification.)

9  BY MR. ARROWOOD:

01:48PM 10  Q.      Now I'd like to show you some documents.  I'd

11  like to show you Government's Exhibit 9-A.  Take a

12  moment and take a look at it.

13  A.      Uh-huh.

14  Q.      Do you recognize this document?

15  A.      Yes, I do.

16          MR. ARROWOOD:  Your Honor, at this time, the

17  government admits Exhibit 9-A.

18          MR. LOMONACO:  No objection.

19          THE COURT:  So admitted.

01:48PM 20          (Government's Exhibit 9-A was received into

21           evidence.)

22  BY MR. ARROWOOD:

23  Q.      So who is the author of the email?

24  A.      Jennifer Benson.

25  Q.      Do you know Ms. Benson?

1  A.        Not personally, but she must work for -- I'm

2  looking to see if it shows her name on that piece of

3  paper.   Here it shows me that she is from the University

4  of Tennessee, Knoxville.

5  Q.        So on the To line of the email, couple of names

6  I just want to ask you about.

7  A.        Okay.

8  Q.        Who is Mr. Scott Hutchins?

9  A.        Scott Hutchins is our -- at that time was our

01:49PM  10  primary point of contact for all the cooperative

11  agreements.   He was the person who -- I'll say wrangled

12  all the cats for all the different papers, technical,

13  and just making sure that they met all our needs, set up

14  the board meetings, etcetera.

15  Q.        Okay.   And then on the cc line --

16  A.        Uh-huh.

17  Q.        -- do you know who Marvin Barnes is?

18  A.        I do.

19  Q.        Who is Mr. Barnes?

01:49PM  20  A.        Marvin Barnes was our technical subject matter

21  expert who was helping to manage -- I'll say manage this

22  paper, this project.

23  Q.        And next is Kelcey Cole.   Do you know Kelcey

24  Cole?

25  A.        I do.   Kelcey works for me.   She is on

1    the -- or did at that time, anyway -- PS22 team as a

2    contract specialist.

3    Q.         And then is that your email address that

4    follows?

5    A.         Yes.

6    Q.         Your email address.

7              Now, does this email appear to contain a number

8    of attachments?

9    A.         Yes.

01:50PM 10    Q.         Okay.  And just directing your attention there

11    to the first line.  Does it appear that these proposal

12    documents were submitted on behalf of Dr. Anming Hu --

13    A.         Yes.

14    Q.         -- at the University of Tennessee?

15    A.         Yes.

16    Q.         Okay.  Now I'd like to show you just a few of

17    the attachments.  If you would please show Government's

18    Exhibit 9-B.

19              Do you recognize this kind of document?

01:50PM 20    A.         I do.  It looks like a proposal submitted in

21    this case by the University of Tennessee, Knoxville for

22    printed metallic sensors.

23    Q.         And based on the first line of this letter, who

24    is identified as the principal investigator?

25    A.         Dr. Hu.

 1   Q.        What are the dates associated there at the

 2   bottom of the second paragraph related to this

 3   cooperative -- or this proposal?

 4   A.        1/11/2018 through October 31st, 2019.

 5   Q.        At this time, I move to admit Government's

 6   Exhibit 9-B if it's not already in.

 7             MR. LOMONACO:  No objection, Your Honor.

 8             THE COURT:  So admitted.

 9             (Government's Exhibit 9-B was previously

10              received into evidence.)

11   BY MR. ARROWOOD:

12   Q.        Now I'd like to show you Government's

13   Exhibit 9-D, as in dog.

14             Do you recognize this?

15   A.        Yes, this is the format our proposals typically

16   looked like.

17   Q.        And, again, who's the principal investigator?

18   A.        Dr. Hu.

19   Q.        Where does it indicate that the principal

20   investigator works?

21   A.        Tennessee, Knoxville.  University of Tennessee,

22   Knoxville.

23             MR. ARROWOOD:  Can we please scroll down to

24   page 7 and then into page 8.

25

01:51PM (line 10)
01:51PM (line 20)

1  BY MR. ARROWOOD:

2  Q.       Okay.   There at the bottom is a heading

3  associated with the letter B.

4  A.       Uh-huh.

5  Q.       Will you please read that.

6  A.       The header is Personal and Facilities.

7           MR. ARROWOOD:  Can you please scroll up?

8  BY MR. ARROWOOD:

9  Q.       All right.  Will you just take a few minutes

01:52PM 10  and read those two paragraphs to yourself, please.

11  A.       Okay.

12  Q.       Is there anywhere in this document where the

13  Beijing University of Technology is mentioned?

14  A.       No, sir.

15  Q.       All right.   Thank you.

16           (Government's Exhibit 9-G was marked for

17            identification.)

18  BY MR. ARROWOOD:

19  Q.       And I'd like to show you Government's

01:53PM 20  Exhibit 9-G.

21           I see that you're copied on this email.

22  A.       Uh-huh.

23           MR. ARROWOOD:  Your Honor, the government moves

24  to admit Government's Exhibit 9-G.

25           THE COURT:  So admitted.

1          (Government's Exhibit 9-G was received into

2           evidence.)

3    BY MR. ARROWOOD:

4    Q.      So what is going on in this email?

5    A.      Kelcey Cole, who worked for me at that time, is

6    letting the university know that the attached is their

7    signed, executed cooperative agreement.

8    Q.      Okay.  I'd like to show you the attachment to

9    that.

01:54PM 10   A.      Okay.

11          (Government's Exhibit 9-H was marked for

12           identification.)

13   BY MR. ARROWOOD:

14   Q.      I show you Government's Exhibit 9-H.

15          Do you recognize this kind of document?

16   A.      I do.  It's a little blurry.  There we go.

17   Q.      Okay.  Please take a look at the Period of

18   Performance.  What are the dates associated with the

19   Period of Performance?

01:54PM 20   A.      November 8th, 2018 through November 8th, 2019.

21   Q.      Is the University of Tennessee the recipient of

22   this cooperative agreement?

23   A.      Yes.

24   Q.      And Marshall Space Flight Center, is that the

25   awarding organization?

1    A.        It is.

2    Q.        Who is the principal investigator on this?

3    A.        Dr. Hu.

4              MR. ARROWOOD:  Please scroll down.

5              Okay.  Stop right there (indicating).

6    BY MR. ARROWOOD:

7    Q.        There where it says Technical Officer, who is

8    identified there?

9    A.        Marvin Barnes.

01:55PM  10  Q.        And the -- both negotiator and administrator,

11   who is identified?

12   A.        Kelcey Cole.

13   Q.        And there under Payments, it says, "NASA Shared

14   Services Center."  Do you see that?

15   A.        I do.

16   Q.        What is the NASA Shared Services Center?

17   A.        They're located down in Mississippi on the

18   Stennis Space Flight Center.  They're the ones that are

19   responsible for issuing payment to all the work that's

01:55PM  20  completed.  So if anybody comes in with an invoice, it

21   goes through the NASA Shared Services to make sure they

22   get paid.

23             MR. ARROWOOD:  Can you please scroll down.

24   Right there (indicating).

25

1   BY MR. ARROWOOD:

2   Q.      On Box 16 --

3   A.      Yes.

4   Q.      -- does this indicate there are terms and

5   conditions enclosed with this cooperative agreement?

6   A.      It does.

7           MR. ARROWOOD:  Please scroll down to the next

8   page.  Right there (indicating).

9   BY MR. ARROWOOD:

01:56PM 10  Q.      Okay.  So on the left-hand side of the screen,

11  does this document appear to be signed?

12  A.      It is, yes.

13  Q.      By whom?

14  A.      Iris Walter.

15  Q.      Do you know Iris Walter?

16  A.      I do.  She was, at that time, a contract

17  specialist/contracting officer that worked for me.

18  Q.      And at that time was she authorized to sign

19  cooperative agreements on behalf of Marshall Space

01:56PM 20  Flight Center?

21  A.      Yes, she was a warranting contracting officer.

22  Q.      And then on the right-hand side does it also

23  appear to be signed?

24  A.      It does.

25  Q.      What is the date on the right-hand side?

1   A.        11/12/2018.

2   Q.        Earlier you testified that you were familiar

3   with terms and conditions that are associated with

4   cooperative agreements; do you recall that?

5   A.        Yes, sir.

6   Q.        Are you familiar with any type of term and

7   condition associated with cooperative agreements that

8   pertains to restrictions on funding in collaboration

9   with particular countries?

01:57PM  10   A.        I do.

11   Q.        And, if you know, what specific country does

12   that pertain to?

13   A.        China.

14   Q.        I'm sorry?

15   A.        China.

16            MR. ARROWOOD:  I'd like you to scroll down to

17   page 6 of the same document.

18   BY MR. ARROWOOD:

19   Q.        Does this look familiar to you?

01:57PM  20   A.        Yes, that clause is included in all of our

21   cooperative agreements.

22   Q.        Okay.  I believe you also testified before that

23   Ms. Walters works for you; is that correct?

24   A.        She did at that time, yes.

25   Q.        When a university on behalf of a principal

 1  investigator submits a proposal on behalf of that

 2  principal investigator, what, if anything, does or do

 3  employees at Marshall Space Flight Center do to ensure

 4  compliance with the NASA China funding restriction at

 5  the proposal stage?

 6  A.      We would read through it and see if anything

 7  caught our attention, but we rely on the university to

 8  ensure that the people working and representing their

 9  organization met the requirements of these terms and

01:58PM 10  conditions.  By signing the agreement, they're

11  acknowledging that they are responsible and agree to all

12  of its terms and conditions.

13  Q.      Now, at the cooperative agreement stage, what,

14  if anything, does Marshall Space Flight Center do to

15  assure compliance with this restriction?

16  A.      Again, our agreement is with the university

17  itself.  So we -- unless something really blatant jumped

18  out at us, we would assume by the university signing it

19  that all the terms and conditions within it are being

01:58PM 20  met.

21  Q.      Would you ensure that this restriction is

22  included with every cooperative agreement?

23  A.      It should be.  I can't say I've seen every

24  single one, but it is a required clause.

25  Q.      So if at the proposal stage, if a principal

investigator had disclosed his or her employment with a
university in China, what, if anything, would you or
others you supervise have done differently?

A.      We would probably call our policy office and
our legal office to say, "Hey, is there any issue here
that we need to be concerned about?"

Q.      Now, moving forward, if you knew that a
principal investigator was at the time of the signing of
the cooperative agreement employed at a university in
China and failed to disclose that fact, what, if
anything, would you or those you supervise do?

A.      Again, because we're not trained at that level,
our go-to position is always go check with policy, check
with legal, and get some guidance on what to do.

Q.      Is it your understanding that by signing one of
these cooperative agreements a university is
representing that it will comply with all the terms and
conditions of the cooperative agreement?

A.      Yes.

Q.      Let's just say hypothetically, if a university
had declined to sign the agreement because it was not in
compliance with the China restriction, would the
cooperative agreement have been processed as normal?

A.      No, we would have probably pursued to see what
specifically were the issues.  Sometimes we can resolve

1    things.  There are some leniencies occasionally; others,

2    we cannot give on when they're required or mandated.

3    And depending on how that went, we would either work to

4    make those corrections and award the agreement or we may

5    not award at all.

6    Q.       So if the university had asked you to remove

7    the China funding restriction from the cooperative

8    agreement in order to sign it --

9             MR. LOMONACO:  Your Honor, I need to object to

02:00PM  10   all these hypotheticals he's asking and leading this

11   witness.  I don't think it's proper.

12            THE COURT:  Is your objection based on leading?

13            MR. LOMONACO:  Leading and assuming facts that

14   are not in evidence.

15            THE COURT:  All right.  Response?

16            MR. ARROWOOD:  Your Honor, it's not leading.

17   I'm asking what she would do.  I'm not suggesting the

18   answer to the question at all.  And it's based on her

19   own experience in this position, having supervised these

02:01PM  20   folks for a number of years, and in particular

21   supervision on this particular cooperative agreement.

22            THE COURT:  I'll overrule the objection.

23            Also, for record purposes, I'm not sure it's

24   been admitted.  9-H is admitted, I'm assuming without

25   objection.

1          MR. ARROWOOD:  Thank you, Judge.

2          (Government's Exhibit 9-H was received into

3           evidence.)

4     BY MR. ARROWOOD:

5     Q.      So let me just repeat that.  If the university

6     had asked you to remove the China restriction from the

7     cooperative agreement so it could go forward, what, if

8     anything, would you have done?

9     A.      Probably have gone back and said that's not one

02:01PM  10   that we can remove.

11    Q.      Has that ever happened?

12    A.      No.

13    Q.      To your knowledge and based on your experience,

14    has a university ever refused to sign a cooperative

15    agreement because of the NASA China restriction?

16    A.      No.

17    Q.      And, to your knowledge, has Marshall Space

18    Flight Center ever changed the language of the NASA

19    funding restriction in order to accommodate a request

02:02PM  20   from a university or some other entity on one of these

21    cooperative agreements?

22    A.      Not that I'm aware of.

23    Q.      Does your office do any independent research

24    regarding China affiliations of principal investigators?

25    A.      No, not really.

1  Q.        I'd like to move on to what happens after the

2  cooperative agreement has been signed and there is some

3  performance on the agreement.  In particular, I'd like

4  to talk to you -- talk about the invoice, the invoice

5  process.  Are you familiar with the invoice process?

6  A.        To some extent, yes.

7  Q.        Will you describe what you know to the jury

8  about this process.

9  A.        Okay.  For our cooperative agreements, we have

02:03PM 10  a payments milestone clause included in all of them that

11  basically says, once you've had a kickoff meeting, you

12  can submit an invoice for, say, $50, and if we agree

13  it's been completed, we'll allow it to get paid.  That

14  payment goes, again, to the NSSC, the NASA Shared

15  Services Center, to actually submit the payment to the

16  university.

17  Q.        Where is the National -- where is the NSSC

18  located?

19  A.        It's on Stennis Space Flight Center in

02:03PM 20  Mississippi.

21  Q.        And if -- during the invoice processing period,

22  if you had learned that a university was no longer in

23  compliance with the China funding restriction, would an

24  invoice -- when an invoice was submitted, what, if

25  anything, could you have done?

A.          We could reject it.  We could hold it and not

pay it.  Of course, after a certain amount of time, we

might incur interest, but we could always reject it

saying the scope of work was not completed, the invoice

was invalid.  You know, there are ways to reject it and

hold off on processing it for payment.

Q.          Thank you.  Now defense counsel is going to ask

you some questions.

            MR. ARROWOOD:  Nothing further, Your Honor.

            THE COURT:  All right.  Thank you.

            Cross-examination?

            MR. LOMONACO:  Yes, Your Honor.  Thank you.

                         CROSS-EXAMINATION

BY MR. LOMONACO:

Q.          Good afternoon, Ms. Cooper.

A.          Hi.

Q.          Let me show you what's already been marked as

Exhibit 9-A of the government exhibits, and this is an

email from -- it looks like it's from UT; is that right?

A.          Yes, sir.

Q.          And it says, "Please find the attached proposal

documents on behalf of Dr. Anming Hu."  Proposal is a

document.  Proposer is an organization or person;

correct?

