IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE, TENNESSEE

3  _____
                                  )
   UNITED STATES OF AMERICA,       )
4                                  )
             Government,            )
5                                  )
   vs.                             )  Case No. 3:20-cr-21
6                                  )
   ANMING HU,                      )
7                                  )
             Defendant.            )
8  _____)

9                    **TRIAL PROCEEDINGS**
           **BEFORE THE HONORABLE THOMAS A. VARLAN**
10
                       **June 14, 2021**
11                    **Volume VI of VII**

12 **APPEARANCES:**

13         **ON BEHALF OF THE GOVERNMENT:**

14         CASEY ARROWOOD, ESQ.
           U.S. DEPARTMENT OF JUSTICE
15         OFFICE OF U.S. ATTORNEY
           800 Market Street
16         Suite 211
           Knoxville, TN 37902
17
           MATTHEW J. MC KENZIE, ESQ.
18         U.S. DEPARTMENT OF JUSTICE
           NATIONAL SECURITY DIVISION
19         950 Pennsylvania Avenue, NW
           Washington, DC 20530
20

21

22 **REPORTED BY:**

23
   Teresa S. Grandchamp, RMR, CRR
24 P.O. Box 1362
   Knoxville, Tennessee 37901
25 (865) 244-0454

1  **APPEARANCES:** (Continued)

2           ON BEHALF OF THE DEFENDANT:

3           A. PHILLIP LOMONACO, ESQ.
           LAW OFFICES OF A. PHILLIP LOMONACO
4           800 South Gay Street, Suite 1950
           Knoxville, TN 37929
5
                   *  *  *  *  *  *  *  *
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# INDEX

**CLOSING ARGUMENTS**                                                    PAGE

By Mr. Arrowood                                                           43
By Mr. Lomonaco                                                           74
By Mr. Arrowood                                                          108

\* \* \* \* \* \* \* \*

1    THE COURTROOM DEPUTY:  All rise.  This

2    honorable court is again in session.

3        THE COURT:  Good morning, everyone.  All right.

4    Everyone be seated.

5        Let me ask Mr. Lomonaco:  Is the defendant

6    going to present additional proof?

7        MR. LOMONACO:  Your Honor, we did have an

8    exhibit that we wanted to -- to move into evidence.  We

9    talked about it.  I'm not sure we gave a copy to the

08:35AM  10   other side.  And this is a 2020 Outside Interest

11   Disclosure Form that is being used.  It started being

12   used in 2020.

13       THE COURTROOM DEPUTY:  Which source do you

14   want?  Here or there (indicating)?

15       THE COURT:  Well, let's do this:  Let's hold

16   off because I'm going to ask each side if there is any

17   additional exhibits just in case.  So hold off on that

18   for a moment.

19       So when the jury comes back in, you'll rest on

08:35AM  20   your -- the defendant will rest?

21       MR. LOMONACO:  Yes.

22       THE COURT:  And will the government present any

23   rebuttal testimony or evidence?

24       MR. MC KENZIE:  No, Your Honor.

25       THE COURT:  All right.  So the parties will

rest. And I'll consider the parties having rested on the entire case, but I'll ask you that in front of the jury.

Does the defendant -- I think this would be probably the time. Does the defendant want to renew its motion for judgment under Rule 29?

MR. LOMONACO: Yes, Your Honor. Would you like me to do that now?

THE COURT: You can do that -- are you going to present additional argument or are you going to rely on --

MR. LOMONACO: I'm just going to clarify the case law.

THE COURT: Okay. Well, let's hold off on that then. Let's look at the jury charge right now because that's what we said we're going to do this morning. We'll see how far we get.

The parties have the draft. I've also got the parties' proposed jury instructions, some of which are incorporated in this draft charge, some of which I wanted to discuss further.

I'm going to go a little bit out of order. Let me just -- let me just jump to the pages that deal with the elements of the crime.

I'm looking at -- starting on page 23 -- the

Counts 1, 2 and 3, wire fraud.

I know the defendant had submitted some jury instructions that related to those elements, but we pretty much used the pattern instruction here.

Are there any questions about the -- I guess it's page 23 through 26, the wire fraud elements instruction.

MR. LOMONACO: Your Honor, if you can give me a second, I need to try to pull that up.

THE COURT: Okay.

MR. LOMONACO: We've got our jury charge in, what, the -- where did we put it?

THE COURT: While he's doing that, Mr. Arrowood or Mr. McKenzie, does the government have any questions or issues with respect to the wire fraud instruction?

MR. ARROWOOD: Your Honor, no. In the proposed jury instruction that I provided the Court, I did include an additional clause at the end of -- I believe it's paragraph 3 in the draft instructions that was not incorporated. But, Your Honor, we don't have any objection to them as written.

THE COURT: All right. So the government has no objection to the wire fraud instruction.

Mr. Lomonaco, have you had a chance to look at that?

1          MR. LOMONACO:  Yes, Your Honor.  I don't have
2    any objections to those either.

3          THE COURT:  Okay.  Then let's go to -- I do
4    have some questions of the parties.

5          Let's go to page 27, the false statement
6    instruction.  I guess the question for the
7    government -- this is somewhat patterned after what was
8    submitted by the government, but in looking at it
9    earlier this morning -- and this somewhat relates to, I
10   think, the defendant has a question or a request about
11   the good-faith defense to wire fraud, whether it should
12   apply to the false statements as well.

13         Is that correct, Mr. Lomonaco?

14         MR. LOMONACO:  Yes, Your Honor.

15         THE COURT:  Hold on to that thought.  We're
16   going to let you talk about that.  But here -- so the
17   way this is currently written, it speaks -- excuse me
18   just a moment.  It speaks to whether the statement was
19   false.

20         Now, the indictment talks about false,
21   fictitious, or fraudulent.  So I guess my question is:
22   In looking back at the pattern instruction, it's got in
23   brackets the -- first, the defendant made a statement
24   that is, bracket, [false], bracket, [fictitious],
25   bracket, [fraudulent].  So should this be limited to

```
 1   false or should it all -- and there is separate
 2   definitions for false or fictitious versus fraudulent.
 3         So I don't know if it was the government's
 4   intent in their pattern to speak only to falsity, or
 5   should it read false, fictitious -- should it include
 6   the terms "false, fictitious, and fraudulent" as in the
 7   indictment?  And I think that bears, perhaps, on the
 8   good-faith defense as well.
 9         MR. ARROWOOD:  Your Honor, to the extent that
10   the pattern -- or that the proposed jury instructions
11   the government provided didn't track the indictment,
12   that was an oversight.  We should track the language
13   that's in the indictment, Your Honor.  It should include
14   fictitious, fraudulent, and false.
15         THE COURT:  I think the defendant would
16   probably prefer that as well.
17         MR. LOMONACO:  Yes, Your Honor.
18         THE COURT:  All right.  So we'll redo it.  When
19   you look at the pattern instruction, first, the
20   defendant made a statement, the statement was false,
21   fictitious -- would it be "or" or "and"?
22         MR. LOMONACO:  It what?  It would be what?
23         MR. ARROWOOD:  "Or," Your Honor.
24         THE COURT:  It would be "or" based on the --
25   and then we'll include the definitions for false or
```

fictitious versus fraudulent in the pattern instruction.
Okay.  So we'll make that change.  Then that brings us
over to --

MR. LOMONACO:  Excuse me, Your Honor.  Just to
make sure, did you say you would include the word
"fraudulent," too?

THE COURT:  Yes, false, fictitious or
fraudulent.

MR. LOMONACO:  Okay.

08:41AM      THE COURT:  And then we'll include the pattern
instructions for -- they actually combine false or
fictitious.  If it was untrue as made and the defendant
knew it was untrue at that time.  A statement is
fraudulent if it was untrue when it was made and the
defendant knew it was untrue at that time and the
defendant intended to deceive.

Which then leads, I think, to the discussion of
whether the fraud, good-faith defense should apply only
to wire fraud, or should it also apply to making a false
08:41AM  statement, since we do have the intent to deceive
definition now from the pattern instruction?

Mr. Lomonaco, your position is it should speak
to both?

MR. LOMONACO:  Yes, Your Honor.

THE COURT:  When I say both counts, I'm kind of

 1    grouping both counts.  I'm saying wire fraud and false

 2    statement.

 3            MR. LOMONACO:  Yes, Your Honor.

 4            THE COURT:  Does the government have any

 5    thoughts in that regard?

 6            MR. ARROWOOD:  Your Honor, we have no

 7    objection.

 8            THE COURT:  All right.  So we'll make that

 9    change and we'll expand the good-faith defense to apply

08:41AM  10    to both segments of the indictment.

11            Okay.  Those are the main things that I wanted

12    to bring up.

13            Now, do the parties have other ones that

14    weren't included in here?

15            Let me ask you, Mr. Lomonaco:  Do you want to

16    include -- does the defendant want to include a defense

17    theory instruction, or do you just want to leave that to

18    your argument?

19            MR. LOMONACO:  We'd like to include -- you mean

08:42AM  20    telling the jury what our theory is?

21            THE COURT:  Defense theory is.

22            MR. LOMONACO:  Yes, we sent that in last night

23    to the Court.

24            THE COURT:  Do we have that, Jennifer?

25            THE CLERK:  No.

                    MR. LOMONACO:  I sent something to you in the

middle of the night, our theory of defense.  I'd like to

include that, Your Honor.

                    THE COURT:  All right.  You might need to

resend it or put it on the board or display it so we can

all look at it.  I don't think the Court got anything,

unless --

                    MR. ARROWOOD:  I have nothing, Your Honor.

                    THE COURT:  Okay.

08:42AM    MR. LOMONACO:  Okay.  Let's see what I've got

here.

                    THE COURT:  While he's looking for that, what

about the government?

                    MR. ARROWOOD:  Your Honor, the only additional

proposed jury instruction that we provided the Court was

an instruction on the failure of victim to detect the

scheme.  We think that's been raised by the defendant in

his opening statement and throughout the trial.

                    Whether it's included in the pattern

08:43AM    instruction or in these jury instructions or not, Your

Honor, we want to make certain the jury understands in

this particular case, the failure of the defendant -- or

failure of a victim to detect the crime is not a defense

to the scheme.

                    Whether that comes in, again, Your Honor, as

1    part of the jury instructions or whether we just happen

2    to answer that if the jury has a question, we can do it

3    at that point, Your Honor.

4            THE COURT:  I'm inclined to do the latter.

5            Mr. Lomonaco, the government has proposed Jury

6    Instruction No. 4, failure of victim -- excuse

7    me -- failure of victim to detect scheme.  There is a

8    little concern that it's not in the pattern and there is

9    not a Sixth Circuit case that's been cited.

08:43AM  10            MR. ARROWOOD:  Correct, Your Honor.

11            THE COURT:  And I think it might be -- you

12    know, that's an argument that can be made and/or we'll

13    see if the jury has a question.  So that's inclined --

14    the Court is not inclined to do that.

15            I assume, Mr. Lomonaco, that the defendant

16    would not want that charge given as a separate charge.

17            MR. LOMONACO:  If I'm arguing for my client the

18    best I can, that would probably not be wanted if it's

19    not a jury pattern charge.

08:44AM  20            THE COURT:  I think we'll leave that to

21    argument as to the elements.  Is that the only other one

22    the government has?

23            MR. ARROWOOD:  I believe so.  Yes, Your Honor.

24            THE COURT:  All right.  Mr. Lomonaco, you're

25    looking for the defense theory.

1          Was there anything else from the defendant on

2    the jury charges?  We'll redo these elements charges

3    while you're looking for that.

4          MR. LOMONACO:  I thought I sent it.  Let me

5    see.

6          THE COURT:  Whether you sent it or not, do you

7    have a copy of it that you can display?

8          MR. LOMONACO:  I have it printed out, but I

9    have -- I'm sorry, Your Honor.

08:45AM  10          MR. PARSONS:  Check your drafts.

11          MR. LOMONACO:  Check my drafts?

12          MR. PARSONS:  Yeah.

13          THE COURT:  If you have it in an email, you can

14    email it to Ms. Norwood.  Can you email it to

15    Ms. Norwood?  Do you have her address in there?

16          MR. LOMONACO:  Yes, I can email it, Your Honor.

17    Let me see.

18          Did the Court -- Jennifer, did you get it last

19    night?

08:45AM  20          THE CLERK:  No, I did not.

21          MR. LOMONACO:  We're going to take it out of

22    our trial notebook and cut and paste it and send it over

23    right now.  Sorry about that.

24          THE COURT:  Is it very long?

25          MR. LOMONACO:  It's four short paragraphs.

          1          THE COURT:  That might be too long for a

          2   defense theory charge, but --

          3          MR. LOMONACO:  It's a complicated case, Judge.

          4          THE COURT:  We've got to leave something for

          5   argument, though.

          6          MR. LOMONACO:  Here it is right there on the

          7   end of the --

          8          THE COURT:  And, also, just while we're on the

          9   jury charges, we may have had alternatives in the

08:49AM  10   initial draft of defendant not -- defendant not

         11   testifying versus defendant testifying.  So we'll

         12   include the charge that incorporates the defendant

         13   testifying.

         14          Let me also -- so one other thing I meant to

         15   ask about -- so that's on page 36 of your draft,

         16   defendant's testimony.  You should consider, you know,

         17   the same things related to credibility as to other

         18   witnesses in assessing defendant's testimony.

         19          Let me ask about witness testifying to both

08:49AM  20   facts and opinions.  We have some blank lines there.  I

         21   think that might relate to Dr. Zomchick's testimony.

         22   I'm not -- do we need to -- is that relevant, or do we

         23   need to --

         24          MR. MC KENZIE:  The only real opinion

         25   testimony -- Zomchick, we noticed him as an expert but

1    we never got around to asking any kind of expert

2    opinions from him.  At least that was my perception of

3    it.  The only person whose opinion we asked was Fiona

4    Yiu for her opinion of the translation interpretation.

5         THE COURT:  So do we need this charge?

6         MR. MC KENZIE:  I'll leave it to the defense

7    whether they want it.  The government doesn't insist on

8    it.

9         THE COURT:  Mr. Lomonaco, do we need a charge

08:50AM  10   related to witness testifying to both facts and

11   opinions?

12        MR. LOMONACO:  I don't think so, Your Honor.

13   It might just confuse the jury.

14        THE COURT:  All right.  We'll take that out.

15        Let me just go through others real quick.

16   Character and reputation of defendant, page 38, there

17   was testimony from a reputation witness.  So I'll leave

18   that in, unless anybody thinks I should not.

19        What about -- I guess we do need to talk about

08:50AM  20   these.  What about page 39?  You know, we had

21   alternative summaries and other materials not admitted

22   into evidence and/or summaries and other materials

23   admitted into evidence.

24        MR. LOMONACO:  I think there were some things

25   we referred to that we didn't admit into evidence.

1          THE COURT:  That were or were not?

2          MR. LOMONACO:  That were not entered into

3     evidence.

4          THE COURT:  Did we have summaries that were not

5     admitted into evidence?

6          MR. MC KENZIE:  Well, yes, Your Honor, I

7     believe so.  And certainly the -- like a PowerPoint

8     during summation or a PowerPoint during opening I would

9     think qualify as a summary not in evidence.

08:51AM  10          And then as far as other summaries that were in

11     evidence, the example that jumps to mind is the chart

12     that the defense provided about travel from -- that came

13     from the passport.  So I think that that could be

14     relevant.

15          THE COURT:  All right.  So why don't we say in

16     the first paragraph, "During the trial you've seen

17     counsel use summaries or similar material which were

18     offered" -- or, "you may have seen," just to

19     distinguish.  "You may have seen counsel use summaries

08:51AM  20     or similar material which were offered to assist in the

21     presentation and understanding of the evidence.  This

22     material is not itself evidence and must not be

23     considered as proof of any facts."

24          And I guess it should say, "During the trial,

25     you may have also seen or heard summary evidence in the

1    form of a chart or similar material.  This summary was

2    admitted into evidence in addition to material it

3    summarizes," etcetera.

4          How about including both of those; is that

5    alright with everybody, on page 39?

6          MR. ARROWOOD:  Yes, Your Honor.

7          MR. LOMONACO:  Yes, Your Honor.

8          THE COURT:  All right.  Let's talk about these

9    other acts of defendant.  I'm not sure that's relevant

08:52AM 10   here.  We didn't really -- or is it?  You all tell me.

11          Obviously there weren't evidence of other

12   crimes or wrongs.  Was there evidence of other acts of

13   the defendant other than the ones charged in the

14   indictment?

15          Because, I mean, that's almost -- I'm not sure

16   we went down that path during the course of the trial.

17          MR. MC KENZIE:  Your Honor, I don't believe

18   that we did.  The only reason that I think that it might

19   be worthwhile giving this instruction is during the

08:53AM 20   rehabilitation of Special Agent Sadiku, there was talk

21   about occasions to other PRC entities.  I wouldn't want

22   the jury to be confused that those -- those

23   communications or relationships with anybody somehow

24   mean he's guilty of this crime.  That's -- I don't want

25   any confusion about that with the jury.

|     |     |
| --- | --- |
| | 1 |

                    THE COURT:  Here is what -- let me suggest

this, maybe, because I understand the evidence you're

talking about or the testimony you're talking about, but

we're really not saying that it relates to the

defendant's intent, motive, and opportunity, etcetera.

So maybe we just need the second paragraph about,

"Remember, the defendant is on trial here only for wire

fraud."  Would that be -- I don't think we need the

first paragraph.  Would everybody agree with that?

08:54AM     MR. LOMONACO:  I agree, Your Honor.

                    THE COURT:  Page 40?  That might get confusing.

                    All right.  We'll eliminate the first

paragraph.  That may be somewhere else in the charge,

too, but we'll probably retitle it.  We won't title it

Other Acts of Defendant.  We'll come up with a title

or -- Remember, or something.

                    All right.  Then the rest of it is pretty pro

forma.

                    Okay.  Let me look at this.  Does everybody

08:54AM have this, or do we need to make a copy of it?

                    MR. LOMONACO:  Yes, Your Honor.  And then I do

have one other point that we wanted to try to make, and

we had submitted a couple of proposed jury charges on

intent to commit harm, and those weren't included in

here, and --

1          THE COURT:  Well, let's talk about that first

2     because I also didn't include the government's about

3     that.  I think I remember which one you're talking

4     about.

5          So the government had a proposed jury

6     instruction No. 4, Failure of Victim to Detect Scheme,

7     which cited various cases outside the circuit, and the

8     Court's not inclined to give that.

9          And then you had -- you, the defendant, had

08:55AM   10   defendant's first proposed jury instruction, "For

11    defendant to be found guilty of fraud, its purpose must

12    have been to injure NASA."  Is that the one you're

13    talking about?  And you cite a Sixth Circuit case which

14    was not a jury instruction case.

15         Does the government have a position on that

16    charge?  This is defendant's first proposed jury

17    instruction, Document 94.

18         It's kind of not -- it's not the opposite of,

19    but it's kind of somewhat interrelated to the

08:56AM   20   government's proposed charge, which the Court is not

21    inclined to give about failure to detect scheme.  But

22    then the defendant wants to say the purpose must have

23    been to injure NASA.

24         MR. ARROWOOD:  Your Honor, I think that the

25    jury instructions as drafted are correct, that the

1  actual element the government has to prove is that there

2  is an intent to defraud.

3       In fact, in our proposed jury instructions with

4  respect to paragraph 3 of the wire fraud charges, we

5  added a clause at the back of it which was not included,

6  but, nevertheless, I think is the correct statement of

7  the law, which is that the government need not show that

8  the defendant intended to obtain money or property from

9  the same person or an entity deceived as part of the

10 scheme.

11      I think that's the correct statement of the

12 law.  It's not in the jury instructions.  But I think

13 that this jury instruction adopted by the Court would

14 essentially contradict what the government suspects is

15 the actual law with respect to the intent to defraud

16 element of wire fraud.