A.          Yes.

1  Q.        The proposer would be the University of

2  Tennessee; correct?

3  A.        Yes.

4            MR. LOMONACO:  Okay.  And let's go to No. 9-B.

5  BY MR. LOMONACO:

6  Q.        This is a transmittal letter transmitting the

7  proposal; correct?  No, this is a commitment letter.

8  I'm sorry.  Is that right?

9  A.        I just -- sorry, I want to -- I can't see what

02:05PM 10  it is completely.

11            This is a proposal submission from the

12  university.

13  Q.        Okay.  Thank you.

14            MR. LOMONACO:  Let's go ahead to 9-D now.

15  BY MR. LOMONACO:

16  Q.        This is actually the proposal; correct?

17  A.        Yes, the other was the cover letter to this

18  proposal.

19  Q.        Yes.  And there is supposed to be an assurance

02:06PM 20  letter attached to this; correct?

21  A.        The cover letter that you just showed was the

22  assurance.

23  Q.        Oh, assurance that they're in compliance with

24  the NASA restriction?

25  A.        It was signed by an authorized representative.

1   Q.     What was?

2   A.     The cover letter to this proposal.

3   Q.     Okay. There was no separate assurance letter

4   attached to this proposal, is there?

5   A.     No, sir, just the cover letter that would be

6   there.

7         MR. LOMONACO: And let's go back to the cover

8   letter, if we can, 9-B.

9         And if we can look at the first paragraph.

02:07PM 10   BY MR. LOMONACO:

11   Q.     It says they will perform the work as outlined

12   in the proposal. Second paragraph, it talks about money

13   and dates. Third one says they look forward to the

14   anticipated project.

15         MR. LOMONACO: Scroll down a little bit

16   further. Keep going.

17   BY MR. LOMONACO:

18   Q.     I don't see any assurance that they're going to

19   comply with the NASA restriction in this letter. Can

02:08PM 20   you point that out to me?

21   A.     Those specific words are not there.

22         MR. LOMONACO: Okay. Well, then, let's go to

23   9-B again. And go all the way to the bottom.

24         Now, just page up one page at a time for a

25   while there.

1    BY MR. LOMONACO:

2    Q.      You've seen these assurance letters before,

3    have you not?

4    A.      Can you explain what you mean by "assurance

5    letter," if it's anything different than the signed

6    cooperative agreement that they signed?

7    Q.      Assurance letter --

8           MR. LOMONACO:  Have you got one?  Put one up.

9    BY MR. LOMONACO:

02:08PM   10    Q.      This is Exhibit 3-Z.  I think it's already been

11    admitted.  Do you see where it says Assurance across the

12    top?

13    A.      Yes, sir.

14    Q.      Have you ever seen one of those from the

15    University of Tennessee that you can recall?

16    A.      It doesn't look familiar to me, but it doesn't

17    mean it wasn't included.

18    Q.      Included in what?

19    A.      In a proposal.

02:09PM   20    Q.      Do you want to look through the whole proposal?

21    My understanding is it would be included at the end, but

22    we can page through the proposal.

23    A.      Okay.  This is the submission of the proposal.

24    The proposer represents that it's not Chinese or Chinese

25    national.

1 Q.        And this is signed actually by -- I think by --

2 this one is Mr. Smelser.  The assurance letter is signed

3 by -- well, it should be signed.  This is just an

4 example.  This is not the one that was in the --

5 A.        Okay.

6 Q.        -- the proposal that was submitted to you.

7           MR. LOMONACO:  Let's go to -- excuse me -- 9-D

8 again.

9 BY MR. LOMONACO:

02:10PM 10 Q.        And you were asked to review some paragraphs in

11 this proposal pertaining to Dr. Hu.

12 A.        Yes.

13           MR. LOMONACO:  Can we go to those paragraphs

14 again?  Keep going.  Here it is.

15 BY MR. LOMONACO:

16 Q.        Had you received any previous proposals from UT

17 drafted by Dr. Hu that you recall?

18 A.        I can't recall.  There has been so many

19 different papers.

02:11PM 20 Q.        Okay.  Now, the question was put to you that if

21 Dr. Hu had disclosed -- and I don't want to misquote it,

22 but if he had disclosed an affiliation or association

23 with a Chinese university, you said you would take that

24 up with your supervisors or compliance review, or what

25 would you do?

1    A.        If we were aware there was anything that seemed

2    out of the ordinary or that was dealing with a Chinese

3    company or affiliation, we probably would have addressed

4    that with the university and then dealt with our policy

5    office and legal office to determine what to do with it.

6    Q.        Okay.  Does NASA have -- besides the NASA

7    restriction --

8    A.        Uh-huh.

9    Q.        -- have any instructions to universities such

02:12PM  10   as UT to ask their professors if they have affiliations

11   with China?

12   A.        There is clauses that are included within all

13   of our documentation that outline the requirements and

14   restrictions that we have.  At that time if there is any

15   questions, the university or the companies would ask

16   us --

17   Q.        Okay.

18   A.        -- what does it mean.

19   Q.        That's not my question, though.

02:12PM  20   A.        Can you restate it, please?

21   Q.        Does NASA have any guidance, documents, or

22   instructions that would be given to the University of

23   Tennessee to ask their principal investigators if they

24   have any affiliations or associations with a Chinese

25   company?

1    A.        I do not know.  I have not seen any.

2    Q.        And is the responsibility of making sure that

3    the NASA restriction is complied with a responsibility

4    ultimately for the proposer?

5    A.        Say that one more time for me, please.

6    Q.        Is the responsibility -- the ultimate

7    responsibility to comply and follow the NASA

8    restriction, whatever it means, an ultimate

9    responsibility of the proposer?

02:13PM  10   A.        Yes.

11   Q.        Yes?

12   A.        Yes.

13   Q.        And in this case, UT is the proposer?

14   A.        Yes.

15   Q.        But you know of no instructions to UT to ask

16   their principal investigators if they have any

17   affiliations with China?

18   A.        Nothing other than the terms in the agreement.

19   Q.        I see.  Well, the terms in the agreement say

02:14PM  20   that they will comply and they will not have any

21   violations of the NASA restriction; right?

22   A.        Yes, sir.

23   Q.        But it doesn't say for them to search or ask

24   questions to comply with that; correct?

25   A.        That's their business how they do that, as far

1  as I know.

2  Q.        So that's really not up to NASA; that's up to

3  the UT?

4  A.        It's UT's responsibility.

5  Q.        Are you familiar with any other -- you work for

6  NASA.  So you're not familiar with other agencies that

7  give grants; just NASA?

8  A.        Just NASA.

9          MR. LOMONACO:  Okay.  Let's go to 9-Q; okay?

02:14PM 10  BY MR. LOMONACO:

11  Q.        While he's doing that, let me ask you:  Do you

12  know with any degree of certainty how much affiliation a

13  principal investigator would need to have with a Chinese

14  university in order to not be allowed a NASA grant?

15  A.        It says "will have no affiliation".  That's

16  what I believe the clause would be.  We'd have to look

17  at that clause to get the specific language.

18  Q.        Okay.  So it depends, doesn't it?

19  A.        Each situation would be different.  But --

02:15PM 20  Q.        I mean, if -- if a principal investigator flew

21  to China just to visit his son at Beijing University, I

22  mean, that wouldn't be too big of a deal, would it?

23  A.        I don't know.

24  Q.        You don't know?  So it just depends; correct?

25  A.        I think it depends on the university and the

1   clause and the terms and conditions of that agreement.

2              MR. LOMONACO:  9-Q.

3              MR. PARSONS:  9-Q is not an exhibit.  It ends

4   at P.

5              MR. LOMONACO:  Do you have 9-P?

6              (A discussion was had off the record.)

7              MR. LOMONACO:  Okay.  If we can go to 9-B.

8   BY MR. LOMONACO:

9   Q.         This is the letter of commitment, and it

02:16PM 10  gives -- is this the document that gives the dates?

11             Yes, it says the inclusive dates anticipated is

12  November of 2018 to October 31st, 2019.

13  A.         Yes.

14  Q.         Does that mean that those are the dates that

15  NASA and the UT research team are going to be working

16  together?

17  A.         Those are the dates they believe would work.

18  It's not always in alignment with that when they're

19  signed.

02:17PM 20  Q.         Okay.  And -- well, thank you very much,

21  Ms. Cooper.  I appreciate it.

22             THE COURT:  Thank you.

23             Redirect?

24             MR. ARROWOOD:  Nothing further, Your Honor.

25  Thank you.

1      THE COURT:  All right.  Thank you.  This

2  witness may be excused.

3      The government may call its next witness.

4      MR. ARROWOOD:  Your Honor, at this time, the

5  government calls Kelcey Cole.

6      MR. LOMONACO:  I apologize.

7      THE COURT:  That's all right.  All set?

8      We'll swear in the witness.

9      (The witness was thereupon duly sworn.)

02:19PM 10      THE COURTROOM DEPUTY:  Have a seat, please.

11  Scoot in really close.

12      Will you state and spell your name for the

13  record.

14      THE WITNESS:  Kelcey Cole, K-e-l-c-e-y, Cole,

15  C-o-l-e.

16      THE COURTROOM DEPUTY:  Thank you.

17                  **KELCEY COLE**,

18  having been first duly sworn, was examined and testified

19  as follows:

02:19PM 20                  DIRECT EXAMINATION

21  BY MR. ARROWOOD:

22  Q.     Good afternoon, Ms. Cole.

23      Would you please tell the jury what you do for

24  a living.

25  A.     I'm a contract specialist for Marshall Space

1  Flight Center.

2  Q.        Is that in Alabama?

3  A.        Yes.

4  Q.        How long have you been at the Marshall Space

5  Flight Center?

6  A.        Since about 2016; so a little over five years.

7  Q.        Have you held the same job at Marshall Space

8  Flight Center for that five-year time period?

9  A.        I started off as a student trainee, and then

02:20PM  10  after I finished my master's degree, then I was

11  converted to a contract specialist.

12  Q.        Do you recall when that was?

13  A.        I want to say in 2018.

14  Q.        Have you been a contract specialist ever since

15  2018?

16  A.        Yes.

17  Q.        Will you please briefly describe in general

18  terms the scope and duties of a contract specialist.

19  A.        So a contract specialist, you can work on a

02:20PM  20  variety of type of contracts.  So I would just say

21  contracts, cooperative agreements, interagency

22  agreements.  That's all I can think of off the top of my

23  head.

24  Q.        What does a contract specialist do when you say

25  working with these agreements?

1    A.        Basically the daily activities of administering

2    the contracts.  So you talk to the contractor on a daily

3    basis.  You manage invoices.  You do modifications to

4    different types of contracts.  That's pretty much it,

5    yeah.

6    Q.        So in the course of your duties, would you

7    interact with universities?

8    A.        Yes.

9    Q.        How frequently?

02:21PM 10   A.        It would depend on if their cooperative

11   agreement would have something that need to be done, as

12   far as a modification or an invoice or if we were

13   working on white papers or proposals.  So it just

14   depends on what was needed for that cooperative

15   agreement.

16   Q.        So in terms of cooperative agreements

17   specifically, does a contract specialist put that

18   document together?

19   A.        Yes.

02:22PM 20   Q.        Do you fill in most of the --

21   A.        Yes, you --

22   Q.        -- aspects of the document; is that right?

23   A.        You put the file together.  So, as far as like

24   the white paper and the proposal, everything that we

25   would need to document a file for the cooperative

1  agreement, that's what the contract specialist would put

2  together.

3  Q.      And do you negotiate any terms with

4  universities on these cooperative agreements?

5  A.      To a certain extent, yes.  I won't say the

6  contract specialist negotiates them, but the contract

7  specialist puts them in the award, and then if the

8  contracting officer agrees and the university agrees,

9  then that's where it comes in.  But I don't negotiate

02:22PM  10  them.

11  Q.      Okay.

12  A.      Okay.

13  Q.      So just in terms of your role, once you get the

14  documents together and the university, for example,

15  agrees with everything, what do you do next?

16  A.      Can you repeat that?

17  Q.      What do you do next after you kind of have

18  a -- let me back up.

19          So, prior to a signature --

02:23PM  20  A.      Okay.

21  Q.      -- you put the document together; correct?

22  A.      Yes.

23  Q.      You interact with the university in putting

24  that together?

25  A.      Yes.

1  Q.        Okay.  So, then, let's say at that point there

2  is an agreement but it's not yet signed.  Do you

3  recommend that someone in your office sign that

4  document?

5  A.        I recommend that they sign it after the

6  university has signed it.  So the -- the contracting

7  officer will have reviewed the cooperative agreement

8  before it went to the university, and then once they

9  agree that it's a good cooperative agreement, it will go

02:23PM  10  to the university for signature, and then it will come

11  back to us.

12  Q.        At that point, is it eventually signed by the

13  contracting officer?

14  A.        Yes.

15  Q.        Who is your supervisor while you're a contract

16  specialist?

17  A.        My supervisor would be our branch chiefs.  So

18  right now it's Sadie Molten.

19  Q.        And how about prior?

02:24PM  20  A.        Prior to that it was Kathy Cooper.

21  Q.        Okay.  Great.

22            And earlier I think you mentioned the invoicing

23  process.  Do you get involved in the invoicing process?

24  A.        Yes.

25  Q.        Please sort of describe for the jury briefly

1    what that process is or -- I'm sorry -- what your role

2    in that process is.

3    A.       So my role would be the invoice would come in

4    to me from the Iris system.  So the university or

5    whoever would have to submit an invoice -- they would

6    have to submit an invoice to Iris or the NSSC, and then

7    the NSSC would route that invoice to the contract

8    specialist or the buyer, whoever the buyer was that was

9    listed.

02:24PM 10    Q.       Would that be someone in your role or would

11    that be someone else?

12    A.       That would be my role.

13    Q.       What would you do with that?

14    A.       So, with that, I would take the invoice and I

15    would send it to the technical representative and I

16    would ask them if they want to approve or reject the

17    invoice.

18    Q.       All right.  Then what happens if the technical

19    manager approves the invoice; what was next?

02:25PM 20    A.       I would put that approval notice in the Iris

21    system, and then I would send the email to the

22    contracting officer and tell them that the invoice has

23    been -- that technical has concurred with the invoice

24    and that I suggest they approve it.

25    Q.       And only if you know, what happens to the

1    invoice after the contracting officer approves?

2    A.        It goes back to the NSSC, and I don't know

3    after that part.

4    Q.        Do you know where the NSSC is located?

5    A.        I think it's in Mississippi.

6    Q.        Thank you.

7             Now I'd like to show you some documents.

8    A.        Okay.

9    Q.        I'd like to start by showing you Government's

02:25PM  10   Exhibit 9-A.

11            MR. ARROWOOD:  Your Honor, I believe this has

12   already been admitted.

13   BY MR. ARROWOOD:

14   Q.        Take a moment.  Do you recognize this document?

15   A.        Yes.

16   Q.        Is that your email address in the carbon copy

17   line?