17      THE COURT:  I think that just goes toward -- I

18 think you can argue materiality and wilfulness.  But I'm

19 not inclined to give this instruction.  Just like I'm

20 not inclined to give the government's proposed

21 instruction.

22      MR. LOMONACO:  I was hoping it would go towards

23 the directed verdict.

24      THE COURT:  We'll argue that next.  So --

25      All right.  So other than defense theory, is

1   there anything else?

2           MR. LOMONACO:  No, Your Honor.

3           THE COURT:  All right.  Let's look at -- does

4   the government have this yet?

5           MR. MC KENZIE:  Yes, Your Honor.

6           THE COURT:  Let's all read it real quick here.

7           Does the government have a position?

8   Recognizing this is the defendant's theory, it's not

9   telling the jury statements of fact, but what's the

08:58AM  10  government's position?

11          MR. MC KENZIE:  Your Honor, the government's

12  position is that, you know, no objection to paragraphs 1

13  or 2, but that paragraphs 3 and 4 should certainly be

14  left for closing argument.

15          In particular, paragraph 4, which essentially

16  is his closing, in hearing the Court adopt his

17  determination or his -- the defense's description of his

18  relationship with Beijing University of Technology as a

19  part-time summer position, that's something -- the

08:58AM  20  government contends quite the opposite, and the

21  government further contends that that's an issue of fact

22  for the jury to decide, and, therefore, hearing it

23  characterized as that from -- from the bench, while it

24  would be highly prejudicial against the government on an

25  issue that is certainly within the province of the jury.

                        As to paragraph 3, paragraph 3 expands on why

paragraph 2 is his theory.  But, Your Honor, I also

submit that that would be best for closing arguments.

The theory is he didn't have the intent, and then the

argument is this is why he didn't have the intent.

                        MR. LOMONACO:  Your Honor, I think it just

clarifies what the defense's theory is and that it helps

the jury focus on, you know, what -- what the defense is

going to say in its closing argument.  It's only a

theory.  You're not telling the jury that this is the

facts of the case or they should follow it.  But I think

it does allow them to listen more carefully to closing

argument, and I'd ask that we keep it in.

                        THE COURT:  All right.  Well, we'll eliminate

paragraph 4 because that's a pretty factual summary.

We'll leave in paragraph 3 since it's, "Therefore, he

could not knowingly or willfully violate the

restriction."  That's part of a theory, and I'll -- you

know, I'm explaining the defense's position.  I think we

might even say -- what page is this, Jennifer?

                        THE CLERK:  34.  It's 34, Judge.

                        THE COURT:  All right.  Defense argues and the

defense further argues, and I'll eliminate 4 and I'll

leave in 3, and I believe that it -- you know, the Court

makes it clear within the instructions, you know, the

1  defense -- the defense argues, or maybe it's better,

2  "The defense's theory is that he did not commit wire

3  fraud and the defense further submits that the

4  meaning" -- I might not use -- I might do "theory" and

5  "submits" as opposed to "argues". It might make it

6  clearer that it's defendant's theory. I'm not just

7  repeating closing argument.

8       MR. LOMONACO: No objection, Your Honor.

9       MR. MC KENZIE: No objection from the

09:01AM  10  government. Thank you.

11      THE COURT: Okay. Well, I think that concludes

12  the -- concludes the charge conference then.

13      Mr. Lomonaco, do you want to renew your motion

14  at this time?

15      MR. LOMONACO: Yes, Your Honor. I would renew

16  my Rule 29 motion. I believe that, first of all, there

17  is insufficient evidence in an aspect of the case. One

18  of the elements of the fraud is a material

19  misrepresentation. The theory of the government is that

09:02AM  20  the misrepresentation was the conflict of interest form

21  being filled out incorrectly saying that he had no

22  employment.

23      Your Honor, there was insufficient evidence

24  presented after Mr. Zomchick testified about the policy,

25  PL0256, stating that there is only certain conditions

1    that are required to list a confidential -- or list a

2    conflict of interest.

3          The government has not put one bit of evidence

4    on that shows that Professor Hu came over the limit of

5    $5,000 a year to show that it was not a true statement,

6    that he didn't have to report it.

7          THE COURT:  Are you talking about the

8    "included, but not limited to" language here?

9          MR. LOMONACO:  Yes, I believe I am.  But, you

09:03AM 10   know, the -- the government talks about the -- the

11   defendant falsely stating he did not have employment,

12   and all the evidence showed that he didn't need to

13   report it.

14          I don't think there is sufficient evidence for

15   the jury to find beyond a reasonable doubt, and I

16   believe it's an element of the offense.  I don't think

17   there is sufficient evidence to find beyond a reasonable

18   doubt that he lied.

19          So I would say that on that particular count or

09:04AM 20   that particular argument, that should cause the fraud

21   charges to -- to be dismissed and also the false

22   statements because if he didn't make a false statement,

23   if he didn't lie, the false statement should be

24   dismissed, too.  I don't think there is sufficient

25   grounds to show that he made a false statement.  That's

1    my first argument.

2          And then I've got a couple more on the, "To be

3    guilty of fraud, an offender's purpose must be to

4    injure."  And that's Sixth Circuit law.  "One who makes

5    a fraudulent misrepresentation is subject to liability

6    for pecuniary losses suffered."

7          There was no proof that Professor Hu had a

8    purpose or intent to injure NASA.  So under the case

9    law, the condition -- the conventional meaning of

09:05AM 10   "deprive" applies in the fraud case and the -- they

11   didn't get deprived of anything.

12         All of the NASA employees -- I believe all of

13   them.  At least Mr. Bar-Cohen testified they got what

14   they bargained for.  They got the project.  And, in

15   fact, Bar-Cohen sought and reached out to Professor Hu

16   as the person most qualified.  So they got the most

17   qualified research that was available.  So I don't think

18   that there was any purpose to injure NASA.

19         And, of course, I don't know if that goes to

09:06AM 20   Counts 4, 5, and 6 on that issue, but I think it goes to

21   Counts 1, 2, and 3 that it can't be fraud.  Basically,

22   you know, no harm, no foul, and there is case law to

23   support that.

24         The Sixth Circuit case that we cite in our

25   brief, *State v. Sadler,* was a case where some people

1   were trying to get drugs from a pharmaceutical company

2   and they misrepresented in their letters and

3   communications and made false statements to obtain these

4   drugs and they got convicted of fraud.

5           The Sixth Circuit reversed it saying that the

6   pharmaceutical company got paid for what they asked.

7   They got their pay, their -- they got their asking price

8   for the drugs.  They weren't injured.  There was no

9   intent to deprive them of property.  They just lied to

09:07AM 10  them.  It was -- it was a false statement, but it wasn't

11  fraud because they did not injure the pharmaceutical

12  company.

13          So I think in this particular case, Professor

14  Hu didn't deprive NASA of anything.  Even if he

15  committed a false statement and intentionally tried to

16  get that NASA grant, he didn't deprive them of anything

17  because they got exactly what they bargained for and

18  they were happy with it.

19          So I don't think that the elements of -- you

09:07AM 20  know, I think that's a bar to being convicted of fraud.

21  You have to have the intent or purpose to injure, and we

22  don't have it in this case, Your Honor.

23          And then the third argument is the void for

24  vagueness, and I think you've probably been hit with

25  that enough times to know what I'm talking about.

1          THE COURT:  I'm pretty familiar with that one.

2          MR. LOMONACO:  Thank you.

3          THE COURT:  Thank you.

4          Does the government want to briefly respond?

5          MR. ARROWOOD:  Yes, Your Honor.

6          The government submits that the evidence has

7    been sufficient in this case to sustain a conviction on

8    all counts of the indictment.

9          Referring first to wire fraud, the evidence

10   throughout this trial has indicated that ever since the

11   defendant joined the University of Tennessee, he's never

12   disclosed his employment with BJUT to anyone at the

13   university, to any government agency, including NASA.

14         The defendant's omissions, his concealment to

15   those facts were material.  They were material precisely

16   because of NASA's China funding restriction.  NASA has

17   this particular restriction in place.  It seeks

18   assurances and information at certain points in this

19   process in order to ensure that it's not in violation of

20   the funding statute.  And so the defendant's material

21   omissions went directly to that point.

22         With respect to materiality, we heard witness

23   after witness indicate that they would not have

24   processed the contract as normal had they known the

25   defendant was employed at the Beijing University of

1  Technology.

2        The third, we have to prove that the defendant

3  had the intent to defraud.  So here we're talking about

4  contracts at its essence.  The contracts in this

5  particular instance involve the giving the money.

6        Now, the defendant had the intent to defraud

7  here because he's trying to advance his career.  The

8  testimony from Dr. Zomchick indicated that having these

9  types of grants is a crucial aspect of the tenure

09:09AM 10  decisions, hiring decisions.  They're important for, in

11  particular, the STEM-related professors to show success

12  in the field.  The defendant knew that.  He's been a

13  researcher for 25 years.  And he attempted to advance

14  that career by obtaining these NASA contracts that he

15  otherwise could not have had had he disclosed his

16  employment relationship.

17        With respect to the wire, Your Honor, I think

18  that's not really even -- not really contested at this

19  point.  All three of the wires crossed state lines.

09:10AM 20        And with respect to the intent to deprive NASA,

21  again, all that has to be shown is there is an intent to

22  defraud, generally speaking.  As the jury instructions

23  state here, the government need not prove that the

24  defendant obtained money or property for his own

25  benefit.

1           Moreover, the instruction states the government

2    need not prove that the alleged scheme actually

3    succeeded in defrauding anyone.  All it's required to

4    show is that the defendant engaged in the scheme, the

5    scheme involved material omissions, those omissions were

6    material because of the NASA China funding restriction,

7    and the point of the whole thing was to get NASA to give

8    grant money so that the research could be performed and

9    the defendant could add it to his tenure application and

10   his other documents showing his professional accolades,

11   and that's what he was trying to do.

12           Now, it's sort of also connected to the false

13   statements.  The false statements that were made

14   admittedly were not made by the defendant in this case.

15   The false statements were made by the accountants of the

16   university back to NASA for payment on those invoices.

17           As you recall the testimony of Monica Cole, she

18   indicated that she certified all of the Jet Propulsion

19   Lab related invoices stating, in essence, that they were

20   in compliance with the terms of the contract.

21           Now, the evidence in the case suggests that

22   that's not true; that they were not in compliance with

23   the terms of the contract because the principal

24   investigator on those contracts at that time was

25   employed by a university in China.

1    Because they weren't in compliance with the
2    terms of the contract, the statements on those invoices
3    certified by the university were false.  But that
4    falsity was caused by the defendant's scheme.

5    Those statements were made ultimately to NASA
6    for payment, which is an agency within the executive
7    branch, and that the defendant acted knowingly and
8    willfully, the same reasons that the government can
9    prove intent to defraud in this case.

09:12AM  10    With respect to the vagueness challenge, Your
11    Honor, I think the Court has addressed that when it took
12    up the motion to dismiss many months ago on this
13    particular case.  The government need not prove that the
14    defendant knew of the NASA China funding restrictions
15    specifically or that it was even violated.  We simply
16    have to show that the defendant had the intent to
17    defraud.

18    THE COURT:  What about -- and I don't want to,
19    you know, forecast the closing arguments, but I'm sure
09:12AM  20    you're both going to get into this.  I mean, the
21    defendant already has.  He's saying there was not a
22    fraudulent statement and, therefore, not an intent to
23    defraud because of the -- I think he said 5,000, but I
24    think it was $10,000, the "included, but not limited to"
25    language, and basically the check of the box on the

1  failure to -- on the conflict of interest form read in

2  conjunction with the other documents was not a false

3  statement.  And that's one of defendant's -- that's

4  defendant's somewhat threshold argument to try to

5  convince the Court that the elements are not met.

6            MR. ARROWOOD:  Your Honor, the defendant's

7  scheme took many forms, and we've talked about that.  So

8  one form is the conflict of interest disclosures, the

9  Outside Interest Disclosure Form where he did not

09:13AM  10  disclose.

11            Now, that particular policy states fairly

12  clearly, "included, but not limited to," as the Court

13  stated.  It also indicates that those -- I'm

14  paraphrasing here, Your Honor, since I don't have it in

15  front of me, but essentially researchers whose outside

16  activities conflict with the university activities must

17  disclose.

18            Well, that's what exactly happened here.  Those

19  university activities were part and parcel to his NASA

09:13AM  20  contracts.  So his outside activities, his employment

21  with BJUT conflicted with that, and so he was required

22  to disclose.

23            But the concealment was beyond simply the

24  Outside Interest Disclosure Form.  He knew back in

25  January 2016 when he talked to Dr. Bar-Cohen that

 1   researchers on NASA -- on NASA contracts that are

 2   employed by Chinese universities can't work on NASA

 3   projects.  He knew it then.  And he failed to disclose

 4   time and again from that point forward.

 5        So it's not simply the Outside Interest

 6   Disclosure Form.  It's all the different ways in which

 7   he knew that he had a duty to disclose his employment

 8   with the Beijing University of Technology, certainly to

 9   the university, but certainly to NASA, and he engaged in

09:14AM  10   this scheme to avoid having to do that so he could

11   continue to get those contracts.

12        And then there was one other argument, Your

13   Honor, with respect to what -- did NASA get what it

14   bargained for.  Here, Your Honor, NASA bargained for

15   someone who was not -- for someone to do the research

16   who was not at that time, while doing the work on the

17   project, at that same time employed by a university in

18   China.  That's what it bargained for.  It did not get

19   that, Your Honor.

09:14AM  20        THE COURT:  Okay.  Thank you.  I understand the

21   parties' positions.

22        Anything further, Mr. Lomonaco?

23        MR. LOMONACO:  Only in that the -- he got the

24   bargain, Your Honor.  NASA got the bargain.  *Takhalov*,

25   the case we cite, Eleventh Circuit case, talks about an

example.  "Consider the following two scenarios:  In the

first, the man wants to exchange a dollar for four

quarters without going to the bank.  He calls his

neighbor on the cellphone and says that his child is

very ill, a false statement.  His neighbor runs over,

and when she arrives, he asks her to make a change for

him.  She agrees.  The quarter passes to the man, the

dollar passes to the woman, and they part.  She later

learns that the child was just fine.  The second

scenario is identical to the first except that instead

of giving the woman a true dollar, he gives her a

counterfeit one.  That is fraud.  The first one is not."

        They got -- they got their research.  They were

happy with it.  No harm, no foul, Your Honor.  That's

our argument.

        THE COURT:  I'll take a closer look at those

cases.  That's why I'm going to keep the motion under

advisement while we proceed to closing arguments.

        MR. LOMONACO:  Okay.  Thank you, Your Honor.

        THE COURT:  So, other than that, are we ready

to -- ready with closing arguments?

        MR. ARROWOOD:  Your Honor, the government may

need just a few minutes to --

        THE COURT:  No, we'll take a break.

        MR. ARROWOOD:  Yes, Your Honor, we are.

       1          THE COURT:  All right.  Still an hour total,
       2   roughly, is what we're looking at?
       3          MR. ARROWOOD:  Your Honor, as we're going
       4   through it, I think maybe an hour and ten minutes.  But
       5   certainly no more than that, Your Honor.
       6          THE COURT:  All right.  Well, we'll see how
       7   much time you've got left in terms of rebuttal.
       8          Obviously we don't -- depending on how
       9   long -- typically what I say is:  If you have an hour
09:16AM  10   and ten minutes, you have approximately 20 minutes for
      11   rebuttal.  If you use 30 minutes, you don't have 40 or
      12   50 for rebuttal.  We'll allocate of that time 20 minutes
      13   for rebuttal based on the anticipated length of
      14   defendant's argument.
      15          And hour and ten minutes is fine with you,
      16   Mr. Lomonaco.
      17          MR. LOMONACO:  I think it might bubble over an
      18   hour, but not much.
      19          THE COURT:  That's fine.  We'll look at that
09:17AM  20   hour to hour-ten-minute frame.  The Court is fine with
      21   that.
      22          MR. LOMONACO:  Thank you.
      23          THE COURT:  Well, let's stand in recess.  We'll
      24   say until 9:30 and we'll get set up.
      25          If you need a little more time, let Ms. Norwood

1    know, but, otherwise, the jury should be here and we'll

2    start with closing arguments.

3          My thought is -- we'll see how long you take on

4    your opening closing, "you" being the government.  We

5    might do opening closing and closing and then take a

6    break and then do rebuttal and charge, but we'll play

7    that by ear.

8          MR. LOMONACO:  Do you think we can get it all

9    done by lunchtime, or at least the arguments?

09:17AM  10          THE COURT:  At least the arguments, I would

11    say.  We'll see how the jury is after the opening, but

12    based on how long we typically go with the jury, we

13    would -- you know, if Mr. Arrowood takes 45 minutes or

14    so for his opening closing, you take an hour or so,

15    that's about how long we go anyway.  So that's kind of

16    my thought process there.

17          And, yeah, we'll either -- I think we can

18    definitely get the closings done before lunch, and maybe

19    we'll do the closing charge and then go to a later

09:18AM  20    lunch, or go to lunch, come back from lunch and do the

21    charge.  We'll play it by ear.

22          All right.  Let's stand in recess for ten or

23    15 minutes.  When everything is set up, we'll bring our

24    jury down and start our closings.

25          THE COURTROOM DEPUTY:  This honorable court

1  stands in recess.

2          (A brief recess was taken.)

3          THE COURT:  I guess we can go back on the

4  record.  Did you all look at the verdict form?  Is that

5  okay with everybody?

6          MR. ARROWOOD:  It's fine, Your Honor.

7          MR. LOMONACO:  Yes.

8          THE COURT:  So what we might do is:  While

9  you're doing your closings, we may give you -- at least

09:19AM 10  on the ones that we changed, you know, give you a draft.

11  You can look at that before the Court actually gives its

12  charge.  How about that?

13          All right.  Thank you very much.

14          MR. LOMONACO:  Thank you, Your Honor.

15          (A brief recess was taken.)

16          THE COURTROOM DEPUTY:  This honorable court is

17  again in session.

18          THE COURT:  All right.  Thank you.  Before we

19  bring the jury in, Mr. Lomonaco, you wanted to raise the

09:41AM 20  document.

21          MR. LOMONACO:  Yes, Your Honor.  What we have

22  is the University of Tennessee Faculty and Staff Outside

23  Interest Disclosure Form, 2020 version, and I believe I

24  discussed with -- I think it is Ms. Mercer -- that isn't

25  it a fact they changed the form after the professor got

arrested, and we -- we have -- in fact, we asked for

this over and over again, and they said, well, we

don't -- you know, nobody has one.

We've got one and we've got redacted -- what we

did is:  We got somebody that disclosed one in 2020.  We

made a copy of it and redacted personal information, and

we'd like to introduce it as the final exhibit so I can

show that there were changes in the policy.

It's sort of similar to the training manuals

where they changed every year.  This sort of tracks

along those lines, and I think we've -- we've introduced

all of those.

THE COURT:  Well, was this discussed with

anyone at trial?  I guess that's what I'm --

MR. LOMONACO:  That's what I say.  I believe

Ms. Mercer, I asked her did they change the Outside

Interest Disclosure Form after he was arrested, and I

believe she said yes, if I'm remembering the evidence

correctly.

THE COURT:  What's the document number?

MR. PARSONS:  37.

THE COURT:  All right.  What's the government's

position, or is there an objection?

MR. MC KENZIE:  Yes, Your Honor.  The

government objects on several grounds.  The first is

1   relevance; just, in general, relevance.

2          What we have here is a document from an unknown

3   person that was submitted and filled in out -- on

4   November 18th, 2020, if you were to look at the approval

5   path history on the bottom.  That's about nine months

6   after the defendant was arrested.  So we have a document

7   filled out by a person who is not the defendant nine

8   months after the defendant was already in custody, nine

9   months after the conduct charged here.  There is no

09:43AM 10  evidence that the defendant saw or had to contemplate

11  any type of form such as this.  So, one, it's just pure

12  relevance.  It's not.  It doesn't go to a single element

13  of the case.  It doesn't have anything to do with the

14  defendant.