18   A.        Yes.

19   Q.        Just take a second and read that email, and

02:26PM  20   then at the end, I'm just going to ask you what's going

21   on in this email generally.

22   A.        Okay.

23   Q.        Okay.  So what's going on in this email?

24   A.        In this email, it looks like Jennifer works at

25   the university.  She has submitted the proposal for

1  Dr. Hu.

2  Q.        Okay.  Does this email appear to contain some

3  attachments?

4  A.        Yes.

5  Q.        I'm not going to show you the attachments.

6  A.        Okay.

7  Q.        At this time, I'd like to show you Government's

8  Exhibit 6-A.  Take a look at this document.

9           Do you recognize this?

02:26PM 10  A.        Yes.

11  Q.        What is this?

12  A.        Can you scroll down a little bit so I can read

13  the body of the -- thank you.  It's the proposal

14  selection letter.

15  Q.        So, in terms of the cooperative agreement

16  process, at what stage in that process does a letter

17  like this get submitted?

18  A.        So the selection letter is normally sent

19  after -- after the selection board, after they have

02:27PM 20  approved this as being the agreement that the center and

21  the technical think it would be -- they think it would

22  be beneficial for us to do the work with the university.

23  So this letter normally comes out after they agree that

24  this would be a good cooperative agreement.

25  Q.        Okay.  But is this letter sent before a

1  cooperative agreement is signed?

2  A.       No.

3  Q.       The cooperative agreement is actually signed

4  before the proposal is awarded?

5  A.       Oh, I'm sorry.  I misunderstood your question.

6  Can you ask me again?

7  Q.       It's probably my fault.

8           So at this stage, once this document is

9  submitted or sent out, I should say, is this before a

02:28PM  10  cooperative agreement is ultimately signed?

11  A.       Yes.

12           MR. ARROWOOD:  Okay.  Please scroll down to the

13  bottom.

14           And is that your electronic signature?

15  A.       Yes.

16  Q.       All right.  Thank you.

17           I'd like to show you Government's Exhibit 9-E.

18           MR. ARROWOOD:  Please scroll down to the

19  bottom.  All right.  Stop right there (indicating).

02:28PM  20  BY MR. ARROWOOD:

21  Q.       So this particular email, do you know who Greg

22  Tolliver is?

23  A.       Can you, I guess, ask me that question -- I

24  guess what's your definition of "know him," because I

25  don't --

1  Q.      Do you recognize the name?

2  A.      Yes.

3  Q.      Okay.  Is he associated with the University of

4  Tennessee?

5  A.      Yes.

6  Q.      And is this an email to you?

7  A.      Yes.

8  Q.      Okay.  If you would just please describe for

9  the jury what's going on in this email.

02:29PM  10  A.      It looks like Greg is responding back to my

11  email, and he's telling me that the university is

12  reviewing the cooperative agreement we've sent them for

13  signature.

14          MR. ARROWOOD:  Okay.  Please scroll up to the

15  next email.

16  BY MR. ARROWOOD:

17  Q.      Did you respond?

18  A.      Yes.

19          MR. ARROWOOD:  Okay.  Please scroll up.

02:30PM  20  BY MR. ARROWOOD:

21  Q.      Okay.  So this particular response, just take a

22  moment and take a look at it.

23          And please explain for the jury kind of what's

24  going on in this email.

25  A.      In this email, Greg is saying that the

1    university has signed the agreement and they're agreeing

2    to the start date.

3    Q.        Okay.  Who is identified in the cc line of this

4    email?

5    A.        Dr. Hu.

6    Q.        Does it appear that this email has an

7    attachment?

8    A.        Yes.

9    Q.        Okay.  I'd like to show you what's been marked

02:30PM 10  as Government's Exhibit 9-F.

11           MR. ARROWOOD:  I believe this was previously

12   admitted.  Actually, no.

13   BY MR. ARROWOOD:

14   Q.        Do you recognize this document?

15   A.        Yes, it appears to be the cooperative

16   agreement.

17           MR. ARROWOOD:  Your Honor, at this time, we'd

18   move to admit Government's Exhibit 9-N (sic).

19           THE COURT:  So admitted.

02:31PM 20         MR. ARROWOOD:  I'm sorry, 9-F.

21           THE COURT:  9-F?  So admitted.

22   BY MR. ARROWOOD:

23   Q.        What is this document?

24   A.        This is the NASA Form 1687.

25   Q.        And is that a NASA Grant and Cooperative

1    Agreement?

2    A.        Yes.

3    Q.        Who is the recipient of this?

4    A.        The University of Tennessee.

5    Q.        And the awarding organization?

6    A.        Marshall Space Flight Center.

7    Q.        Principal investigator?

8    A.        Dr. Anming Hu.

9             MR. ARROWOOD:  Please scroll down.

02:31PM 10   BY MR. ARROWOOD:

11   Q.        What's the amount of the award for this

12   cooperative agreement?

13   A.        $50,000.

14   Q.        There it lists you, I believe, as the

15   negotiator; is that correct?

16   A.        Yes.

17   Q.        What does that mean?

18   A.        That means that I negotiated this award on

19   behalf of Marshall Space Flight Center.

02:32PM 20   Q.        Does it also list you as an administrator?

21   A.        Yes.

22   Q.        What, if anything, does that mean?

23   A.        That I would be doing the day-to-day actions

24   for this cooperative agreement or any changes to this

25   cooperative agreement if they were needed.

1  Q.        Is that your email address there on the

2  right-hand side?

3  A.        Yes.

4  Q.        Okay.  Great.

5            MR. ARROWOOD:  Please scroll down to Box 16.

6  BY MR. ARROWOOD:

7  Q.        Which boxes are checked under No. 16?

8  A.        All three, Terms and Conditions, Special

9  Conditions, Required Publications and Reports.

02:32PM  10            MR. ARROWOOD:  Okay.  Scroll down to the

11  signature section, please.

12  BY MR. ARROWOOD:

13  Q.        Okay.  So here on the left-hand side of the

14  document, who is the name of the grant officer?

15  A.        Iris Walter.

16  Q.        Do you know Iris Walter?

17  A.        Yes.

18  Q.        Does she work at your office?

19  A.        She works in our organization, but she doesn't

02:33PM  20  work in PS22 anymore.  So Iris is -- works in our policy

21  office now.

22  Q.        Okay.  But back in 2018, did she work in your

23  office; do you recall?

24  A.        Yes, she was our team lead at the time.

25  Q.        So did she have the authority to sign this

1  agreement on behalf of Marshall Space Flight Center, if

2  you know?

3  A.      Yes.

4  Q.      Then on the right-hand side, does this document

5  appear to be signed?

6  A.      Yes.

7          MR. ARROWOOD:  I'd like to scroll down to

8  page 4 of this document.

9  BY MR. ARROWOOD:

02:33PM  10  Q.      Is it typical to have the terms and conditions

11  attached to the cooperative agreement like this?

12  A.      Yes.

13  Q.      And there it identifies in the middle of the

14  page a term and condition related to China.  Are you

15  familiar with that?

16  A.      Yes.

17  Q.      To your knowledge, is this restriction a part

18  of every cooperative agreement that Marshall Space

19  Flight Center awards?

02:34PM  20  A.      To my knowledge, yes.

21          MR. ARROWOOD:  All right.  Let's go back to

22  Government's Exhibit 9-E, please.

23  BY MR. ARROWOOD:

24  Q.      All right.  We've seen this email before, but I

25  just wanted to direct your attention to the top.  What's

1    the date on this email?

2    A.        November 12th, 2018.

3    Q.        Do you recall what state in the United States

4    you were in when you received this email?

5    A.        Alabama.

6    Q.        Thank you.

7              MR. ARROWOOD:  All right.  You can take that

8    off.

9    BY MR. ARROWOOD:

02:34PM 10   Q.        If at the time that you were working on this

11   particular cooperative agreement, if you had known that

12   a principal investigator was employed at a university in

13   China, would you have processed this cooperative

14   agreement as usual?

15   A.        Not as usual.  I would have forwarded that

16   information to either my team lead at the time or our

17   office chief and just gave the information to them and

18   asked them to advise me.

19   Q.        Do you know if your office or the people you

02:35PM 20   work with if they do any independent investigating to

21   determine whether or not a principal investigator has

22   any employment in China?

23   A.        To my knowledge, no.

24   Q.        Why not?

25   A.        Because we check the SAM registration to make

 1   sure that the university or commercial farm that we're

 2   doing business with is registered in SAM.  So if they're

 3   registered in SAM, then we're able to award a contract

 4   or cooperative agreement with them.  So, no.

 5   Q.        To your knowledge, has the university ever

 6   declined to sign a cooperative agreement with Marshall

 7   Space Flight Center because of the China funding

 8   restriction?

 9   A.        To my knowledge, no.

02:36PM 10   Q.        To your knowledge, has a university ever asked

11   that the restriction be removed from a cooperative

12   agreement?

13   A.        To my knowledge, no.

14             MR. ARROWOOD:  Your Honor, could I just have

15   one second?

16             No further questions, Your Honor.

17             THE COURT:  Thank you.

18             Cross-examination?

19                     CROSS-EXAMINATION

02:36PM 20   BY MR. LOMONACO:

21   Q.        Good afternoon, Ms. Cole.

22   A.        Hi.

23   Q.        Ms. Cole, are you familiar with what they call

24   an assurance letter?

25   A.        No.

1    Q.        No?  Does NASA, to your knowledge, require the

2    proposer to assure that they are in compliance with all

3    of the terms and conditions of the contract?

4    A.        I would assume so, yes.

5    Q.        Or do they just do it by signing their

6    contract?  I mean, is there a separate document that you

7    know of?

8    A.        I guess I don't really understand your

9    question.

02:37PM  10    Q.        I'm sorry?

11    A.        I don't understand your question.  Can you --

12    Q.        Well, I'm asking if -- you're the contract

13    specialist.  You would have responsibility to have a

14    file on the contract; right?

15    A.        Yes.

16    Q.        And you would have a file on the proposal, too,

17    that would be in the con- -- in the file?

18    A.        Would I have the proposal?  Yes.

19    Q.        Yes.

02:38PM  20              Did you see an assurance letter from the

21    University of Tennessee as a separate document, maybe

22    attached at the back of the proposal?

23    A.        It doesn't ring a bell; so I'm not really sure.

24    Q.        I'm sorry?

25    A.        I can't remember; so I'm not sure.

1    Q.        Okay.  Thank you.

2              Let me ask you:  Do you do any of the

3    assurances or compliance -- what's the word I'm looking

4    for?

5              Do you actually look for a statement that the

6    proposer is in compliance with the NASA restriction, the

7    China restriction?

8    A.        No.

9    Q.        No?  Okay.  So you're really not too familiar

02:39PM  10  with who would be responsible for making sure that, say,

11   the principal investigator didn't have a part-time job

12   in China?

13   A.        Can you rephrase that?

14   Q.        Well, would the proposer be responsible for

15   making the assurances on the contract?

16   A.        I just -- I don't understand the question.  I'm

17   sorry.

18   Q.        Let me ask it one other way.

19   A.        Okay.

02:39PM  20  Q.        When you have the contract, the compliance

21   agreement, I believe -- that's what you call the

22   contract; right?

23   A.        No.

24   Q.        What do you call it?

25   A.        It will be a cooperative agreement.

1   Q.        Cooperative agreement.  Yes.  NASA is one of

2   the parties on that agreement and the proposer is the

3   other party; correct?

4   A.        Yes, the university is the other party.

5   Q.        The university.  I guess that's what I wanted

6   to say.

7   A.        Okay.

8   Q.        So the university is the one on the contract,

9   not -- contracting with NASA; correct?

02:40PM  10   A.        Yes.

11             MR. LOMONACO:  Thank you very much.

12             THE COURT:  Thank you.

13             Any redirect?

14             MR. ARROWOOD:  No, Your Honor.

15             THE COURT:  Thank you.  This witness may be

16   excused.

17             Next witness, please.

18             MR. MC KENZIE:  Your Honor, the government

19   calls Carol Malkemus.

02:41PM  20             (The witness was thereupon duly sworn.)

21             THE COURTROOM DEPUTY:  Have a seat, please.  If

22   you'll scoot as close as you can.

23             Will you state and spell your name for the

24   record.

25             THE WITNESS:  My name is Carol Malkemus,

1 C-a-r-o-l, M-a-l-k-e-m-u-s.

2 THE COURTROOM DEPUTY: Thank you.

3 MR. MC KENZIE: Your Honor, may I inquire?

4 THE COURT: Yes.

5 **CAROL MALKEMUS**,

6 having been first duly sworn, was examined and testified

7 as follows:

8 DIRECT EXAMINATION

9 BY MR. MC KENZIE:

02:41PM 10 Q. Good afternoon. By whom are you employed?

11 A. The University of Tennessee.

12 Q. What is your current position?

13 A. My current position is director of sponsored

14 projects accounting.

15 Q. Approximately how long have you served in that

16 role?

17 MR. LOMONACO: Excuse me. I'm sorry; could you

18 move a little bit closer to the microphone, please.

19 THE WITNESS: Sure, yeah.

02:41PM 20 MR. LOMONACO: Thank you.

21 BY THE WITNESS:

22 A. I've been the director of sponsored projects

23 accounting since 2008.

24 BY MR. MC KENZIE:

25 Q. Please describe to the jury what some of your

1    duties and responsibilities are in your role.

2    A.        Sure.  We provide the financial accounting,

3    reporting, billing, collections of grants and contracts

4    for the Knoxville campus.  We do also financial

5    compliance as well.

6    Q.        Are you familiar with the term

7    "sponsored" -- "sponsored programs"?

8    A.        Yes.

9    Q.        Are you familiar, in general, with how funds

02:42PM 10  get awarded to the University of Tennessee at Knoxville?

11   A.        Generally, yes; yeah.

12   Q.        Please describe to the jury, like, at which

13   point of that process does your -- or do you in your

14   office get involved?

15   A.        Okay.  So when the faculty members submit a

16   proposal and if the proposal is awarded into a grant or

17   a contract, then it comes to my office, and then what we

18   do is:  We would set up the accounting for it to collect

19   the costs and then report to the sponsors and collect

02:42PM 20  the money.

21   Q.        Please describe to the jury the process that

22   occurs once the research begins.

23   A.        Once the research begins, like I said, our

24   account -- our office establishes an account in our

25   accounting system, and then the department and the

1  faculty members start to incur costs and then post to

2  that account, and then my office is the one that we act

3  as the go-between between the university and the

4  sponsor.  So we do all the financial reporting and the

5  billing and the collecting based on the PI's or the

6  faculty member's expenditures.

7  Q.      When you say "PI," just -- what do you mean by

8  that?

9  A.      Principal investigator.

02:43PM 10  Q.      How does your office let the sponsor know that

11  the university wants to get paid and how much money the

12  sponsor should be giving the university?

13  A.      So each award agreement that we receive that's

14  fully executed generally has terms and conditions on how

15  we go about to collect the funds, and so we review the

16  award agreement and abide by the terms and agreements.