15          Next I'll move on to Rule 403.  Even if Your

16  Honor were to find that there was relevance, I would

17  argue that it is very confusing to the jury to talk

18  about something that happened nine months after the

19  conduct which is alleged by the defendant about a form

09:44AM 20  that's filled out by other people outside of the

21  defendant's knowledge or presence, having nothing to do

22  with the defendant's conduct.

23          Then I would direct your attention to Rule 407

24  which deals with subsequent remedial measures and object

25  on those grounds.  I'll just read from those rules.

"When measures are taken that would have made an earlier

injury or harm less likely to occur, evidence of the

subsequent measures is not admissible to prove

negligence, culpable conduct, a defense, or a defect in

a product or its design or a need for a warning or an

instruction.  But the Court may admit this evidence for

another purpose, such as impeachment, or, if disputed,

proving ownership, control, or the feasibility of

precautionary measures."

Your Honor, none of the conditions in the last

paragraph apply here.  So I object on the grounds of

relevance.  I object on the grounds of Rule 403.  I

object on the grounds of Rule 407.

And, Your Honor, you can see the policy reasons

for the existence of Rule 407.  I mean, it seems like it

speaks more to the civil context, but you could see why

Your Honor wouldn't want to set a precedence where you

don't want -- it would have a chilling effect on victims

of crimes taking remedial measures.  We wouldn't want

people saying, "Oh, no, don't start locking your doors

at night when you're a victim of burglary or that will

be used against you in court."  It makes no sense, Your

Honor.

THE COURT:  All right.  Well, let's do this:  I

understand the parties' positions.  I'm not going -- go

1  ahead, Mr. Lomonaco.  No, I think I've heard enough,

2  but -- well, go ahead.  Very quickly.

3          MR. LOMONACO:  Your Honor, first of all, I

4  don't know if subsequent remedial measures apply in

5  criminal cases.  And, third, I think it is one of the

6  exceptions, the feasibility of precautionary measures.

7  The feasibility that if they had done it right the

8  first -- the precautionary measures could have been

9  changed.  If they had done it right the first time, we

10  wouldn't be here.  So that is the feasibility of

11  something they could have done but they didn't do.

12          THE COURT:  All right.  Well, I think here is

13  what we're going to do:  If there was testimony by

14  Ms. Mercer, obviously the jury ultimately determines the

15  proof in this case, but I think based on what you're

16  saying, Mr. Lomonaco, you asked her about changes to the

17  form, and if that's the case, then you can discuss that

18  during your closing arguments.  But I think this

19  specific form the Court does not recall was shown to any

20  witness during the course of the trial and --

21          MR. LOMONACO:  I didn't show it to anyone.

22          THE COURT:  And as the government stated, it

23  appears to be to someone unrelated to this defendant.

24  I'm not going to allow the document.  I'll sustain the

25  government's objection but I'll allow you to argue

09:46AM (line 10)
09:46AM (line 20)

1  that -- argue what, you know, the outgrowth from your

2  evidentiary discussion with the witness as to -- I'm not

3  going to --

4          MR. LOMONACO:  That's fine, Your Honor.

5          THE COURT:  Withholding the document or

6  granting the objection to the document itself does not

7  preclude, perhaps, some of the arguments you plan to

8  make otherwise based upon what you've described as the

9  testimony that occurred during trial; okay?

09:47AM 10         All right.  Are we ready for our jury?

11          MR. ARROWOOD:  Yes, Your Honor.

12          MR. LOMONACO:  Yes, Your Honor.

13          THE COURT:  All right.  Let's bring the jury

14  in.

15          (Whereupon the following report of

16           proceedings was had within the presence

17           and hearing of the jury:)

18          THE COURT:  All right.  Thank you.  Everyone

19  please be seated.

09:48AM 20         Good morning to our members of the jury.  I

21  hope everyone had a pleasant weekend.  Thank you for

22  being back here and waiting a few extra minutes, or more

23  than a few extra minutes, while we discussed some

24  matters and prepared for moving the case along.

25          The defendant presented proof on Friday, and,

1   Mr. Lomonaco, if you want to announce to the jury where

2   we are.

3           MR. LOMONACO:  Yes.  The defendant rests with

4   its case.  Thank you.

5           THE COURT:  All right.  So the defendant rests.

6           And is there any rebuttal or additional

7   testimony to be offered by the government?

8           MR. ARROWOOD:  No, Your Honor.

9           THE COURT:  Does the government rest on its

10  entire case?

11          MR. ARROWOOD:  Yes, Your Honor.

12          THE COURT:  Does the defendant rest on his

13  entire case?

14          MR. LOMONACO:  Yes, Your Honor.

15          THE COURT:  All right.  Ladies and gentlemen of

16  the jury, that does conclude the testimony in this case

17  by both parties.  So we are prepared to proceed forward

18  with closing arguments.

19          As you heard me state at the beginning of last

20  week, closing arguments, like opening statements, are

21  not proof, but they are the opportunity for counsel for

22  the parties to argue or discuss with you what they

23  believe the evidence has shown and how you should treat

24  or discuss that evidence when you begin your

25  deliberations.

1          So, again, we'll begin with closing -- opening

2     closing argument by the government, followed by closing

3     argument by the defendant, and then a final rebuttal

4     closing argument by the government.  We may take some

5     breaks in-between, but that's the order in which we'll

6     proceed.

7          So, Mr. Arrowood, you may proceed with opening

8     closing argument on behalf of the government.

9          MR. ARROWOOD:  Thank you.  If it please the

09:50AM 10     Court.

11          Where do you work?  Is that a difficult

12     question or is that an easy one?  Before each of you

13     began serving on this jury, you each filled out a juror

14     questionnaire, and that juror questionnaire asked you,

15     "Where do you work?"  Was that hard to answer or was it

16     easy to answer?

17          Now, the defendant has not one, but two Ph.D.s.

18     He's been a visiting scholar at Harvard.  He's taught in

19     Japan, Germany, Spain, Canada, the United States, and

09:50AM 20     China.  He's been a professional researcher for over

21     25 years, and he wants you to believe, he needs you to

22     believe that that question is difficult to answer.

23          But, ladies and gentlemen, that question is

24     difficult only if there are consequences for a truthful

25     answer.  And for the defendant, there were consequences

for a truthful answer. Consequences that he knew, consequences that he understood, and consequences for which he engaged in a years-long scheme to avoid.

Now, during the course of the trial, the evidence has proven beyond a reasonable doubt that the defendant was asked some form of that question for years by the University of Tennessee. He was supposed to provide truthful information when he applied for the job at UT. He was supposed to provide truthful information on his annual Outside Interest Disclosure Form, and he was supposed to provide truthful information in his tenure application. He was also supposed to provide this information to NASA.

Now, the evidence has also proven beyond a reasonable doubt that the defendant was fully aware that the answer to that question included two universities, one here in Knoxville, Tennessee and one in Beijing, China.

The evidence has also proven that he intentionally hid his employment in China in order to further his career and gain access to government grants from NASA that he otherwise could not have gotten had he told the truth.

Now, that concealment, those omissions, those lies led the University of Tennessee to file fraudulent

1   proposals, sign fraudulent contracts, and submit

2   fraudulent invoices.  Now, this case, ladies and

3   gentlemen, is just that simple.

4           Now, before I get into the evidence in the

5   case, I'd like to take just a few minutes and introduce

6   some of the law.  Now, I'm going to tell you what I

7   think the judge is going to tell you the law is, but if

8   you hear anything different between from what I tell you

9   and the judge tells you, please listen to the judge.

09:53AM  10       There on your screen -- is it being shared?

11          THE COURTROOM DEPUTY:  Laptop is on.

12          THE COURT:  Give us just a moment.

13          MR. ARROWOOD:  I apologize, ladies and

14   gentlemen.  Sorry.

15          Okay.  Ladies and gentlemen, I apologize for

16   that.

17          So as you can see here on the screen, you have

18   both wire fraud and false statements.  Now, this

19   indictment contains six counts, three counts of wire

09:54AM  20   fraud and three counts of false statements.

21          Now, on your screens as displayed are the

22   elements of each of those defenses that the government

23   must prove beyond a reasonable doubt.  So please allow

24   me to introduce you to just a few of the terms that

25   appear on your screen.

1          First, scheme to defraud.  I believe the judge

2     will instruct you that a scheme to defraud includes any

3     plan or course of action by which someone intends to

4     deprive another of money or property by means of false

5     or fraudulent pretensions, representations, or promises.

6     And this includes false statements, half-truths, and,

7     importantly, concealment of material facts.

8          Now, specifically for this case, that means

9     that the government must prove, and I submit has proven

09:55AM 10     beyond a reasonable doubt, that the defendant, through

11     material misrepresentations and concealment of material

12     facts regarding his employment with the Beijing

13     University of Technology, caused the University of

14     Tennessee to falsely certify to NASA and to NASA

15     contractors that the university was in compliance with

16     NASA's China funding restrictions regarding NASA

17     projects that the university sought and obtained on the

18     defendant's behalf.

19          Now let's take a look at the term "material".

09:56AM 20     Please notice "material" is included on both the false

21     statement charges and wire fraud, and it's pretty much

22     the same thing for both.

23          A misrepresentation and concealment is material

24     if it has a natural tendency to influence or is capable

25     of influencing the decision of a person of ordinary

prudence and comprehension.

        And then finally intent to defraud.  This means
to act with an intent to deceive or cheat for the
purpose of depriving another of money or property.

        Now, it's typically not possible to get direct
evidence of someone's intent because you can't get
inside someone's mind.  So I suspect the judge will
instruct you that this element can be proven from
surrounding circumstances, like what the defendant said,
what the defendant did, and how the defendant acted.

        Now I'm going to go through some of the
evidence in the case.  You've seen a lot of the
documents in the case.  You've heard from a lot of
witnesses.  I'm not going to touch everything that the
government submitted.  But I do want to hit some of the
highlights for you.

        So, first, let's begin by talking about the two
contracts that the defendant signed with the Beijing
University of Technology.  The contract on the left is
the contract that the defendant signed in April 2016.
The contract on the right is the contract whose
signature page was signed by the defendant in March of
2019.

        Both contracts are entitled Employment Contract
For High-Level Talents, Beijing University of

1    Technology, Short-Term.  Both contracts have a

2    three-year term.  The first contract expired at the end

3    of December in 2018, and the second contract expiring at

4    the end of December of this year.  Both contracts

5    require the defendant to complete a research project by

6    a national foundation in China, and both require the

7    defendant to publish papers and acknowledge the Beijing

8    University of Technology in those papers.

9            Now, regarding research projects, this document

10   is into evidence.  It's a draft of the final report for

11   a project that the defendant was working on for the

12   Beijing Natural Science Foundation.  As you can see, the

13   defendant was a principal investigator for this project,

14   and was, according to the chart, in charge of all

15   matters for this project.

16           You also probably recall from the first day of

17   trial a number of research publications that we entered

18   into evidence.  I know the testimony got a little bit

19   monotonous, but it's, nevertheless, important.  And so

20   for each of these research papers, the defendant lists

21   himself as a coauthor, and in each of these, he

22   identifies his relationship not only with the University

23   of Tennessee, but also with the Beijing University of

24   Technology.

25           We also presented evidence that the defendant

managed a laboratory in Beijing, that he hired Ph.D.
students for his research group in Beijing, and even
attended conferences as an employee for the Beijing
University of Technology.  We even showed you his
business card.  Note there under his name, it says,
"Chair Professor."  We'll talk a little bit about that
later on.

        We also showed you several examples of his
resume.  This version was from 2016.  Notice, ladies and
gentlemen, the very top entry, Dr. Anming Hu, Professor
of Institute of Laser Engineering, Beijing University of
Technology.  Not the University of Tennessee, but the
Beijing University of Technology.  This resume also
includes a number of positions that the defendant held
at the Beijing University of Technology and it includes
his research projects for Chinese entities.

        Ladies and gentlemen, make no mistake, the
information on your screen was never disclosed to the
University of Tennessee administration, not in his
tenure application, not when he joined the university,
not in his Outside Interest Disclosure Form.  It was
never disclosed to NASA.  It's never been disclosed to
any U.S. government agency for any contract he's ever
gotten.

        Now, ladies and gentlemen, the evidence the

prosecution has presented is clear.  The defendant was
employed as a professor and researcher at the Beijing
University of Technology, and this fact that cannot be
denied after looking at the evidence is the exact same
fact that the defendant tried so hard to conceal from
the university.  And the question that is so simple to
answer, "Where do you work?" is a question the defendant
refused to truthfully answer time and again.  In fact,
he never disclosed his employment relationship; never.
Not in his initial application, not in his tenure
application, and not in his Outside Interest Disclosure
Forms.

Here is 2013 (indicating).  We don't have one
for 2014, but here is 2015, '16, '17, '18, '19.

Now let's talk for a few minutes about the NASA
contracts.  I know some of that evidence came in and it
made it a little bit confusing because we had certain
witnesses only testifying to certain aspects.  So let me
put this in context for you.

Now, this story begins in January of 2016
related to the Jet Propulsion Lab contracts.  Now, of
course, prior to January 2016, the defendant had never
disclosed his employment relationship with BJUT to the
university.  But, for our purposes, let's begin in
January of 2016.

1    So late 2015 and early 2016 was a big moment

2  for the defendant.  As you heard Dr. Bar-Cohen testify

3  from the JPL, he needed help with a NASA research

4  project, and who did he reach out to?  Dr. Babu at the

5  University of Tennessee.  You met Dr. Babu.  Dr. Babu is

6  a rock star.  He's just been appointed to the National

7  Science Board advising the president.  Dr. Babu is a big

8  deal.

9    And so when Dr. Bar-Cohen reached out to

10  Dr. Babu, Dr. Babu said, "Hey, why don't you talk to my

11  colleague, Dr. Hu," the defendant.  This is the

12  defendant's big moment.  So, in early January 2016, he's

13  beginning to work on a NASA proposal with Dr. Bar-Cohen.

14    The defendant sends this email (indicating),

15  and this email contains an attachment as you can see

16  there highlighted by the red box with

17  "letter-BJUT-chen."

18    Now, this is the top of that document.  What

19  this is is a document from this Professor Tao at the

20  Beijing University of Technology identifying his

21  collaboration with the defendant, and here the defendant

22  is trying to have his colleague, Dr. Tao, work on this

23  NASA project.  Dr. Tao again works at the same

24  university as the defendant.

25    Now, a little bit earlier and in response to

other emails I have not shown you today about the use of
Chinese facilities, Dr. Bar-Cohen sends an email to the
defendant.  And note the time, ladies and gentlemen.
7:24 in the morning, he tells the defendant, "I removed
the mentioning of the use of facilities in China.  We
need to avoid mentioning since NASA does not allow such
formal collaboration."

        35 minutes later the same day, Dr. Bar-Cohen
again emails the defendant.  This time, "If you are
preparing letters from China, I cannot use them in the
proposal."

        A few hours later, Dr. Bar-Cohen again emails
the defendant, same day, (as read) "We cannot include
any collaboration with Chinese entities."

        Now, a little over a week later, Drew Haswell,
a University of Tennessee Office of Sponsored Programs
employee, sends the proposal to Dr. Bar-Cohen, and in
this email -- it's a little bit lengthy -- Mr. Haswell
makes clear that a different professor working at a
Chinese university cannot work on this project.  In
fact, he uses the term, "The letter of commitment will
not" -- you see "will not" is his emphasis; bold, caps,
underlined, "will not."  And why not?  He cites why not.
Because of the assurance form.

        Now, in addition to that email, you also have

attached the NASA China Assurance form.  You've seen

this a lot of times throughout this last week, and let's

talk about this for a moment.  And I want to provide a

little bit of context here.  This is a University of

Tennessee form.  This is not a NASA form.  The

University of Tennessee has decided to create this.  The

University of Tennessee decides when to include it and

when not to include it.

So this is a University of Tennessee form, and

there at the very bottom in bold is language that was

placed there by the University of Tennessee involving

their interpretation of this particular restriction.

And there about the third line, essentially

what it says is that the it's view of the university

that the NASA China funding restriction does not apply

to the participation of faculty, students, staff from

non-Chinese entities, which makes sense.

Now, this particular language gets garbled

from time to time in trainings for sure, but understand,

ladies and gentlemen, nobody in the Office of Sponsored

Programs believed any of the faculty they're working

with were also employed at a Chinese university.  So it

makes sense that they wouldn't think that this

particular provision applied to their faculty.  Of

course, they didn't know because the defendant never

1  told them.

2        Now, going back to that letter from Professor

3  Tao.  It's important to underscore the importance of

4  that.  That's a collaboration letter from someone at the

5  defendant's university, the same university, Beijing

6  University of Technology, and not only the same

7  university, but the same institute, the Institute of

8  Laser Engineering.

9        And at this point in the story, what does the

10:07AM 10  defendant know?  He knows that someone from his

11  institute, from his university in China, can't work on

12  NASA projects.

13        And so put yourself in his shoes.  If you are

14  someone who is not intending to defraud, not engaged in

15  a scheme, what would you do?  Would you raise your hand

16  and say, "Hey, I actually work at that same place.  Is

17  that a problem?"  The defendant didn't do that.  He

18  didn't say a word.  And he wants you to believe that he

19  never knew.  But, ladies and gentlemen, here it is:  His

10:08AM 20  colleague, someone from the same institute, the same

21  university, can't work on NASA projects.

22        Now, ladies and gentlemen, at this point, the

23  defendant's been told four times, four times,

24  researchers employed at Chinese universities can't work

25  on NASA projects.  Four times.  Three by Dr. Bar-Cohen,

1  once by Drew Haswell.  And so at this point in the

2  story, the government's willing to give him the benefit

3  of the doubt.  Even though he never disclosed his

4  employment prior to this, at this point, he knows.  From

5  this point forward, he knows.

6      Now, fast forward four months later in

7  April 2016.  The defendant signs an employment contract

8  with the Beijing University of Technology.  Now, at this

9  point, the defendant made a choice.  He chose to

10 continue his employment relationship with the Beijing

11 University of Technology, an employment relationship

12 that he knew that if he disclosed it, it would mean that

13 he would not be able to obtain NASA contracts.

14      Now, fast forward just five months later,

15 September 2016, and the defendant, fully aware of his

16 employment contractual relationship with BJUT, submits

17 another proposal to NASA.

18      And here you have an email from September 2016.

19 The university's Office of Sponsored Programs is

20 providing a proposal on behalf of the defendant to work

21 with Dr. Bar-Cohen again on another NASA project.

22      Now, attached to this email is a letter of

23 commitment and budget justification.  Here is a letter

24 of commitment, a letter signed by David Smelser, the

25 Assistant Director of Sponsored Programs.  He testified

1    and he told you that he never would have signed this

2    form or submitted the proposal had he known the

3    defendant was employed at the Beijing University of

4    Technology.  And, of course, he didn't know that fact

5    because the defendant didn't disclose it.

6          Here, I'm a professor at the University of

7    Tennessee, Knoxville.  No mention of the Beijing

8    University of Technology.  Now, unlike the previous

9    proposal, this one gets awarded.

10:10AM 10   The next month, October 2016, Tara Halstead, an

11   employee at the university's Office of Sponsored

12   Programs sends the contract that was signed by the

13   University of Tennessee to the Jet Propulsion Lab so

14   that JPL could sign it and work could begin.

15         Let's take a quick look at this contract.

16   Notice on the top right-hand part of the contract is the

17   contract number.  Also, you can see there are a number

18   of terms and conditions that apply to this contract, and

19   those terms and conditions include NASA's China funding

10:11AM 20   restriction.