17          Some cases it's cost reimbursement, and if we

18  have to submit a bill or an invoice, you know, it

19  depends on what their terms are.

02:44PM 20          Generally most of our awards are cost

21  reimbursement, and we usually try to bill every month or

22  whatever is allowed per the agreement.

23  Q.      Do you review the terms and conditions of the

24  agreement or contract?

25  A.      Yes.  We -- my office primarily focuses on the

1    financial reporting since that's what we're responsible

2    for.

3             (Government's Exhibit 8-T was marked for

4              identification.)

5    BY MR. MC KENZIE:

6    Q.       I'd like to draw your attention now to July of

7    2017, and show the witness what has been marked as 8-T,

8    as in Thomas, for identification.

9             Do you recognize this document?

02:45PM 10   A.       Yes, this is our typical standard invoice form.

11            MR. MC KENZIE:  Could we scroll down to the

12   bottom.

13   BY MR. MC KENZIE:

14   Q.       Did you sign this document?

15   A.       Yes.

16            MR. MC KENZIE:  Your Honor, at this time, I ask

17   that Exhibit 8-T be admitted into evidence.

18            THE COURT:  So admitted.

19            (Government's Exhibit 8-T was received into

02:45PM 20            evidence.)

21            MR. MC KENZIE:  Could we please scroll back up

22   to the top.

23   BY MR. MC KENZIE:

24   Q.       Will you please explain to the jury, what is

25   this form and what is the purpose of the form?

A.        This is a typical invoice that our department

generates through our accounting system.  It's a

standard invoicing form.  And so this tells us who is

our sponsor, who is paying for the research on this,

tells us the invoice number.  It tells us the agreement

period.  The invoice period in this case was June 2017.

It shows that this award was for a total of $60,000.

And then the middle section tells us the budget, the

cumulative expenditures through that period, and also

02:46PM  what was incurred for that invoicing period of June

2017.

Q.        Who was the sponsor for this particular

invoice?

A.        NASA.

          MR. MC KENZIE:  Okay.  Can we scroll down.

BY MR. MC KENZIE:

Q.        What was the total amount that was being

requested from NASA in this invoice?

A.        $11,202.74.

02:47PM           MR. MC KENZIE:  Can we scroll down, please.

Could we please highlight Certification.

BY MR. MC KENZIE:

Q.        Would you please read that certification to the

jury?

A.        (As read) "I certify that all expenditures

1    reported or payment requested are for appropriate

2    purposes and in accordance with the provisions of the

3    application and the award documents."

4    Q.       And then underneath that certification, whose

5    signature is that?

6    A.       That is mine.

7    Q.       At the time you signed this document, did you

8    believe that the expenditures in the invoice were,

9    indeed, in accordance with the provisions of the

02:47PM  10   application and award documents?

11   A.       Yes.

12   Q.       Upon what did you base this belief?

13   A.       One, the award was fully executed.  And -- and

14   that everything was assured in the terms and conditions

15   and it was signed and sent to our office.  Had we known

16   anything different, of course, we would have reached out

17   and --

18   Q.       Reached out and what?

19   A.       And inquired before sending.

02:48PM  20   Q.       What did you do with that invoice after you

21   signed it?

22   A.       After I signed it, then it usually goes to my

23   admin person.  And in this case, it was emailed per the

24   instructions in the award agreement, which is to a NASA

25   email account.

1   Q.      Okay.  Did you personally send that email?

2   A.      No, I did not.

3   Q.      Who did you give the invoice to to send it?

4   A.      My admin assistant, Robin Owens.

5           MR. MC KENZIE:  Your Honor, I have no further

6   questions.

7           THE COURT:  Thank you.  Cross-examination.

8                       CROSS-EXAMINATION

9   BY MR. LOMONACO:

02:49PM 10   Q.      Good afternoon.  Is it Ms. Malkemus?

11   A.      Malkemus.

12   Q.      Malkemus?

13   A.      Yes.

14   Q.      Good afternoon.

15           You indicated a minute ago that had there been

16   some problem, you would have reached out to your

17   administrators of some kind?

18   A.      If there were; if it was known, yes.

19   Q.      If what was known?

02:49PM 20   A.      If there were any issues with the -- with the

21   terms of the agreement.

22   Q.      Okay.  Did somebody discuss that with you

23   before you testified here today?

24   A.      No.

25   Q.      Okay.  Are you -- you're aware of what this

1    case is about; right?

2    A.        Generally, yes; yeah.

3    Q.        Okay.  On this invoice, there was a payment to

4    the professor; is that correct?  Do you want to see it

5    again?

6             MR. PARSONS:  It's up.

7    BY MR. LOMONACO:

8    Q.        Faculty salary.

9    A.        I'm not sure whose salary that was.

02:50PM 10    Q.        All right.

11    A.        It's a faculty member's salary, but I don't

12    know whose.

13    Q.        Would it be fair to say that most of the -- and

14    you handled mostly the contracts with sponsors; right?

15    A.        I handle the financial end, yes.

16    Q.        Financial end of --

17    A.        Yes.

18    Q.        -- sponsor agreements?

19    A.        Uh-huh, yes.

02:50PM 20    Q.        And when the faculty works during the summer

21    and the faculty member is a nine-month employee for the

22    University of Tennessee, he would get compensation for

23    his summer work through the grant; is that correct?

24    A.        It's possible, yes.

25    Q.        Okay.  Are you aware that faculty members that

1  are nine-month employed members can usually take the

2  summer off?

3  A.        Yes.

4  Q.        Okay.  So if they're working on something, do

5  they usually apply for some sort of payment while

6  they're working during the summer?

7  A.        If they're working on a sponsor project and

8  working towards -- for that research, then, yes, they

9  can apply for a summer salary or additional pay, yes.

02:51PM  10  Q.        Okay.  Are you familiar with the total

11  amount -- oops -- of this contract?

12  A.        Yes.

13  Q.        And this is not a total amount on the contract,

14  is it?  This is just a monthly invoice?

15  A.        The total amount of the contract is awarded for

16  $60,000.  This invoice is requesting funds for the

17  amount spent of $11,202.74.

18  Q.        Okay.  And who is making that request?

19  A.        That is our office making the request on behalf

02:52PM  20  of the University of Tennessee.

21  Q.        Okay.  Making the request to NASA?

22  A.        Correct.

23  Q.        Okay.

24  A.        Yes.

25          MR. LOMONACO:  Thank you, ma'am.

1  THE COURT: All right. Thank you.

2  Any redirect?

3  MR. MC KENZIE: No, Your Honor.

4  THE COURT: Thank you. If the witness will

5  just hold on. We've had a request to go ahead and take

6  our afternoon break. So we'll excuse the jury at this

7  time for our afternoon recess.

8  And in conjunction with the recess, this

9  witness is excused.

02:52PM  10  (Jurors excused from the courtroom.)

11  THE COURTROOM DEPUTY: This honorable court is

12  in recess until 3:05.

13  THE COURT: 3:10.

14  (A brief recess was taken.)

15  THE COURTROOM DEPUTY: All rise.

16  THE COURT: All right. Thank you. Let's bring

17  our jury in.

18  (Whereupon the following report of

19  proceedings was had within the presence

03:25PM  20  and hearing of the jury:)

21  THE COURT: All right. Thank you. Everyone

22  may be seated. And Ms. Norwood will swear in our next

23  witness.

24  (The witness was thereupon duly sworn.)

25  THE COURTROOM DEPUTY: Have a seat. Scoot in

1    super, super close.

2              Please state and spell your name for the

3    record.

4              THE WITNESS:  Monica Cole, M-o-n-i-c-a,

5    C-o-l-e.

6              THE COURTROOM DEPUTY:  Thank you, ma'am.

7              MR. MC KENZIE:  Your Honor, may I inquire?

8              THE COURT:  Yes.

9                        **MONICA COLE**,

10   having been first duly sworn, was examined and testified

11   as follows:

12                      DIRECT EXAMINATION

13   BY MR. MC KENZIE:

14   Q.        Good afternoon.  By whom are you employed?

15   A.        The University of Tennessee.

16   Q.        What is your current position with University

17   of Tennessee?

18   A.        Assistant director in the sponsored projects

19   accounting department.

03:26PM  20   Q.        How long have you been assistant director?

21   A.        It will be 16 years October 1st.

22   Q.        What is your educational background?

23   A.        I have a bachelor's degree in accounting.

24   Q.        From where did you earn that degree?

25   A.        The University of Tennessee, Knoxville.

1    Q.          After receiving your degree in accounting, what

2    did you do professionally?

3    A.          I started my career at Ernst & Young.  And then

4    I was in healthcare for 15 years.  For ten of those

5    years, I was the internal audit manager, and then for

6    five years, I was assistant controller for a local

7    hospital.  And then I've been with UT for the last

8    16 years in this role.

9    Q.          Are you familiar with the phrase "sponsored

03:27PM  10    programs"?

11    A.          Yes, sir.

12    Q.          Please explain to the jury what your role in

13    sponsored programs is as far as accounting.

14    A.          We're responsible for the billing, the

15    collections, and the financial reporting for grants and

16    contracts received by the faculty at the University of

17    Tennessee, Knoxville campus.

18    Q.          Who provides -- who provides those

19    payments -- or excuse me -- those documents for you to

03:27PM  20    review in order for you to issue payments?

21    A.          The pre-award office sponsored programs would

22    send the contract to our office, and then once the

23    charges post to the account, we would begin our process

24    of preparing the invoices and submitting those to our

25    sponsors.

1  Q.        In your role as an accountant, are you involved

2  in preparing proposals?

3  A.        No, sir.

4  Q.        Are you involved in signing contracts?

5  A.        No, sir.

6  Q.        Are you involved prior to a contract or

7  agreement being signed in any way?

8  A.        We may be asked for advice on terms and

9  conditions, but -- before a contract is signed, but

03:28PM  10  typically we are not involved in that process.

11  Q.        Once research begins, please explain to the

12  jury how invoices are created and to whom they are

13  submitted.

14  A.        So, once the faculty and the students begin the

15  work, the department -- so, for example, mechanical

16  engineering, they would actually post the charges in the

17  department, and then at the end of the month, the

18  controller's office closes the accounting books at the

19  university, and that's when our accountants would begin

03:29PM  20  to see those charges in our accounting software.  The

21  accountants would then prepare those invoices in

22  accordance with the contract terms and present them the

23  way the sponsor wants the bills presented.

24        And then once the invoice is prepared, it's

25  submitted to me for review and signature, and then we

submit those to the sponsor in the way they want them

submitted, whether it's email or via the portal.

Q.      You made a reference to the terms of the

agreement.  In your role as an accountant, to what

extent do you review the terms of those agreements?

A.      We focus primarily on the financial terms and

conditions.  So, for example, how the sponsor wants the

invoice prepared, how they want the invoice submitted,

what would be considered appropriate charges on that

particular project.  So mainly financial terms and

conditions.

Q.      Whom, if anyone, do you rely on when

determining whether or not the university is in

compliance with those terms and conditions?

A.      We rely on the department where the charges are

actually posted in the field.  That's where the faculty

certifies their time, and where students report their

time, and where the travel documents are processed.  We

also rely on the pre-award office to review the terms

and conditions in advance, so by the time we become

involved in the process, the proposal has been

submitted, the contract has been negotiated and signed,

the work has been conducted -- at least partially -- and

then we start the billing process.

Q.      As an accountant, are you conducting any

1    independent investigations into whether or not the terms

2    of the agreement are being complied with?

3    A.        Strictly from a financial standpoint.  So as I

4    review an invoice, if I see something that I think may

5    be outside the terms and conditions, we would research

6    that further.

7    Q.        I'd like to draw your attention now to in or

8    about February 2017.

9              And I'd like to show you what has been marked

03:31PM 10   as Exhibit 8-O, as in Oscar, for identification at this

11   point.

12             (Government's Exhibit 8-O was marked for

13              identification.)

14   BY MR. MC KENZIE:

15   Q.        Showing you 8-O.  In general terms, what type

16   of document is this?

17   A.        This is what we call a cost reimbursable

18   invoice.  And so that type of contract requires that we

19   invoice dollar for dollar.  And so at the end of the

03:31PM 20   month, the charges for the prior month are posted, and

21   then we request reimbursement for those expenses in the

22   following month.  So we're reimbursed dollar for dollar

23   for what we spend.

24             MR. MC KENZIE:  Will you please scroll down to

25   the bottom.

1  BY MR. MC KENZIE:

2  Q.        Do you recognize -- do you recognize that

3  signature?

4  A.        Yes, sir.

5  Q.        Whose signature is that?

6  A.        Mine.

7  Q.        Did you sign this document?

8  A.        I did.

9            MR. MC KENZIE:  Your Honor, at this time, I ask

03:32PM 10  that 8-O be admitted into evidence and published to the

11  jury.

12            THE COURT:  So admitted.

13            MR. MC KENZIE:  Could we please scroll to the

14  top.

15  BY MR. MC KENZIE:

16  Q.        I'm going to ask you some detailed questions

17  about this document.  I apologize if it gets repetitive.

18            Could you please read the invoice number in the

19  top right-hand corner?

03:32PM 20  A.        90080002.

21  Q.        To whom is this invoice issued?

22  A.        National Aeronautics and Space Administration,

23  Jet Propulsion Lab.

24  Q.        Who is requesting the payment of money?

25  A.        The University of Tennessee.

1    Q.        Would you please read the award amount.

2    A.        $60,000.

3    Q.        And then we'll scroll down.

4              On the left side under Description, will you

5    please just describe to the jury what these categories

6    are and why they're included in this invoice.

7    A.        So, these are what we call our general ledger

8    classifications and this is where the various costs post

9    in our accounting system, and so those are broken out

03:33PM 10   into salaries and staff benefits, supplies, and then

11   student fees on this particular award.

12   Q.        And how much money is being requested to be

13   paid to the University of Tennessee in this invoice?

14   A.        $7,332.97.

15             MR. MC KENZIE:  Will you please scroll down.

16   BY MR. MC KENZIE:

17   Q.        Would you please read that certification.

18   A.        "I certify that all expenditures reported (or

19   payment requested) are for appropriate purposes and in

03:34PM 20   accordance with the provisions of the application and

21   award documents."

22   Q.        And then underneath, what did you do?

23   Underneath that affirmation.

24   A.        I signed the invoice.

25   Q.        On what date did you sign this invoice?

1    A.        February 15th, 2017.

2    Q.        At the time you signed the invoice, did you

3    believe that all expenditures reported were for

4    appropriate purposes and in accordance with the

5    provisions of the application and award documents?

6    A.        Yes, sir.

7    Q.        And upon what did you base your belief?

8    A.        My review of the invoices and the charges that

9    were presented there.

03:35PM 10    Q.        What did you do with the invoice after you

11   signed it?

12   A.        I routed it to our administrative assistant,

13   who then emailed the invoice to the sponsor.

14   Q.        And for what purpose was this document emailed

15   to the sponsor?

16   A.        To request payment.

17            (Government's Exhibit 8-P was marked for

18             identification.)