21         Now, here is the signature portion of this

22   contract.  As you can see, the assistant vice-chancellor

23   for research, Jean Mercer, signed this contract on

24   behalf of the university.  Please also take note of the

25   sentence above.  "The parties below have agreed to the

subcontract's terms and conditions."  And those terms
and conditions, ladies and gentlemen, included NASA's
China funding restriction.

        Now, at this time, David Smelser when he signed
the letter of commitment that we saw had no reason to
believe that the defendant was employed by a university
in China.  When Tara Halstead recommended that Jean
Mercer sign the contract, she had no reason to believe
that the defendant was employed at a university in
China.  And when Jean Mercer signed this contract, she
had no reason to believe the defendant was employed at a
university in China.

        You heard from all three of those employees.
They all told you that they would not have performed
their part of the contract process had they known the
truth.  But they didn't know.  They didn't know because
the only person involved in obtaining the contract on
the defendant's behalf who knew the truth was the
defendant.  He knew and he said nothing.

        Remember, he had just signed a new employment
contract with the Beijing University just six months
prior, but he said nothing and continued his scheme to
defraud by concealing facts that he knew would prevent
him from obtaining the contracts.  His omissions caused
David Smelser to sign the letter of commitment.  They

caused Tara Halstead to recommend that Jean Mercer sign
the contract, and caused Jean Mercer to sign the
contract on behalf of the university, and on
October 20th, 2016, Tara Halstead, who testified that at
that time she was in Tennessee, sent this contract that
was signed by Jean Mercer to Kathryn Manzanares at the
Jet Propulsion Lab, an employee in California who
testified she was in California at this time, and that,
ladies and gentlemen, is wire fraud.  Count 1.

Now, you also heard from Kathryn Manzanares,
the person who received this email.  You may recall she
testified via Zoom, and she said that had she known the
principal investigator on the project was employed by a
university in China, she would not have processed the
contract.  Instead, she would have consulted with her
supervisor and others at JPL to determine what to do.

Now, after this contract was executed and work
began on the project, the University of Tennessee began
submitting invoices to get paid.  You may recall the
testimony of Monica Cole and Carol Malkemus.  Both were
accountants that submitted invoices on this project.
And there were a lot of invoices submitted.  All of them
were paid totaling approximately $60,000.  But I'm only
going to discuss three.

The first is Invoice No. 90080002, the amount

1    $7,332, signed by Monica Cole on February 15th, 2017.

2    The certification which Ms. Cole signs states, "I

3    certify that all expenditures reported or payment

4    requested are for appropriate purposes and in accordance

5    with the provisions of the application and award

6    documents."

7              However, unbeknownst to Ms. Cole, the

8    university was not in compliance with the provisions of

9    the contract.  The university was not in compliance with

10   the terms of the contract because the principal

11   investigator on the project, the defendant, was at that

12   time employed by a university in China, a fact that the

13   defendant knew and intentionally hid from university

14   officials and JPL employees, and, nevertheless, this

15   invoice was signed and submitted.

16             It was submitted to the Jet Propulsion Lab,

17   which is a federally-funded research and development

18   center.  JPL was and is funded by NASA.  NASA is an

19   agency of the executive branch of government.  And,

20   ladies and gentlemen, that's a false statement.  Count

21   2 -- I'm sorry -- Count 4.

22             Now, of course, the defendant did not make this

23   statement.  This statement was made by the university

24   and specifically by Ms. Cole.  However, as the judge

25   will instruct you, you may find the defendant guilty if

1  you find that he willfully caused the false statement to

2  be made.

3        Now, let's quickly go through the next two.

4  Invoice No. 90080450 for $7,812.45, again signed by

5  Ms. Cole on March 9th, 2017.  Same certification as

6  before, and, again, the certification was false because

7  the university was not in compliance with the provisions

8  of the contract.  Another count of false statements,

9  Count 5.

10:15AM  10        And then finally Invoice No. 90082670.  This

11  time for $11,202.  This time signed by Carol Malkemus on

12  July 24, 2017.  As with the previous two, this

13  certification was also false.  Count 6, the last count

14  of the false statements.

15        Now, let's turn briefly to the NASA contracts

16  involving Marshall Space Flight Center.  Here we begin

17  in August of 2018.  On August 28th, 2018, an employee at

18  the University of Tennessee's Office of Sponsored

19  Programs sends a proposal on the defendant's behalf to

10:16AM  20  Marshall Space Flight Center.  Included in the

21  attachments to this email is a letter of commitment and

22  the proposal itself.  So, again, as you can see, this

23  letter is signed by David Smelser.  Here is the top part

24  of the proposal.  Identifies the defendant as the

25  principal investigator and as an employee of the

University of Tennessee, and, again, no mention of his

employment with the Beijing University of Technology.

Now, some time between August and

November 2018, the defendant's proposal is selected for

an award in a cooperative agreement -- or you may have

heard of the term "CAN," essentially short for

cooperative agreement -- is drafted.

On November 12th, 2018, Greg Tolliver who

testified, who is an employee at the Office of Sponsored

Programs, he sent the cooperative agreement, which had

only been signed by the university at this point, to

Marshall Space Flight Center and asked Marshall Space

Flight Center to sign it and return a fully-executed

copy.

Here is the attachment to that email. First

full page on the left side of the screen. On the right,

please note the award number. And, importantly, that

Box 16 indicates that there are terms and conditions

enclosed with this contract. And as you might suspect,

those terms and conditions, ladies and gentlemen,

include NASA's China funding restriction.

And as you can see here, the agreement is

signed by Jean Mercer again, assistant vice-chancellor

for research. Now, at this time, David Smelser, who

signed the letter of commitment that was submitted with

this proposal for this project, still had no reason to
believe the defendant was employed at a Chinese
university.

When Greg Tolliver recommended to Jean Mercer
that she sign the contract, Greg Tolliver had no reason
to believe that the defendant was employed at a
university in China.

Both witnesses told you that they would not
have performed their part of the contract process had
they known the truth, and they didn't know because the
defendant was continuing his scheme to defraud by
concealing the truth from the university, the truth that
would have prevented him from obtaining the contract.

But while Mr. Smelser and Mr. Tolliver didn't
know about the defendant's affiliations, Jean Mercer was
aware.  Now, she wasn't aware of the defendant's
relationship with Chinese universities because the
defendant finally decided to come clean and tell the
truth.  She didn't learn of his affiliations with the
Beijing University because he disclosed it on his
outside disclosure forms.  She didn't learn about it
from his annual activity report because it certainly
doesn't say that there either.

Jean Mercer became aware there was an issue
with the defendant's undisclosed affiliations from law

enforcement agents.  Law enforcement agents uncovered at

that time a variety of evidence indicating that the

defendant had an undisclosed employment relationship

with the Beijing University of Technology and the agent

shared that information with the university.

As a result of the information shared by law

enforcement agents, Jean Mercer was unsure how to

proceed with this contract.  So she reached out to one

of the law enforcement agents and asked, and that law

enforcement agent contacted Special Agent Lee Gibson,

who testified, from the NASA Office of Inspector

General.  Special Agent Gibson advised to proceed with

the contract as if all was normal.  And that makes

sense.  Although there was some evidence of the

defendant's undisclosed employment with BJUT, the

investigation was ongoing.  There was still a whole lot

more to do.  And, in fact, it would still be over a year

before the defendant was ever charged in this case.

Now, I suspect the judge may tell you that it's

not a defense to the charges in the case that one or

more of university employees involved became aware of

the defendant's scheme from law enforcement while the

scheme was ongoing.  And, ladies and gentlemen, that

makes sense, too, because this trial is about what the

defendant did, what the defendant said, and what the

1　defendant knew.

2　　　　Back to November 12th, 2018.  Again,

3　Mr. Tolliver, who testified he was located in Tennessee,

4　sends this partially-executed agreement to Kelcey Cole

5　at Marshall Space Flight Center.  She testified she was

6　in Alabama.  Ladies and gentlemen, Count 2 of the wire

7　fraud.

8　　　　Now, after this agreement was fully executed

9　and work began on the project, as with the other

10:20AM 10　contract, the university began submitting invoices.

11　　　　Now, for purposes of the charges in this case,

12　we only have to talk about one of them, and that's

13　Invoice No. 90095483.  The amount is $5,000, and this

14　was signed by Monica Cole.

15　　　　Now, you may recall that Monica Cole testified

16　that this invoice was transmitted to NASA through the

17　Department of the Treasury's Invoice Processing

18　Platform.  You may also recall testimony from Kathy

19　Cooper, the contracts manager of Marshall Space Fight

10:21AM 20　Center and Kelcey Cole, that these invoices are routed

21　to NASA's shared services center in Mississippi.  The

22　transmission of this invoice across state lines is the

23　third count of wire fraud that we ask you to consider.

24　　　　Ladies and gentlemen, those are all six counts.

25　The evidence in the case is overwhelming.  We ask that

1  you use your common sense and life experience to tell

2  you the truth here.  It was a simple question.  Where do

3  you work?  It's not a hard question.  It's not.  You

4  don't need two Ph.D.s to answer it.  It's an easy

5  question, ladies and gentlemen.  The proof is beyond a

6  reasonable doubt as to all six counts.

7          Now, I want to address some of the defendant's

8  arguments that he's made during the course of the trial.

9  Some of those, ladies and gentlemen, I believe are

10 distractions designed to keep you away from the actual

11 elements you're going to have to consider as you

12 deliberate.  But I want to address a few of those.

13         One of the arguments he's been trying to make

14 throughout this trial is some form of blaming the

15 victim.  The defendant is suggesting that the university

16 is to blame.  The university should have done more.  The

17 university should have known.

18         But let's take a look at what he's actually

19 saying.  The defendant has suggested that the university

20 should have taken a look at the defendant's

21 publications, then take the citation for those

22 publications, put them in the internet, have them come

23 up, find the defendant's name as a coauthor, look to see

24 who the defendant is affiliated with, and there, see,

25 the university could have known.

But at its core, this argument suggests that the Office of Sponsored Programs that handles hundreds of contracts a year should have gone on some sort of wild goose chase to find all the little breadcrumbs the defendant left out instead of relying on this world-renowned scientist to just tell the truth.

Now, ladies and gentlemen, some of us lock our doors at night; some of us don't. Some of us try to but maybe forget. But an unlocked door is not an invitation for an unwanted intruder.

The university had a system whereby they asked for material information. They asked throughout the interest disclosure forms and they provided the terms and conditions of contracts from the U.S. government agencies to principal investigators like the defendant, and they relied on their faculty and staff to provide truthful information. They expected that they would and they trusted their employees, and that makes sense. These are not arms-length transactions with some door-to-door salesman. Dr. Hu is part of the UT family. They were talking to a world-renowned expert in the field and they trusted him to do the right thing.

Now, the defendant's second argument that I suspect he may make is that the NASA China funding restriction is so vague. Ladies and gentlemen, this is

1    a distraction.  When you're deliberating, think

2    carefully about the elements of the offense as the judge

3    gives them to you, and you'll see that the NASA China

4    funding restriction merely shows why the defendant's

5    omissions mattered.

6            You may recall at the beginning of my

7    presentation here I discussed the term "material" with

8    you.  The NASA China funding restriction makes the

9    defendant's scheme to defraud by concealing his

10   employment with BJUT material, and the materiality of

11   the defendant's omissions was confirmed by witness after

12   witness.

13           University witnesses Drew Haswell, David

14   Smelser, Jean Mercer, Tara Halstead, Greg Tolliver all

15   said they would not have performed their part of the

16   contract had they known the truth.

17           JPL employees, Dr. Bar-Cohen, Kathryn

18   Manzanares, told you the same thing.  NASA employees,

19   Kathy Cooper, Kelcey Cole, again, the same thing.

20           Remember, ladies and gentlemen, in order to be

21   material, the fact need only be capable of influencing a

22   decision.  And the NASA China funding restriction is

23   precisely why the defendant's scheme to defraud was

24   material.

25           Now, the defendant has talked a lot about

collaborators, ad hoc reviewers, visiting Ph.D.
students.  Again, ladies and gentlemen, this is a
distraction.  It's designed to show you that he had some
connection with people at the Beijing University of
Technology and others.  Of course he did.  There is
nothing wrong with having a collaborator, nothing wrong
with a visiting Ph.D. student.

Remember, ladies and gentlemen, this question
is not about who the defendant collaborated with, who
the defendant had as a visiting Ph.D. student, who he
had as a visiting postdoctoral researcher.  It's about
where he worked.  It's about where he was employed.
This other stuff is just distractions.

He says, well, I disclosed my collaboration
with someone else at the BJUT.  Well, ladies and
gentlemen, that shows that the defendant knows full well
that when it's time to identify someone else's
employment, no problem.  BJUT, there it is.  But when
it's time to say where he works, nothing; nothing.

Now, I suspect you may also hear about this FBI
conspiracy.  Now, ladies and gentlemen, what happened
here was:  The FBI began an investigation, as they
normally would.  They collected information.  And
instead of rushing to judgment, instead of putting
handcuffs on somebody, what do they do?  They went and

asked questions.  They met with the people.  They said,

tell us about your practice and your policy so we can

understand the information we have.  Isn't that what you

want the FBI to do?  There is no rush to judgment here.

They took their time.  They did their investigation.

They talked to people.  They asked questions and they

got answers, ladies and gentlemen, and that's exactly

what you want a law enforcement agency to do.

Now, ladies and gentlemen, on Friday, you heard

from the defendant.  And the burden of proof never

shifts from the government.  We have it the whole time.

And I'd have it no other way.  But the defendant did

testify in this case, and you're free to evaluate his

testimony as you would any other witness in the case.

In doing so, keep in mind that he is an

interested witness.  No one has more to gain or to lose

than the defendant.

Now, the defendant's highly educated.  He's

been sitting and thinking about this case since February

of 2020.  He's been able to craft and tailor his story

for over a year.  And as is his right under the

Constitution, no doubt about it, he sat there and

listened to every single question we asked of every

single witness.  He heard every single answer, allowing

him even more time to decide what exactly to say to you.

1  And what you saw last Friday was a result of that

2  preparation, the result of that planning, and the result

3  of his keen intellect.

4       You may recall that during opening statement my

5  colleague, Mr. McKenzie, told you this case was about

6  admitting what you cannot deny and denying what you

7  cannot admit.

8       Well, ladies and gentlemen, that's exactly what

9  you saw.  The defendant put on a master class in

10 admitting only the facts that he can't deny, but denying

11 everything else.  And let's walk through just a few of

12 those examples.

13      First let's talk about the term "chair

14 professor."  You recall during cross-examination there

15 was a lot of discussion about the meaning of chair

16 professor.  Now, the defendant wants you to believe that

17 this term, while sounding prestigious in English,

18 amounts to nothing more than guest professor.

19      But, ladies and gentlemen, here he is using the

20 term "chair professor" to describe his position.  This

21 is not a translated document.  This wasn't first in

22 Chinese and then translated into English.  He wrote this

23 in English.  Now, he could have said, "I'm a guest

24 professor," but he didn't.  He said, "I'm a chair

25 professor."  And, also, ladies and gentlemen, it's the

10:29AM (line 10)

10:29AM (line 20)

first thing he says about himself.  And what you can

discern from this, ladies and gentlemen, is that he uses

the term when it suits him.  He uses chair professor

when it advances his career and he uses guest professor

when he wants to minimize.

Now, the defendant also wants you to believe

that the second contract that we saw that he signed in

March of 2019 was never valid because it wasn't signed

by both parties.

Now, ladies and gentlemen, use common sense and

your life experience.  First, Beijing University of

Technology certainly wanted him to sign the contract.

They sent it to him.  How else did he get it?  Surely

they wanted to engage in that contractual relationship.

And, second, the defendant, as he testified, he

printed the signature page.  He signed it with his own

hand.  He scanned it and he saved it.  But he wants you

to believe that contract never happened.  He needs you

to believe that.  But, ladies and gentlemen, your life

experience will tell you something else.

And if that's not enough, there is evidence

that the relationship continued.  Here is the BJUT

website.  The defendant is listed as a faculty member.

He's there as of April 23rd, 2019, after his previous

contract expired.

1    Here is a research publication done on

2 February 2019; again, after the defendant says his

3 employment contract expired.  He indicates he's

4 affiliated with the Beijing University of Technology.

5    Here is another one.  This one published in

6 August.  Affiliated with the Beijing University of

7 Technology.

8    And, ladies and gentlemen, this is the

9 translated version of his contract, the one he says was

10:31AM 10 never entered into.  Please note the name of the class

11 that he's supposed to teach, Front Line of Laser

12 Manufacturing.  Sure enough, October 10th, 2019, he gets

13 a message from someone at BJUT asking him specifically

14 about Front Line of Laser Manufacturing.  And he wants

15 you to believe he never worked that contract.  Ladies

16 and gentlemen, that doesn't make sense.

17    And you've also heard information about

18 conflict of interest policies, conflict of interest

19 forms.  You've probably heard more about conflict of

10:32AM 20 interest than you've ever known or ever want to hear

21 again.  So let me just hit a couple of these things

22 quickly with you; okay?

23    This is the paragraph of the conflict of

24 interest policy that we've all been talking about.  Now,

25 the defendant is laser focused on the $10,000 -- what he

1   calls threshold here.  But, ladies and gentlemen,

2   remember, he works in nanotechnology.  He is specific.

3   He is precise.

4         You saw him testify.  He was careful.  And he

5   wants you to believe -- well, he never read, "but not

6   limited to."  He never read that part.  Ladies and

7   gentlemen, does that make sense?  You saw him testify.

8   Does that make sense that he wouldn't see that?  Does it

9   make sense that he wouldn't read the first sentence that

10  has no dollar threshold value whatsoever?

11         And this is the very first thing on the

12  document.  It expresses the objective of the policy.

13  "Objectivity and integrity are essential qualities for

14  employees."  He didn't mention that part.

15         Now, throughout this case, you heard example

16  after example of the defendant lying, the defendant

17  omitting material facts to get what he wanted.  Now, he

18  walks into the courtroom, raises his right hand and

19  swears to tell the truth and expects you to trust him

20  when he gives you this tale.  He was willing to lie to

21  gain access to grants.  He was willing to take advantage

22  of the trusting nature of his colleagues at the

23  university.  And now when the stakes have never been

24  higher, ladies and gentlemen, he expects complete

25  strangers to trust his story.  But his story doesn't

1  make sense.  What makes sense is that he was employed at

2  Beijing University of Technology from before he even

3  came to the University of Tennessee and that employment

4  relationship continued until he was indicted.

5      What does make sense is that after

6  January 2016, when he was told four times, four times,

7  researchers employed by Chinese universities cannot work

8  on NASA projects, he was fully aware; fully aware from

9  that point forward.  What makes sense is:  He doubled

10:34AM  10  down on his efforts to hide his employment relationship

11  with BJUT from the university.  And what does makes

12  sense is that he wanted to work on these contracts

13  because they advanced his career.

14      Ladies and gentlemen, as I told you, the

15  question is an easy one.  We all know it's an easy one.

16  Where do you work?

17      The government has proven its case beyond a

18  reasonable doubt, ladies and gentlemen, and we ask that

19  you consider the evidence and find the defendant guilty

10:35AM  20  of all six counts of the indictment.  Thank you.

21      THE COURT:  Thank you, Mr. Arrowood.

22      Mr. Lomonaco, are you ready to proceed with

23  closing argument on behalf of the defendant?

24      MR. LOMONACO:  Yes, Your Honor.

25      Good morning, ladies and gentlemen.  Thank you

very much for sitting through this.  I had everything
all prepared to go and then I wrote down three pages of
responses to the government's closing statement.

I'd like to start by the breadcrumb that the
government said Professor Hu sprinkled over this whole
process.

Exhibit 39.  Can we get that on the screen,
please.