19            MR. MC KENZIE:  Your Honor, I ask that the

03:35PM 20   witness now be shown what has been marked as 8-P for

21   identification.

22   BY MR. MC KENZIE:

23   Q.        Do you recognize this?

24   A.        Yes, sir.

25   Q.        What type of document is this?

1    A.        It's a cost reimbursement invoice.

2              MR. MC KENZIE:   Could we please scroll down to

3    the bottom of the screen.

4    BY MR. MC KENZIE:

5    Q.        Did you sign this document?

6    A.        Yes, sir.

7              MR. MC KENZIE:   Your Honor, at this time, I ask

8    that Exhibit 8-P be admitted into evidence.

9              THE COURT:   So admitted.

03:36PM 10            (Government's Exhibit 8-P was received into

11             evidence.)

12             MR. MC KENZIE:   Will you please scroll up to

13   the top.

14   BY MR. MC KENZIE:

15   Q.        Will you please read the invoice number.

16   A.        90080450.

17   Q.        To whom was this invoice addressed?

18   A.        National Aeronautics and Space Administration,

19   Jet Propulsion Laboratory.

03:36PM 20   Q.        Who was the sponsor for this -- for this

21   program?

22   A.        National Aeronautics and Space Administration,

23   Jet Propulsion Laboratory.

24   Q.        Would you please read the agreement number.

25   A.        1560728.

1    MR. MC KENZIE:  Could we please scroll down.

2  BY MR. MC KENZIE:

3  Q.        Would you please read the total expenditures

4  that were being requested in this invoice.

5  A.        This invoice requested $7,812.45.

6          MR. MC KENZIE:  Can we scroll all the way to

7  the bottom, please.

8  BY MR. MC KENZIE:

9  Q.        Would you please read the certification at the

03:37PM  10  bottom?

11  A.        "I certify that all expenditures reported (or

12  payment requested) are for appropriate purposes and in

13  accordance with the provisions of the application and

14  award documents."

15  Q.        And at the time -- and on what date did you

16  sign this document?

17  A.        March the 9th, 2017.

18  Q.        On March 9th, 2017, at the time you signed this

19  document, did you believe that all expenditures reported

03:37PM  20  were for appropriate purposes and in accordance with the

21  provisions of the application and award documents?

22  A.        Yes, sir.

23  Q.        Upon what did you base your belief?

24  A.        My review of the charges presented on this

25  invoice.

1    Q.      After signing this document, what did you do

2    with it?

3    A.      I routed it to our administrative assistant who

4    then emailed it to NASA.

5    Q.      And why did you -- why did you do that?

6    A.      To request payment for these charges.

7            (Government's Exhibit 8-Q was marked for

8             identification.)

9            MR. MC KENZIE:  Your Honor, I ask that the

03:38PM 10   witness be shown Exhibit 8-Q for identification.

11   BY MR. MC KENZIE:

12   Q.      Do you recognize this?

13   A.      Yes, sir.

14   Q.      What is this?

15   A.      A cost reimbursable invoice.

16           MR. MC KENZIE:  Could we please scroll to the

17   bottom.

18   BY MR. MC KENZIE:

19   Q.      Did you sign this document?

03:39PM 20   A.      Yes, sir.

21   Q.      On what date?

22   A.      April the 14th, 2017.

23           MR. MC KENZIE:  Your Honor, I ask that the

24   Government's 8-Q be admitted into evidence.

25           THE COURT:  So admitted.

1          (Government's Exhibit 8-Q was received into

2           evidence.)

3    BY MR. MC KENZIE:

4    Q.       Will you please again read the invoice number.

5    A.       90081036.

6    Q.       To whom was this invoice addressed?

7    A.       National Aeronautics and Space Administration,

8    Jet Propulsion Laboratory.

9    Q.       Who was requesting payment?  What organization

03:39PM  10   or entity?

11   A.       The University of Tennessee.

12   Q.       Who was the sponsor for this program?

13   A.       National Aeronautics and Space Administration.

14   Q.       Will you please read the agreement number.

15   A.       1560728.

16          MR. MC KENZIE:  Can we please scroll down.

17   BY MR. MC KENZIE:

18   Q.       What dollar amount was requested in this

19   invoice?

03:40PM  20   A.       $9,065.96.

21   Q.       If you could please read this certification.

22   A.       "I certify that all expenditures reported (or

23   payment requested) are for appropriate purposes and in

24   accordance with the provisions of the application and

25   award documents."

1  Q.       At the time you signed that document, did you

2  believe that was true?

3  A.       Yes, sir.

4           (Government's Exhibit 8-R was marked for

5            identification.)

6           MR. MC KENZIE:  Your Honor, I ask that the

7  witness be shown Exhibit 8-R for identification.

8  BY MR. MC KENZIE:

9  Q.       What is this?

03:40PM 10  A.       A cost reimbursable invoice.

11           MR. MC KENZIE:  Can we scroll to the bottom.

12  BY MR. MC KENZIE:

13  Q.       Who, if anyone, signed this document?

14  A.       I did.

15           MR. MC KENZIE:  Your Honor, I ask to admit 8-R.

16           THE COURT:  So admitted.

17           (Government's Exhibit 8-R was received into

18            evidence.)

19           MR. MC KENZIE:  Please scroll up to the top.

03:40PM 20  BY MR. MC KENZIE:

21  Q.       Will you please read the invoice number.

22  A.       90081674.

23  Q.       To whom is this invoice directed?

24  A.       National Aeronautics and Space Administration,

25  Jet Propulsion Laboratory.

1    Q.      From whom -- or from who is this sent?

2    A.      The University of Tennessee.

3    Q.      Who is the sponsor for this program?

4    A.      National Aeronautics and Space Administration.

5    Q.      Will you please read the agreement number.

6    A.      1560728.

7    Q.      What is the amount of the expenditure requested

8    on this invoice?

9    A.      $2,938.46.

03:41PM  10          MR. MC KENZIE:  Can we please scroll down.

11   BY MR. MC KENZIE:

12   Q.      Will you please read this certification.

13   A.      "I certify that all expenditures reported (or

14   payment requested) are for appropriate purposes and in

15   accordance with the provisions of the application and

16   award documents."

17   Q.      At the time you signed this document on

18   May 13th, 2017, did you believe that that affirmation

19   was true?

03:42PM  20   A.      Yes, sir.

21   Q.      After signing this invoice, what did you do

22   with it?

23   A.      I routed it to our administrative assistant who

24   emailed it to NASA.

25   Q.      Why did you do that?

1    A.        To request payment.

2              (Government's Exhibit 8-S was marked for

3               identification.)

4              MR. MC KENZIE:  Your Honor, I ask that the

5    witness be shown Exhibit 8-S for identification.

6    BY MR. MC KENZIE:

7    Q.        Do you recognize this document?

8    A.        Yes, sir.

9              MR. MC KENZIE:  Can we please scroll to the

03:42PM 10   bottom.

11   BY MR. MC KENZIE:

12   Q.        Who, if anyone, signed this document?

13   A.        I did.

14             MR. MC KENZIE:  Your Honor, I ask that 8-S be

15   admitted into evidence.

16             THE COURT:  So admitted.

17             (Government's Exhibit 8-S was received into

18              evidence.)

19   BY MR. MC KENZIE:

03:43PM 20   Q.        Can you please read the invoice number.

21   A.        90082092.

22   Q.        To whom is this invoice addressed?

23   A.        National Aeronautics and Space Administration,

24   Jet Propulsion Laboratory.

25   Q.        Who is the request for payment being made on

1    the behalf of?

2    A.        The University of Tennessee.

3    Q.        Who was the sponsor?

4    A.        National Aeronautics and Space Administration.

5    Q.        What is the agreement number?

6    A.        1560728.

7             MR. MC KENZIE:  Will you please scroll down.

8    BY MR. MC KENZIE:

9    Q.        What is the total amount of expenditures

03:43PM  10  requested?

11   A.        $2,938.46.

12   Q.        Will you please read the certification.

13   A.        "I certify that all expenditures reported (or

14   payment requested) are for appropriate purposes and in

15   accordance with the provisions of the application and

16   award documents."

17   Q.        At the time that you signed this document on

18   June 13th, 2017, did you believe that certification was

19   true?

03:44PM  20  A.        Yes, sir.

21   Q.        After signing this document, what did you do

22   with it?

23   A.        I routed it to our administrative assistant who

24   emailed it to NASA.

25   Q.        Why did you do that?

1 A.        To request payment.

2           (Government's Exhibit 8-U was marked for

3            identification.)

4           MR. MC KENZIE:  Your Honor, I ask that the

5  witness be shown 8-U for identification.

6  BY MR. MC KENZIE:

7  Q.        What is this?

8  A.        A cost reimbursable invoice.

9  Q.        I apologize.  I know that you can predict my

03:44PM 10 next question, but can we scroll down.

11           Who, if anyone, signed this document?

12 A.        I did.

13           MR. MC KENZIE:  Your Honor, I ask that 8-U be

14 admitted into evidence.

15           THE COURT:  So admitted.

16           (Government's Exhibit 8-U was received into

17            evidence.)

18           MR. MC KENZIE:  Will you please scroll up to

19 the top.

03:44PM 20 BY MR. MC KENZIE:

21 Q.        Please read the invoice number for us.

22 A.        90083042.

23 Q.        To whom was this invoice sent?

24 A.        National Aeronautics and Space Administration,

25 Jet Propulsion Laboratory.

1  Q.        Who was the requesting party?

2  A.        The University of Tennessee.

3  Q.        Who was the sponsor?

4  A.        National Aeronautics and Space Administration.

5  Q.        Would you please read the agreement number.

6  A.        1560728.

7           MR. MC KENZIE:  Can we please scroll down.

8  BY MR. MC KENZIE:

9  Q.        What was the total amount of the expenditures

03:45PM 10 requested on this invoice?

11 A.        $2,938.46.

12          MR. MC KENZIE:  Can we please scroll to the

13 bottom.

14 BY MR. MC KENZIE:

15 Q.        Will you please read that certification.

16 A.        "I certify that all expenditures reported (or

17 payment requested) are for appropriate purposes and in

18 accordance with the provisions of the application and

19 award documents."

03:45PM 20 Q.        When did you sign this document?

21 A.        August 26, 2017.

22 Q.        At the time you signed that document, did you

23 believe it was true, that certification?

24 A.        Yes, sir.

25 Q.        After you signed the document, what did you do

1    with it?

2    A.        I routed it to our administrative assistant who

3    emailed it to NASA.

4    Q.        Why did you do that?

5    A.        To request payment.

6              (Government's Exhibit 8-V was marked for

7               identification.)

8              MR. MC KENZIE:  I'd like to show the witness

9    8-V, as in Victor, for identification.

03:46PM  10   BY MR. MC KENZIE:

11   Q.        What is this?

12   A.        A cost reimbursable invoice.

13             MR. MC KENZIE:  Please scroll down.

14   BY MR. MC KENZIE:

15   Q.        Who, if anyone, signed this document?

16   A.        I did.

17             MR. MC KENZIE:  Your Honor, I ask that 8-V be

18   admitted into evidence.

19             THE COURT:  So admitted.

03:46PM  20            (Government's Exhibit 8-V was received into

21             evidence.)

22   BY MR. MC KENZIE:

23   Q.        Will you please read the invoice number.

24   A.        90083579.

25   Q.        To whom was this invoice sent?

1  A.        National Aeronautics and Space Administration,

2  Jet Propulsion Laboratory.

3  Q.        And on whose behalf did you send this invoice?

4  A.        The University of Tennessee.

5  Q.        Who was the sponsor?

6  A.        National Aeronautics and Space Administration.

7  Q.        Will you please read the agreement number.

8  A.        1560728.

9           MR. MC KENZIE:  Will you please scroll down.

03:47PM  10  BY MR. MC KENZIE:

11  Q.        What is the total expenditures requested on

12  this invoice?

13  A.        $8,577.07.

14  Q.        Will you please read the certification.

15  A.        "I certify that all expenditures reported (or

16  payment requested) are for appropriate purposes and in

17  accordance with the provisions of the application and

18  award documents."

19  Q.        At the time that you signed that certification,

03:47PM  20  did you believe it to be true?

21  A.        Yes, sir.

22  Q.        After signing the invoice, what did you do with

23  it?

24  A.        I routed it to our administrative assistant who

25  emailed it to NASA.

1    Q.       Why did you do that?

2    A.       To request payment.

3            (Government's Exhibit 8-W was marked for

4             identification.)

5            MR. MC KENZIE:  Your Honor, I'd like to show

6    the witness what has been marked as 8-W for

7    identification.

8    BY MR. MC KENZIE:

9    Q.       What is this document?

03:48PM  10    A.       A cost reimbursable invoice.

11            MR. MC KENZIE:  Will you please scroll to the

12    bottom.

13    BY MR. MC KENZIE:

14    Q.       Who, if anyone, signed this document?

15    A.       I did.

16            MR. MC KENZIE:  Your Honor, I ask that 8-W be

17    admitted into evidence.

18            THE COURT:  So admitted.

19            (Government's Exhibit 8-W was received into

03:48PM  20             evidence.)

21    BY MR. MC KENZIE:

22    Q.       Will you please read the invoice number.

23    A.       90084524.

24    Q.       To whom was this invoice submitted?

25    A.       National Aeronautics and Space Administration,

1    Jet Propulsion Laboratory.

2    Q.        Who was the requesting agency or organization?

3    A.        The University of Tennessee.

4    Q.        Who was the sponsor?

5    A.        National Aeronautics and Space Administration.

6    Q.        What is the agreement number?

7    A.        1560728.

8              MR. MC KENZIE:  Please scroll down.

9    BY MR. MC KENZIE:

03:48PM 10   Q.        What was the total expenditures requested in

11   this invoice?

12   A.        $2,393.76.

13             MR. MC KENZIE:  Can we please scroll down.

14   BY MR. MC KENZIE:

15   Q.        Will you please read the certification.

16   A.        "I certify that all expenditures reported (or

17   payment requested) are for appropriate purposes and in

18   accordance with the provisions of the application and

19   award documents."

03:49PM 20   Q.        What was the date on which you signed this

21   document?

22   A.        November 10th, 2017.

23   Q.        At the time you signed this document, did you

24   believe that affirmation to be true?

25   A.        Yes, sir.

1  Q.       After signing this invoice, what did you do

2  with it?

3  A.       I routed it to our administrative assistant who

4  emailed it to NASA.

5  Q.       Why did you do that?

6  A.       To request payment.

7           (Government's Exhibit 8-X was marked for

8            identification.)

9  BY MR. MC KENZIE:

03:49PM 10  Q.       I'd like to show you what has been marked as

11  Government's 8-X for identification.

12           Do you recognize this?

13  A.       Yes, sir.

14  Q.       What is it?

15  A.       A cost reimbursable invoice.

16           MR. MC KENZIE:  Can we please scroll to the

17  bottom.

18  BY MR. MC KENZIE:

19  Q.       Who, if anyone, signed this document?

03:49PM 20  A.       I did.

21           MR. MC KENZIE:  Scroll back up to the top,

22  please.