Exhibit 39.  This is where Agent Sadiku went
and just dropped in on Professor Hu.  Agent Sadiku of
the FBI and Laura Slatton of the Department of Energy
came to his office and talked to him unannounced.
Professor Hu wasn't prepared.  He didn't know they were
coming.  But this is a breadcrumb, ladies and gentlemen,
as the government calls it.

He stated this high-level talent pooling
project was different from TTP.  It was a short-term
plan, approximately two weeks long, offered through the
Beijing University of Tennessee (sic).  He told
them when they first came that he had that job.  And he
also told them he had two NASA projects.

If they want to prevent crime, why didn't they
say, "Oh, you can't do that.  You can't do that.  You've
got a part-time job over there in Beijing.  You can't
work on a NASA project."

1        Now, two different reasons they may have told

2    him that -- not told him that.  The first one being they

3    didn't even know about the NASA restriction, or they

4    wanted him to work on the NASA restriction so they could

5    charge him with another crime.  That's eventually what

6    happened.  But that's a pretty big breadcrumb, ladies

7    and gentlemen.  He was being honest.  He was being

8    truthful.

9        I saw -- I heard one statement from the

10   government just a minute ago saying that Ms. Mercer

11   checked the conflict of interest form and it didn't have

12   his job on it.  You heard her testify.  If you recall,

13   she never checked.  She never checked the conflict of

14   interest form because the conflict of interest form

15   didn't have anything to do with NASA.  It was an

16   internal document that UT uses to see if their faculty

17   members are moonlighting to the extent that they're not

18   doing a good job at UT.  If they're working too hard,

19   too long, making too much money someplace else which

20   would be a conflict to them doing a good job at UT.

21   That's what the document was for.

22       And that's why Professor Hu never filled it out

23   because he never made enough money to qualify for a

24   conflict of interest.  And we'll go through that, but I

25   went through that with Mr. Zomchick.  We went through

the policy manual and the handbook and the fact that
there are limits to what you have to report.  But the
government is saying she checked.  It's just not
accurate.

The government also said four times he was
told; four times he was told.  What was he told four
times?  He was told that that professor over in China
couldn't work with him on a NASA project.  That's what
his understanding was when Professor Bar-Cohen said,
"Oh, we can't use this guy."  And what did he say?
"Okay.  We can do it without him."

That was his understanding, ladies and
gentlemen.  He did not understand the theory that the
FBI placed on this whole case about what he did wrong to
NASA.

Government started out with, "Where did you
work?  Where do you work?  Simple question.  Where do
you work?"  He answered it.  "You all were asked that on
your application to be a juror.  Where do you work?"

That's not the full question he was asked.  He
is precise.  He's a smart guy.  He wants to do the right
thing.  He wants to work hard.  He read the handbook
when he first started at UT.  He read the top of the
conflict of interest form when it says, "Instructions:
Follow the procedures manual PL0126 " -- I can never

 1   remember that number.  But he wanted to follow the

 2   instructions.  That's what he did.  The question was:

 3   Where do you work that conflicts with UTK?  That's what

 4   the whole question was.

 5        So when the prosecutor says, "Where do you

 6   work?  Where do you work," there is more to it than

 7   that.

 8        You know, speaking about being precise, I want

 9   to mention this because I wrote it down, too.  UT during

10:42AM 10   this whole process when Professor Hu was applying for

11   grants and working for UT, I don't know what their story

12   was, but they weren't very precise.

13        The JPL project is supposed to have an

14   assurance letter.  They never submitted one.  They

15   didn't care.  They really didn't care.  And that was

16   sort of the course of conduct that -- you know, this

17   case is really embarrassing.  Basically -- I mean, it

18   really wants to make -- it really makes me want to cry.

19        But we said we would show the truth.  We would

10:43AM 20   try to not say anything that wasn't true in this case,

21   and I believe we lived up to that.  We tried to bring

22   out the truth.  We wanted this case to be based on

23   truth.

24        And what do we have in a case like this?  We

25   have judgments that's been turned away backwards.

1   Justice is standing far off.  Truth has fallen in the

2   streets and equity cannot enter.  That's what happened

3   in this case.  That's what we've got.  And we need to

4   try to straighten it out.

5          They came in and took everything he had, his

6   computers, hard drives, jump drives, every drive he

7   saved.  They took his cellphone.  They took his papers.

8   They took his passport.  They took his career, his

9   livelihood, his students, and his research.  They took

10:44AM 10   everything.  And what did they find?  They found a text

11   message where his contract had expired.  And he had not

12   gone back to China since 2017, but they found a text

13   message from BJUT that said, "Hey, we've got some

14   students over here that, you know, you had a class that

15   we thought you were going to teach and they" -- "they

16   need somebody to give them a test so they can get credit

17   for the lecture."  And what did he do?  "Sure, no

18   problem."  He loved his students.  He devised a quick

19   test.  He sent it over there.  They answered it.  He

10:44AM 20   graded them.  There was no charge for that.  He didn't

21   get paid for that.  But that is a thing that a good

22   professor does, and they used that against him.

23          This job he had, this chair, a part-time,

24   couple of weeks per year, it wasn't a conflict of

25   interest under the policy and he was not required to

report it.  They said he defrauded NASA.  He tricked
them into letting him work on their grant.  But you know
what?  He gave them exactly what they wanted.  In fact,
Bar-Cohen sought him out because he was qualified and he
gave him the research.  They were happy with it.  He did
his job.  That's all he was concerned about.  He wasn't
trying to trick NASA.

You have to decide, ladies and gentlemen, in
2014, he started filling out that form.  Did he say no
in 2014 so two years later he could trick NASA?  Did he
have the intent, the willful, knowing intent to trick,
to cause a scheme to defraud?

The government's going to argue -- maybe they
will argue when I sit back down -- that he denied them
the right to find someone else to -- you know, denied
NASA their right to find somebody else.  Well, who else
would they find?  He was the best one, best one for the
job.  They picked him.

There is two reasons why he's innocent, ladies
and gentlemen.  I want to go over these with you.  One,
they tried to put him in jail for something he didn't
understand.  You can't form specific intent or you can't
knowingly and willfully devise a scheme to defraud NASA
if you don't understand the NASA restriction.  You've
got to know enough to devise the scheme.

 1          The second one is:  He didn't need to report.

 2    So it was not material misrepresentation.  And that's an

 3    element of the offense.  A material misrepresentation

 4    has to be proof beyond a reasonable doubt.  In other

 5    words, that's one of the elements of fraud that he made

 6    a material misrepresentation, and the government -- and

 7    the prosecutors actually talked about that a little bit,

 8    about the materiality, that it merely means something;

 9    okay?  So he did not need to report, so it's not a

10    material misrepresentation.  He didn't misrepresent to

11    anybody because he didn't have to do it.

12          So let's first talk about understanding the

13    NASA restriction because it goes to Professor Hu's lack

14    of intent to willfully and knowingly try to deceive.

15          Let's take a look at Exhibit 3-Z, if we could.

16    It's the government's exhibit.  It's the assurance

17    letter.  This is what he was told.  First of all, it

18    goes through the NASA restriction.  He's restricted

19    using funds appropriated in the Act to enter into or

20    fund any grant or cooperative agreement of any kind to

21    participate, collaborate, coordinate bilaterally with

22    China or any Chinese-owned company at the prime

23    recipient level, so on and so on.

24          "Definition:  China or Chinese-owned company

25    means People's Republic of China, any company owned by

1 the People's Republic of China, or any company

2 incorporated under the laws of the People's Republic of

3 China."

4 Professor Hu, before we send this grant in,

5 you've got to assure that you're not China or a Chinese

6 company. Well, I'm a professor. I'm at UT. Is he

7 thinking, well, I got this part-time job during the

8 summer. Does that make me China? He didn't understand

9 the NASA assurance.

10:49AM 10 Professor -- Dr. Bar-Cohen didn't understand it

11 either, and he admitted he didn't know exactly what the

12 government's interpretation of the NASA restriction is.

13 By submission of its proposal, the proposer

14 represents that the proposer is not China or a

15 Chinese-owned company. The proposer is the University

16 of Tennessee. So that makes it even more confusing.

17 And then in Exhibit 27, a letter from -- an

18 email from Drew Haswell. You heard Drew testify. He's

19 the guy with the big beard. Regarding the China

10:50AM 20 Assurance, NASA requires you to include a signed

21 document stating you assure you will comply with the

22 Chinese funding restriction. However, UTK always

23 includes a special copy stating that, as we understand

24 it, the restriction does not apply to faculty, staff,

25 and students.

1          It didn't include the language unless you're a

2    part-time -- unless you've got a part-time job during

3    the summer, or on Christmas holidays, in China.   It

4    didn't say that.   The government wants you to believe

5    it.   You know, one of these days, and maybe this case

6    will do it, we'll understand exactly what the NASA

7    restriction really requires.   It's never been litigated

8    before.   But clearly it was confusing.   And Professor Hu

9    said, "Yeah, sure.   No problem."

10:51AM   10          You have to look at intent.   Did he intend to

11   lie, or was he just trying to get through the process as

12   the University of Tennessee was presenting it?

13          Nobody ever told him it applied to him.   No one

14   ever explained to him the meaning of the China or

15   Chinese company.   Nobody ever told him, oh, well, that

16   means you or that means universities.   Nobody ever told

17   him that.

18          The training from UT on this subject was

19   anemic.   The training had the two words "China" or

10:51AM   20   "Chinese corporation" and that was it.   You saw the

21   training orange manual during this period of time.   It

22   was pathetic.   They didn't train anybody on it.   They

23   really didn't give it a second thought about what the

24   NASA restriction meant.

25          As the years developed and Professor Hu got

arrested and UT was turned around in their direction of
thinking about this whole process by the FBI, they
started changing the training, and they went from a
one-page mention to multiple, multiple pages about the
NASA restriction, and those documents are in evidence if
you want to look at the difference.

        Dr. Bar-Cohen, the actual NASA grant
administrator, testified he did not understand the
restriction back then.  He did not understand it.  How
could Anming Hu understand it?

        If he didn't know it applied to him, how could
he form intent to willfully and knowingly devise a
scheme to trick NASA into thinking he was in compliance
with the NASA restriction?

        Bar-Cohen admitted that NASA got what they
asked for.  They weren't injured.  They weren't deprived
of property.  So remember that willfully and knowingly
are elements that have to be proven beyond a reasonable
doubt.  If you think, well, maybe he did it and maybe he
didn't do it, that's not reasonable doubt.

        Professor Hu showed letters to Bar-Cohen and
Drew Haswell from a Chinese professor who stated he had
a longtime collaboration with Professor Hu.  If he's
trying to hide his attachment to Beijing University and
China, why is he going and showing letters saying, hey,

maybe this will help our project?  This guy -- this guy
has got some expertise; maybe he's got some equipment.
We can use it.  Why is -- common sense, ladies and
gentlemen.  Why would he do that if he's trying to hide
his affiliations with BJUT, his longtime collaboration?
He delivers the letter himself to Bar-Cohen and to Drew
Haswell.

          Now, if that doesn't speak about lack of intent
to deceive, we're deeper down the hole than I thought we
were, and we're pretty down -- this country is pretty
down in the holes right now.

          Both Haswell and Bar-Cohen didn't understand
the collaboration, did not understand the collaboration
and said they couldn't do it.  They didn't understand
the FBI's theory either because they had not gotten to
them yet.  But that's coming.  That's coming.

          And these two people are in a superior position
to know the restriction, and they said -- and they never
said that collaboration with China disqualified him.
These are probably the most -- well, what did I say?  In
a superior position to know if the restriction applies.

          And their course of conduct -- I mean, how they
dealt with it and what they told Anming Hu and what they
let Professor Hu continue to do, their course of conduct
shows that it was not a violation of the restriction, as

far as they knew.  And how is he supposed to know if the

professionals don't know?

I keep thinking about why did they do this?

Why are we here?  We're here because of the China

Initiative that FBI agents and DOE agents and government

agents and prosecutors all over the country are told, we

need to search out this Chinese espionage, and you're

going to look real good if you get us a Chinese spy.

Professor Hu discloses his affiliations with

China in many ways.  On his annual reviews, on his

technical disclosures, he had students that came from

BJUT.  He had to run that right up the chain of command

at UT with his professor, the head of his department.

They had to approve all of this.  They knew he had these

contacts.

So fraud is creating a scheme to knowingly and

willfully deprive another of money or property.  Second,

the scheme included a material misrepresentation or

concealment of a material fact.

The government says that material

misrepresentation is that he -- that he -- well, the

government said he lied on the conflict of interest

form.  Was that a material misrepresentation?  Did he

lie?

You know, the government and their witnesses

don't want to get into the facts of the conflict of
interest form.  None of them tried to explain it to you;
right?  They didn't come up with a policy that says,
Instructions:  Before you fill this out, look at the
policy manual.  We went to the policy manual, and what
do we got?

        Could we go to 2-J, please.

        THE COURT:  Mr. Lomonaco, while we're pulling
this document up, we've had a request for a restroom
break.

        MR. LOMONACO:  Sure.  I can understand that.

        THE COURT:  If you can pause during your
closing argument, we'll take a break and we'll come back
and hear the rest of the defendant's closing argument
and the government's rebuttal.

        The jury is excused.

        (Jurors excused from the courtroom.)

        THE COURT:  We'll -- if you need to go back
and --

        MR. LOMONACO:  Start over again?

        THE COURT:  Not start over, but if you need to
get a few minutes to get back to where you were, that's
fine, but we'll take a break until 11:15.

        MR. LOMONACO:  How much?  11:15?

        THE COURTROOM DEPUTY:  Yes.

1          THE COURT:  11:15.  And we have an update of

2    the jury charge for you to take a look at.  Thank you.

3          (A brief recess was taken.)

4          THE COURTROOM DEPUTY:  This honorable court is

5    again in session.

6          THE COURT:  Bring our jury in.

7          (Whereupon the following report of

8           proceedings was had within the presence

9           and hearing of the jury:)

11:18AM  10          THE COURT:  All right.  Everyone can be seated.

11          Mr. Lomonaco, please continue with closing

12    argument on behalf of the defendant.

13          MR. LOMONACO:  Thank you, Your Honor.

14          Let me -- let me go over the NASA restriction

15    language that -- on the assurance letter that -- let's

16    see that again.

17          I wanted to point out the wording in paragraph

18    No. 1, "cooperative agreement of any kind to

19    participate, collaborate or coordinate."  Collaboration

11:19AM  20    was really a key issue.  They didn't want to collaborate

21    with people in China, from what I can understand from

22    the assurance letter.

23          So in the -- in the different forms that

24    Professor Hu had from the University of Tennessee, he

25    showed his affiliations and his collaborations with

China in many ways. I've mentioned a couple, annual
reviews, his technical disclosures, but if we can look
at one of them in particular, the NSF grants, National
Science Foundation. This is a federal agency that gives
money, too. And he was required to report
collaborations and affiliations.

Do you see here where he puts down Bai? Now,
this is his -- this is his NASA -- or -- excuse me --
NSF, the National Science Foundation, grant application
to get a grant. And he's supposed to list collaborators
and other affiliations. He puts down Beijing University
of Tennessee -- or Technology, and over at the end,
thesis advisee. He's disclosing that he's an advisor to
this person, a faculty advisor to this person at the
Beijing University of Technology.

So the point is that when he's asked the
question and he understands the question, he answers the
question. Why didn't UT just ask him the right
questions? Why didn't they just ask him if he
collaborates with China? I mean, he openly showed it.
The reason why they didn't ask him is because that form
that he is accused of lying on was not for NASA. It was
never intended to be NASA. It was intended to make sure
that he didn't have a job someplace that was taking away
from his -- his work at the University of Tennessee.

1    And if you recall, his job that he told the FBI

2  was that he had a short-term talents program job at

3  Beijing University, and that was -- and you've heard him

4  testify that it was only -- in the contract -- you've

5  got a copy of the contract.  It's a two-month maximum.

6  If you look at the exhibit that sets out all of his

7  dates when he went to China and came back -- which

8  exhibit is that?

9    MR. PARSONS:  147.

11:22AM 10    MR. LOMONACO:  147.  If you look at

11  Exhibit 147, we had to take the dates off of the

12  professor's passport because the government has the

13  passport.  They were nice enough to let us copy to get

14  the dates down.  And you'll see the last time he went to

15  China was in 2017.

16    The contracts the interpreter interpreted, she

17  didn't get it all right.  But we asked her, "Does that

18  mean when you appear or you're onsite you get paid?"

19  And she said, "Yes."

11:23AM 20    So he had a contract that expired in December

21  of 2018.  He had a copy of a new contract.  He had it in

22  his computer.  Is there any proof he sent it to Beijing?

23  Is there any proof that it was signed by Beijing?  No,

24  because Professor Hu testified that he didn't have a

25  position at the time.

1    Remember he was on the phone pleading with his

2    son to tell his wife, "Tell mom to tell them at UT I

3    didn't have a position"?  And the reason he was saying

4    that is because the court-appointed attorney told him,

5    "Oh, they're saying you had this job you were hiding."

6    And the only thing he was saying is, "I didn't have a

7    position."  And he didn't.  He did some work.  He didn't

8    get paid for it.  He testified that, you know, he did

9    volunteer work after the contract expired.  I believe

10   that's at least summarizing his testimony.

11   So with the NSF grant, they asked the question;

12   they got the answer.

13   Now, fraud is a scheme to knowingly and

14   willfully deprive another of money or property.

15   Knowingly and willfully.  Second, that the scheme

16   includes a material misrepresentation or concealment of

17   a material fact.  In other words, includes a lie or

18   concealment, hiding, hiding a fact.  Sort of like lying.

19   If it's not a lie, it's not a material

20   misrepresentation.  If it was made innocently but for

21   another purpose, it's not fraud.

22   We'll get into the good-faith defense.  But,

23   third, that the defendant had the intent to defraud.  In

24   other words, the intent to deceive or trick.  And in

25   this case, they're saying he had an intent to deceive

and defraud NASA by filling out a form he filled out the
same way every year two years before he had a NASA
grant.  And then when he got the grant, he started
talking about his affiliations openly and willingly.

How much did he get from these NASA grants?  I
think he testified about $1400 on one of them, and only
because he worked during the summer.  The second one he
didn't expect to get any money because they filled it
out during the school year.  But he didn't get paid
anything on the other one.  That doesn't seem like a big
incentive to lie when he's got so many other grants and
proposals he's worked on and can work on.

It's unfair to convict him of something he's
not knowingly and intentionally misrepresenting.  He was
operating in good faith just trying to do the best job
he could with his students at UTK.

Now, he was required to report outside
interests that created a conflict of interest to
University of Tennessee at Knoxville.  I believe the
jury charge says that.  The Outside Interest Disclosure
Form instructions refer to policy FL0125.  And I know
you've probably seen this before and you might be
getting a little bit bored about this, but let me just
go to it.

Government's Exhibit 2-F.

1          MR. PARSONS:  You want the form or the policy?

2          MR. LOMONACO:  Let's go to the form first.

3          Okay.  So page up a little bit.  Right there.

4          Do you see where it says "Instructions"?  (As

5   read) "This form is for the University of Tennessee

6   faculty and staff to disclose outside interests as

7   required by the university's conflict of interest policy

8   F10125."  So let's go to that.

9          This was designed to protect UT and make sure

11:28AM 10  that their faculty is not working too much for someone

11   else.  And when you go through this policy -- I won't go

12   through all of it, but you have a -- you have the

13   ability to review it.  It's Government's Exhibit 2-J up

14   at the top.  And, really, it's talking about the

15   academic year.  Really, it's talking about, okay, if

16   you've got conflicts when you're supposed to be teaching

17   the kids right there at Holt Tower and you're over here

18   doing something else that doesn't have anything to do,

19   you need to report that employment.  You need to report

11:28AM 20  it if you got a conflict.  And it explains what it is.

21   And it talks about receiving payments for services

22   exceeding $10,000.

23          Professor Hu never received services that

24   exceeded not even close to that from Beijing University.