23  BY MR. MC KENZIE:

24  Q.       Please read the invoice number.

25  A.       90085260.

1  Q.      To whom is this invoice addressed?

2  A.      National Aeronautics and Space Administration,

3  Jet Propulsion Laboratory.

4  Q.      Who is requesting the payment?

5  A.      The University of Tennessee.

6  Q.      Who is the sponsor?

7  A.      National Aeronautics and Space Administration.

8  Q.      What is the agreement number?

9  A.      1560728.

03:50PM  10         MR. MC KENZIE:  Will you please scroll down.

11  BY MR. MC KENZIE:

12  Q.      What is the total expenditure requested in this

13  invoice?

14  A.      $2,955.07.

15         MR. MC KENZIE:  Will you please scroll all the

16  way to the bottom.

17  BY MR. MC KENZIE:

18  Q.      Will you please read this certification.

19  A.      "I certify that all expenditures reported (or

03:40PM  20  payment requested) are for appropriate purposes and in

21  accordance with the provisions of the application and

22  award documents."

23  Q.      And which date did you sign this document?

24  A.      December 19, 2017.

25  Q.      On December 19th, 2017, did you believe that

1    affirmation to be true?

2    A.        Yes, sir.

3    Q.        What did you do with this invoice after you

4    signed it?

5    A.        I routed it to our administrative assistant who

6    emailed it to NASA.

7    Q.        And why did you do that?

8    A.        To request payment.

9              (Government's Exhibit 8-Y was marked for

10             identification.)

11             MR. MC KENZIE:  Your Honor, I ask that the

12   witness be shown 8-Y, as in yellow.

13   BY MR. MC KENZIE:

14   Q.        Do you recognize this document?

15   A.        Yes, sir.

16   Q.        What is it?

17   A.        A cost reimbursable invoice.

18             MR. MC KENZIE:  Will you please scroll to the

19   bottom.

20   BY MR. MC KENZIE:

21   Q.        Who, if anyone, signed this document?

22   A.        I did.

23             MR. MC KENZIE:  Your Honor, I ask that 8-Y be

24   admitted into evidence.

25             THE COURT:  So admitted.

1              (Government's Exhibit 8-Y was received into

2               evidence.)

3    BY MR. MC KENZIE:

4    Q.       Will you please read this invoice number.

5    A.       90085587.

6    Q.       To whom was this invoice sent?

7    A.       National Aeronautics and Space Administration,

8    Jet Propulsion Laboratory.

9    Q.       And on whose behalf was this sent?

03:52PM  10  A.       The University of Tennessee.

11   Q.       Who was the sponsor?

12   A.       National Aeronautics and Space Administration.

13   Q.       What was the agreement number?

14   A.       1560728.

15            MR. MC KENZIE:   Could we please scroll down.

16   BY MR. MC KENZIE:

17   Q.       What was the expenditure requested on this

18   invoice?

19   A.       $1,407.17.

03:52PM  20            MR. MC KENZIE:   Can we please scroll to the

21   bottom.

22   BY MR. MC KENZIE:

23   Q.       Will you please read this certification.

24   A.       "I certify that all expenditures reported (or

25   payment requested) are for appropriate purposes and in

1   accordance with the provisions of the application and

2   award documents."

3   Q.      On what date did you sign this?

4   A.      January the 18th, 2018.

5   Q.      At the time that you signed the document, did

6   you believe that affirmation to be true?

7   A.      Yes, sir.

8   Q.      After you signed it, what did you do with this

9   invoice?

03:52PM  10   A.      I routed it to our administrative assistant who

11   emailed it to NASA.

12   Q.      Why did you do that?

13   A.      To request payment.

14          (Government's Exhibit 8-Z was marked for

15           identification.)

16   BY MR. MC KENZIE:

17   Q.      I'd like to show you what has been marked as

18   8-Z, as in zebra, for identification.

19          Do you recognize this?

03:53PM  20   A.      Yes, sir.

21   Q.      What is it?

22   A.      A cost reimbursable invoice.

23          MR. MC KENZIE:  Could we please scroll to the

24   bottom.

25

DIRECT EXAMINATION - MONICA COLE

1   BY MR. MC KENZIE:

2   Q.        Who, if anyone, signed this document?

3   A.        I did.

4             MR. MC KENZIE:  Your Honor, I ask that 8-Z be

5   admitted into evidence.

6             THE COURT:  So admitted.

7             (Government's Exhibit 8-Z was received into

8              evidence.)

9   BY MR. MC KENZIE:

03:53PM 10  Q.        Will you please read this invoice number.

11  A.        90085951.

12  Q.        To whom was this invoice sent?

13  A.        National Aeronautics and Space Administration,

14  Jet Propulsion Laboratory.

15  Q.        Who was requesting payment in this invoice?

16  A.        The University of Tennessee.

17  Q.        Who was the sponsor?

18  A.        National Aeronautics and Space Administration.

19  Q.        What is the agreement number?

03:53PM 20  A.        1560728.

21            MR. MC KENZIE:  Could we please scroll down.

22  BY MR. MC KENZIE:

23  Q.        What is the current expenditures?

24  A.        $436.48.

25            MR. MC KENZIE:  Can we scroll all the way down.

BY MR. MC KENZIE:

Q.      Will you please read this certification.

A.      "I certify that all expenditures reported (or payment requested) are for appropriate purposes and in accordance with the provisions of the application and award documents."

Q.      When did you sign this document?

A.      February the 12th, 2018.

Q.      At the time that you signed it, did you believe that the affirmation was true?

A.      Yes, sir.

Q.      After you signed this document, what did you do with it?

A.      I routed it to our administrative assistant who emailed it to NASA.

Q.      Why did you do that?

A.      To request payment.

Q.      All right.  Now, I'd like to direct your attention to a little bit in the future.

        (Government's Exhibit 9-I was marked for identification.)

        MR. MC KENZIE:  Could we please show the witness 9- -- Government's 9-I for identification.

BY MR. MC KENZIE:

Q.      Do you recognize -- do you recognize this?

1    A.        Yes, sir.

2              MR. MC KENZIE:   Could we please scroll down to

3    the bottom.

4    BY MR. MC KENZIE:

5    Q.        Who, if anyone, signed this document?

6    A.        I did.

7              MR. MC KENZIE:   Your Honor, I ask that 9-I be

8    admitted into evidence.

9              THE COURT:   So admitted.

03:55PM  10            (Government's Exhibit 9-I was received into

11             evidence.)

12             MR. MC KENZIE:   Can we please scroll up to the

13   top.

14   BY MR. MC KENZIE:

15   Q.        I'd like to talk first about the format of this

16   invoice.  What, if anything, is different about the

17   formatting in the body where it says Payment Per

18   Contract?

19   A.        This particular contract was not a cost

03:55PM  20   reimbursement contract.  It was a fixed-price,

21   milestone-based contract, and for those particular

22   contracts, we did not itemize our costs.  They're based

23   on a fixed amount when a milestone is completed.

24   Q.        What was the first type of contract that you

25   mentioned; cost reimbursement?

1    A.        Yes, sir.

2    Q.        Will you please explain to the jury what cost

3    reimbursement means.

4    A.        Cost reimbursable contracts are where we bill

5    dollar for dollar for our actual expenses.  So on those

6    particular invoices, we itemize our costs and then we

7    get paid back dollar for dollar what we spend.

8    Q.        And what type of contract was this invoice for?

9    A.        This invoice is for a fixed price,

03:56PM  10   milestone-based contract, and in those cases we did not

11   itemize our cost.  We bill a sponsor when a milestone is

12   completed by the faculty member and then we bill a fixed

13   amount, fixed agreed-upon amount for that milestone.

14   Q.        Thank you.

15             Could you please read this invoice number.

16   A.        90094841.

17   Q.        To whom was this invoice sent?

18   A.        National Aeronautics and Space Administration.

19   Q.        And who was requesting payment?

03:56PM  20   A.        The University of Tennessee.

21   Q.        Who was the sponsor?

22   A.        National Aeronautics and Space Administration.

23   Q.        What was the award amount?

24   A.        $50,000.

25   Q.        Could we please -- would you please read the

1  agreement number.  I'm only going to ask you to do this

2  one time.

3  A.          80MSFC19M0003.

4          MR. MC KENZIE:  Can we please scroll down.

5  BY MR. MC KENZIE:

6  Q.          What was the -- what was the amount of the

7  payment requested?

8  A.          $20,000.

9          MR. MC KENZIE:  Please scroll down to the

03:57PM 10  bottom.

11  BY MR. MC KENZIE:

12  Q.          Will you please read this affirmation.

13  A.          (As read) "By signing this report, I certify to

14  the best of my knowledge and belief that the report is

15  true, complete, and accurate, and the expenditures,

16  disbursements, and cash receipts are for the purposes

17  and objective set forth in the terms and conditions of

18  the above-referenced award/contract.  For any Federal

19  Award, I'm aware that any false, fictitious, or

03:58PM 20  fraudulent information, or the omission of any material

21  fact, may subject me to criminal, civil, or

22  administrative penalty for fraud, false statements,

23  false claims, or otherwise."

24  Q.          At the time that you signed this document, did

25  you believe that the affirmation was true?

1    A.        Yes, sir.

2    Q.        On what date did you sign this affirmation?

3    A.        July 22nd, 2019.

4    Q.        Upon what did you base your belief that that

5    affirmation was true?

6    A.        For fixed price, we reach out to the professor

7    in the department and ask if the milestone has been

8    completed, and once they confirm that is has, then we

9    invoice for that.

03:58PM  10           (Government's Exhibit 9-J was marked for

11             identification.)

12   BY MR. MC KENZIE:

13   Q.        I'd like to direct your attention now to 9-J,

14   as in Jerry, for identification.

15             What is this?

16   A.        A milestone-based invoice.

17             MR. MC KENZIE:  Could we please scroll to the

18   bottom.

19   BY MR. MC KENZIE:

03:59PM  20  Q.        Who, if anyone, signed this document?

21   A.        I did.

22             MR. MC KENZIE:  Your Honor, I ask that 9-J be

23   admitted into evidence.

24             THE COURT:  So admitted.

25

1    (Government's Exhibit 9-J was received into

2         evidence.)

3  BY MR. MC KENZIE:

4  Q.      To whom was this invoice sent?

5  A.      National Aeronautics and Space Administration.

6  Q.      Who was requesting the payment?

7  A.      The University of Tennessee.

8  Q.      Could you please read the invoice number.

9  A.      90094842.

03:59PM  10  Q.      Who was the sponsor?

11  A.      National Aeronautics and Space Administration.

12  Q.      Is that the same agreement number that we read

13  in Government's 9-I?

14  A.      Yes, sir.

15         MR. MC KENZIE:  Can we please scroll to the

16  bottom or the middle.

17  BY MR. MC KENZIE:

18  Q.      How much money was requested in this invoice?

19  A.      $10,000.

03:59PM  20         MR. MC KENZIE:  Could we please scroll to the

21  bottom.

22  BY MR. MC KENZIE:

23  Q.      Will you please read this affirmation.

24  A.      (As read) "By signing this report, I certify to

25  the best of my knowledge and belief that the report is

1    true, complete, and accurate, and the expenditures,

2    disbursements, and cash receipts are for the purposes

3    and objectives set forth in the terms and conditions of

4    the above-referenced award/contract.  For any Federal

5    Award, I'm aware that any false, fictitious, or

6    fraudulent information, or the omission of any material

7    fact, may subject me to criminal, civil, or

8    administrative penalties for fraud, false statements,

9    false claims, or otherwise."

04:00PM 10    Q.        At the time -- on what date did you sign this

11    document?

12    A.        July 22nd, 2019.

13    Q.        At the time you signed this document, did you

14    believe that affirmation to be true?

15    A.        Yes, sir.

16    Q.        After signing this document, what did you do

17    with it?

18    A.        I returned it to the accountant who entered it

19    into a portal called Invoice Processing Platform or IPP.

04:00PM 20    Q.        Okay.  Please describe to the jury what that

21    invoice processing portal is and how it works.

22    A.        The Invoice Processing Platform is a portal

23    hosted by the U.S. Department of Treasury, and a variety

24    of federal agencies use that for billing and payment

25    purposes, and NASA is one of those, and so my accountant

1  submits invoices into that portal for payment.

2  Q.        When you say your accountant, or -- let me

3  rephrase.  I'm sorry.  I got a little tongue-tied there.

4          When the document is uploaded by the University

5  of Tennessee employee, where does that take place

6  physically; in what state?

7  A.        Tennessee.

8  Q.        Okay.  And then it gets uploaded into -- it's

9  an electronic platform?

04:01PM 10  A.        Yes, sir.

11          MR. MC KENZIE:  Okay.  Your Honor, I think I

12  may have forgotten to move 8-T, as in Thomas, 8-U, as in

13  umbrella, and 8-X into evidence.  At this time, I ask to

14  admit those.

15          THE COURT:  All right.  U may have already been

16  admitted, but just out of an abundance of caution, all

17  three of those are admitted.

18          (Government's Exhibit 8-X was received into

19           evidence.)

04:02PM 20          MR. MC KENZIE:  Thank you, Your Honor.

21          (Government's Exhibit 9-K was marked for

22           identification.)

23  BY MR. MC KENZIE:

24  Q.        I'd like to direct your attention now to

25  Government's 9-K for identification.

1        What is this?

2    A.      A milestone-based invoice.

3        MR. MC KENZIE:  Can we please scroll to the

4    bottom.

5    BY MR. MC KENZIE:

6    Q.      Who, if anyone, signed this document?

7    A.      I did.

8        MR. MC KENZIE:  Your Honor, I ask that 9-K be

9    admitted into evidence.

04:02PM 10        THE COURT:  So admitted.

11        (Government's Exhibit 9-K was received into

12         evidence.)

13    BY MR. MC KENZIE:

14    Q.      To whom was this invoice submitted?

15    A.      National Aeronautics and Space Administration.

16    Q.      Is this the same agreement number that we read

17    in 9-I?

18    A.      Yes, sir.

19        MR. MC KENZIE:  Can we please scroll down.

04:02PM 20    BY MR. MC KENZIE:

21    Q.      How much money was being requested in this

22    document?

23    A.      $10,000.

24        MR. MC KENZIE:  Can we please scroll down.

25

1  BY MR. MC KENZIE:

2  Q.        Is this the same --

3          MR. MC KENZIE:  Can we blow it up and give the

4  witness an opportunity to read this.

5  BY MR. MC KENZIE:

6  Q.        Is this the same affirmation that we just read

7  in the last -- I don't want you to keep reading the same

8  thing -- in the last exhibit?

9  A.        Yes, sir.

04:03PM 10  Q.        At the time that you signed this particular

11  document, did you believe that the affirmation that you

12  were making was true?

13  A.        Yes, sir.

14  Q.        Upon what was that belief based?

15  A.        The fact that we had reached out to the

16  professor and received confirmation that the milestone

17  had been completed.

18  Q.        And on October -- or August 30th, what did you

19  do with this document after you signed it?

04:03PM 20  A.        I returned it to one of my accountants who

21  entered it into the Invoice Processing Platform.