25   So when he saw this -- and it's in the manual, too.

It's in the handbook that he read when he first got there. He didn't think he had a conflict. And it wasn't even during the academic year that he was doing this. This doesn't really ask for jobs during the summer.

So if there is a question in your mind about whether Professor Hu had to disclose his outside interests, then that's not proof beyond a reasonable doubt. That's not evidence that you can use to convict him. It would seem logical that if the form is dependent on this policy and the policy defines an interest of 10,000 or more and he did not get paid that much, he did not have to report it. I guess, you know, you've heard that enough from me. It makes sense, though.

And even if it was wrong, if he didn't fill it out for an innocent reason or he thought he misunderstood the policy and he wasn't trying to trick NASA, it's still not a crime. Even if he didn't fill it out and he should have, if he did not have the willful, knowing intent when he said "no," it's not a crime.

And we've shown you many parts of this case that demonstrate he was open and honest and did not try to hide anything. So, you know, remember we talked right at the beginning of this lawsuit, this trial,

1  you're going to be asked to decide a person's mind, what

2  his intent was, what he was thinking, and the only way

3  you can do that is to look at what he did.

4  I ask you, ladies and gentlemen, to look at the

5  honest things he did which show that he wasn't trying to

6  conceal anything.  I don't know how much clearer we can

7  be when he goes right to Bar-Cohen and Drew Haswell and

8  shows him what he's got.

9  So some of the facts to consider whether he had

11:31AM  10  to report this job, if it was a job, if it was

11  employment, you know, he was -- I put to you, ladies and

12  gentlemen, he was doing this more to continue his

13  contacts around the world, trying to help students,

14  trying to work his trade, trying to study nanoparticles.

15  That was his -- that was his life.

16  The policy said it wasn't a conflict.  His pay,

17  he testified he always was paid less than 5,000 a year.

18  He didn't work during the academic year, only holidays

19  and summers.

11:32AM  20  Sometimes -- okay.  Sometimes he may have sent

21  some emails or done a few things, but the policy says as

22  long as you don't put in 20 percent of your time on

23  something else.  In other words, if you're working a

24  hundred percent at UT, you can work another -- up to

25  another 20 percent doing something else and it's not a

1    conflict.

2              So how much time did it take to invite students

3    to come over to UT or do an exam and send it back to

4    Beijing?  Not very long at all compared to the

5    nine-month -- nine-month commitment he had for UT.

6              And, you know, we had Professor Zomchick come

7    up here and the first thing is he didn't know he was a

8    nine-month employee.  Do you remember that?  He was sort

9    of put back by that.

11:33AM  10        His travel times will show you that he never

11   even worked one, three or four -- he worked maybe the

12   most a couple of those years three weeks, and part of

13   that was giving lectures and so on.  So it never had any

14   kind of conflict under the policies.

15             Now, Professor Hu acted in good faith on his

16   NASA grant applications.  There was simply no evidence

17   he lied to UT or NASA to get the grants.

18             If we could go to page 32 of the jury

19   instructions.

11:34AM  20        And the judge is going to tell you what good

21   faith is.  And this is -- good faith is a complete

22   defense to the charges of fraud because good faith on

23   the part of Professor Hu is simply inconsistent with any

24   intent to defraud.

25             So, "A person who acts or causes another person

1  to act on a belief or an opinion honestly held is not

2  punishable under the statute merely because the belief

3  or opinion turns out to be inaccurate, incorrect, or

4  wrong."

5          He worked on a belief that he didn't need to

6  fill out this application.  Even if that turns out to be

7  wrong, if he did it with a good-faith belief that -- and

8  he did it without the intent to deceive NASA, that's a

9  good-faith defense.  That's what this says.

11:35AM  10          (As read) "An honest mistake in judgment or an

11  honest error in management does not rise to the level of

12  criminal conduct.  A defendant does not act in good

13  faith if, even though he honestly holds a certain

14  opinion or belief, that defendant also knowingly makes

15  false or fraudulent pretenses, representations, or

16  promises.  While the term 'good faith' has no precise

17  definition, it encompasses, among other things, a belief

18  or an opinion honestly held."

19          Ladies and gentlemen, you have heard several

11:36AM  20  witnesses in this case.  You've seen them testify.

21  You've seen their demeanor.  You've seen how they answer

22  or don't answer questions.  You saw Professor Hu

23  testifying.  He started out before the lunch break

24  nervous as heck and he was talking so fast I could

25  hardly understand him, but he slowed down.  But all the

way through all of that, ladies and gentlemen, you think
he was trying to deceive you?  Do you think he was
trying to trick you, or do you think he was honestly
telling you what he went through and what he really was
all about?

The judge will tell you you are the triers of
facts.  You have to decide who is telling the truth and
who is not telling the truth.  The government says, oh,
he's got motives; right?  He was in here the whole time.
You know, he put his plan together before he got on the
witness stand.  Well, who else has motives in this case?
Who else was in here the whole time?  Who else sat there
and listened to everything from the government's side?

So why are we here?  He lost his career and
tenured position at UK.  Why did he do that?  Why did he
lose it?  Why did he lose everything?  You want to say
everything, that's sort of a figure of speech.  I'm not
trying to exaggerate or lie or anything, but he lost a
lot.

You know how hard it was to get two Ph.D.s and
a tenured position at the University of Tennessee?  Why
would he throw it all away for trying to trick NASA when
he could get grants and did get grants from other
places?

We're here because the FBI wanted a spy, a

Chinese spy.  They were told to go out and research and

investigate economic espionage from the highest sources

in our government, from Donald Trump and Pompeo, about

the China threat that we need to go out and

get -- protect our country.  That's true.  I mean, we're

an American country and we're based on freedom and we're

based on ingenuity and hard work and we have a right to

protect what we've built and we have a right to keep our

country together.  But we don't have a right to go

without reasonable cause or even just reasonable

suspicion and fabricate a charge to take a Chinese

national professor that's actually a Canadian citizen

out of the picture unless he's doing something wrong;

unless he's doing something wrong.

        They went to the internet and found a Chinese

professor who's actually a Canadian citizen by

then -- Canadian citizen by then, and accused him of

being a member of the Chinese government Thousand

Talents Plan.  "You're a member of this plan."  He said,

"No, I'm not.  That's not a good plan.  That one is run

by the Chinese government."

        And they accuse him of a lot of things.  And

then when Agent Sadiku got on the witness stand, the

first thing the prosecutor started asking him were

questions that were going to try to explain why he lied

1  on certain things; that his sources were giving him the

2  wrong information.  Yeah, his sources were leading him

3  in the wrong direction.

4          Well, they came to his workplace.  They accused

5  him of being in the Thousand Talents Plan.  They said

6  they would protect him.  They wanted him to be a spy for

7  them, apparently, because they asked him to go to this

8  seminar in China and come and see us first and then go

9  over there and then come back and talk to us.  And

10  Anming didn't feel comfortable doing that.  So he sent

11  him an email basically saying, "I'm not going to go.  Do

12  I still need to talk to you?"  And he never heard

13  anything.  Never heard a thing.

14          Now, what does that sound like if somebody is

15  telling you to go across there and come back and talk to

16  them about it with the power of the United States

17  government behind them?  And he told them, "Well, I've

18  got a couple of NASA grants.  I'm sort of busy right

19  now."  Another full disclosure.

20          So when he didn't go, they started a

21  year-and-nine-month surveillance of him without him

22  knowing it, following him around to work, to school,

23  everywhere.  They were looking real hard to find

24  something.  Looking real hard.  They didn't want to let

25  him go.  Looking real hard.  Took pictures of his son.

11:40AM (line 10)

11:41AM (line 20)

They took him -- they followed his son.  They found

nothing.  They found nothing but a hardworking

professor.

        But that didn't stop them.  They got a hold of

this NASA restriction and they started getting every

document that pertained to him from UT and the internet

and everything else and they started putting it

together.  And they took a PowerPoint -- put together a

PowerPoint presentation to present to the UT

administrators.

        And one thing developed after that.  Every one

of these administrators came up here and said, "Oh,

well, had we known he had a part-time job or a job at

Beijing University, we wouldn't have given him that NASA

grant."

        They even said -- they even made Bar-Cohen say

that two weeks before we did the Zoom.  And he said at

the time he didn't understand the NASA grant.  What they

did is:  They made witnesses and weaponized the UT

administrators to be a weapon against Professor Hu.  And

don't believe that the UT administrators had a lot of

ability to argue with the FBI.  They went there three

different times, July, August, and September of 2019.

They went with FBI, DOE.  Third one was with Gibson,

also.  They went with prosecutors.  They went with

several people sitting down with the UT administrators.

Why would they do that? Why would they show up with PowerPoint presentations, which I think we made a couple of exhibits of some of those? Why would they go in there to tell them everything about Anming Hu if it wasn't to get them on their side? And they did.

But no one in this case testified about the facts that would have shown he had a conflict of interest under the UT policy. The government has said, well, he's got this job, but nobody from the government's side sat down and explained what the policy really was and explained that there are limits to the policy and that you could interpret it that if you don't reach those limits, you don't even have to answer it because it's not a conflict of interest.

They didn't want you to know the details. They didn't want you to know because they want to just blend it all together and say, oh, he didn't answer this; therefore, he's lying to NASA.

Details matters, ladies and gentlemen, because -- especially to a person with two Ph.D.s in rocket science. I mean, details matter.

I mean, they just wanted you to assume that he violated it. I group UT in on that statement because the FBI intimidated them, probably scared them into

1  going along with the whole thing.

2          Just try to remember Mr. Smelser and

3  Mr. Haswell, how they testified.  They were shaking in

4  their boots.  They were afraid they were going to say

5  something wrong.  They were really slow to answer, very

6  guarded.

7          UT was going along with the whole thing.  That

8  was the FBI plan for these PowerPoint presentations

9  because they needed these witnesses to come in and say

11:46AM  10  he violated it; saying he violated it.  I mean, they

11  even went so far as to submit the second NASA proposal

12  knowing that to do so, they would cause another crime.

13          Jean Mercer had a dilemma.  She said, "Well,

14  now that you tell me that he's violated the NASA

15  restriction, I got to certify to NASA that there is

16  no" -- "no" -- "I've got to certify to NASA that we're

17  not violating the restriction."  And what happened?

18  They called up the NASA federal agent, and he said,

19  "Well, just go ahead and process it the same way."  What

11:47AM  20  happened there?  He got charged with another NASA

21  violation when UT could have stopped it.

22          If UT had used some independent backbone, they

23  could have said, "We're not going to sign this thing.

24  You've already said he's committing a crime.  Why would

25  we want him to commit another one?"  That, ladies and

gentlemen, shows you how much pressure they had and how much influence they had.

And their biggest witness, Mr. Zomchick, a lot of qualifications, top man from UT that came here, he's almost probably the top man or close to it, he finally had to admit under the policy there are limits to reporting potential conflicts of interest. He didn't even know Professor Hu was a nine-month faculty member.

Has the prosecutor proved beyond a reasonable doubt that Professor Hu made a material misrepresentation? The burden of proof is on the prosecutors. They have to show you beyond a reasonable doubt, and if they can't do that, the law says he remains presumed innocent like he is presented to be at the beginning.

They have to prove beyond a reasonable doubt every element of the offense. If you think maybe he is guilty, maybe he's not, that's not enough. 50/50 is not enough. You know, we've got the difference between probable cause in a civil case where you have to prove at least 51 percent chance, and we've got the condition of proof beyond a reasonable doubt in a criminal case. And nobody knows exactly how much stronger that is, but it's stronger than just 51 percent chance.

You can find and decide maybe he did, maybe he

1    didn't, and the law requires you to say not guilty.

2    Only if you're convinced beyond a reasonable doubt of

3    every element in these charges can you vote guilty.

4         If -- if he's not guilty of defrauding NASA, if

5    he had an innocent reason for the filling out that form

6    that was not checked no with the knowing intent and

7    wilfulness to deceive NASA, if he didn't have that

8    intent when he checked that box, if he didn't have some

9    sort of trick going on to trick NASA into getting a NASA

10   grant that really just gave him a lot of work, if he

11   filled it for some other reason, then good faith says

12   he's not -- he's not guilty.  If NASA got what they

13   bargained for, then there was no harm.

14        So when you -- when Professor Hu -- I'm losing

15   my train of thought.  Hold on.  I'm sorry.

16        If you find that there is no fraud in his case,

17   that he did not try to trick NASA, you'll also logically

18   find in Counts 4, 5, and 6 that there is no false

19   statement because the false statement requires that UT

20   made the statement based on a fraudulent or willful lie.

21        So if you find that he didn't understand the

22   NASA restriction and that he did not misrepresent or

23   defraud NASA willfully and knowingly, then you would

24   also find on Counts 4, 5, and 6 that these letters that

25   were sent on UT's behalf were not based on fraudulent

1   pretenses.  So he would be innocent of that, too.

2           Ladies and gentlemen, this case needs to have a

3   truthful and honest ending.  It needs to be presented

4   and sent in a way that people understand that the FBI

5   can't just come in and create a crime where one doesn't

6   exist so they can put Professor Hu on the stand and

7   put -- take his life and his livelihood away from him

8   hoping that some other Chinese scientists out there that

9   maybe was committing some espionage will get the

10  message.  We're going to sacrifice him, whether he's

11  guilty or not, just to send a message because of the

12  China Initiative.  That's not the way we should do

13  things in this country.  We should base our prosecution

14  on true facts and not reasons for changing or scaring

15  others where there was no espionage in this case.

16          Remember, a year and nine months they followed

17  him around and found nothing.  They went through every

18  one of his computers.  They went through all his jump

19  drives.  They -- but yet they still wanted something.

20  And when they saw the NASA restriction on the paperwork

21  they looked at, they said, well, maybe we could show

22  that he didn't let them know that he was China or a

23  Chinese company.

24          How absurd is that that he would know that he's

25  China or a Chinese company because that basically is

1  what they have to convince you is that he knew that he

2  was China?  He didn't say, "Oh, you have to disclose

3  your" -- "your work with China and you didn't do it," or

4  ask him if he had influence in China.  If they had asked

5  the questions the right way, they would have gotten the

6  right answers, but they never asked.  And they never

7  went and tried to protect him.  They wanted a

8  conviction.  They wanted an arrest.  And now, ladies and

9  gentlemen, here we are.

11:54AM 10      So two reasons why:  One, the restriction is so

11  vague he couldn't form criminal intent.  Professor Hu

12  didn't understand the restriction; so how could he plan

13  a scheme to devise and trick NASA?  If you look at that

14  wording on all this stuff, you'll know what I'm talking

15  about.

16      And second of all, this answering the question

17  has an honest -- maybe mistaken, but honest explanation

18  of why he put down no.

19      The government has not proved beyond a

11:54AM 20  reasonable doubt the fraud in this case, and I ask you

21  to return a verdict of not guilty on everything.

22      Thank you, ladies and gentlemen.

23      THE COURT:  Thank you, Mr. Lomonaco.

24      Closing rebuttal argument on behalf of the

25  government.

1              MR. ARROWOOD:  Okay.  Ladies and gentlemen, let

2    me just start by saying this:  The government has never

3    alleged that the defendant is a Chinese spy.  The only

4    time you've heard that type of language is from the

5    defendant.

6              Now, let's list some of the things that the

7    defendant wants you to believe.  He wants you to believe

8    that you can only work for the Beijing University of

9    Technology if you're physically in China.  He wants you

11:56AM  10    to believe that the contract that he signed in 2019

11    wasn't in full force and effect.  He wants you to

12    believe that he read a very narrow phrase in a conflict

13    of interest policy and relied on that throughout his

14    entire tenure at the University of Tennessee.

15              He wants you to believe there is an FBI

16    conspiracy that goes all the way to the provost of the

17    University of Tennessee to falsify testimony.  He wants

18    you to believe there is a conspiracy with the FBI, NASA,

19    and Jet Propulsion Lab, and he wants you to believe that

11:57AM  20    a researcher with 25 years of experience in submitting

21    proposals for grants, and not just submitting them

22    himself, but reviewing proposals of others, somehow all

23    of a sudden has no idea how to do proposals and what

24    types of information is included in them.  He wants you

25    to believe all those things, ladies and gentlemen, and

it just -- it doesn't make sense.  Don't mistake the
defendant's plausible deniability for reasonable doubt
because it's not reasonable.

Let's go through a couple of these things that
the defendant raised.  At multiple instances he
suggested to you that somehow reporting a collaboration
with a particular individual who is at a particular
university is the same thing as disclosing your own
employment.  But, ladies and gentlemen, use your life
experience.  We know that's not true.  It doesn't make
sense.

And when Dr. Bar-Cohen was asked about it, you
saw his reaction.  It is not the same thing.  You work
with someone on a particular project, you work with
someone else on a particular project, that doesn't mean
you're employed at those other entities.  Of course not.
And, again, ladies and gentlemen this case is about
where the defendant works.  That's what this case is
about.

By identifying those collaborations and where
those visiting students work, what the defendant is
showing you is that he knows very well how to identify
someone else's employer or school.  Yet somehow when it
comes time to identify his, nothing.

Now, multiple times during the trial the

1   defendant has asked you to look at this NSF proposal.

2   We urge you to look at it. Because in that NSF

3   proposal, the defendant submits his resume, and there is

4   a section for employment, ladies and gentlemen. I urge

5   you to look at it. Look for BJUT. You already know the

6   answer. It's not there. It's not there.

7       He identifies collaborators with BJUT later on

8   in the application, but, again, those are -- BJUT

9   affiliations of the people he's collaborating with and

10  he's disclosing that, but not his own employment. He

11  keeps that to himself.

12      Now, with respect to the conflict of interest

13  policy, ladies and gentlemen, that's just one component.

14  That's one particular piece where the defendant could

15  have disclosed his outside employment.

16      But make no mistake, ladies and gentlemen, this

17  scheme involved more than just a conflict of interest

18  form. At its core, the defendant knew that NASA cared

19  where he worked and he didn't tell them.

20      He does proposals for a living. You all have

21  just been introduced to it for this week. Remember, he

22  does this for a living. The Office of Sponsored

23  Programs folks do this for a living and they were

24  consistent in their testimony that it mattered; that it

25  would have changed what they did.

1    Here it is (indicating).  It's the same part
2  we've been looking at forever.  The defendant wants you
3  to believe he did not see that particular statement and
4  didn't read the top.

5    Ladies and gentlemen, he's a very careful
6  person, a very specific person.  It doesn't make sense.
7  The defendant knows well how to use his employment with
8  BJUT when he wants to.  And this particular email shows
9  it.  He's emailing someone from BJUT.  He's trying to
10 get a Ph.D. student onto his team who needs to apply for
11 a scholarship.  He sends a resume.  A resume, by the
12 way, ladies and gentlemen, that does not have his BJUT
13 employment on it.  And what does he tell that person?
14 Tell her to add this line because it's not on my resume;
15 add this line, 2011 to president, Professor at Institute
16 of Laser Engineering at BJUT.  He knows how to use BJUT
17 when it suits him and keep it secret when it does suit
18 him as well.

19    But, ladies and gentlemen, if anything over the
20 course of this last year-and-a-half or so has taught us,
21 you don't have to be physically present in a particular
22 place to work.  The defendant wants you to believe that
23 because he only took short trips to China and his last
24 trip was in 2017 that he could not have worked at the
25 Beijing University of Technology for any significant

1    amount of time.

2          Ladies and gentlemen, it just doesn't make

3    sense.  We all know it doesn't make sense.  And the

4    evidence presented before you in this trial has shown

5    you that he has continued to work for BJUT with BJUT

6    students, administrators, managing a laboratory, all

7    while being here at the University of Tennessee here in

8    Knoxville.

9          Now, in multiple instances here the defendant

12:01PM 10  has referred to his job at BJUT as a part-time summer

11   job.  We've heard it time and again.  We heard it a few

12   moments ago.