22  Q.        Did that take place here in Tennessee?

23  A.        Yes, sir.

24          (Government's Exhibit 9-L was marked for

25            identification.)

1   BY MR. MC KENZIE:

2   Q.        I'd like to direct your attention now to

3   Government's 9-L for identification.

4             What is this?

5   A.        A milestone-based invoice.

6             MR. MC KENZIE:  Can we please scroll to the

7   bottom.

8   BY MR. MC KENZIE:

9   Q.        Who, if anyone, signed it?

04:04PM  10  A.        I did.

11            MR. MC KENZIE:  Your Honor, I ask that 9-L be

12  admitted into evidence.

13            THE COURT:  So admitted.

14            (Government's Exhibit 9-L was received into

15             evidence.)

16            MR. MC KENZIE:  Scroll up to the top.

17  BY MR. MC KENZIE:

18  Q.        To whom was this invoice sent?

19  A.        National Aeronautics and Space Administration.

04:04PM  20            MR. MC KENZIE:  Please scroll down.

21  BY MR. MC KENZIE:

22  Q.        What was the amount of this invoice?

23  A.        $5,000.

24            MR. MC KENZIE:  Please scroll down.

25

1  BY MR. MC KENZIE:

2  Q.       Is that the same affirmation that we've seen on

3  prior exhibits?

4  A.       Yes, sir.

5  Q.       At the time that you signed this affirmation,

6  did you believe it to be true?

7  A.       Yes, sir.

8  Q.       On what date did you sign this document?

9  A.       August 30th, 2019.

04:05PM  10  Q.       On August 30th, 2019, upon what did you base

11  your belief that this document was true?

12  A.       The fact that we had received confirmation from

13  the PI that this milestone had been completed.

14  Q.       After you signed the document, what did you do

15  with it?

16  A.       I returned it to one of my accountants who

17  entered it in the Invoice Processing Platform portal.

18  Q.       Was that here in Tennessee?

19  A.       Yes, sir.

04:05PM  20  Q.       If at any point for any of the invoices that we

21  talked about, if you believed that the University of

22  Tennessee was not in compliance with the terms and

23  conditions set forth in the agreements, would you have

24  signed those affirmations?

25  A.       No, sir.

1     Q.      Would you have submitted those affirmations for

2     payment or those invoices for payment?

3     A.      No, sir.

4          MR. MC KENZIE:   All right.   Your Honor, I have

5     no further questions.

6          THE COURT:   Thank you.

7          Cross-examination?

8          MR. LOMONACO:   Yes, Your Honor.   Thank you.

9                   CROSS-EXAMINATION

04:06PM 10   BY MR. LOMONACO:

11     Q.      Ms. Cole, do you know of your own personal

12     knowledge whether any of those affirmations are false?

13     A.      To my knowledge, they are not false.

14     Q.      They are not false?   That's your knowledge;

15     right?

16     A.      Would you please repeat the question?

17     Q.      Do you know of your own personal knowledge if

18     any of those affirmations you made are false

19     affirmations?

04:06PM 20   A.      They are not false affirmations.

21     Q.      Thank you.

22          Ms. Cole, this was two contracts we're talking

23     about; right?

24     A.      Yes.

25     Q.      Basically?

1    A.       Yes, sir.

2    Q.       And that's two NASA projects; right?

3    A.       Yes, sir.

4    Q.       And do you know off the top of your head how

5    much money the university -- do they get a certain

6    percentage off of a contract?

7    A.       It depends.  There is an F&A rate on a certain

8    contracts where we collect F&A.

9    Q.       What's F&A stand for?

04:07PM  10    A.       Facilities and administrative costs.

11    Q.       Okay.

12             MR. LOMONACO:  If we went to 8-Z -- I think

13    that's the last one on the first contract.

14    BY MR. LOMONACO:

15    Q.       Do you see that on the screen?

16    A.       Yes, sir.

17    Q.       8-Z is an award amount of total --

18             MR. LOMONACO:  Just down a little bit.

19    BY MR. LOMONACO:

04:07PM  20    Q.       -- $60,000.  Award amount, 60,000; correct?

21    A.       Yes, sir.

22    Q.       And it appears that -- how much was paid,

23    $59,999.05?

24    A.       Yes, sir.

25    Q.       Okay.  How much did the University of Tennessee

1  get out of that contract?  Can you tell?  Do you know?

2  A.       We were paid $59,999.05.

3  Q.       Yes, but there are some expenses for graduate

4  students.  It looks like faculty got paid $1,402; is

5  that correct?

6  A.       Yes, sir.

7  Q.       And that would be the -- this is the last

8  payment; correct?

9  A.       Yes, sir.

04:08PM 10  Q.       Graduate students got paid 19,397?

11  A.       Yes, sir.

12  Q.       And I don't know about staff benefits.  And I

13  know supplies would not be something that the university

14  would get paid, as far as profit, or -- but how much

15  here actually went into the university's coffers?

16  A.       $59,999.05.

17  Q.       Okay.  Well, they got everything, but then they

18  had to pay something; is that what you're saying?

19  A.       The university was reimbursed for its costs.

04:09PM 20  Q.       All right.  So after everything was said and

21  done, after all these costs were paid, faculty salary,

22  graduate students salaries, staff benefits, supplies,

23  grant and subsidies, contract and special services,

24  total direct expenses, facilities and admin costs, after

25  all those were paid, the university still got $59,999?

1    A.        NASA paid the University of Tennessee

2    $59,999.05.

3    Q.        All right.  Did you understand my question?  I

4    don't understand your answer.  I'm sorry.

5              NASA paid them a total of 59999; correct?

6    A.        Correct.

7    Q.        And then the university made some payments;

8    correct?

9    A.        Correct.

04:10PM  10  Q.        And would it be fair to say that the

11   university, after making -- which payments did the

12   university make?  Did they pay for the salaries?

13   A.        Yes, sir.

14   Q.        And the graduate students' salaries?

15   A.        Yes, sir.

16   Q.        And they paid for staff benefits; right?

17   A.        Yes, sir.

18   Q.        And supplies?

19   A.        Yes, sir.

04:11PM  20  Q.        They paid for grant and subsidies; is that

21   correct?

22   A.        Correct.

23   Q.        Contract and special services, $800; they made

24   that payment?

25   A.        Correct.

1   Q.        So the total direct expenses are 44,000; is

2   that right?

3   A.        Correct.

4   Q.        So out of 44,000, they would receive the

5   balance; is that correct?  15,000, so to speak?

6   A.        The 15,000 is our F&A rate.  That's our

7   overhead rate to cover things like buildings and lights

8   and my salary.  And so, in this particular case, the

9   contract had a 51 percent overhead rate, and that's what

04:11PM   10   the $15,000 is.

11   Q.        Okay.  Thank you.

12             On the next contract --

13             MR. LOMONACO:  Can we see the last -- I think

14   it's -- do you know which one it is?

15             MR. PARSONS:  Yeah, 9-L.

16   BY MR. LOMONACO:

17   Q.        And is there any way of knowing on these

18   invoices the F&A that went to the university?

19   A.        It was 51 percent as well.

04:12PM   20   Q.        I'm sorry?  Please.

21   A.        51 percent of our direct cost as well.

22   Q.        51 percent.

23             And do you know whether Professor Hu -- and I

24   take it he was the PI on both of these.

25             Do you know, any way of telling if he

1   made -- if any payments were made to him at all?

2   A.       I don't know for sure.

3   Q.       Okay.

4            MR. LOMONACO:  Okay.  Thank you very much.

5            THE COURT:  Thank you.

6            Any redirect?

7            MR. MC KENZIE:  No, Your Honor.  Thank you.

8            THE COURT:  Thank you.  This witness may be

9   excused.

04:13PM  10            Next witness.

11            MR. ARROWOOD:  Your Honor, the government calls

12  Pasquale Rinaldi.

13            (The witness was thereupon duly sworn.)

14            THE COURTROOM DEPUTY:  Have a seat.  Scoot as

15  close as you can.

16            Will you state and spell your name for the

17  record.

18            THE WITNESS:  Yes.  My name is Pasquale

19  Rinaldi.  First name is P-a-s-q-u-a-l-e.  Last name is

04:14PM  20  Rinaldi, R-i-n-a-l-d-i.

21            THE COURTROOM DEPUTY:  Thank you.

22

23

24

25

1 **PASQUALE RINALDI**,

2 having been first duly sworn, was examined and testified

3 as follows:

4                          DIRECT EXAMINATION

5 BY MR. ARROWOOD:

6 Q.        Mr. Rinaldi, where do you work?

7 A.        I work at the Federal Bureau of Investigation

8 at the Knoxville Field Office.

9 Q.        What do you do for the FBI?

04:14PM 10 A.        I am a digital forensic examiner.

11 Q.        How long have you been a digital forensic

12 examiner?

13 A.        I've been an examiner for a little over seven

14 years, eight years.

15 Q.        Have you had other positions at the FBI?

16 A.        Yes, I have.

17 Q.        What were some of those?

18 A.        Prior to being a forensic examiner, I was an IT

19 support specialist.  And then prior to that, I developed

04:14PM 20 web-based training for the FBI out of Quantico,

21 Virginia.

22 Q.        Would you please describe for the jury your

23 experience in digital forensic examinations.

24 A.        Yes.  So I have conducted digital forensic

25 examinations, and I've analyzed over 760 pieces of

1  digital media in support of over a hundred examinations.

2  Q.        What types of electronic devices have you

3  examined?

4  A.        So, for digital media, that can be hard drives

5  from computers, such as desktops or laptops.  That can

6  be cellphones.  It can be USB flash drives, SD cards

7  from cameras, DVR devices from businesses or home use,

8  and pretty much anything that stores digital data.

9  Q.        All right.  What type of training do you have

04:15PM  10  in digital forensic examinations?

11  A.        I've had over 600 hours of training in digital

12  forensics, which was provided by the FBI, as well as

13  outside vendors.

14  Q.        Have you received certifications in digital

15  forensics examinations?

16  A.        Yes, I have.

17  Q.        Will you just describe some of those for the

18  jury.

19  A.        So I have an FBI examiner certification.  I

04:16PM  20  also receive from the FBI a Linux certification, mobile

21  forensic certification.  And then I've received

22  different certifications from outside vendors, such as a

23  GIAC certified forensic examiner and a GIAC certified

24  forensics analyst.

25  Q.        Describe for the jury your educational

1  background.

2  A.        Yes.  So I received my bachelor's of science in

3  physics from the University of Tennessee in 2000.  And

4  then I received a master's of science in engineering

5  science from the University of Tennessee, and that was

6  in 2002.

7  Q.        Let's talk for a few minutes about forensic

8  examination of hard drives in particular.  First of all,

9  will you please tell the jury:  What is a forensic

04:17PM  10  image?

11  A.        So a forensic image is -- so if you think of a

12  hard drive as a physical storage device and it contains

13  a bunch of data on it, then a forensic image is simply a

14  digital file that contains that same amount of data

15  packaged into that single or multiple file.  And so it

16  has a -- it has a verification that tells you that it

17  contains the same data as what's on the hard drive.

18  Q.        How do you know when a forensic image is an

19  exact copy of what -- of a particular device?

04:17PM  20  A.        So you can take a verification hash, and so

21  essentially a hash is just if you kind of took all the

22  data that's on a hard drive and you pushed it through a

23  mathematical formula, you could output a number, which

24  contains letters and numbers, and it's called

25  hexadecimal.

1  And so you can take that number, and then once

2  you make the forensic image, you can also throw all the

3  data from that image through the mathematical formula,

4  and then you'll get another number, and if the two

5  numbers match, then you know that the data on the hard

6  drive and the data in the forensic image is an exact

7  copy.

8  Q.  When you do your analysis, do you do your

9  analysis on the image or on the device?

04:18PM 10  A.  So the analysis is done on the image.

11  Q.  Let's talk about analysis of forensic images.

12  Describe, generally speaking and basic, how do you go

13  about analyzing a forensic image?

14  A.  So to analyze a forensic image, you use

15  specialized forensic software, and that essentially just

16  provides different views in which to look at the data.

17  So you could have a file listing that lets you navigate

18  files in folders.  It can categorize the files in terms

19  of, like, documents or spreadsheets or system files that

04:19PM 20  might contain information that, with the right training,

21  you can understand what it means.

22  And so you just review the data, and then

23  that's pretty much the analysis.  You just make

24  conclusions based on the results of the data.

25  Q.  Did you analyze any devices in this particular

1  case?

2  A.        So it wasn't a full analysis; it was more just

3  a generate forensic images, process the images, and then

4  just make the user files available for the investigative

5  team to review.

6          So for a -- on an average computer, you have

7  about a million files or so, and, you know, maybe 10,000

8  of those are from the user, whether they browse the

9  internet or download files or write a report, and the

04:20PM  10  rest are just the operating system files.

11         So for some cases, whether it's a financial

12  or -- different cases, there is not really an in-depth

13  analysis on to -- that I would need to do.  So it's

14  simply just a matter of just removing the system files

15  and providing the user files for the investigative team

16  to review.

17  Q.        And so separate from this particular case, do

18  you typically use special software to analyze a forensic

19  image?

04:20PM  20  A.        Yes.  We use different kinds of forensic

21  software, depending on how it's being reviewed or the

22  analysis that's being done.

23                (Government's Exhibit 10-F was marked for

24                 identification.)

25

1    BY MR. ARROWOOD:

2    Q.        I'd like to show you what's been marked as

3    Government's Exhibit 10-F.

4            MR. ARROWOOD:  Scroll way to the bottom,

5    please.

6            Back up to the top.

7    BY MR. ARROWOOD:

8    Q.        Do you recognize this document?

9    A.        Yes.

04:21PM 10   Q.        Is that your signature on the bottom of the

11   second page?

12   A.        Yes.

13           MR. ARROWOOD:  Your Honor, at this time, the

14   government would move to admit Government's

15   Exhibit 10-F.

16           THE COURT:  So admitted.

17           (Government's Exhibit 10-F was received into

18            evidence.)

19   BY MR. ARROWOOD:

04:21PM 20   Q.        All right.  Take a look at the top, please.

21   What's the title of this document?

22   A.        The title is Process Report.

23   Q.        Who is it to?

24   A.        It's to Special Agent Kujtim Sadiku.

25   Q.        The date?

1  A.       Huh?

2  Q.       The date?

3  A.       That's May 5th, 2021.

4           MR. ARROWOOD:  Scroll down.

5  BY MR. ARROWOOD:

6  Q.       There is a list of items here; is that correct?

7  A.       Yes.

8  Q.       What are these items?

9  A.       Those were the items which were submitted, and

04:22PM  10  they came from a search.

11  Q.       Specifically, I'd like to direct your attention

12  to one specific device identified as QKX05.

13           MR. ARROWOOD:  Can you please highlight that.

14  BY MR. ARROWOOD:

15  Q.       Can you please read that to the jury.

16  A.       That's QKX05, a one-terabyte Toshiba external

17  hard drive, serial number 34L- -- as in Lima -- -3P- --

18  as in papa -- -94QT- -- as in Tom -- -1X- -- as in

19  X-ray, and then -8.

04:23PM  20           MR. ARROWOOD:  Scroll down to the second page,

21  please.