13         You recall during his cross-examination, he was

14   asked about patents.  Did he appear pretty surprised by

15   that question?  He's been a professor at the University

16   of Tennessee since 2013.  He testified he's applied for

17   one patent.  He wasn't successful.

18         During that same time for his part-time summer

19   job, he's the inventor on 12.  That was his testimony.

12:02PM 20  On 12 patents.  That's a lot.  That's significant.  But

21   he wants you to believe that job, not really that

22   important.

23         And here we are, ladies and gentlemen, in

24   January.  He's hiring a Ph.D. student.  In February,

25   he's publishing articles.  In March, he's signing an

1  employment contract.  In April, he's attending

2  conferences.  In May, he's drafting letters of

3  recommendation.  June, he's managing the lab.  July,

4  he's submitting a paper for publication.  August, he's

5  using his BJUT email account.  September, he's attending

6  a conference.  October, he's dealing with a class.

7  November, he's soliciting for a joint BJUT-Japan

8  project.  December, he's welcoming students at BJUT.

9  Part-time summer job, ladies and gentlemen.

12:03PM  10  That's what he wants you to believe.  But it doesn't

11  make sense.

12  He also needs you to believe that the contract

13  he signed in 2019 is not valid.  But we've been through

14  that before.  Again, BJUT sent him the contract.  He

15  printed out the page.  He signed it.  He scanned it and

16  it was on his device.  To be sure, the government has

17  not shown you both parties signing that contract.  We

18  don't have it.  But, ladies and gentlemen, use your

19  common sense.  Why would you do that if you weren't

12:04PM  20  going to follow the contract?  And we've shown you

21  pieces of evidence within 2019 where he's continuing to

22  perform under the terms of that contract.

23  And the reason he needs you to believe that, he

24  needs you to believe that he did not have a position in

25  China, is because, ladies and gentlemen, when the

1    defendant was arrested, he was recorded by the jail, and
2    you heard three jail calls. This is crucial and the
3    defendant knows it.

4            The defendant tells his son, "You need to
5    contact your mother. And you have to say that my
6    husband says that he does not have any position in
7    China. Say this, represent me because they, within
8    48 hours from yesterday to today, we need to say this;
9    okay?"

12:04PM 10            Now, ladies and gentlemen, during his
11   testimony, he told you he didn't understand the charges
12   in the case when he first was arrested. This is the day
13   after he was arrested. He understands. This case is
14   about his position in China and he knows it. There it
15   is right there (indicating). He's telling you he knows
16   what the case is about, ladies and gentlemen.

17            "You need to say that I don't hold a position
18   in China. This is extremely crucial."

19            And the next call, the defendant's son tells
12:05PM 20   him that his mom is hesitating. And why is she
21   hesitating? "Because if she says it wrong or something
22   then won't that be a problem?"

23            But if he doesn't have a job at BJUT at this
24   point, why would it be a problem? Why would it be a
25   problem to tell the truth? Use your common sense and

1    life experience, ladies and gentlemen.

2           "To say this one sentence, then I am the one

3    who says it, not mom."

4           And we showed you evidence, of course, that she

5    did send the email to the University of Tennessee saying

6    the defendant didn't hold a position in China.  But,

7    ladies and gentlemen, he did.  That's what the evidence

8    has shown you.

9           Now, in a few moments the judge is going to

12:06PM 10    give you your final instructions in the case and you'll

11    begin your deliberation.

12           Now, we've all had to make big decisions in our

13    life, some positions are big, some decisions are small,

14    and this is a big decision.  For sure, it is a big

15    decision.  But it's not a difficult one.

16           We've proven the case beyond a reasonable

17    doubt.  And when you're back there deliberating,

18    remember that you did not put the defendant in that

19    chair.  I did not put the defendant in that chair.  And

12:07PM 20    the FBI did not put the defendant in that chair.  The

21    defendant is in that chair because of his choices,

22    because of his actions, because of his repeated lies and

23    omissions, and now you're being called upon to hold him

24    accountable, hold him accountable for those intentional

25    omissions, hold him accountable for his schemes to

1  defraud, and hold him accountable for the false

2  statements that he caused the university to make on his

3  behalf.

4      Ladies and gentlemen, the defendant is guilty.

5  He's guilty of Count 1, wire fraud, Count 2, wire fraud,

6  Count 3, wire fraud.  He's guilty of Counts 4, 5, and 6,

7  false statements.

8      THE COURT:  Thank you, Mr. Arrowood.  Thank you

9  both counsel for your closing arguments.

12:07PM  10      I'd like to go ahead and go ahead and give the

11  charge now as opposed to taking a lunch break and coming

12  back for the charge.  It will probably take about

13  30 minutes or so, and then you'll be free to probably

14  take a lunch break, but then not come back into the room

15  and begin your deliberations.  Is that okay with

16  everyone?

17      All right.  So let's go into the charge.

18  Specifically it's time for me to instruct you about the

19  law that you must follow in deciding the case.  I'll

12:08PM  20  start by explaining your duties and the general rules

21  that apply in every criminal case.  Then I'll explain

22  the elements or parts of the crime the defendant is

23  accused of committing.  Then I'll explain the

24  defendant's position.  Then I'll explain some rules you

25  must use in evaluating particular testimony and

evidence.  And last I'll explain the rules you must
follow during your deliberations in the jury room and
the possible verdicts you may return.  Please listen
very carefully to everything I say, and be mindful
you'll have a copy of this jury charge available in the
jury deliberation room.

You have two main duties as jurors.  The first
is to decide what the facts are from the evidence that
you saw and heard here in court.  Deciding what the
facts are is your job, not mine, and nothing that I've
said or done during this trial was meant to influence
your decision about the facts in any way.

Your second duty is to take the law I give you,
apply it to the facts, and decide if the government
has -- if the government has proved the defendant guilty
beyond a reasonable doubt.  It is my job to instruct you
about the law, and you're bound by the oath you took at
the beginning of the trial to follow the instructions I
give you, even if you personally disagree with them.
This includes the instructions I gave you before and
during the trial and these instructions.  All the
instructions are important and you should consider them
together as a whole.

The lawyers may have talked about the law
during their arguments, but if what they said is

different from what I say, you must follow what I say.
What I say about the law controls.  Perform these duties
fairly.  Do not let any bias, sympathy, or prejudice you
may feel toward one side or the other influence your
decision in any way.

As you know, the defendant has pleaded not
guilty to the crimes charged in the indictment.  The
indictment is not any evidence at all of guilt.  It is
just the formal way the government tells the defendant
what crimes he is accused of committing.  It does not
even raise any suspicions of guilt.  Instead, the
defendant starts the trial with a clean slate with no
evidence at all against him and the law presumes that he
is innocent.  This presumption of innocence stays with
him unless the government presents evidence here in
court that overcomes the presumption and convinces you
beyond a reasonable doubt that he is guilty.

This means the defendant has no obligation to
present any evidence at all or to prove to you in any
way that he is innocent.  It is up to the government to
prove he is guilty, and this burden stays on the
government from start to finish.  You must find the
defendant not guilty unless the government convinces you
beyond a reasonable doubt that he is guilty.

The government must prove every element of the

crimes charged beyond a reasonable doubt.  Proof beyond

a reasonable doubt does not mean proof beyond

all -- does not mean proof beyond all possible doubt.

Possible doubts or doubts based purely on speculation

are not reasonable doubts.  A reasonable doubt is a

doubt based on reason and common sense.  It may arise

from the evidence, the lack of evidence, or the nature

of the evidence.

Proof beyond a reasonable doubt means proof

which is so convincing that you would not hesitate to

rely and act on it in making the most important

decisions in your own lives.

If you are convinced the government has proved

the defendant guilty beyond a reasonable doubt, say so

by returning a guilty verdict.  If you are not

convinced, say so by returning a not guilty verdict.

You must make your decision based only on the

evidence you saw and heard here in court.  Do not let

rumors, suspicions, or anything else you may have seen

or heard outside of court influence your decision in any

way.  The evidence in this case includes only what the

witnesses said while they were testifying under oath and

the exhibits that I allowed into evidence.  Nothing else

is evidence.  The lawyers' statements and arguments are

not evidence.  Their questions and objections are not

evidence.  My legal rulings are not evidence and my comments and questions are not evidence.

Now, during the trial I may not have let you hear the answers to some of the questions the lawyers asked.  I also may have ruled that you could not see some of the exhibits that the lawyers wanted you to see. And sometimes I may have ordered you to disregard things that you saw or heard or struck things from the record. You must completely ignore all these things.  Do not even think about them or speculate about what a witness might have said or what an exhibit might have shown. These things are not evidence and you're bound by your oath not to let them influence your decision in any way. Make your decision based only on the evidence as I've defined it here and nothing else.

You're to consider only the evidence in the case.  You should use your common sense in weighing the evidence, consider the evidence in light of your everyday experience with people and events and give it whatever weight you believe it deserves.  If your experience tells you that certain evidence reasonably leads to a conclusion, you're free to reach that conclusion.

In our lives we often look at one fact and conclude from it that another fact exists.  In law, we

call this an inference.  A jury is allowed to make
reasonable inferences unless otherwise instructed.  Any
inferences you make must be reasonable and must be based
on the evidence in the case.

The existence of an inference does not change
or shift the burden of proof from the government to the
defendant.

Now, some of you may have heard the terms
"direct evidence" and "circumstantial evidence."  Direct
evidence is simply evidence like the testimony of an
eyewitness which if you believe it directly proves a
fact.  If a witness testified he saw it raining outside
and you believed him, that would be direct evidence that
it was raining.

Circumstantial evidence is simply a chain of
circumstances that indirectly proves a fact.  If someone
walked into the courtroom wearing a raincoat covered
with drops of water and carrying a wet umbrella, that
would be circumstantial evidence from which you could
conclude that it was raining.

It is your job to decide how much weight to
give the direct and circumstantial evidence.  The law
makes no distinction between the weight you should give
to either one or say that one is any better evidence
than the other.  You should consider all the evidence,

both direct and circumstantial, and give it whatever
weight you believe it deserves.

Another part of your job as jurors is to decide
how credible or believable each witness was.  This is
your job, not mine.  It is up to you to decide if a
witness' testimony was believable and how much weight
you think it deserves.

You are free to believe everything a witness
said or only part of it or none of it at all, but you
should act reasonably and carefully in making these
decisions.

Now, let me suggest some things for you to
consider in evaluating each witness' testimony.  Ask
yourself if the witness was able to clearly see or hear
the events.  Sometimes even an honest witness may not
have been able to see or hear what was happening and may
make a mistake.  Ask yourself how good the witness'
testimony seemed to be.  Did the witness seem able to
accurately remember what happened?  Ask yourself if
there was anything else that may have interfered with
the witness' ability to perceive or remember the event.
Ask yourself how the witness acted while testifying.
Did the witness appear honest or appear to be lying?
Ask yourself if the witness had any relationship to the
government or the defendant or anything to gain or lose

1    from the case that might influence the witness'

2    testimony.

3         Ask yourself if the witness had any bias or

4    prejudice or reason for testifying that might cause the

5    witness to lie or slant the testimony in favor of one

6    side or the other.

7         Ask yourself if the witness testified

8    inconsistently while on the witness stand, or if the

9    witness said or did something or failed to say or do

10   something at any other time that is inconsistent with

11   what the witness said while testifying.  If you believe

12   what the witness said was inconsistent, ask yourself if

13   this makes the witness' testimony less believable.

14   Sometimes it may; other times it may not.

15        Consider whether the inconsistency was about

16   something important or about some unimportant detail.

17   Ask yourself if it seemed like an innocent mistake or if

18   it seemed deliberate, and ask yourself how believable

19   the witness' testimony was in light of all the other

20   evidence.

21        Was the witness' testimony supported or

22   contradicted by other evidence that you found

23   believable?  If you believe that a witness' testimony

24   was contradicted by other evidence, remember that people

25   sometimes forget things, and that even two honest people

who witness the same event may not describe it exactly the same way.

These are only some of the things you may consider in deciding how believable each witness was. You may also consider other things you think shed some light on the witness' believability.

Use your common sense and everyday experience in dealing with other people, and then decide what testimony you believe and how much weight you think it deserves.

One more point about the number of witnesses: Sometimes jurors wonder if the number of witnesses who testify makes any difference. Do not make any decisions based only on the number of witnesses who testify. What is more important is how believable the witnesses were and how much weight you think their testimony deserves. Concentrate on that, not the numbers.

There is one more general subject I want to talk to you about before I begin explaining the elements of the crimes charged. The lawyers for both sides objected to some of the things that were said or done during the trial. Do not hold that against either side. The lawyers have a duty to object whenever they think that something is not permitted by the rules of evidence. Those rules are designed to make sure that

1  both sides receive a fair trial.  And do not interpret

2  my rulings on their objections as any indication of how

3  I think the case should be decided.  My rulings were

4  based on the rules of evidence, not on how I may feel

5  about the case.  Remember, your decision must be based

6  only on the evidence that you saw and heard here in

7  court.

8          That concludes the part of my instructions

9  explaining your duties and general rules that apply in

12:17PM 10  every criminal case.  In a moment, I'll explain the

11  elements of the crimes the defendant is accused of

12  committing.  But before I do that, I want to emphasize

13  the defendant is only on trial for the particular crimes

14  charged in the indictment.  Your job is limited to

15  deciding whether the government has proved the crimes

16  charged.

17          Also keep mind that whether anyone else should

18  be prosecuted and convicted for these crimes is not a

19  proper matter for you to consider.  The possible guilt

12:17PM 20  of others is no defense to a criminal charge.  Your job

21  is to decide if the government has proved this defendant

22  guilty.  Do not let the possible guilt of others

23  influence your decision in any way.

24          Now, the defendant's been charged with multiple

25  crimes.  The number of charges is no evidence of guilt

1  and this should not influence your decision in any way.

2  It is your duty to separately consider the evidence that

3  relates to each charge and to return a separate verdict

4  for each one.  For each charge you must decide whether

5  the government has presented proof beyond a reasonable

6  doubt that the defendant is guilty of that particular

7  charge.  Your decision on one charge, whether it is

8  guilty or not guilty, should not influence your decision

9  on any of the other charges.

12:18PM  10        Now, to summarize the indictment, Counts 1, 2,

11  and 3 charge that from in or about 2016 through the date

12  of the indictment in the Eastern District of Tennessee

13  and elsewhere, the defendant, Anming Hu, did knowingly,

14  willfully, and with intent to defraud, devise and intend

15  to devise and attempt to devise a scheme to defraud NASA

16  into obtaining money and property by means of materially

17  false and fraudulent pretenses, representations,

18  promises, and half-truths and concealment of material

19  facts with a duty to disclose.

12:18PM  20        On or about the relevant dates in the Eastern

21  District of Tennessee and elsewhere, the defendant,

22  Anming Hu, for the purposes of executing and attempting

23  to execute the scheme to defraud caused to be

24  determine -- caused to be transmitted by any means of

25  wire communication -- by means of wire communication in

interstate commerce certain writings, signs, signals,
pictures, and signs.  Specifically, as to Count 1, on or
about October 20, 2016, an email transmitting a cost
reimbursement with an educational institution
subcontract from the University of Tennessee in
Tennessee to the Jet Propulsion Laboratory at the
California Institution of Technology in California.  As
to Count 2, on or about November 12, 2018, an email
transmitting a NASA grant and cooperative agreement from
the University of Tennessee in Tennessee to Marshall
Space Flight Center in Alabama.  And as to Count 3, on
or about August 30, 2019, an invoice requesting payment
transmitted from the University of Tennessee in
Tennessee to NASA in Mississippi, all allegedly in
violation of 18 United States Code §§ 1343 and 2.

      Counts 4, 5, and 6 of the indictment charge
that on or about the relevant dates, the defendant did
willfully and knowingly and with intent to deceive cause
to be made materially false, fictitious, and fraudulent
statements, representations, and omissions in a matter
within the jurisdiction of the executive branch of the
government of the United States; to wit, defendant
caused the University of Tennessee to falsely certify to
NASA and the Jet Propulsion Laboratory at the California
Institute of Technology via submission of certain

invoices that the University of Tennessee was in
compliance with NASA's China funding restriction.

Defendant caused the certifications contained
in the identified invoices to be false because, as
defendant then and there knew, defendant was affiliated
with the Beijing University of Technology, and,
therefore, the University of Tennessee was not in
compliance with NASA's China funding restriction.

As to Count 4, on or about February 15, 2017,
according to the indictment, defendant caused the
University of Tennessee to submit an invoice requesting
payment and falsely certifying that the University of
Tennessee was in compliance with NASA's China funding
restriction.

As to Count 5, on or about March 9, 2017,
defendant caused the University of Tennessee to submit
an invoice requesting payment and falsely certifying
that the University of Tennessee was in compliance with
NASA's China funding restriction.

And as to Count 6, on or about July 24, 2017,
defendant caused the University of Tennessee to submit
an invoice requesting payment and falsely certifying
that the University of Tennessee was in compliance with
NASA's China funding restriction, all allegedly in
violation of Title 18 United States Code §§ 1001 and 2.

1          Now, next I want to say a word about the dates

2     mentioned in the indictment.  The indictment charges

3     that particular crimes happened on or about specified

4     dates.  The government does not have to prove that the

5     crimes happened on those exact dates, but the government

6     must prove the crimes happened reasonably close to those

7     dates.

8          And although the indictment charges that the

9     statute was violated by acts that are connected by the

10    word "and," it is sufficient if the evidence establishes

11    a violation of the statute by anyone of the acts

12    charged.  Of course, this must be proved beyond a

13    reasonable doubt.

14         I'll now give you some instructions regarding

15    elements of the offenses as charged in the indictment.

16    Again, Counts 1, 2, and 3 of the indictment charge the

17    defendant with wire fraud.  For you to find the

18    defendant guilty of wire fraud, you must find the

19    government has proved each and every one of the

20    following elements beyond a reasonable doubt:  First,

21    that the defendant devised a scheme to defraud in order

22    to deprive another of money or property; that is, the

23    defendant, through material misrepresentations or

24    concealment of a material fact regarding his affiliation

25    with the Beijing University of Technology, caused the

1  University of Tennessee, Knoxville to falsely certify to

2  NASA and to NASA contractors that the University of

3  Tennessee, Knoxville was in compliance with NASA's China

4  funding restriction regarding NASA funding projects that

5  the University of Tennessee, Knoxville sought and

6  obtained on the defendant's behalf.

7          Second, that the scheme included a material

8  misrepresentation or concealment of a material fact.

9          Third, that the defendant had the intent to

10  defraud; and, fourth, that the defendant used or caused

11  another to use wire, radio, or television communications

12  in interstate commerce in furtherance of the scheme.

13          Next I'll give you more detailed instructions

14  on some of these terms.  A scheme to defraud includes

15  any plan or course of action by which someone intends to

16  deprive another of money or property by means of false

17  or fraudulent pretenses, representations, or promises.

18          The term "false or fraudulent pretenses,

19  representations, or promises" means any false statements

20  or assertions that concern a material aspect of the

21  matter in question that were either known to be untrue

22  when made or made with reckless indifference to their

23  truth.  They include actual direct false statements, as

24  well as half-truths and the knowing concealment of

25  material facts.

1          An act is knowingly done if done voluntarily

2     and not because of a mistake or some other innocent

3     reason.  A misrepresentation or concealment is material

4     if it has a natural tendency to influence or is capable

5     of influencing the decision of a person of ordinary

6     prudence and comprehension.

7          To act with intent to defraud means to act with

8     an intent to deceive or cheat for the purposes of

9     depriving another of money or property, to cause wire,

10    radio, or television communications to be used to do an

11    act with knowledge that the use of communications will

12    follow in the ordinary course of business or where such

13    use can reasonably be foreseen.