22  BY MR. ARROWOOD:

23  Q.       Please read the paragraph that begins on

24  March 3rd, 2020.

25  A.       "On March 3rd, 2020, the forensic images for

1  submitted items QKX02, QKX03, QKX04, QKX05, QKX06_1,

2  QKX07_1, and QKX08_1, and QKX09 were created and

3  verified.  Also on March 3rd, 2020, extractions for

4  submitted item QKX01 completed successfully."

5          MR. ARROWOOD:  Scroll down a little bit more.

6  All right.  Thank you.

7  BY MR. ARROWOOD:

8  Q.      So I'd like to talk specifically about QKX05,

9  the Toshiba hard drive that we saw.

04:24PM 10          (Government's Exhibit 10-N was marked for

11           identification.)

12          MR. ARROWOOD:  Please show the witness

13  Government's Exhibit 10-N, as in November.

14  BY MR. ARROWOOD:

15  Q.      Do you recognize the device that's depicted in

16  this photograph?

17  A.      Yes.

18  Q.      What is this?

19  A.      That is QKX05, the one-terabyte Toshiba hard

04:24PM 20  drive.

21  Q.      Did you create a forensic image of this device?

22  A.      Yes.

23  Q.      Did you provide the user files from that

24  forensic image to Special Agent Sadiku?

25  A.      Yes.

1   Q.       Have you reviewed any of the contents of the

2   Toshiba hard drive?

3   A.       Yes.

4            MR. ARROWOOD:  All right.  At this time,

5   government moves to admit Government's Exhibit 10-N.

6            THE COURT:  So admitted.

7            (Government's Exhibit 10-N was received into

8             evidence.)

9            (Government's Exhibit 10-G was marked for

10            identification.)

11  BY MR. ARROWOOD:

12  Q.       All right.  Now I'd like to show you

13  Government's Exhibit 10-G.

14           Do you recognize this?

15  A.       Yes.

16           MR. ARROWOOD:  It's a few pages.  So if you'll

17  scroll through them quickly so we can take a look.

18           Scroll back up.

19  BY MR. ARROWOOD:

04:25PM 20  Q.       What is this document?

21  A.       It is a screen shot of the folder contents for

22  the route of the Toshiba external hard drive.

23  Q.       So let me just make sure I understand you

24  correctly.  Is this the folder structure that existed on

25  that device?

1  A.        Yes.

2  Q.        So the names of these folders were names that

3  the user of that device presumably used for these

4  folders?

5  A.        Yes.

6  Q.        In other words, you did not change any of the

7  names of the folders; is that correct?

8  A.        That's correct.

9  Q.        Okay.  So I'd like to direct your attention to

04:26PM 10  a particular folder.  What is that folder labeled?

11  A.        The name of that folder is UTK.

12  Q.        Are you familiar with the folder structure

13  contained within the UTK folder?

14  A.        Yes.

15            MR. ARROWOOD:  Will you please scroll to

16  page 2.

17  BY MR. ARROWOOD:

18  Q.        And is this the folder structure that appears

19  within the UTK folder?

04:27PM 20  A.        Yes.

21  Q.        Okay.  And, again, the names of these folders

22  were the names associated or the names put on these

23  folders by the user of the device?

24  A.        Yes.

25  Q.        I'd like to direct your attention to this

1  particular file labeled Department.  Have you viewed the

2  contents of this folder?

3  A.      Yes.

4          MR. ARROWOOD:  All right.  Please scroll down.

5  BY MR. ARROWOOD:

6  Q.      Okay.  So we're getting pretty deep into this.

7  Is this the folder structure that existed within the

8  department subfolder?

9  A.      Yes.

04:27PM 10  Q.      Did you view the contents of this subfolder

11  identified as UTK-student?

12  A.      Yes.

13          MR. ARROWOOD:  So the next page, please.

14  BY MR. ARROWOOD:

15  Q.      Now, is this the folder structure within the

16  UTK-student folder?

17  A.      Yes.

18  Q.      Have you viewed the contents of this folder?

19  A.      Yes.

04:28PM 20          MR. ARROWOOD:  Can we please go to the next

21  page.

22  BY MR. ARROWOOD:

23  Q.      Does this depict the files that were located

24  within the BJUT folder?

25  A.      Yes.

1    Q.        Have you reviewed these files?

2    A.        Yes.

3              (Government's Exhibit 7-K was marked for

4               identification.)

5    BY MR. ARROWOOD:

6    Q.        I'd like to show you what's been marked as

7    Government's Exhibit 7-K.

8              MR. ARROWOOD:  Scroll down through a few pages.

9    BY MR. ARROWOOD:

04:29PM  10    Q.        Do you recognize this document?

11    A.        Yes.

12    Q.        Is this one of the documents that was included

13    in the BJUT folder?

14    A.        Yes.

15    Q.        Thank you.

16              I'd like to show you what's been previously

17    admitted as Government's Exhibit -- I'm sorry --

18    previously conditionally admitted as Government's

19    Exhibit 7-L.

04:29PM  20              Do you recognize this document?

21    A.        Yes.

22    Q.        Is this one of the documents that was contained

23    within the BJUT folder?

24    A.        Yes.

25              MR. ARROWOOD:  Thank you.  Your Honor, no

```
 1   further questions.

 2               THE COURT:  Thank you.

 3               Cross-examination?

 4               MR. LOMONACO:  No questions, Your Honor.  Thank

 5   you.

 6               THE COURT:  Thank you.  This witness may be

 7   excused.

 8               Thank you.  Is that it?  Okay.  I think the

 9   government went -- not the government.  It went a little
04:30PM 10   quicker this afternoon, but in lieu of calling another

11   witness, if the jury doesn't mind, we're going to let

12   you go on home at 4:30.

13               So thank you for your attention today.

14   Reminder, we'll start back up -- you've done a good job

15   being here at 8:45 so we can line up and start right at

16   9:00 a.m., which will be tomorrow, Thursday, June 10.

17               Again, just a reminder to keep an open mind as

18   you continue to hear all of the evidence in this case.

19   Don't discuss the case among yourselves or anyone else,
04:31PM 20   and continue not to read anything about this case that

21   might be published or in any form or manner, and

22   otherwise adhere to all the conduct instructions that I

23   gave you at the beginning of this week.

24               So the jury, again, is excused with the thanks

25   of everyone.
```

1          (Jurors excused from the courtroom.)

2          THE COURT:  All right.  Thank you.  Sit down

3    just a moment.  Couple things.  Just to confirm, we've

4    got the two video witnesses tomorrow afternoon?

5          MR. ARROWOOD:  Yes, Your Honor, we do have two

6    video witnesses.  I don't know that we've confirmed a

7    time yet.

8          THE COURT:  I think we were talking about,

9    based on the breaks we've been taking, it would be

04:32PM 10   promptly 1:30.  Does that work out, 1:30 Eastern Time?

11   We would have them -- just coordinate with Ms. Norwood.

12   I would have them ready at 1:30.  Our break's been right

13   about then.

14         MR. ARROWOOD:  Your Honor, given the speed with

15   which we went today, it may be that we may like to try

16   to do one before lunch.  I don't know if that's

17   advisable or not, but that's at least our thinking;

18   potentially at, like, 11:00 a.m., and then maybe

19   a -- the first witness won't be that long, I don't

04:33PM 20   expect.  The second may be a little longer.  Maybe an

21   11:00 a.m. and a 2:00 p.m.

22         Again, it's sort of hard to --

23         THE COURT:  Just coordinate with Ms. Norwood

24   when we break here today and she will check with IT to

25   make sure that's okay.  I think they will have to come

in and set up a little bit; so maybe after our morning

break, if it works out -- ideally, it sounds like maybe

we do the morning break and then pick up the first

witness after that.

And then if we start between 10:30 and 11:00

with the first videotaped witness, about how long would

that be?  I think if we do another live witness

in-between or something --

MR. ARROWOOD:  Your Honor, I don't think it

would be more than like an hour-and-a-half or so.  So it

would be about 12:15 or 12:30 we'd be done with it.

THE COURT:  That would work out pretty good

then.

MR. ARROWOOD:  We could break out for lunch and

pick up at 2:00.

THE COURT:  Okay.  Well, why don't we shoot for

that.  We'll do the -- do you have a live witness at

9:00 a.m.?

MR. ARROWOOD:  Yes, Your Honor, we do.

THE COURT:  Okay.  So we'll maybe take our

morning break before, and subject to checking with IT,

we'll do a morning break, and then pick up with the

first video witness and then lunch break and then the

second video witness --

MR. ARROWOOD:  Yes, Your Honor.

1      THE COURT:  -- will kind of be the plan.

2          How are -- in terms of overall case, where we

3  are now, where would you potentially anticipate, you

4  know, factoring in cross-examination, finishing?  I'm

5  not going to hold you to it, but --

6          MR. ARROWOOD:  Assuming that the witness is at

7  2:00 p.m. -- we've talked about his name a lot.  It's

8  going to be Dr. Yoseph Bar-Cohen.  Assuming he takes

9  through the day, through the afternoon, we would have

04:34PM 10  two additional witnesses that we could call Friday.  One

11  would be very, very quick, and then to be followed by

12  Special Agent Sadiku.  So that's kind of what we have

13  lined up here.

14          THE COURT:  So, as of now, probably we would

15  finish sometime on Friday?

16          MR. ARROWOOD:  Yes, Your Honor.

17          THE COURT:  Okay.  Then maybe we'll see where

18  we are at the end of the day Thursday, Mr. Lomonaco, in

19  terms of whether you would start your case, or the

04:35PM 20  defendant would start his case on Friday versus Monday.

21  We'll talk about that more tomorrow afternoon.

22          MR. LOMONACO:  Okay.

23          THE COURT:  Okay?  All right.  Anything else we

24  need to bring up?

25          MR. MC KENZIE:  Yes, Your Honor, just one quick

housekeeping matter.  A few weeks before trial, defense

provided the government with notice of an expert

linguist that he intended to call and we had been

talking about that expert and the notice of testifying

right after ours.

          When I was talking to defense counsel today

about that scheduling, he told me that he's actually

going to be calling a different expert as a witness that

he hasn't disclosed to the government.  So the

government doesn't have any expert disclosures.  We

don't know -- I assume, because it's a linguist, we know

the subject, but I would ask for, you know, a resume,

professional qualifications be provided to the

government forthwith in order for us to make a

determination as to whether or not we're going to

challenge this expert.

          THE COURT:  What about that, Mr. Lomonaco?

          MR. LOMONACO:  Yes, Your Honor, the original

expert we were going to do at the same time, but

she -- I don't want to say developed, but she has got a

medical condition where she is able to see a specialist

in New Hampshire and she wasn't able to be here.  And

she referred me to Ms. Ralph, which is probably one of

the top Mandarin specialists in the state of Tennessee.

She is very qualified.

1          And I sent her an email asking for her CV.  I
2    expect to get it back either tonight or tomorrow.  I
3    don't think there is going to be any problem with the
4    qualifications.
5          THE COURT:  When you get that, will you supply
6    it to government counsel as soon as you get that?
7          MR. LOMONACO:  I should have it by sometime
8    tomorrow.
9          THE COURT:  If there is any delay beyond midday
04:37PM 10  tomorrow, let us know, or let the government counsel
11   know.
12          Is that satisfactory?
13          MR. MC KENZIE:  Yes.  Thank you, Your Honor.
14          And there is just one other matter, and I know
15   it's irregular because the jury is not here, but I
16   asked -- may I approach with counsel to raise an issue
17   with you?
18          THE COURT:  Okay.
19          (Whereupon a sidebar was had as follows:)
04:37PM 20          MR. MC KENZIE:  I just wanted to raise
21   something with you.
22          THE COURT:  Just stand there.
23          MR. MC KENZIE:  Okay.  Your Honor, during one
24   of the breaks, counsel for the University of Tennessee
25   approached me and said -- I'm just relaying what she

1  told me -- that the defendant's wife approached Jean

2  Mercer after -- after she testified and exchanged words

3  with Ms. Mercer; said that she hoped that Ms. Mercer

4  couldn't sleep at night and that Ms. Mercer is crying.

5       I'm not accusing defense or the defendant of

6  doing anything untoward.  However, Ms. Mercer was very

7  upset, and we ask that everyone be reminded to stay

8  civil and not say anything to these witnesses

9  afterwards.  And I don't want -- I don't want to cast

04:38PM  10  dispersions, but I wanted to make the Court aware of

11  that.

12       MR. LOMONACO:  That's reasonable, Your Honor.

13  I don't know.  She told me when we went back to lunch

14  that she had talked to Ms. Mercer and said, "I can't

15  sleep at night.  I hope you can sleep at night," or

16  something to that effect, and that was probably uncalled

17  for, but she is pretty hysterical about this whole

18  thing.

19       THE COURT:  Why don't we do this:  Rather than

04:38PM  20  make a general pronouncement right now, since you had

21  that conversation, why don't you talk with the

22  defendant's wife, and if it arises again, I'll deal with

23  it.

24       MR. LOMONACO:  I don't think it will, Your

25  Honor.

1     MR. MC KENZIE:  I didn't want to create a

2 controversy or anything.  That's why I wanted to bring

3 it here at sidebar.

4     THE COURT:  Well, since she mentioned it to

5 you, that gives you, Mr. Lomonaco, the opportunity to

6 say something to her.

7     MR. LOMONACO:  Yeah.  We're communicating, but

8 I think she is just -- you know, has some emotional

9 feelings, and I'll tell her to keep it to herself.  And

04:39PM 10 she will.  I think she will.  I think she will, Your

11 Honor.

12     MR. MC KENZIE:  Thank you, Your Honor.

13     (Whereupon the following was had in open court

14      within the hearing of the jury:)

15     THE COURT:  Okay.  Unless there is anything

16 else then, we will see everyone back here for starting

17 court right at 9:00 a.m. tomorrow, Thursday.

18     Thank you, everyone.

19     THE COURTROOM DEPUTY:  All rise.  This

04:39PM 20 honorable court stands in recess.

21     (Which were all the proceedings had and

22      herein transcribed.)

23       * * * * * * *

24

25

1                    C-E-R-T-I-F-I-C-A-T-E

2    STATE OF TENNESSEE

3    COUNTY OF KNOX

4            I, Teresa S. Grandchamp, RMR, CRR, do hereby

5    certify that I reported in machine shorthand the above

6    proceedings, that the said witness(es) was/were duly

7    sworn; that the foregoing pages were transcribed under

8    my personal supervision and constitute a true and

9    accurate record of the proceedings.

10           I further certify that I am not an attorney or

11   counsel of any of the parties, nor an employee or

12   relative of any attorney or counsel connected with the

13   action, nor financially interested in the action.

14           Transcript completed and signed on Wednesday,

15   June 30, 2021.

16

17

18

19

21   _____
     TERESA S. GRANDCHAMP, RMR, CRR
22   Official Court Reporter

23

24

25