14         The term "interstate commerce" includes wire,

15    radio, or television communications which cross the

16    state line.  It is not necessary that the government

17    prove all the details alleged concerning the precise

18    nature and purpose of the scheme or that the material

19    transmitted by wire communications was itself false or

20    fraudulent, or that the alleged scheme actually

21    succeeded in defrauding anyone, or that the use of wire

22    communications was intended as the specific or exclusive

23    means of accomplishing the alleged fraud, or that

24    someone relied on the misrepresentation or false

25    statement, or that the defendant obtained money or

property for his own benefit.

If you are convinced the government has proved all of the elements, say so by returning a guilty verdict on these charges. If you have reasonable doubt about any one of the elements, then you must find the defendant not guilty of these charges.

Counts 4 through 6 charge the defendant with causing a false statement to be made in a matter within the jurisdiction of the United States government. For you to find the defendant guilty of making a false statement in a matter within the jurisdiction of the United States government, you generally must find the government has proved each and every one of the following elements beyond a reasonable doubt: First, that the defendant made a statement. Second, that the statement was false, fictitious, or fraudulent. Third, that the statement was material. Fourth, that the defendant acted knowingly and willfully; and, fifth, that the statement pertained to a matter within the jurisdiction of the executive branch of the United States government.

However, for you to find the defendant guilty of making false statements in a matter within the jurisdiction of the United States government, it is not necessary for you to find that he personally committed

the act charged in the indictment. You may also find
him guilty if he wilfully caused an act to be done which
would be a federal crime if directly performed by him or
another.

       But for you to find the defendant guilty of
making false statements in a matter within the
jurisdiction of the U.S. government, you must be
convinced the government has proved each and every one
of the following elements beyond a reasonable doubt:
First, that the defendant caused the University of
Tennessee, Knoxville to commit the act of making a false
statement in a matter within the jurisdiction of the
United States government.

       Second, if the defendant or another person had
committed the act, it would have been the crime of
making a false statement in a matter within the
jurisdiction of the U.S. government; and, third, that
the defendant willfully caused the act to be done.

       Proof that the defendant may have known about
the crime, even if he was there when it was committed,
is not enough for you to find him guilty. You may
consider this in deciding whether the government has
proved that he caused the act to be done, but without
more, it is not enough. What the government must prove
is that the defendant willfully did something to cause

1   the act to be committed.

2          Now I'll give you more detailed instructions on

3   some of these terms.  A statement is false or fictitious

4   if it was untrue when it was made and the defendant knew

5   it was untrue at the time.

6          A statement is fraudulent if it was untrue when

7   it was made, the defendant knew it was untrue at that

8   time, and the defendant intended to deceive.

9          A material statement or representation is one

12:27PM  10   that has the natural tendency to influence or is capable

11  of influencing a decision or function of NASA.  An act

12  is done knowingly and willfully if it is done

13  voluntarily and intentionally and not because of a

14  mistake or some other innocent reason.  A matter is

15  within the jurisdiction of the executive branch of the

16  U.S. government if NASA has the power to exercise

17  authority in that manner.

18          It is not necessary that the government prove

19  the defendant knew the matter was within the

12:27PM  20   jurisdiction of the U.S. government, or that the

21  statements were made directly to or even received by the

22  U.S. government.

23          If you are convinced the government has proved

24  all these elements, say so by returning a guilty verdict

25  on this charge.  If you have reasonable doubt about any

1  one of these elements, then you cannot find the

2  defendant guilty of making a false statement in a matter

3  within the jurisdiction of the U.S. government.

4      The good faith of the defendant is a complete

5  defense to the charges of wire fraud and causing a false

6  statement to be made because good faith on the part of

7  the defendant is simply inconsistent with an intent to

8  defraud.

9      A person who acts or causes another person to

10 act on a belief or an opinion honestly held is not

11 punishable under this statute or these statutes merely

12 because the belief or opinion turns out to be

13 inaccurate, incorrect, or wrong.  An honest mistake in

14 judgment or an honest error in management does not rise

15 to the level of criminal conduct.

16     A defendant does not act in good faith if even

17 though he honestly holds a certain opinion or belief

18 that defendant also knowingly makes false or fraudulent

19 pretenses, representations, or promises to others.

20     While the term "good faith" has no precise

21 definition, it encompasses, among other things, a belief

22 or opinion honestly held, an absence of malice or

23 ill-will and an intention to avoid taking unfair

24 advantage of another.

25     The burden of proving good faith does not rest

with the defendant because the defendant does not have
any obligation to prove anything in this case. It is
the government's burden to prove to you beyond a
reasonable doubt that the defendant acted with an intent
to defraud.

If the evidence in this case leaves you with a
reasonable doubt as to whether the defendant acted with
an intent to defraud or in good faith, you must acquit
the defendant.

Next I want to explain something about proving
a defendant's state of mind. Ordinarily there is no way
that a defendant's state of mind can be proved directly
or indirectly because no one can read another person's
mind and tell what that person is thinking. But a
defendant's state of mind can be proved indirectly from
the surrounding circumstances. This includes things
like what the defendant said, what the defendant did,
how the defendant acted, and any other facts or
circumstances in evidence that show what was in the
defendant's mind.

You may also consider the natural and probable
result of any acts the defendant knowingly did or did
not do and whether it is reasonable to conclude that the
defendant intended those results. This, of course, is
all for you to decide.

1    Now, that concludes the part of my instructions

2    explaining the elements of the crime.  Next I'll explain

3    the defendant's position.

4    The defense's theory is that he did not commit

5    wire fraud and, as such, also did not cause the

6    University of Tennessee, Knoxville to make any false

7    statements.  The defendant states that he did not

8    knowingly and intentionally deceive NASA, and,

9    therefore, he did not knowingly and intentionally commit

12:30PM 10    a fraud or cause the University of Tennessee, Knoxville

11    to make false statements.

12    The defendant further submits that the meaning

13    of the NASA restriction is so vague or hard to

14    understand that he could not understand what was

15    required of him or that if -- or that it even applied to

16    him, and, therefore, he could not knowingly or willfully

17    violate the restriction.

18    Now, that concludes the primary instructions

19    explaining the elements of the crimes and the

12:31PM 20    defendant's position.  Next I'll explain some rules you

21    must use in considering some of the testimony in

22    evidence.

23    You've heard the defendant testify.  Earlier I

24    talked to you about credibility or believability of the

25    witnesses and I suggested some things for you to

consider in evaluating each witness' testimony.  You
should consider those same things in evaluating the
defendant's testimony.

You've heard testimony about the defendant's
good character.  You should consider this testimony
along with all the other evidence in deciding if the
government has proved beyond a reasonable doubt that he
committed the crimes charged.

Now, during the trial you may have seen counsel
use summaries or similar material which were offered to
assist in the presentation and understanding of the
evidence.  The material itself is not -- the material is
not itself evidence and must not be considered as proof
of any facts.

During the trial you may have also seen or
heard summary evidence in the form of a chart or similar
material that was admitted into evidence in addition to
the material it summarizes because it may assist you in
understanding the evidence that is being presented.  But
the summary itself is not evidence of the material it
summarizes and is only as valid and reliable as the
underlying material it summarizes.

Remember, the defendant is only on -- is on
trial here only for wire fraud and causing false
statements to be made within the jurisdiction of the

United States government, not for any other acts.  Do not return a guilty verdict unless the government proves the crimes charged in the indictment beyond a reasonable doubt.

That concludes the part of my instructions explaining the rules for considering some of the testimony and evidence.  Now let me finish up by explaining some things about your deliberations in the jury room and your possible verdicts.

12:32PM  The first thing you should do in the jury room is choose someone to be your foreperson.  This person will help to guide your discussions and will speak for you here in court.

Once you start deliberating, do not talk to anyone else except each other about the case.  If you have any questions or messages, you must write them down on a piece of paper, sign them, and give them to the court security officer or to the courtroom deputy who will give them to me and I'll respond as soon as I can.

12:33PM  Now, keep in mind, if you do submit any questions, I may have to talk to the lawyers about what you may have asked, so it may take me some time to get back to you.  Any questions or messages normally should be sent to me through your foreperson.

One more thing about messages:  Do not ever

1  write down or tell anyone else, including me, how you

2  may stand on any votes you are taking or have taken.

3  For example, do not write down or tell anyone that you

4  are split or whatever your vote happens to be.  That

5  should stay secret until you are finished.

6        Exhibits that were admitted into evidence will

7  be sent into the jury room with you.  One more thing

8  about -- or one thing about evidence:  This court uses

9  the Jury Evidence Recording System, also known as JERS,

12:33PM 10  J-E-R-S, which is a system that makes evidence

11  electronically accessible in the jury deliberation room.

12        To the extent possible, the evidence presented

13  during trial has been captured electronically.  Once it

14  is released to you, you can review the evidence in the

15  deliberation room through the use of a touch-screen

16  computer.  Any evidence that cannot be captured by JERS

17  will be physically sent to the jury deliberation room,

18  as will any other evidence that the Court finds should

19  be physically sent into the jury deliberation room.  And

12:34PM 20  if you need assistance with this JERS equipment, please

21  let Ms. Norwood, the courtroom deputy, know.

22        Remember, you must make your decision based

23  only on the evidence you saw and heard here in court.

24  During your deliberations, you must not communicate with

25  or provide any information to anyone by any means about

1    this case.  You may not use any electronic device or

2    media, such as a telephone, cellphone, smartphone,

3    iPhone, BlackBerry, or computer, the internet, any

4    internet service, or any text or instant messaging

5    service, any internet chat room, blog, or website such

6    as Facebook, Myspace, YouTube, or Twitter to communicate

7    to anyone any information about the case or to conduct

8    any research about the case until I accept your verdict.

9    In other words, you cannot talk to anyone on the phone,

12:35PM   10    correspond with anyone, or electronically communicate

11    with anyone about this case.

12    You can discuss this case in the jury room with

13    your fellow -- you can only discuss this case in the

14    jury room with your fellow jurors during deliberations.

15    And certainly while I don't anticipate any difficulty in

16    that regard, I would expect to be informed if you became

17    aware of any violations of these instructions.

18    You may not use these electronic means to

19    investigate or communicate about the case because it is

12:35PM   20    important that you decide this case based solely on the

21    evidence presented in the courtroom.  Information on the

22    internet or available through social media might be

23    wrong, incomplete, or inaccurate.  You're only permitted

24    to discuss the case with your fellow jurors during

25    deliberations because they have seen and heard the same

1  evidence that you have.

2       In our judicial system, it is important that

3  you are not influenced by anything or anyone outside

4  this courtroom; otherwise, your decision may be based on

5  information known only by you and not your fellow jurors

6  or the parties in this case.  This would unfairly and

7  adversely impact the judicial process and a violation of

8  these restrictions would jeopardize the fairness of the

9  proceedings and a mistrial could result, which would

12:36PM 10  require the entire trial process to start over.

11       Now, your verdict, whether it is guilty or not

12  guilty on any particular count, must be unanimous as to

13  each count.  To find the defendant guilty of a

14  particular count, every one of you must agree that the

15  government has overcome the presumption of innocence

16  with evidence that proves his guilt beyond a reasonable

17  doubt.

18       To find him not guilty of a particular count,

19  every one of you must agree that the government has

12:36PM 20  failed to convince you beyond a reasonable doubt.

21  Either way, guilty or not guilty, your verdict must be

22  unanimous as to each count.

23       Now that all the evidence is in and the

24  arguments are completed, you are free to talk about the

25  case in the jury room once you begin your deliberations.

In fact, it is your duty to talk with each other about the evidence and to make every reasonable effort you can to reach a unanimous agreement. Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say. Try your best to work out your differences. Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong. But do not ever change your mind just because other jurors see things differently or just to get the case over with. In the end, your vote must be exactly that, your own vote. It is important for you to reach a unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room and no record will be made of what you say, so you should all feel free to speak your mind. Listen carefully to what the other jurors have to say and then decide for yourself if the government has proved the defendant guilty beyond a reasonable doubt.

Now, remember that if you elected to take notes during the trial, your notes should be used only as memory aids. You should not give your notes greater weight than your independent recollection of the evidence. You should rely upon your own independent

recollection of the evidence or lack of evidence and you
should not be unduly influenced by the notes of other
jurors.  Notes are not entitled to any more weight than
the memory or impression of each juror.  Whether you
took notes or not, each of you must form and express
your own opinion as to the facts of the case.

If you decide the government has proved the
defendant guilty, then it would be my job to decide what
the appropriate punishment should be.  Deciding what the
punishment should be is my job, not yours.  It would
violate your oaths as jurors to even consider the
possible punishment in deciding your verdict.  Your job
is to look at the evidence and decide if the government
has proved the defendant guilty beyond a reasonable
doubt.

Now, I've prepared a verdict form that you'll
use to record your verdict in this case.  It should be
self-explanatory and tracks the counts of the indictment
as have been discussed and read to you.

If you decide the government has proved a
particular charge against the defendant beyond a
reasonable doubt, say so by having your foreperson mark
the appropriate place on the form.

If you decide the government has not proved a
particular charge against him beyond a reasonable doubt,

1  say so by having your foreperson mark the appropriate

2  place on the form.  Your foreperson will then sign the

3  form, put the date on it, and return it to me here in

4  the courtroom.

5        Remember, the defendant is only on trial for

6  the particular crimes charged in the indictment.  Your

7  job is limited to deciding whether the government has

8  proved the crimes charged.  Also remember that whether

9  anyone else should be prosecuted and convicted for these

10 crimes is not a proper matter for you to consider.  The

11 possible guilt of others is no defense to a criminal

12 charge.  Your job is to decide if the government has

13 proved the defendant guilty.  Do not let the possible

14 guilt of others influence your decision in any way.

15       And let me finish up by repeating something

16 that I said to you earlier:  Nothing that I've said or

17 done during this trial was meant to influence your

18 decision in any way.  You decide for yourselves if the

19 government has proved the defendant guilty beyond a

20 reasonable doubt.

21       Now, that concludes my instructions to you, and

22 in just a moment, I'll allow you to retire back to the

23 jury deliberation room.  I'll let you -- you're somewhat

24 in charge of your schedule now.  It may be appropriate

25 to take a lunch break before you begin your

deliberations.  You may want to organize yourself, pick

a foreperson, but I would anticipate that you would take

a lunch break.  So, you know, we've being going an hour,

hour and 15 minutes.  I would assume you'd stick within

that general time frame.

Let me say this:  Whether you take a lunch

break right away or whether you start deliberations in

some fashion and then take a lunch break, when you go to

lunch, again, it's okay if you have been, you know,

going to lunch in small groups or in larger groups or by

yourself, but do not in any way -- and you know this,

but I'll repeat it.  Do not in any way undertake any

deliberations other than in the jury deliberation room.

So when you take breaks, either a lunch break

or an afternoon break, put things aside and don't

discuss the case with whomever else you may happen to be

with in the moment.  Restrict your deliberations to in

the jury deliberation room when all 12 of you are

present.

And in that regard, as you know, or as you may

have heard me say last week, in a case that lasts a

while sometimes, in this case we have alternate jurors

just in the event that something happens during the

course of the trial and a juror or jurors are not able

to make it all the way through the trial.  It does not

1  appear that we're going to need our alternate jurors to

2  deliberate.  I know that can be frustrating at times,

3  but our alternate jurors in this case are Juror 34 in

4  seat 13 and Juror 119 in seat 14.  You are our alternate

5  jurors just the way the jury selection came through.  So

6  it does not appear that you will participate in

7  deliberations.

8        However, with that being said, let me tell you

9  this -- and Ms. Norwood will give you some more

12:41PM  10  instructions when we break here in just a moment back in

11  the jury deliberation room.  But, first of all, if we

12  don't see you back in here at the conclusion of the

13  deliberations, let me, on behalf of the court and

14  everyone, thank you for your time that you've given to

15  this case.  Again, I know it can be frustrating not to

16  participate in deliberations, but even as alternate

17  jurors, you have performed an important civic duty and

18  we all thank you for that.

19        Also, I'm going to ask -- you've heard me talk

12:42PM  20  a lot about not talking among yourselves outside the

21  deliberation room and not discussing the case with

22  others.  I'm going to ask you to adhere to that

23  requirement as well, even though I'm letting you go, so

24  to speak, as alternate jurors or not participate in the

25  deliberations, and the reason for that is -- and this

1   has happened before in the cases that I and other judges
2   have tried -- sometimes the jury begins deliberations
3   and a juror on the primary panel becomes ill or
4   something happens where they can't complete the
5   deliberation process.  If that's the case, then we would
6   call one or both of you back here, as the case may be,
7   to rejoin the jury, and in that case I would give
8   instructions to everyone about starting deliberations
9   anew.  But that's the reason I ask you.

12:42PM  10          Now, you can -- Ms. Norwood can get your
11  cellphone numbers, or you can stay here in the courtroom
12  somewhere, but I ask until you know that a verdict has
13  been reached that you continue not to discuss the case
14  among yourselves, the two of you, or certainly not with
15  anyone else until that time.  So I think those
16  instructions are clear.  And, again, I appreciate -- if
17  we don't see you back here for a verdict or otherwise,
18  thank you very much.

19          With that being said, we'll dismiss the jury
12:43PM  20  back to the deliberation room again to discuss among
21  yourselves your lunch recess, and we'll see you back
22  here at a later point in time.

23          The jury is excused.

24          (Jurors excused from the courtroom.)

25          THE COURT:  All right.  Thank you.  Be seated

for just a moment.  A couple things.  First, any further
comments or objections to the charge as given from the
government?

            MR. ARROWOOD:  No, Your Honor.

            THE COURT:  From the defendant?

            MR. LOMONACO:  No, Your Honor.

            THE COURT:  All right.  Also, typically we send
not only the verdict form back to the jury, but the
indictment.  In this case, you know, the indictment is
summarized within the jury charge context and it's -- I
guess somebody referred to it as more of a speaking
indictment.  So there are more background facts in it.
So are there any requests that the indictment go back?
I'm not sure it's necessary for the jury to follow in
terms of reviewing --

            MR. LOMONACO:  There is an awful lot there that
wasn't discussed in the trial, Your Honor.  I'd ask that
it not go back.

            THE COURT:  Does the government have any --

            MR. ARROWOOD:  No objection, Your Honor.

            THE COURT:  All right.  Then we
won't -- without any objection by the parties and
specific request of the defendant, we won't send the
indictment back with the jury.

            All right.  With that being said, I guess we

1  will stand down pending either a verdict or a question

2  from the jury.  I think Ms. Norwood has your contact

3  information so that if either occurs, you can get back

4  here, you know, in a relatively short time period.

5       And I know there are those in the audience who

6  are interested in the verdict, and I think a lot may be

7  associated, or those who are here on the defendant's

8  behalf, Mr. Lomonaco, you'll keep in touch with them if

9  we get further -- we get word from the jury.  And the

12:45PM 10  same would go from the prosecution.

11       So with that being said, we'll see everyone

12  back here at some point later this afternoon.  If the

13  jury deliberates and does not reach a conclusion today,

14  we'll have further discussion and direction about that

15  later.

16       Thank you, everyone.

17       MR. LOMONACO:  Thank you, Judge.

18       (Which were all the proceedings had and

19        herein transcribed.)

20                 * * * * * * *

21

22

23

24

25

1          C-E-R-T-I-F-I-C-A-T-E

2    STATE OF TENNESSEE

3    COUNTY OF KNOX

4              I, Teresa S. Grandchamp, RMR, CRR, do hereby

5    certify that I reported in machine shorthand the above

6    proceedings, that the said witness(es) was/were duly

7    sworn; that the foregoing pages were transcribed under

8    my personal supervision and constitute a true and

9    accurate record of the proceedings.

10             I further certify that I am not an attorney or

11   counsel of any of the parties, nor an employee or

12   relative of any attorney or counsel connected with the

13   action, nor financially interested in the action.

14             Transcript completed and signed on Wednesday,

15   June 30, 2021.

16

17

18

19

21   _____
     TERESA S. GRANDCHAMP, RMR, CRR
22   Official Court Reporter

23

24

25